# EXHIBIT C

LEXSEE 2004 DEL CH LEXIS 70

## IN RE EMERGING COMMUNICATIONS, INC. SHAREHOLDERS LITIGATION

Consolidated Civil Action No. 16415

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2004 Del. Ch. LEXIS 70*

August 30, 2003, Submitted
May 3, 2004, Decided

NOTICE: [*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. ·

**SUBSEQUENT HISTORY:**

As Revised June 4, 2004.

**DISPOSITION:** Appraisal action, Innovative is liable to Greenlight in the amount of $ 38.05 per share for each of the 750,300 shares that are subject to the appraisal, plus interest at the rate of 6.27%, compounded monthly, from the date of the merger to the date of the judgment. In fiduciary duty action, Innovative, ICC, Prosser, Raynor and Muoio are jointly and severally liable to the plaintiff class and to Greenlight (in its capacity as holder of litigation rights assigned by former ECM shareholders) in an amount equal to $ 27.80 per share.

**LexisNexis(R) Headnotes**

**COUNSEL:** Thomas J. Allingham II, Leonard P. Stark, Rosemary S. Goodier, Douglas E. McCann, and James A. Whitney, Esquires, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Attorneys for Greenlight Capital Qualified L.P., Greenlight Capital L.P. and Greenlight Capital Offshore, Ltd.

Norman M. Monhait, Esquire, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Shane T. Rowley, Esquire, of Faruqi & Faruqi, LLP, New York, New York; Attorneys for Brickell Partners and the Class.

Thomas A. Beck, Raymond J. DiCamillo, Catherine G. Dearlove and Kelly C. Ashby, Esquires, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; OF

COUNSEL: P. Kevin Castel and Jonathan R. Donnellan, Esquires, of CAHILL GORDON & REINDEL, New York, New York; Attorneys for Emerging Defendants Communications, Inc., Jeffrey J. Prosser, Innovative Communication Corporation and Innovative Communication Company, LLC.

David C. McBride and Bruce L. Silverstein, Esquires, of YOUNG CONAWAY STARGATT & TAYLOR, Wilmington, Delaware; [*2] Attorneys for the Board Defendants; OF COUNSEL: Kevin C. Logue, and Ryan K. Roth Gallo, Esquires, of PAUL, HASTINGS, JANOFSKY & WALKER LLP, New York, New York; Attorneys for Defendants Richard N. Goodwin, John G. Vondras, Salvatore Muoio, Terrence A. Todman, Sir Shridath Ramphal; and Paul J. Ruskin, Esquire, of THE LAW OFFICES OF PAUL J. RUSKIN, Douglaston, New York; Attorney for Defendant John P. Raynor.

**JUDGES:** JACOBS, JUSTICE. *.

\* Sitting by designation as Vice Chancellor under DEL. CONST., art. IV, § 13(2).

**OPINIONBY:** JACOBS

**OPINION:** JACOBS, JUSTICE *

\* Sitting by designation as vice Chancellor under *DEL. CONST., art. IV, § 13(2).*

Addressed in this Opinion are the merits of consolidated statutory appraisal and class actions for breach of fiduciary duty. These actions all arise out of the two-step "going private" acquisition of the publicly owned shares of Emerging Communications, Inc. ("ECM"), by Innovative Communications Corporation, L.L.C. ("Innova-

tive"), ECM's majority stockholder. The first step tender offer was commenced on August 18, 1998 by Innovative for 29% of ECM's outstanding shares at a price of $ 10.25 per share. The balance of ECM's publicly held [*3] shares were acquired in a second-step cash-out merger of ECM into an Innovative subsidiary, at the same price, on October 19, 1998.

At the time of this two-step transaction (the "Privatization"), 52% of the outstanding shares of ECM, and 100% of the outstanding shares of Innovative, were owned by Innovative Communication Company, LLC ("ICC"). ICC, in turn, was wholly owned by ECM's Chairman and Chief Executive Officer, Jeffrey J. Prosser ("Prosser"). Thus, Prosser had voting control of both of the parties to the Privatization transaction.

In June 1998, shortly after the Privatization proposal was announced, a fiduciary duty class action was brought on behalf of the former public shareholders of ECM by Brickell Partners, an ECM shareholder. On February 10, 1999, four months after the Privatization was consummated, an appraisal action was filed by Greenlight Capital, L.P. and certain of its affiliates (collectively, "Greenlight"). A settlement of the Brickell Partners class action was thereafter proposed and later withdrawn. Greenlight, which had objected to the proposed settlement, filed a separate fiduciary duty action on behalf of both its 750,300 "appraisal shares" and 2,026,685 [*4] ECM minority shares to which Greenlight had been assigned the litigation rights. Thereafter, the Brickell fiduciary duty action and the Greenlight appraisal and fiduciary duty actions were consolidated, and were tried on the merits between September 17, 2001 and November 6, 2001. Post-trial briefing and the submission of other memoranda were completed on August 30, 2003.

This is the decision of the Court, after trial, on the merits of the consolidated fiduciary and appraisal actions.

## I. THE FACTS

Next recited are the material facts, many of which are undisputed. Where there are disputes, the facts are as found below. Although the recited facts set forth the basic storyline, they are not intended to be comprehensive. To avoid unduly diverting the reader from the essential plotline, other facts that are relevant to discrete issues are discussed elsewhere in this Opinion in the context where those issues are addressed.

### A. The Parties

#### 1. The Plaintiffs

The plaintiffs, as noted are Brickell Partners, which represents a class of persons who owned shares in ECM between May 29, 1998 and October 19, 1998; and

Greenlight, which comprises three investment funds that focus on special [*5] situation value investments. At the time of the tender offer, Greenlight owned 750,300 shares of ECM, and it was also the assignee of the litigation rights (which Greenlight had previously acquired) to 2,026,685 ECM minority shares. Greenlight brings its appraisal action on behalf of the 750,300 shares that it owns outright. Greenlight brings its class action on behalf of those shares, and also on behalf of the 2,026,685 ECM shares as to which Greenlight holds the litigation rights.

#### 2. The Defendants

There are two groups of defendants: (1) the "ECM defendants," which consist of ECM, ICC, and Innovative; and (2) the "Board defendants," who were ECM's directors at the time of the Privatization. In addition to Jeffrey Prosser, who was also ECM's Chairman and Chief Executive Officer, ECM's directors were Richard Goodwin; John Raynor; Sir Shridath Ramphal; Salvatore Muoio; John Vondras; and Terrence Todman. Each of the board defendants served as an ECM director at Prosser's request.

##### (a) The ECM Defendants

ECM, a Delaware corporation that was headquartered in the U.S. Virgin Islands ("USVI"), was formed in 1997 to receive the Virgin Islands operations of ECM's corporate predecessor, [*6] Atlantic Tele-Network, Inc. ("ATN"), in connection with a division of ATN's business. At the time of the October 1998 Privatization, ECM's principal business was the Virgin Islands Telephone Co. ("Vitelco"), which was the exclusive provider of local wired telephone services in the USVI. Vitelco represented the largest portion of ECM's business and accounted for approximately 88% of its revenues. ECM's other businesses included Vitelcom, an indirect subsidiary engaged in selling and leasing telecommunications equipment; and Vitelcom Cellular ("VitelCellular"), which provided cellular service in the USVI. ECM also owned SMB Holdings, which provided cellular service to the island of St. Maarten/St. Martin.

Innovative, a Virgin Islands corporation that was 100% owned by ICC, is a Delaware limited liability company with its principal place of business in the USVI. As earlier noted, at the time of the Privatization, Prosser owned the entire (100%) membership interest in ICC, which in turn owned 52% of ECM's common stock, and 100% of the stock of Innovative.

##### (b) The Board Defendants

The Board Defendants, and their respective backgrounds, are described at this point.

Richard N. Goodwin [*7]

Richard Goodwin, a member of the Massachusetts Bar, is a noted author of books on American history, government, and politics. In 1959, Mr. Goodwin served as a law clerk to United States Supreme Court Justice Felix Frankfurter, and during the 1960's, he served as Assistant Special Counsel to President John F. Kennedy. After President Kennedy's assassination, Goodwin served as Deputy Assistant Secretary of State for Inter-American Affairs and as Special Assistant to President Lyndon B. Johnson. In the late 1960's Mr. Goodwin served as campaign advisor to Senator Robert F. Kennedy. During the 1980's and part of the 1990's, Mr. Goodwin also served as a consultant to the government of the USVI.

### Shridath S. Ramphal

Sir Shridath S. Ramphal ("Ramphal"), a native of Guyana, is a Barrister at. Law who has held numerous prestigious government and academic positions. Between 1965 and 1993, Ramphal served successively (from 1965 to 1975) as Solicitor General of British Guyana, Assistant Attorney General of the West Indies, Attorney General of Guyana, and Guyana's Minister of Foreign Affairs of Justice. From 1975 to 1990, Ramphal served as Secretary General of the British Commonwealth, a [*8] group of 58 nations headquartered in London, England. Ramphal also served as Vice President of the United Nations General Assembly (from 1968 to 1973), Chairman of the United Nations Committee on Development Planning (from 1984 to 1987), Special Advisor to the United Nations Conference on Environment and Development (1992), Chairman of the West Indian Commission (1990 to 1992), and as President of the World Conservation Union (from 1990 to 1993). Finally, Ramphal served as chancellor of the University of Guyana from 1988 to 1992, and as chancellor of the University of Warwick in the United Kingdom and chancellor of the University of the West Indies, since 1989.

Apart from these positions, Ramphal served as a director of, and a paid consultant to, ATN (ECM's corporate predecessor) in 1992, 1993, 1994, and 1995, during which years he was paid (respectively), $ 20,000, $ 140,000, $ 140,000, and $ 120,000.

### John G. Vondras

John G. Vondras ("Vondras") is a professional engineer, with over 25 years of independent experience in the telecommunications industry. Vondras has served and continues to serve as a director (and as President Director) of PT ARIAWEST International, a joint venture [*9] company that operates a partnership with PT TELKOM, which provides wireless and land based telephone services in Indonesia. In 1986, Vondras spent two weeks in the USVI assisting Prosser on technical due diligence in

Prosser's purchase of Vitelco. Vondras also served as a director of ATN.

### Salvatore Muoio

Salvatore Muoio ("Muoio") is a principal and general partner of S. Muoio and Co., LLC, an investment advising firm, with significant experience in finance and the telecommunications sector. Mr. Muoio's background includes employment as a securities analyst and vice president at Lazard Freres & Co., from 1995 to 1996 in the telecommunications and media sector, and then for Gabelli & Co., Inc., from 1985 to 1995, serving both as a generalist and in the communications sector. During his career, Mr. Muoio has been quoted in many well-regarded financial newspapers and periodicals.

### Terrence A. Todman

Terrence Todman, ("Todman"), a USVI native, is a former United States ambassador to Argentina, Denmark, Spain, Costa Rica, Guinea, and Chad, and has served as special advisor to the Governor of the USVI. Todman, who is now retired, serves on the boards of directors of several other [*10] companies, including Areolineas Argentinas and the Exxel Group.

### John P. Raynor

John P. Raynor, ("Raynor"), a practicing attorney, was a partner of an Omaha, Nebraska law firm, and served as Prosser's personal attorney as well as ECM's counsel. Raynor was also a business associate of Mr. Prosser, had been a director of ATN, and acted as Prosser's advisor in formulating the terms of the Privatization transaction.

### B. Background Leading To The Formation of ECM

ECM's corporate predecessor, Atlantic TeleNetwork, Inc. ("ATN"), was a company that Prosser and a partner, Cornelius Prior, formed in 1987 to acquire the Virgin Islands Telephone Corporation ("Vitelco").

Vitelco, which was ATN's (and later ECM's) principal subsidiary, was (and still is) the exclusive provider of local wired telephone service in the USVI, where Vitelco operates a modern, fully digital telecommunications network. Vitelco was an extremely valuable asset, for several reasons. At the time of the Privatization, Vitelco faced no competition in the foreseeable future, and was guaranteed an 11.5% rate of return on the rate base for local telephone service by the Virgin Islands Public Service Commission. Vitelco's [*11] business, which is essentially non-cyclical and not materially affected by recession or inflation, was enhanced by its membership in the Rural Telephone Finance Cooperative ("RTFC"), a non-profit lending cooperative that provided Vitelco with capital at below-market interest rates. Prosser and his

entities had access to RTFC financing only because of their affiliation with Vitelco.

Moreover, Vitelco had been essentially free from taxation. In May 1997, Vitelco was granted by the USVI Industrial Development Commission ("IDC") a five year tax abatement from 90% of income taxes and 100% of gross receipts, property and excise taxes (running from October 1998 through October 2003). The tax abatement was granted to help Vitelco recover from uninsured damage caused by Hurricane Marilyn in 1995. The tax abatement lasted for almost the entire period from the time ATN acquired Vitelco, until the Privatization.

In January 1991, ATN acquired an 80% interest in a second telephone company: Guyana Telephone & Telegraph Company Limited ("GT&T"). Eleven months later, ATN completed an initial public offering of over 5 million shares of its common stock at $ 19 per share. As a result, Prosser and Prior [*12] together owned about 65% of ATN's stock.

By 1993, Prosser and Prior had a falling out. That led to a management deadlock, which effectively precluded Prosser from pursuing his acquisition strategy. With the co-CEOs at loggerheads and the ATN board deadlocked, Prosser and Prior sued each other in June 1995. In February 1996, Prior and Prosser entered into a global settlement of their disputes, in which they terminated all litigation and released all claims.

As part of the settlement, Prosser and Prior attempted to sell ATN, and engaged two investment banks--Prudential and PaineWebber--to assist in that endeavor. Both banks concluded that a buyer should be willing to pay $ 25 to $ 30 per share for ATN, which represented a 150% to 200% premium over ATN's market price. But, potential acquirors expressed interest only in acquiring ATN's Virgin Islands operations, primarily Vitelco.

Because ATN could not be sold as an entirety, and because selling only the USVI business would not resolve the management deadlock, Prosser and Prior decided to split ATN into two new companies (the "Split Off"). One of those companies, to be controlled by Prosser, would consist of ATN's Virgin Islands Group. [*13] That company was ECM. The other company, which would be controlled by Prior, was New ATN, to which GT&T would be transferred. The Split Off was approved by ATN's board of directors and shareholders, and was consummated on December 30, 1997. Although ATN had no controlling stockholder before the Split Off (Prosser and Prior owned a large but not majority position), as a result of the Split Off Prosser ended up owning 52% of ECM's 10,959,131 shares, and ECM's public shareholders were relegated to the position of minority stockholders. n1

n1 Knowing that he would control ECM and Vitelco after the Split Off, Prosser began acquiring telecommunication and other media companies. On December 30, 1997, the same date as the Split Off closed, ICC (wholly owned by Prosser) closed its acquisition of three Caribbean Cable Companies (BVI Cable TV; St. Croix Cable TV, Inc.; and St. Maarten Cable TV) and the Daily News. ICC closed on its agreement to purchase St. Thomas Cable (executed in September 1997) on April 3, 1998. The plaintiffs contend that these acquisitions were all corporate opportunities of ATN and ECM.

[*14]

On December 31, 1997, ECM began trading as a public company on the American Stock Exchange. Shortly after Prosser obtained control of ECM, he appointed his long-time ATN directors, Raynor and Ramphal, to the ECM board. Prosser also appointed Messrs. Goodwin, Muoio and Vondras to the ECM board.

C. The Proposed, But Later Aborted, Merger of Innovative Into ECM

ECM's life as a public company was short - only ten and one half months. That was not accidental: before the Split Off had been completed, Prosser indicated that he intended to merge Innovative into ECM, and began exploring a combination of the two companies in January 1998. On January 20, 1998, ECM hired Prudential to advise it on the fairness of a potential merger of Innovative into ECM's subsidiary ATNCo (the "Proposed Merger"). During the next month, Prosser formulated the terms of the Proposed Merger, assisted by Prudential, the law firm of Cahill, Gordon and Reindel, ECM's legal advisors ("Cahill Gordon"), and director John Raynor.

On February 27, 1998, Prosser sent to each ECM director an outline of the terms of the Proposed Merger, a draft merger agreement, and proposed resolutions creating a special board committee [*15] that would consist of Messrs. Raynor, Goodwin, and Ramphal. At the March 9, 1998 meeting of the ECM board, Prosser formally presented the Proposed Merger, whereby Innovative would merge into ATNCo (the wholly-owned ECM subsidiary that held Vitelco) in exchange for the issuance of $ 35 million of ATNCo convertible preferred stock to ICC (Innovative's parent). No privatization of ECM was contemplated as part of this transaction. At the March 9, 1998 board meeting, the ECM board also constituted a special committee, consisting of Messrs. Goodwin, Raynor, and Ramphal (the "First Special Committee"), to

consider Prosser's Proposed Merger. Those persons were appointed at the suggestion of Prosser. n2 At that time, Raynor, who was an ECM director and a Prosser business associate, was on retainer as ECM's attorney and had helped Prosser formulate the terms of the Proposed Merger.

n2 Trial. Tr. Vol. 10 (Prosser) 1785).

The law firm retained to serve as counsel to the First Special Committee was Cahill Gordon. The [*16] firm that was retained as the financial advisor to ECM and the First Special Committee in connection with the Proposed Merger was Prudential. From April 3, 1998 through May 20, 1998, Prudential engaged in discussions with ICC about the Proposed Merger terms.

Whether or not the First Special Committee actively considered the Proposed Merger is a heavily disputed issue. Goodwin testified that that Committee never met, that it had no financial or legal advisor, and that the Proposed Merger was "dropped within the month." n3 The other Committee members also testified that the First Special Committee never met and that it had no advisors. n4

n3 Trial Tr. Vol. 4 (Goodwin) 829-35, 845-46, 853.
n4 See Trial Tr. Vol. 7 (Ramphal) 1423-1425; Raynor Dep. 118-119.

The record, however, shows that Prudential and Cahill Gordon were retained by, and performed work for, the First Special Committee. n5 The scenario in which the Proposed Merger supposedly "languished" shortly after it first surfaced, is inconsistent [*17] with JX 218, which is Prudential's extensive documentary presentation of the Proposed Merger to the Special Committee. Joint exhibit 218 was sent to the Committee members on May 22, 1998 in preparation for the Committee's meeting scheduled for May 27, 1998. In that document Prudential valued ATN -- the wholly owned ECM subsidiary into which Innovative would be merged -- at $ 25 to $ 30 per share. n6 It is difficult to square Prudential having sent this document -- which evidenced that that firm had done significant work -- to the First Special Committee as late as May 22, if in fact the Proposed Merger had languished or if the Special Committee had been disbanded after a week or two, as Goodwin testified.

n5 See, e.g., JX35 (Prudential retainer letter); JX96 (draft fairness opinion); JX 265 (Prudential presentation to Cahill Gordon and First Committee); JX218 (Prudential Presentation to Special Committee containing its evaluation of the Proposed Merger); Trial Tr. Vol. 8 (Heying) (stating Prudential and Cahill Gordon were retained; Trial Tr. Vol. 10 (Prosser) 1796-98 (same).
n6 JX 218, Appendix, EC 020890-893. The Proposed Merger, if consummated, would have benefited ECM and its minority shareholders by combining all the media holdings Prosser had assembled (telephone, cellular and cable), using Vitelco's cash flow and capital, under the single corporate umbrella of ECM. Those benefits were not made available to ECM's minority stockholders in the Privatization. By definition, only Prosser received those benefits.

[*18]

D. Prosser Abandons the Merger In Favor Of The Privatization

During the third week of May 1998, Prosser began having significant reservations about the Proposed Merger, because the low market interest in ECM's common stock had caused that stock to be undervalued. n7 On May 21, 1998, Prosser, together with Raynor, met with representatives of Prudential and Cahill Gordon to discuss the feasibility of Innovative acquiring all of the outstanding stock of ECM. By that point, Prosser had decided (in Raynor's words) to "flip the transaction." n8 Having concluded that the market was not recognizing ECM's intrinsic value, Prosser switched from being a seller of ECM stock to becoming a buyer of that stock. Although Prosser had placed a value of $ 13.25 per share on ECM for purposes of the Split Off that had occurred only 5 months before, as a buyer of that same stock he was now proposing to pay only $ 9.125 per share.

n7 Prosser Dep. June 7, 2000, at 67-69. On the first day ECM stock was traded, its high and low sales prices were $ 8.25 and $ 7.875, respectively. During the second calendar quarter of 1997 (April 1-June 30), ECM shares traded at prices ranging from a high of $ 8.9375 to a low of $ 6.25 per share. On the last trading day before the public announcement of the Privatization, the reported closing price was $ 7.00 per share. JX

155 at SC4133. Prosser informed the ECM board that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not followed- by Wall Street analysts. JX 155 at SC 4111.

**[*19]**

n8 Raynor Dep. 173.

Between May 22 and May 28, Prosser, Prudential and Cahill formulated the terms of a Privatization proposal to be presented to ECM's board. On May 28, Raynor, Prosser and Thomas Minnich, ECM's Chief Operating Officer, informed the RTFC that they had decided to abandon the Proposed Merger and to take ECM private. The next day, Prosser delivered to the ECM board a letter withdrawing the Proposed Merger and proposing instead that Innovative acquire all the ECM shares it did not already own. The proposed Privatization was structured as a first-step cash tender offer for ECM's publicly traded shares at $ 9.125 per share, to be followed by a second-step cash-out merger at the same price. n9

n9 JX 150.

Prosser's May 29th letter was the first occasion that the ECM board and the First Special Committee (other than Raynor) learned of the abandonment of the Proposed Merger in favor of the Privatization. **[*20]** Those directors were never told of the roles played by Prudential, Cahill and Raynor -- all supposedly retained to represent the interest of the ECM minority stockholders -- in formulating the terms of the newly-substituted going private transaction. n10

n10 The $ 9.125 per share merger price was arrived at by Prosser in consultation with Prudential, and no one·else had a significant role in that decision. Prosser Dep. June 7, 2000 at 73-74. The First Special Committee members (other than Raynor) were not told of the ongoing plans to change the transaction until May 29, 1998. Goodwin Dep. August 11, 2000 at 48-52, 62.

On the same day that Prosser proposed the Privatization, he told ECM's board that he (Prosser) had re-

tained ECM's former advisors, Prudential and Cahill Gordon, to represent Innovative as the buyer in that transaction. Prudential was an especially valuable advisor to ECM, because it understood ECM's business and properties and had been ECM's only advisor during its brief life as a stand-alone **[*21]** company. Thus, the advisors that initially were retained to work for the interests of ECM and its minority stockholders would now be working to serve the interests of Innovative, the party now bargaining *against* ECM. There is no evidence that the ECM board objected either to Prosser's co-opting these valuable advisors, or to the timing of the proposed Privatization. n11

n11 At that time (May 1998), Prosser knew that ECM's stock price was artificially depressed, because the market was not viewing ECM as a U.S. telephone company, but, rather, as a developing nation/third world phone company. That perception, Prosser knew, was unfair, because ECM had all the characteristics of a U.S. telephone company--a stable government, dollar economy, English language, American courts and legal system--and none of the characteristics of a third world company. Trial Tr., Vol. 10 (Prosser) at 1728-29; 1801-02, 1807. Rather than educate the market or afford it time to understand ECM's true characteristics, Prosser exploited the market unfairness by proposing the Privatization at a price that reflected a "premium" over ECM's then-current depressed market price level.

**[*22]**

E. The Formation Of The Second Special Committee And The Negotiation Of The Transaction Terms

At the May 29 ECM directors' meeting, the board formed another special committee (the "Second Special Committee") to review the fairness of the proposed Privatization. The directors selected to serve as members of this Second Special Committee were Messrs. Richard Goodwin, John Vondras, and Shridath Ramphal. n12

n12 In their briefs the parties dispute whether Mr. Muoio had also been appointed to the Second Special Committee. Plaintiffs argue that he was, pointing to the minutes of the May 29 meeting (JX 97), which recite that Muoio was appointed. The defendants argue that those minutes were in-

correct, and point to testimony that Muoio was never on the Committee. The materiality of this fact dispute is, to say the least, obscure. Because even the plaintiffs concede that Muoio "did not serve" (Pl. Op. Trial Br. 27), the Court concludes that it is more probable than not that Muoio was never appointed.

There [*23] were several obstacles to the ability of these three directors to operate as a fully functioning Special Committee. Located on different continents and separated by a time difference of 14 hours, the three Committee members were never able to meet in person. Instead, they had to conduct their business by telephone and fax. Even teleconferences were difficult to arrange and as a result, the Second Special Committee never met collectively - even by telephone - to consider the $ 10.25 final negotiated offer whose approval it ultimately recommended.

Because one of the Second Special Committee members lived in Indonesia and the other lived in England, practicality dictated that Goodwin would be the Committee chair. In that capacity, Goodwin was designated to -- and did -- take the lead role in negotiating with Prosser and in selecting the Committee's legal and financial advisors. Mr. Goodwin interviewed William Schwitter of Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), as a potential legal advisor to the Second Special Committee, and on June 5, 1998, the Committee retained the Paul Hastings firm as its legal counsel. Later, after meeting with representatives of J.P. Morgan and [*24] Houlihan Lokey Howard & Zukin ("Houlihan") at his home in Massachusetts, Goodwin recommended that the Committee retain Houlihan as its financial advisor, and in mid-July, 1998, the Second Special Committee retained Houlihan in that capacity. n13

n13 Plaintiffs challenge the independence of both Mr. Schwitter and Houlihan, pointing out that Schwitter had been recommended by Cahill Gordon, counsel for Innovative, and that Houlihan (as well as all other potential financial advisors) "were first vetted by Prudential, which was now working solely for Prosser." Moreover (plaintiffs assert), Houlihan was ultimately recommended by Mr. Goodwin, because Goodwin felt that Houlihan (unlike Morgan Stanley) would not "[push] Prosser too hard," which might cause Prosser to back off and result in a lower stock price. Morgan Stanley, on the other hand, was "more aggressive" in pursuit of the retention, and

was insisting on a fee arrangement that was linked to any increase above Prosser's initial $ 9.125 offer that Morgan could obtain.

These arguments are strained at best. Although at one time Schwitter was an attorney at Cahill, at the time that Cahill recommended Schwitter (among other attorneys), he was a partner at a competitor firm and there is no evidence that Schwitter was beholden to Cahill or that he acted other than loyally as counsel to the Special Committee. Nor is there evidence that the retention of Houlihan prejudiced the Second Special Committee. The weakness was in the bargaining position of the Special Committee in relation to that of Prosser, who was not prepared to support or accept any alternative business transaction other than the Privatization. That is, the Committee's only options were to make a deal with Prosser on whatever terms he was willing to accept, or no deal at all (in which case the stock price might fall, to the minority stockholders' detriment). The defendants' response is that the Special Committee had ample bargaining power to negotiate a fair price, because it had the power to 'lust say no," i.e., to veto the Privatization proposal, and that the Committee would approve the Privatization only if it was the best available transaction and represented fair value for the stock. Although the Court ultimately concludes that the Special Committee was ineffectual, it is not for the reason that Paul Hastings and Houlihan had been retained as the Second Special Committee's advisors.

[*25]

As part of its pre-financial analysis investigation of ECM, Houlihan conducted (among other things) a review of ECM's financial information. That information included financial projections for ECM, dated March 25, 1998 (the "March projections"), that had been prepared by James Heying, ECM's then-Chief Financial Officer and Executive Vice President of Acquisitions. n14 What Houlihan was *not* provided, however, were financial projections dated June 22, 1998 (the "June projections") n15 that Prosser had caused Heying to prepare as part of Prosser's and ICC's application to the RTFC to finance the acquisition of ECM's minority shares.

n14 JX 13, 14.
n15 JX 38.

The June projections forecasted substantially higher growth than did the March projections. Based on the June projections, as modified by the RFTC, the RFTC concluded in July 1998 that ECM was worth (for loan approval purposes) approximately $ 28 per share. n16 Recognizing that the Privatization gave Prosser "the opportunity to retain [*26] control at a price below the true market value of the company," n17 the RTFC approved financing that would enable Prosser to offer up to $ 11.40 per share. n18 That suggests, and Prosser later confirmed, that he always planned (and gave himself sufficient elbow room) to increase his initial offer by some amount. n19 Moreover, the $ 60 million RTFC loan represented the amount Prosser had asked for, not the limit of what the RTFC would have allowed him to borrow. n20

n16 JX 167 at RTFC 698, 707, 720. The RTFC made certain downward modifications to the June projections so that its valuation would be on the conservative side. Using a 12% medium risk discount in its DCF analysis, the RTFC valued ECM at $ 27.84 per share. *Id.*
n17 JX 167 at RTFC 710; Reed Dep. 113-15.
n18 *See* JX 167 at RTFC 710. ("The initial offer price will be $ 9.25. The loan amount includes an additional $ 11.4 million to accommodate a $ 2.15 increase to the initial offer price.")
n19 *See* Prosser June 8, 2000 Dep. 270-71 ("I am quite certain that we had requested enough room to go up so that we would have the ability to fund at a higher price obviously than nine and a quarter . . . .").

[*27]

n20 Trial Tr. Vol. 10 (Prosser) 1813-14.

Although Prosser made the June projections available to his legal advisor (Cahill), his financial advisor (Prudential), and his lender (the RTFC), the June projections were never provided to the Second Special Committee, Houlihan, or the ECM board. Instead, Prosser directed Heying to send Houlihan the March projections, even though the June projections were available by that point. As a result, the Committee and its advisors believed -- mistakenly -- that the March projections were the most recent projections available. n21

n21 Trial Tr. Vol. 7 (Vondras) 1351-52.

On August 4, 1998, the Committee met with Houlihan to discuss Houlihan's preliminary analysis, which had been furnished to the Committee members in the form of a draft presentation booklet. After explaining in detail his firm's assumptions and methodologies, Houlihan's representative informed the Committee [*28] that it was not prepared to opine that $ 9.125 was a price that was fair to the minority stockholders. After further discussion, the Second Special Committee agreed that $ 9.125 would not provide adequate compensation to the ECM minority.

Before beginning its negotiations with Prosser, the Committee members discussed different strategies for obtaining the highest possible price for the minority shareholders. The Committee was not ready to reject Prosser's offer outright without at least attempting first to negotiate a higher price. One strategy the Committee discussed was to present Prosser with a "final price" they believed was fair and acceptable. They concluded, however, that the approach best calculated to achieve the highest price was not to demand a specific price from Prosser, but, rather, to negotiate with Prosser for the highest price he would pay for the shares and then determine whether that price represented fair value for the minority stockholders. n22

n22 There is evidence that sometime after the August 4th meeting, Houlihan told Goodwin that a one point increase above the original $ 9.125 offer, *i.e.*, an increase to $ 10.125, would enable Houlihan to furnish a fairness opinion. *See* JX 219, at SC 04099 (the so-called "Goodwin Diary"), where in his entry for August 7, Goodwin recites that he told Prosser that Houlihan had concluded that the initial offer was too low, and that "after much back and forth [Prosser] said that he could go up another point *(which was price Houlihan had told me privately would be acceptable.)*" Although Goodwin claimed at trial that Houlihan never told him that [Trial Tr. Vol. 5 (Goodwin) 911], Goodwin did not denigrate any other parts of what he wrote in the Goodwin Diary *(see, e.g., id* at 915-18, 923). The defendants suggest no reason why this particular diary entry should be viewed as inaccurate when the other entries were not.

[*29]

Between August 5 and August 10, 1998, in a series of telephone conversations, n23 Messrs. Goodwin and

Prosser negotiated the buyout price for ECM's publicly held shares. During the first conversation, which took place on August 7, Goodwin told Prosser that his initial offer of $ 9.125 was inadequate. According to an entry that Goodwin made in his "diary":

> After much back and forth [Prosser] said that he could go up another point (which was price Houlihan had told me privately would be acceptable). If this failed [Prosser] was considering making a private tender which he calculated would give him around 90% of all the stock. If he could not get it at what he considered a fair price [he] might withdraw his offer and let the stock go to market level. n24

n23 Goodwin testified that in negotiating by telephone, rather than traveling to the Virgin Islands, he could much more "maintain the necessary detachment and impassivity" than he could in Prosser's presence. Trial Tr. Vol. 4 (Goodwin) 771.

n24 JX 219 at SC 04099.

[*30]

Eventually, Prosser told Goodwin that he would consider the matter and call Goodwin back. Shortly thereafter, Prosser raised his offer by one eighth of a point, to $ 9.25 per share. Goodwin reported that offer to the Second Special Committee, which rejected it as inadequate. Goodwin then called Prosser and told Prosser that he would have to improve his offer. In a later negotiation, Prosser raised his offer to $ 10 per share. Again, Goodwin reported that offer to his fellow Committee members and to Houlihan. The Committee rejected that revised offer, and thereafter, Prosser raised his offer to $ 10.125 per share. The Second Special Committee rejected that offer as well.

In response, Prosser raised his offer to $ 10.25 per share, but told Goodwin that $ 10.25 was his final offer. Because the price had been going up in roughly quarter point increments, Goodwin countered by asking for $ 10.50 per share. Prosser rejected that request, pointing out that $ 10.25 was already "straining the limits of [his] financing" for the transaction. n25 At that point, Goodwin made a judgment that the Committee "had reached the limits of how far we could push . . .," n26 and informed the other Committee [*31] members -- Ramphal

and Vondras -- of his conclusion. Ramphal and Vondras agreed to stop the negotiations at that point. n27

n25 Trial Tr. Vol. 4 (Goodwin) 778; JX 142. The record shows that, in fact, Prosser's financing would have enabled him to increase his offer to $ 11.40 per share, and that the implied equity value of ECM was $ 305 million, or $ 28 per share. JX 167 at RFTC 698, 720; Reed Dep. 162-163; Prosser 6/7/00 Dep. 93-96. Goodwin testified that Prosser's representation about the limits of his financing, truthful or not, had no impact except to signal to him (Goodwin) that the negotiations had to end.

n26 Trial Tr. Vol. 4 (Goodwin) 779.

n27 The plaintiffs contend that the negotiations between Prosser and Goodwin were not arm's length, and that, in fact, the Special Committee's entire process was "bankrupt." To prove that point, the plaintiffs rely heavily upon the fact that Goodwin's regular practice was to send faxes to Special Committee members (or their counsel) through Prosser's secretary, Eling Joseph, and ask her to fax it to the others. Although Goodwin told Ms. Joseph that the Committee materials were confidential, this practice did create the potential of giving Prosser access to almost every document that circulated among the Special Committee, including Houlihan's financial analysis. Goodwin did not deny having routed his communications through Ms. Joseph, and defended that practice on the basis of convenience, not necessity. The defendants respond that there is no evidence that Prosser or his advisors saw these faxes. Prosser testified that Ms. Joseph never disclosed any of those materials to him, including Houlihan's valuation materials. The record discloses, however, that at least on one occasion the confidentiality of the faxed Committee materials was breached. Even if that had not occurred, this practice cannot help but undermine confidence in the integrity of the bargaining process. It is manifest that Goodwin's decision to route those materials through the secretary who shared the same office as Prosser--Goodwin's bargaining adversary--rather than route them through the office of the Committee's counsel, Mr. Schwitter, created a serious risk of compromising the Committee's process and its effectiveness in negotiating the highest available value.

[*32]

Thereafter, Goodwin asked Houlihan if it could furnish a fairness opinion at $ 10.25 per share. Houlihan responded that it could, because that price was within the valuation ranges resulting from its market multiple analysis and its discounted cash flow (DCF) analysis.

The Committee having obtained what they believed was the highest available price, the question then became whether that price was fair. On August 12, 1998, Goodwin and Vondras had a telephonic meeting with Houlihan and Paul Hastings to review Prosser's $ 10.25 offer. Having updated its financial analysis, Houlihan concluded that the revised offer price of $ 10.25 was fair to ECM's public shareholders from a financial point of view. Goodwin and Vondras thereafter voted to recommend that the full ECM board approve the Privatization. n28

n28 Ramphal did not attend the Committee's August 12 meeting, even by telephone. Shortly after the meeting, Goodwin contacted Ramphal and gave him a detailed account of what had occurred.

F. ECM's Directors [*33] and Shareholders Approve The Proposed Privatization

A telephonic meeting of the ECM board to consider Prosser's revised offer to buy all of ECM's publicly held stock for $ 10.25 per share, was held on August 13, 1998, the following day. Present at that meeting were Mr. Schwitter and Houlihan representatives. Not attending were Messrs. Prosser (at the request of the Board) and Todman (due to a scheduling conflict). The Board members who had not served on the Special Committee had received copies of Houlihan's fairness analysis before the meeting. n29

n29 Because the copies were sent after the Committee had acted on August 12, the non-Committee member directors had less than a day to review the Houlihan materials.

At the meeting, the Special Committee members described the process they had employed. Houlihan then explained its financial analysis and confirmed that in its opinion, the $ 10.25 per share price was fair to the minority stockholders from a financial point of view. After discussion, the board [*34] determined to approve the Privatization, but only if a majority of the shares held by the minority stockholders were tendered in the first-step tender offer. The meeting was then adjourned to August 17, 1998, at which time the board was told that Prosser would agree to this non-waivable minimum tender condition. The full board, acting upon the unanimous recommendation of the Second Special Committee, then voted to approve the Privatization.

On August 18, 1998, ECM publicly announced the execution of a definitive merger agreement that provided for the Tender Offer and Merger at $ 10.25 per share, and that the Tender Offer was subject to the minimum tender condition. The Tender Offer commenced on August 24, 1998. At the time of the Tender Offer, there were 10,959,131 outstanding ECM shares, of which 5,606,873 shares were owned by Prosser through ICC, and the remaining 5,352,258 were held by the public. As of September 25, 1998, 3,206,844 of those shares (i.e., a majority of the minority shares) had been tendered. On October 19, 1998, a special meeting of ECM shareholders took place, at which the Merger was approved by a vote of 5,760,660 FOR, and 4,466 AGAINST, out of 10,959,131 [*35] shares entitled to vote. The Merger was consummated that same day.

These appraisal and fiduciary duty class actions followed.

II. THE PARTIES' CONTENTIONS AND THE ISSUES PRESENTED

As earlier noted, the plaintiffs have brought and litigated two separate actions--a statutory appraisal action and a class action asserting claims that the Privatization was not entirely fair to ECM's minority shareholders. In a statutory appraisal action, the Court must determine the "fair value" of the corporation whose stock is being appraised. n30 Plaintiff Greenlight claims that the statutory fair value of ECM at the time of the merger was $ 41.16 per share, plus the value of certain corporate opportunities that Prosser is claimed to have usurped (valued at $ 3.79 per share), for a total fair value of $ 44.95 per share.

n30 8 Del. C. § 262(a).

In a class action seeking to invalidate a "going private" acquisition of a corporation's minority stock by its majority stockholder, the standard under [*36] which this Court reviews the validity of the transaction and the liability of the fiduciaries charged with breach of duty, is entire fairness. n31 That standard of review has two aspects: fair dealing and fair price. n32 In this case, the

plaintiffs claim that the Privatization was the product of unfair dealing that, in turn, resulted in an unfair transaction price. The transaction (it is claimed) resulted from violations of the defendants' fiduciary duties of loyalty and good faith, for which the defendants are liable and must respond in damages.

n31 *Emerald Partners v. Berlin, 787 A.2d 85 (Del. 2001).*
n32 *Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983).*

The plaintiffs' claims, both fiduciary and statutory, and the defenses to those claims, involve a plethora of contentions that are too numerous to catalogue in detail at this point without overburdening an unavoidably lengthy Opinion. The reason, in great part, is that the case was over-litigated and over-briefed, [*37] a state of affairs for which the Court (by allowing the parties to file briefs in excess of the page limit) is responsible. The post-trial briefs and other submissions alone total almost 400 pages, n33 and the trial record, not surprisingly, is correspondingly voluminous. To save the reader from losing the forest in the trees, what follows is a "broad brush" sketch of the parties' contentions. A more detailed picture of those contentions - and the specific issues which flow therefrom - is set forth in the sections of this Opinion that follow.

n33 The opening post-trial brief is 143 pages, the answering brief is 150 pages, and the reply brief is 72 pages.

In the fiduciary duty class action, the basic issues are whether the defendants dealt fairly with the ECM minority and whether the $ 10.25 per share transaction price was fair. Because the plaintiffs' class action damages claim is identical (dollar-wise) to their statutory appraisal claim, the fiduciary "fair price," and statutory "fair value," contentions [*38] converge and are addressed in connection with the statutory appraisal claim. Accordingly, at this point the Court summarizes the "fair dealing" contentions. Thereafter, it summarizes the fair price/fair value claims.

With respect to fair dealing, the threshold procedural issue is which side has the burden of proof. Because the defendants stood on both sides of the transaction, normally the burden would fall upon them. If, however, the defendants can satisfy the Court that the transaction was

approved by a fully functioning independent committee of independent directors or by an informed majority of minority stockholders, the burden shifts to the plaintiff to prove that the transaction was unfair. n34 Here, the plaintiffs contend that the Second Special Committee was neither independent of Prosser nor fully functional, for which reason the burden of proving entire fairness falls upon the defendants. The defendants contend the opposite, and assert that the burden of proof must shift to the plaintiffs.

n34 *Weinberger v. UOP, Inc., supra, Kahn v. Lynch Communication Sys., Inc., 638 A.2d 1110, 1117 (Del. 1994).*

[*39]

Turning first to the substantive fair dealing issues, the plaintiffs claim that the Privatization was not the result of "fair dealing because: (1) the entire ECM board was "unfairly stacked" in favor of (*i.e.*, beholden to) Prosser, (2) the timing of the transaction and Prosser's co-opting of ECM's advisors were unfair, (3) the Special Committee was neither independent nor properly functioning, and (4) the defendants violated, in various respects, their "duty of candor" to the minority shareholders in both the tender offer disclosure document and in the proxy statement issued in connection with the second step merger.

Not surprisingly, the defendants vigorously resist these claims, and contend that in their dealings with ECM's minority stockholders they acted fairly in all respects. The defendants also raise three affirmative defenses: (1) Greenlight lacks standing to assert any claims based on its acquired "litigation rights," and (2) no former stockholders of ECM can recover the value of any shares that they tendered into the tender offer or voted in favor of the merger; and (3) even if the Privatization was not entirely fair, the defendants are exculpated from damages liability [*40] under Article Seventh of ECM's certificate of incorporation.

The parties' briefs are largely devoted to the "fair price" and appraisal issues, which in this case (as noted), are one and the same. Typical in litigation of this kind, the overriding question -- what ECM was intrinsically worth on the merger date -- involves a proverbial "battle of the experts." In this case, the valuation experts were University of Chicago Business School Professor Mark Zmijewski, the plaintiffs' expert who valued ECM at over $ 41 per share; and Daniel Bayston, a consultant at Duff and Phelps and the defendants' primary valuation expert, n35 who valued ECM at $ 10.38 per share.

n35 The defendants called two additional valuation experts: Princeton University Professor Burton Malkiel, who testified about issues relating to ECM's market value, and Gilbert Matthews, an investment banker and former managing partner of Bear Stearns & Co., who testified as the defendants' rebuttal witness.

These widely differing valuations of the [*41] same company result from quite different financial assumptions that each sponsoring side exhorts this Court to accept. To evaluate the parties' competing approaches requires the Court to resolve a multitude of DCF-related valuation issues, some of which are factual and others of which are conceptual.

The first set of issues involve which set of management projections is appropriate to use in a discounted cash flow (DCF) valuation of ECM -- the March projections that were furnished to the Special Committee, or the June projections that were created closer in time to the merger date but were furnished only to Prosser, his advisors, and the RTFC, and not the Special Committee or its advisors. Professor Zmijewski used the June projections without modification. Mr. Bayston, on the other hand, used the March projections and modified them in ways that the plaintiffs hotly dispute.

A second set of issues concerns the appropriate discount rate. In this regard, both Prof. Zmijewski and Mr. Bayston determined a discount rate using standard weighted average cost of capital ("WACC") and Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula without any modifications. [*42] Mr. Bayston modified the WACC formulas and inputs, by adding various "small firm" and "weather risk" premiums, substituting new costs of debt, and using a debt-to-value capital structure that (together with Bayston's other modifications) has also generated ardent disputes.

The third and fourth sets of issues center on the questions of what weight should be accorded to ECM's stock market price in determining its fair value; and whether the appraisal (or damages) award should include the value of certain businesses that plaintiffs claim were corporate opportunities of ECM.

The analysis that next follows addresses these fair value and fair price issues. In Part III of this Opinion the Court treats the valuation issues raised by the parties, and concludes that (1) the $ 10.25 merger price was not fair, and (2) ECM's fair value (and fair price) on the date of the merger was $ 38.05 per share. In Part IV, the Court

turns to the fair dealing issues, and concludes that the burden of establishing fair dealing remains with the defendants, who failed to carry that burden. Finally, in Part V, the Court determines what fiduciary duties were violated and which defendants are monetarily liable [*43] as a consequence.

## III. THE FAIR PRICE AND FAIR VALUE OF ECM

Although each side's experts valued ECM using both the comparable company and DCF approaches, in their briefs the parties focus almost exclusively upon DCF valuation issues. This Court views the parties' virtual non-treatment of the comparable company valuation as a tacit concession that that alternative valuation is a "throwaway" of no material significance. Accordingly, this Opinion addresses only the valuation issues presented by the parties' competing DCF approaches. n36

n36 The basic flaw in the comparable company approach is that ECM had no true comparables, as Mr. Bayston conceded. Trial Tr. Vol. 3 (Bayston) at 584-585. The DCF methodology, on the other hand, is more appropriate because ECM had available contemporaneous management forecasts, predictable earnings and cash flow.

Both sides agree, and our case law recognizes, that a DCF valuation is based upon three inputs: (a) the projections of free cash flow for a specified number of [*44] years, (b) the estimated terminal value of the firm at the end of the "projection period," and (c) the discount rate. n37 Although the parties raise a plethora of DCF-related issues, those disputes center around four pivotal questions: (1) which projections (March or June) provide the more appropriate free cash flow input to the DCF model; (2) what is the appropriate discount rate for ECM; (3) how much weight (if any) should the market value of ECM's stock be given in the valuation; and (4) should the value resulting from the DCF method be increased by the value of the businesses that are claimed to be corporate opportunities of ECM? The issues that fall within these four groupings are addressed in this Part of the Opinion.

n37 Cede & Co. and Cinerama v. Technicolor, Inc., 2003 Del. Ch. LEXIS 146, C.A. No. 7129, 2003 WL 23104613, (Del. Ch. Dec. 31, 2003) ("Cinerama") (citing Taylor v. American Specialty Retailing Group, Inc., 2003 Del. Ch. LEXIS

75, 2003 WL 21753752 at * 3 (Del. Ch. July 25, 2003)).

A. Which Set [*45] Of ECM's Projections - March Or June - Is More Reliable For Purposes Of A DCF Valuation On The Merger Date?

Critical to any DCF valuation are the projected revenues, expenses, reserves, and other charges of the firm being valued. On this threshold issue the parties divide, because at Prosser's direction, Heying prepared two sets of management projections, contemporaneously and in the normal course of business. The first set was prepared on March 25, 1998; the second, on June 22, 1998. Plaintiffs' expert, Prof. Zmijewski, used the June projections to derive his projected cash flow inputs, whereas defendants' expert, Duff & Phelps (Bayston) used the March projections, but modified them in significant respects. The issue is what set of projections is the more reliable for purposes of appraising ECM as of the merger date. For the reasons next discussed, the Court determines that the unmodified June projections are the more appropriate and reliable source of inputs for a DCF valuation of ECM.

First, as a general proposition (with which defendants' expert, Gilbert Matthews, agreed), "an appraiser should rely on a company's most recent contemporaneous management forecasts unless there [*46] are compelling reasons to the contrary." n38 Here, the facts compellingly point to reliance on the June projections, which, unlike the March projections, incorporated ECM's first quarter of actual results as a stand-alone company. The June projections also incorporated significant post-March events that were not included in the March projections, namely, the acquisition of St. Maarten Cellular, a corporate jet, and a headquarters building. All those events were "facts on the ground" that would have to be considered in any valuation of ECM on the merger date. If only the March projections were used, those facts could not be considered.

n38 Trial Tr. Vol. 5 (Matthews) 1035.

Prosser conceded that the June projections reflected management's interpretation of the first quarter results in the context of the future performance of ECM, and that they were not unreasonably aggressive. n39 Also telling is that the June projections were provided to Prosser's legal and financial advisors in the Privatization (Cahill [*47] and Prudential) -- but not to the Second Special

Committee or its advisors. At Prosser's direction, those projections were also provided to the RTFC, which used them to value ECM as collateral for the Privatization financing. If contemporaneous reliance upon the June projections by Prosser, his lender and his financial and legal advisors was appropriate, then logic and common sense dictate that reliance on those same projections by Prof. Zmijewski in performing his valuation was no less appropriate.

n39 Trial Tr. Vol. 10 (Prosser) 1020-1022. This testimony flatly conflicts with the defendants' contention that the St. Maarten Cellular forecast in the June projections was "unreasonably aggressive.

Second, the defendants' denigrations of Prof. Zmijewski's reliance on the June projections are unpersuasive. Defendants argue that the June projections are inappropriate for use in an appraisal because they incorporated two projected annual cost savings that (defendants say) are synergistic, i.e., merger-related: [*48] $ 2.5 million in savings from the consolidation of ECM and ICC's operations, and $ 2 million in claimed "going private" savings from the elimination of costs of ECM remaining a public company. Even if those arguments were valid, the proper treatment would be to adjust the June projections for those merger-related cost savings, rather than discard those projections altogether. But more fundamentally, the record shows that (i) the consolidation cost savings were not merger-dependent and (ii) the claimed going private cost savings are not supported by any credible evidence of record.

The cost savings attributed to the consolidation were properly includable in the June projections, because they were contemplated well before the going private merger and could have been achieved without it. Prosser had identified potential consolidation savings before the Privatization occurred. Because Prosser controlled both ECM and ICC, he had the power to accomplish those savings without a business combination, such as by intercompany contractual arrangements. n40 To put it differently, the value achieved by Prosser's existing premerger ability to effect those cost savings was an asset of ECM at the [*49] time of the Privatization merger. It therefore was a benefit in which all ECM stockholders, not just Prosser, were entitled to share. n41 That entitlement cannot be defeated by Prosser's unilateral decision not to achieve those savings except as part of a going private merger that would leave him as the sole owner of the enterprise.

n40 JX 41 at RTFC 1507; Raynor Dep. 156. Although Prosser claimed at trial that ECM had analyzed and discussed the potential of savings through intercompany agreements and determined that regulatory and union issues precluded it, that testimony is uncorroborated by any document, pre-trial testimony or any other testimony. Heying, who was ECM's Chief Financial Officer, testified that he never discussed the subject of intercompany agreements with Prosser. It is implausible that ECM's CFO and two of its paid litigation consultants (Bayston and Matthews) would be unaware of that analysis if it had actually been performed, or would be unaware of any discussions about that analysis had any such discussions been held.

n41 *Cede & Co. v. Technicolor, Inc., 684 A.2d 289 (Del. 1996).*

[*50]

As for the "going private" savings, the only evidence that those savings are reflected in the June projections is the self-interested testimony of Messrs. Prosser and Heying. No document of record identifies or itemizes those savings. Nowhere are those savings reflected or identified in the June projections or in Joint Exhibit 1, a document Heying prepared during this litigation to summarize the differences between the March and the June projections. Unlike the consolidation savings (which are explicitly identified in a separate line item on both the June projections and the Heying memorandum), there is no separate line item for these alleged savings on either of these documents. That is significant, because at the time he prepared the June projections, Heying prepared a cover memorandum to reflect the most significant changes between the March and the June projections. n42 The purported going private savings -- representing an alleged $ 2 million change -- is conspicuously absent from Heying's memorandum.

n42 JX 168; Trial Tr. Vol. 8 (Heying) 1537-1539; Heying June 6, 2000 Dep. 183-84.

[*51]

The defendants claim that the going private savings include reductions in legal fees and professional fees paid to Deloitte Touche and investment relations companies, but defendants introduced no evidence of the magnitude of those fees, even though they possessed all the

relevant data. The defendants could not even reach a consensus among themselves about the magnitude of those undocumented claimed savings. Heying testified at various times that it could be $ 2.2 to $ 2.5 million, or $ 2 million, or $ 1.8 to $ 2.2 million. n43 Bayston (whose source was Heying) testified that the savings were $ 2 to $ 2.5 million annually. n44 Matthews' report quantified those alleged savings exactly at $ 1,644,000 for 1999--a figure for which Matthews was unable to identify any source during his trial testimony. n45

n43 Heying June 6, 2000 Dep. 196-97; Trial Tr. Vol. 8 (Heying) 1473-74, 1541.
n44 Tr. Vol. 3 (Bayston) 536-537.
n45 Trial Tr. Vol. 6 (Matthews) 1211-14; JX 301, Ex. E.

It stands to reason [*52] that when a public company goes private, cost savings in some amount will often be achieved. But, in an appraisal proceeding, each party must bear the burden of establishing its own position. n46 It was the defendants' burden to establish both the existence and the amount of any cost savings from going private. In this case, the defendants nowhere documented the existence, or the amount, of such cost savings, and the testimony of their witnesses on that subject is hopelessly inconsistent. In these circumstances, the defendants have not carried their burden of persuading the Court that the June projections included a significant cost savings of $ 2.5 million attributable to eliminating ECM as a public company. Accordingly, those savings are not a valid basis for the defendants to disregard, or to denigrate an appraiser's reliance upon, the June projections for purposes of performing a DCF valuation of ECM.

n46 *M.G. Bancorporation, Inc. v. LeBeau, 737 A.2d 513, 520 (Del. 1999).*

*Third,* [*53] the March projections are inappropriate for the additional reason that the defendants' expert, Mr. Bayston, initially relied on those projections, but then modified them by making large adjustments to critical inputs. The effect of those inputs was to depress the cash flows that management had contemporaneously projected. The defendants argue that Bayston's adjustments must also be made to the June projections if this Court finds those projections to be the appropriate starting point in a DCF valuation. The Court disagrees. It

concludes that the June projections, without any modifications, are the most reliable source of inputs to project ECM's future net cash flows.

This Court has consistently expressed a preference for the most recently prepared management projections available as of the merger date. The Court has also been skeptical of *ex post* adjustments to such projections. As Chancellor Chandler observed in *Cede & Co. v. JRC Acquisition Corp.*:

> This Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections [*54] entirely. n47

The Chancellor echoed that observation in his most recent appraisal opinion in *Cinerama*:

> Contemporary pre-merger management projections are particularly useful in the appraisal context because management projections, by definition, are not tainted by post-merger hindsight and are usually created by an impartial body. In stark contrast, *post hoc* litigation-driven forecasts have an "untenably high" probability of containing "hindsight bias and other cognitive distortions." n48
>
> * * * *
>
> When management projections are made in the ordinary course of business, they are generally deemed reliable. Experts who then vary from management forecasts should proffer legitimate reasons for such variance. n49

n47 *Cede & Co. v. JRC Acquisition Corp.*, 2004 Del. Ch. LEXIS 12, No. 18648, 2004 WL 286963, at * 2 (Del. Ch. Feb. 10, 2004).

n48 *Cinerama*, at * 7 (quoting *Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch. 2001)).

n49 *Id.*, (internal citation omitted) (citing *Gray v. Cytokine Pharmasciences, Inc.*, 2002 Del. Ch. LEXIS 48, 2002 WL 853549, at * 8 (Del. Ch. Apr. 25, 2002)) (rejecting valuation because it inexpli-

cably ignored and altered management forecasts in favor of litigation-driven projections) and *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 Del. Ch. LEXIS 75, 1995 WL 376911, at * 5 (Del. Ch. June 15, 1995) (observing that variations from management projections merit "close inspection" and may impeach the credibility of an expert witness). In the *Cinerama* opinion, the Chancellor concluded that the respondent company's expert's "repeated discarding or modification of contemporaneous . . . management forecasts . . . cast serious doubt upon the integrity and reliability of his expert report" (*Cinerama, supra at 6*), and that "management was in the best position to project the short-term prospects of the company, as they created projections *ex ante*, based upon information gleaned from their particular customers." *Id. at 8*.

[*55]

The question presented here is whether the defendants have offered "legitimate reasons" for Bayston's modifications to the March projections. The Court concludes that they have not.

The primary modification n50 that Bayston made to the March (and, by inference, the June) projections was to increase projected capital expenditures (CapEx). Both the March and the June projections forecasted CapEx of approximately $ 9 million annually throughout the projection period. Prosser explained that these forecasted capital expenditures were lower than historical levels and were reasonable over the short term, because Vitelco had recently replaced and rebuilt its equipment, thereby reducing the need for short term capital expenditures. n51 Heying n52 and Matthews n53 agreed that the forecasted CapEx were management's best contemporaneous estimates.

n50 Bayston's other modifications were to eliminate the "consolidation savings" and $ 2.5 million of "going private savings" from the projected revenues. For the reasons already discussed, those modifications have been rejected.

n51 Trial Tr. Vol. 10 (Prosser) 1742-43.

[*56]

n52 Trial Tr. Vol. 2 (Bayston) 326 (confirming that Heying told him that management's June CapEx forecasts were their best contemporaneous estimates).

n53 Tr. Vol. 5 (Matthews) 1057-60 (no reason to change management CapEx forecast for 1998 through 2002).

Nonetheless, in his cash flow projection Bayston unilaterally increased forecasted CapEx by $ 3.7 million to $ 5.7 million per year, because (he claimed) managements "typically" underestimate capital expenditures. Bayston could not cite any scholarly research confirming that view. Nor could he quantify the average amount of any such underestimations, and he never performed an analysis of whether ECM's management had regularly underestimated CapEx. n54 Bayston's CapEx adjustment decreased free cash flow for each of the forecast years by the amount of the adjusted increase, and for the terminal year decreased cash flow by almost 20 percent. The result was a *negative growth* in free cash flow for years 2005 to 2007, resulting in a consequential decrease in Bayston's overall valuation. n55

n54 Trial Tr. Vol. 3 (Bayston) 569-72.

[*57]

n55 *Id.*, Vol. 2 (Bayston) 330-332; Trial Tr. Vol. 1 (Zmijewski) 162-63.

That adjustment amounts essentially to Bayston substituting his personal judgment of what CapEx should be for the non-litigation business judgment of ECM's management. Bayston's judgment rests solely upon his opinion that "managements" in general underestimate CapEx. The defendants have nowhere demonstrated that that view is generally accepted within the financial valuation community or that *this* management habitually underestimated CapEx for ECM. Bayston's valuation approach evokes a reaction akin to that expressed by the Chancellor in *Cinerama*. There, the petitioner's expert had rejected a management forecast on unsubstantiated grounds, and the Court observed: "[The expert's] attempts to arrive at more 'realistic' results with a hindsight valuation that . . . completely ignores the closest insiders' projections, and results in a strikingly [low] number. This is simply inexcusable." n56

n56 *Cinerama*, at * 26. Nor is there merit to the defendants' criticism (articulated through Mr. Matthews) that in Prof. Zmijewski's terminal year (2002), depreciation exceeds CapEx, a state of af-

fairs that cannot go on forever. Trial Tr. Vol. 5 (Matthews) 999-1001; Vol. 6 (Matthews) 1236-37. The flaw in this criticism is that Zmijewski projected cash flows only; he did not forecast the individual components of free cash flow, including CapEx or depreciation. Accordingly, there is no basis to conclude that Prof. Zmijewski forecasts perpetual divergent depreciation and CapEx. Trial Tr., Vol. 1 (Zmijewski) 120-123.

[*58]

For these reasons, the Court accepts Prof. Zmijewski's adoption of the June projections, and rejects Mr. Bayston's adoption of (and his modifications to) the March projections, as the basis for the cash flow inputs to the DCF valuation of ECM.

B. What Is The Appropriate Discount Rate?

The second major group of issues concerns the appropriate rate for discounting the projected free cash flows. Both Prof. Zmijewski and Mr. Bayston determined their discount rate(s) using the Weighted Average Cost of Capital ("WACC") and the Capital Asset Pricing Model ("CAPM") formulas. Professor Zmijewski used the WACC formula, without adjustment, to calculate a discount rate of 8.8% during the 1998-2002 period when ECM's tax abatement would be in effect, and 8.5% thereafter, assuming that ECM's tax abatement would not be renewed. Mr. Bayston also used the WACC model, but modified the formula and the inputs to that formula by adding various premiums, substituting new debt costs, and using a different debt-to-equity weighting, to arrive at a discount rate of 11.5%.

To understand the significance of the disputes that arise under this heading, it is useful to explain how the discount rate is determined [*59] under the WACC model. Under WACC, the discount rate is calculated based upon the subject company's cost of capital. WACC is the sum of: (1) the percentage of the company's capital structure that is financed with equity, multiplied by the company's cost of equity capital, plus (2) the percentage of the company's capital structure that is financed with debt, multiplied by its after-tax cost of debt. n57

n57 *See Cinerama, supra,* at * 40; JX 352, p. 11. In formulaic terms, WACC has been expressed thusly (JX 298, at F-1):

WACC = (Leveraged Cost of Equity x Equity % of Capital) + (Cost of Long Term Debt x (1-tax rate) x Debt % of Capital).

One element of the WACC formula -- the "cost of equity capital" -- is determined by the CAPM model. Under CAPM, the cost of equity capital is the risk-free rate of return plus the subject company's risk. The subject company's risk is determined by multiplying the equity risk premium for the market by the company's beta. "Beta" is the measure of a given company's [*60] non-diversifiable risk relative to the market, specifically, the tendency of the returns on a company's security to correlate with swings in the broad market. A beta of 1, for example, means that the security's price will rise and fall with the market; a beta greater than 1 signifies that the security's price will be more volatile than the market; and a beta less than 1 indicates that it will be less volatile than the market. n58

n58 *Cinerama, supra, at 41* and n. 315.

The approximately 3% discrepancy between the two experts' discount rates (8.8% / 8.5% for Zmijewski vs. 11.5% for Bayston) is attributable primarily to their different determinations of the (1) cost of debt, (2) capital structure, and (3) cost of equity. The issues generated by each of these input differences are now discussed.

1. Cost of Debt

Professor Zmijewski calculated the weighted average cost of long term debt for ECM at 6.3%, which was ECM's actual observed cost of debt. He used that figure because of ECM's historical [*61] ability to borrow from the RTFC at below-market rates. Mr. Bayston, on the other hand, determined that ECM's weighted average cost of debt on the merger date was 6.59%, but he assigned ECM a cost of long term debt of 8%. Bayston's judgment was that ECM would not be able to borrow indefinitely from the RTFC at below-market rates and, therefore, ECM would have to borrow from another lender at rates closer to 8%. n59 The issue is which of these two long-term debt cost figures is more reasonable. The evidence of record persuades this Court that the more reasonable long-term debt cost assumption is 6.3%. n60

n59 Trial Tr. Vol. 2 (Bayston) 286.
n60 The reason for the discrepancy between the two experts' calculation of ECM's actual weighted cost of debt appears to be that Zmijewski's 6.3% cost figure was as of October 10, 1998

(JX 352 at 22), whereas Bayston's calculation was as of September 30, 1998 (JX 298 at J-1). Because Zmijewski's figure represented ECM's long term debt cost as of a time closer to the merger date than Bayston's, the Court adopts 6.3% as the relevant actual cost of long term debt for ECM.

[*62]

The defendants admit that there is nothing of record which shows that on the merger date, ECM would not have been able to borrow from the RTFC at the weighted average cost of its existing debt. n61 As of the merger date, ECM had never borrowed at a rate even as high as 8%. Lending at below-market rates was the RTFC's mission, and as of the merger date management expected it could continue to borrow from the RTFC at favorable interest rates. n62 Management never told Mr. Bayston anything to the contrary, n63 and the defendants have cited nothing of record that supports Bayston's contrary assumption.

n61 Def's Consol. Post-Trial Br. at 110.
n62 *See* Reed Dep. 29-30; Trial Tr. Vol. 10 (Prosser) 1791; JX 209 at G331-32.
n63 Trial Tr. Vol. 3 (Bayston) 502.

For these reasons, the Court accepts Prof. Zmijewski's 6.3% cost of debt input, and rejects Mr. Bayston's 8% cost-of-debt assumption, the effect of which was to increase Bayston's calculated WACC from 10.9% to 11.16%. n64

n64 Ex. H to Pls.' Op. Post-Trial Br.

[*63]

2. ECM's Debt/Equity Capital Structure

Another important element of the WACC formula is the percentage of the capital structure represented by equity and by long term debt. This factor has proved to be problematic for both sides, and for the Court as well.

At first glance the difference between the experts on this variable appears trivial. Professor Zmijewski arrived at a 28.2% debt-to-enterprise value capital structure, whereas the debt-to-value capital structure used by Mr. Bayston was 30%. Mr. Bayston's 30% figure, however, was a "target," rather than the actual, percentage of ECM's debt to its total enterprise value as of the merger

date. It is undisputed that on September 30, 1998 (shortly before the merger date), ECM's actual long term debt was $ 190.4 million. What is disputed is ECM's total enterprise value. Bayston calculated enterprise value by (i) multiplying ECM's total outstanding shares (10,959,131) by the merger price ($ 10.38 per share), thus deriving a value of $ 113.7 million represented by "equity," and then (ii) adding to that value the $ 190.4 million of long term debt, to arrive at a total enterprise value of $ 304.1 million. On that basis, Bayston calculated [*64] ECM's actual debt-to-value ratio at approximately 63%.

Bayston did not use the actual 63% debt-to-value ratio, however, because in his judgment ECM could not viably sustain such a highly-leveraged capital structure over the long term. Accordingly, Bayston used a 30% "target" figure, which assumed that management would reduce the debt level from 63% to 30%. n65

n65 Trial. Tr. Vol. 3 (Bayston) 499-500.

Professor Zmijewski, unlike Mr. Bayston, based his 28.2% debt-to-value capital structure upon ECM's actual debt level, as opposed to a "target" debt level. But, to arrive at his 28.2% figure, Prof. Zmijewski assumed an enterprise value of $ 41.16 per share, n66 which also was the ultimate fair value that he had determined for ECM.

n66 Professor Zmijewski's original debt-to-value ratio was 27.2%, based upon a value of $ 42.94 per share. JX 234 at 46. He later adjusted the ratio to 28.2%, based upon a fair value of $ 41.16. JX 235 at Ex. S-1.

[*65]

The finance literature supports elements, but not the entirety, of each side's approach. One treatise instructs that "the appropriate weights to use [to define the firm's capital structure in calculating the WACC] . . . are the firm's *long run target weights stated in terms of market value.*" n67 Moreover:

One simple and popular procedure for estimating the target weights is to assume that they equal the company's current market value weights. Unfortunately, this assumption involves a circularity. In most cases, a company is being appraised be-

cause the market value of its securities is unknown, and, therefore, cannot be used to calculate the weights . . . . The circularity can be overcome in the case of debt and preferred stock by directly establishing the value of these securities . . . . However, common stock is still a problem. The estimated value of the equity depends on the WACC, which, in turn, depends on the value of the equity.

In light of the circularity, an iterative procedure must be employed to solve simultaneously for the value of the equity and for the WACC. The iterative process begins with the selection of an initial estimate for the market value [*66] of the equity; the book value of the equity is a reasonable choice. Based on this initial estimate, the WACC is calculated . . . Subtracting the value of the debt and preferred stock produces a revised estimate of the equity and a revised equity weight. This revised estimate is then used to calculate a new initial estimate of the equity weight. n68

n67 Bradford Cornell, *CORPORATE VALUATION Tools for Effective Appraisal and Decision Making,* 224 (McGraw-Hill 1993) (italics in original) (hereinafter "Cornell").
n68 Cornell, *supra* at 225.

The quoted excerpt does not support the entirety of either side's approach, however. Rather, the quoted treatise appears to support (in some circumstances) Bayston's use of a "target" long term debt weight, but it also supports Zmijewski's employment of an iterative process to solve the circularity problem inherent in the WACC formula. n69 Even so, this Court must decide which (if any) of the two competing enterprise values it should accept in determining [*67] the percentage of the capital structure represented by debt and the percentage represented by equity.

n69 Trial Tr. Vol. 1 (Zmijewski) at 164-165; Zmijewski Dep. at 128-130.

The difficulty is both that Mr. Bayston's assumed $ 10.38 per share "enterprise value" and Prof. Zmijewski's assumed $ 41.16 per share "enterprise value" are identical to the ultimate "fair value" that each expert determined for ECM. Those values exemplify the ultimate circularity inherent in WACC. In this case that circularity is of particular concern, because each expert's ultimate valuation is hotly disputed. Additionally, Mr. Bayston's 30% debt-to-value "target" figure assumes that management would pay down approximately 50% of ECM's debt at some indeterminate future time. That assumption finds no support in the record. For these reasons, the Court is unable to adopt the "enterprise value" assumed by either expert with any degree of confidence. Yet, the Court must still arrive independently at an enterprise value, and neither side [*68] has suggested a neutral or middle ground in their briefs.

Because the purpose of this calculation is to determine WACC based upon a reliable "value of the equity," the only sensible way (in the Court's view) to avoid the circularity in this case is to use an enterprise valuation of ECM that is not litigation-driven. On this record, the only such valuation is the $ 27.84 per share value, based on a 12% discount rate, that the RTFC determined and actually used for purposes of financing the Privatization. n70 Having no better or more reliable information, the Court adopts that value for purposes of determining the percentage of ECM's capital structure represented by long term debt and by equity on the merger date.

n70 JX 167 at RTFC 698, 700, 707, 720. Prudential's estimate that ATNI could be sold for $ 25-30 per share in the Split Off, was for a company that included (but was larger than) ECM. Efforts to sell ATNI at that price were unavailing, because no purchaser was interested in acquiring ATNI in its entirety.

[*69]

As for the percentage represented by long term debt, the only data credibly anchored to the record is the RTFC determination of ECM (ATN)'s net-debt-to-value ratio at 38.8%. Because that ratio was conservatively determined and was calculated as of July 29, 1998, three months before the merger, n71 the actual debt-to-value percentage as of the merger date is unknown and can only be estimated. The Court concludes that a debt-to-value ratio of 38% would have been a reasonable estimate and input for purposes of determining a discount rate as of the merger date. From that conclusion it also follows that the percentage of ECM's capital structure

represented by equity would have been 62% (i.e., 100%-38%).

n71 Id.

### 3. Cost of Equity

Both Prof. Zmijewski and Mr. Bayston used the CAPM formula to calculate ECM's cost of equity. Using that standard approach, Zmijewski derived a cost of equity of 10.4% (for the years when the tax abatement would be in effect), and 10.3% (when the current tax abatement [*70] expires). Bayston's initial cost of equity was somewhat lower -- 9.9% -- but Bayston then increased it to 14% by adding "premiums" totaling 4.1%. n72 More specifically, Bayston added a "small stock premium" of 1.7% and a "company-specific premium" of 2.4%, the latter consisting of a 1 to 1.5% "super-small stock premium" and a .9 to 1.4% hurricane risk premium." n73 Those "premiums" account for most of the difference between these two experts' cost of equity inputs. Accordingly, the issue becomes whether either of these premiums is appropriate in these circumstances. The party seeking to add the premium (here, the defendants) has the burden to establish that they are appropriate. n74

n72 JX 298 at Ex. F-2; JX 352 at 31.
n73 Trial Tr. Vol. 2 (Bayston) 261, 168; Def. Consol. Post-Trial. Br. 87.
n74 ONTI, Inc. v. Integra Bank, 751 A.2d 904, 920 (Del. Ch. 1999).

### (a) The 1.7% "Small Firm/Small Stock" Premium

Although plaintiffs contend that there is no basis in the [*71] finance literature or theory for adding a "small firm/small stock" premium to the cost of equity, that is not entirely accurate. There is finance literature supporting the position that stocks of smaller companies are riskier than securities of large ones and, therefore, command a higher expected rate of return in the market. n75 Our case law also recognizes the propriety of a small firm/small stock premium in appropriate circumstances. n76 The issue, therefore, is not whether a small firm/small stock premium is permissible theoretically, but whether the defendants have shown that a premium of 1.7% is appropriate in this particular case. The Court concludes that the defendants have made that showing.

n75 *See* treatises cited in *Onti, supra,* 751 A.2d 920 at n. 71; *see also,* Jay Fishman, et. al, *Guide to Business Valuation,* Vol. 1 at 502.15 (Practitioners Publishing Co., 13th ed., 2003).

n76 *ONTI, supra, Cede & Co. v. JRC Acquisition, C.A. No. 18648, 2004 WL 286963, at * 8 (Del. Ch., Feb. 10, 2004).*

[*72]

Mr. Bayston computed a 1.7% small stock premium by a two step process. First, he determined qualitatively that such a premium was warranted by the size and business of ECM. Second, after reviewing data from the Ibbotson Associates publication, *Stocks, Bonds, Bills and Inflation 1998 Yearbook* ("Ibbotson"), Bayston quantified that premium by subtracting the 11% geometric mean return for large company stocks from the 12.7% mean return for small company stocks. n77

n77 JX 315; Trial Tr. Vol. 2 (Bayston) 263-264.

Plaintiffs do not attack the amount of the premium. Rather, they argue that no small stock/small company premium should have been added at all. They contend that Bayston mechanically and non-qualitatively applied a premium solely because of ECM's size, even though ECM did not fit the typical profile of a "small company." Moreover, plaintiffs argue, recent research data show that contrary to the empirical assumption that implicitly underlies the small stock/small firm premium, small firms have [*73] in fact under performed large firms.

The answer to the plaintiffs' second argument is that although large-cap companies may have outperformed small-cap companies for discrete, short periods of time, over the last 10 (indeed, the last 75) years, the mean returns for small companies have exceeded the returns for large-cap companies. n78 The short answer to the plaintiffs' first argument is that although the favorable characteristics of ECM n79 are reasons not to apply the second ("supersmall firm") premium that Bayston layered atop the 1.7% small stock/small company premium, those characteristics do not justify ignoring the incremental risk, not fully captured by beta, that typically accompanies a small sized firm.

n78 Trial Tr. Vol. 2 (Bayston) 395; JX 315.

n79 Plaintiffs point out that ECM's returns are not volatile, because its principal subsidiary is well-established, lacks competition, has protection against unforeseen events through regulatory relief, and has access to low-cost capital through the RTFC.

[*74]

Accordingly, the Court accepts the 1.7% small stock/small firm premium that Mr. Bayston added to his 9.9% cost of equity, and arrives at a total cost of equity for ECM of 11.6%.

(b) *The 2.4% "Supersmall Firm" And "Hurricane Risk "Premium*

Far more controversial, and less grounded in finance theory and legal precedent, is the additional 2.4% premium added by Bayston to account for what he determined was the incremental risk of ECM being both a "supersmall" firm and also subject to unusually hazardous weather risk, specifically, hurricanes.

Bayston's justification for adding an incremental premium of 1%-1.5% to ECM due to its "supersmall" size occupies less than one page of defendants' 150 page brief. That justification boils down to an assertion that the 1.7% small firm premium reflected only Ibbotson's average premium for small firms, but that Ibbotson contains "more particularized data which permits an assessment of the appropriate premium for a company, such as [ECM] 'which is much smaller . . . than the average companies within the Ibbotson data.'" n80 Other than to assert that that additional adjustment of the discount rate "reflects the reality of investment returns [*75] in such micro-cap companies" n81 the defendants offer no analysis, discussion of specific data, reference to any finance text, or other rationale for their "supersmall" firm premium.

n80 Def's Answering Post-Trial Br. at 87 (citing Trial Tr. Vol. 2 (Bayston) at 271).

n81 *Id.*

Defendants' support for an incremental premium that if accepted would further increase ECM's cost of capital, falls woefully short of the showing that is required. The defendants offer nothing to persuade the Court that ECM's risk profile fits what they contend is the "reality" of investment returns for micro-cap companies. ECM may be small, but it is also a utility that was unusually protected from the hazards of the marketplace. ECM was well established, it had no competition, it was able to

borrow at below-market rates, and it was cushioned by regulators from extraordinary hazards (for example, by tax abatements). Implicit in the defendants' position, but nowhere straightforwardly argued, is the assumption that these [*76] advantages, however extraordinary, were not enough to offset the added risk created by ECM's "supersmall" size. It is the defendant's burden to support that assumption, and they have not done that.

By adding a second incremental premium to ECM's cost of equity to account for the risk of size, Bayston appears to have performed a mechanical exercise, rather than make a nuanced, textured judgment. Accordingly, the Court determines that the defendants have not established a credible justification for their incremental "supersmall" firm premium, and declines to add that premium to the cost-of-equity.

Apart from the "supersmall firm" premium, Bayston also added a company-specific incremental premium for hurricane risk. The effect was to increase the cost of equity by 1-1.5%, to increase the discount rate by a range of .7% to 1.05%, and to decrease enterprise value by $ 18 to $ 24 million (i.e., by $ 1.64 to $ 2.19 per share). Bayston's justification for this incremental premium was that (1) as a result of Hurricane Hugo in 1989 and Hurricane Marilyn in 1995, Vitelco (ATN) suffered losses, not reimbursed by insurance or Universal Service Fund revenues, of approximately $ 80 million; [*77] and (2) ECM's management believed that hurricanes would pose a significant risk to ECM's business in the future, in that future storm losses would not be reimbursable by insurance because (management was informed) coverage would no longer be available.

This analysis is faulty on factual and conceptual grounds. First, it overstates the amount of unreimbursed hurricane damage. That amount, Mr. Heying testified, totaled about $ 55 million for the entire 70 years preceding the merger. n82 Second, defendants' claim that management knew as of the merger date that its hurricane insurance would not continue, relies entirely on Prosser's trial testimony, n83 which is not corroborated by any contemporaneous document and is inconsistent with ECM's SEC filings and RTFC loan documents, none of which indicate any impending loss of hurricane loss coverage. n84 Third, assuming that the risk of future storm losses should be accounted for in some way, the defendants have not supported their argument that the appropriate way to do that is by increasing the cost of equity. Defendants cite no finance literature supporting that approach, nor have they supported their argument empirically, such as (for [*78] example) by comparing ECM's company-specific weather-related risk (net of mitigation factors) to the "average" or "mean" weather-related risk for all companies, or even for all "small" companies.

n82 Trial Tr. Vol. 8 (Heying) at 1513.
n83 Id., Vol. 10 (Prosser) at 1758-59; Defs' Consol. Post-Trial Br. at 93.
n84 See JX 155 at SC4189 (1997 10K); JX 165 at RTFC 2426 (covenanting to maintain storm insurance for two years).

The absence of theoretical and evidentiary support leaves this Court unpersuaded that the risk of unrecoverable hurricane damage loss is so embedded in ECM's business as to require a structural increase in ECM's cost of equity. Absent theoretical and empirical guidance, a more rational approach would be to factor that risk into ECM's cash flow projections such as (for example) by dividing the net hurricane-related loss by a statistically representative number of years to arrive at a loss deduction from projected cash flow for each forecast year. Unfortunately, [*79] neither side performed such a calculation.

The only rational approach that is supported by the record is the plaintiffs' proposal that if the Court finds that the weather-related risk was not appropriately accounted for in Zmijewski's cash flow projections, the Court should reduce Zmijewski's enterprise value calculation by the dollar amount of the estimated effect of the hurricane risk, i.e., by $ 18 to $ 24 million. That suggested approach supplies the frame of reference for the analysis that follows.

The plaintiffs' proposed approach to the weather risk issue raises two questions. The first is whether that risk has already been fully accounted for in Prof. Zmijewski's cash flow projections; if not, the second issue becomes what should be the amount of the resulting deduction from enterprise value. The record shows that the projections were based on historical results, and that they included the insurance premiums. n85 Because (as defense expert Gilbert Matthews conceded) it would not be appropriate to include the cost of insurance coverage in a forecast without taking into the account the benefit of the protection provided by that insurance, n86 the only loss that should be [*80] accounted for is the hurricane-related loss that was not reimbursed by insurance. Although the plaintiffs argue that that loss was implicitly included in Prof. Zmijewski's forecast, the Court has found no evidence to support that assertion. The Court is, therefore, unable to conclude that Professor Zmijewski factored those unreimbursed losses into his cash flow forecast.

n85 Trial Tr. Vol. 8 (Heying) at 1460-62.
n86 *Id.*, Vol. 6 (Matthews) at 1073.

Accordingly, it is appropriate (as plaintiffs concede) to deduct the dollar value effect of those losses from enterprise value. The question becomes: what amount should be deducted? The possibilities range from $ 18 to $ 24 million. Because the defendants overstated the magnitude of the unreimbursed losses caused by hurricane damage, the Court finds that an appropriately conservative deduction would be at the low end of the range, *i.e.*, $ 18 million or $ 1.64 per share.

To summarize, the Court determines that the correct cost of equity for [*81] ECM at the merger date was 11.6% (Bayston's initial 9.9% plus a 1.7% small firm/small stock premium). That cost of equity figure does not include a premium for hurricane damage risk. That risk shall be accounted for by deducting $ 18 million ($ 1.64 per share) from the enterprise value calculated (independent of that risk) with the DCF inputs as determined in this Opinion. The result will be to reduce the enterprise value by that $ 18 million ($ 1.64 per share) amount.

* * * *

For the reasons previously discussed, the Court cannot accept in its entirety the DCF valuation of either side's expert. Although the Court accepts the plaintiffs' position that the projected cash flows and terminal value should be derived from the June projections, it has determined independently the disputed elements of the WACC and CAPM formulas from which the discount rate is computed. Based upon the Court's findings, the appropriate discount rate is determined to be 8.69%, and the fair value of ECM as of the merger date is determined to be $ 38.05 per share. n87

n87 The $ 38.05 fair value represents the difference between the value of $ 39.69 per share and the $ 1.64 per share hurricane loss adjustment. The $ 39.69 per share value, as well as the 8.69% discount rate, were computed by all counsel at the request of the Court. *(See* letter dated March 17, 2004 from the Court to all counsel.) In its letter the Court asked counsel to compute the discount rate and the resulting fair value, based upon the DCF inputs determined in this Opinion. On April 2, 2004, Mr. Allingham responded to the Court on behalf of all counsel, setting forth the manner in which the $ 39.69 per share value was arrived at. (Letter dated Apr. 2, 2004 from Thomas J. Al-

lingham, II, Esquire, to the Court). In that letter, counsel identified one additional variable that the Court would be required to determine: ECM's assumed growth rate. As disclosed in counsel's April 2, 2004 letter, the parties' different growth rate assumptions yielded a matrix of values ranging from $ 39.69 to $ 40.88 per share. Deciding to err on the side of conservatism, the Court selected the lowest value within that range -- $ 39.69 per share -- from which $ 1.64 per share was deducted to arrive at the ultimate adjudicated fair value for ECM of $ 38.05 per share.

[*82]

C. What Weight Should Be Accorded To ECM's Market Price As Evidence Of Fair Value?

To support their claim that the fair value of ECM on the merger date was no more than $ 10.38 per share, the defendants urge that "where, as here, the market for a publicly traded security is an active and efficient one, the market price [of ECM's common stock] is, at the least, important corroborative evidence of value . . ." n88 For that argument, the defendants rely upon the expert testimony of Professor Burton Malkiel of Princeton University. Professor Malkiel opined that ECM's stock "was trade[d] in an efficient market with enough volume and a low enough bid-asked spread, and that it reflected news without delay; and these . . . indicators led [Prof. Malkiel] to conclude that ECM was traded in an efficient market and that the [$ 7.00 per share] market price of ECM common stock prior to the buyout . . . was a reasonable reflection of its value." n89 Intending no disrespect to Professor Malkiel, the Court is unable to accept his conclusion in this specific case. However sound Professor Malkiel's market price-based theory may be in other circumstances, that theory is inapplicable to these [*83] facts because its premise is not supported by either the trial record or Delaware law.

n88 Defs. Consol. Ans. Post-Trial Br. at 105.
n89 Trial Tr. Vol. 9 (Malkiel) at 1597-1598.

Delaware law recognizes that, although market price should be considered in an appraisal, the market price of shares is not always indicative of fair value. n90 Our appraisal cases so confirm. n91

n90 *Cede & Co. v. Technicolor, Inc., 684 A.2d 289, 301 (Del. 1996)* (the "market price of shares may not be representative of true value.").

n91 *See, e.g., Harris v. Rapid-American Corp., C.A. No. 6462, 1992 WL 69614*, at * 1, * 4. (Del. Ch. Apr. 6, 1992) ($ 28 merger price, representing a 28% premium over unaffected trading price, was barely one-third of adjudicated fair value of $ 73.29); *In re Shell Oil Co., 1990 Del. Ch. LEXIS 199, C.A. No. 8080, 1990 WL 201390*, at * 14-15, * 38 (Del. Ch. Dec. 11, 1990), *aff'd, 607 A.2d 1213 (Del. 1992)* (market price $ 44, adjudicated fair value $ 71.20).

[*84]

Moreover, the record undermines any assertion that ECM's common stock was traded in an efficient market. Indeed, it was precisely because ECM's stock market price did not reflect ECM's underlying values that Prosser decided to abandon the proposed merger and instead acquire the ECM minority interest in the Privatization. Prosser himself told his fellow ECM directors that the ECM stock price had failed to reach the desired appreciation as a result of the small public float and the fact that the stock was not being followed by Wall Street analysts. n92 Moreover, because Prosser always owned the majority interest, the market price of ECM stock always reflected a minority discount. n93

n92 *See note 7, supra.*

n93 Trial Tr. Vol. 1 (Zmijewski) at 95-96; Finger Dep. (Jan. 11, 2000) at 143-144.

Professor Malkiel admitted that markets occasionally make errors, that the market could have been wrong about ECM, and that it is possible for a stock that trades even in an efficient market to be mispriced, [*85] especially in the short run. n94 Professor Malkiel also conceded that the market may be inefficient if material information is withheld from it. n95 In the case of ECM, while the stock was trading freely, *(i.e., before Prosser announced the Privatization)*, the market never had the benefit of any disclosed earnings or projections of future results, including the June Projections. n96

n94 Trial Tr. Vol. 9 (Malkiel) at 1651-52, 1665-66, 1676-79. In this case, ECM stock traded publicly for only five months.

n95 *Id.* at 1633.

n96 Trial Tr. Vol. 1 (Zmijewski) at 93-94, 158-159.

For these reasons, the Court rejects the defendants' argument that the market price of ECM stock corroborates the $ 10.25 price as the fair or intrinsic value of ECM on the date of the merger. In this case, ECM's unaffected stock market price merits little or no weight.

D. The Corporate Opportunity Claims

The plaintiffs contend that to the value of ECM as determined by the DCF method, there should be [*86] added an additional $ 3.79 per share, representing the combined value of the Caribbean Cable Companies n97 and the Daily News. Those companies, which ICC (wholly owned by Prosser) acquired on December 30, 1997, are claimed to have been corporate opportunities of ECM that Prosser wrongfully usurped. The plaintiffs urge that Prosser had a fiduciary duty to make those opportunities available to ECM, and that consequently, ECM's minority shareholders were entitled to share in the value of those opportunities on the merger date.

n97 The Caribbean Cable Companies were BVI Cable TV, St. Croix Cable TV, Inc., St. Thomas-St. John Cable TV and St. Maarten Cable TV.

The Court cannot agree, because ECM did not come into existence until December 30, 1997, long after Prosser had had signed definitive purchase agreements on June 9, 1997 to acquire personally three of the Cable Companies, and an agreement to acquire the fourth Cable Company on September 8, 1997. n98 Because ECM did not exist, and therefore had no public [*87] shareholders at the time Prosser signed those agreements, Prosser was not a fiduciary, and could not have owed any fiduciary duties to ECM. n99

n98 Pretrial Order, Ps 81, 95.

n99 *See Anadarko Pet. Corp. v. Panhandle East. Corp., 521 A.2d 624, 628 (Del. Ch. 1987)* (holding that a parent corporation owes no fiduciary duty to its wholly-owned subsidiary, and that no fiduciary duty arose until the subsidiary had outside stockholders).

If the Cable Companies and the Daily News were corporate opportunities, they were opportunities of ATN,

which owned all the assets later allocated to Messrs. Prior and Prosser in the Split Off. In an Indemnity Agreement entered into among Prosser, Prior, and ATN as part of the Split Off, ATN and Prior relinquished any rights they had to such a claim. In that Agreement, ATN and Prior covenanted "not to bring any action suit or proceeding against Prosser or ECI with respect to any of the matters . . . relating to the business, operations or management [*88] of [ATN] or any of its Subsidiaries prior to and including the Closing." n100

n100 JX 22 at ECI 0857, § 3.01 (b). The Indemnity Agreement was one of the terms of the Split Off that was disclosed to, and approved by, ATN stockholders. JX 22.

In short, ECM had no corporate opportunity claim because ECM did not exist at the time the opportunities arose and were taken. If a corporate opportunity claim existed, it belonged to ATN, which relinquished that claim in connection with the Split Off. Accordingly, the corporate opportunity claims cannot form any part of ECM's fair value as of the merger date.

E. The Fair Value Of ECM And The Unfairness Of The Merger Price

As a consequence of the foregoing determinations, the fair value of ECM on the merger date is found to be $ 416,996,000, or $ 38.05 per share. n101 Under 8 Del. C. § 262, Greenlight, as the single appraisal claimant, is entitled to recover that per share amount, multiplied by the 750,300 shares for which it [*89] seeks appraisal, plus interest as determined in Part III F, infra, of this Opinion.

n101 The fair value of $ 416,996,000 ($ 38.05 per share) is equal to the discounted cash flow valuation of ECM that results from the DFC inputs determined in this Opinion ($ 434,996,000, or $ 39.69 per share) less $ 18 million ($ 1.64 per share), which represents the hurricane losses not reimbursed by insurance. See Apr. 2, 2004 Letter from Thomas J. Allingham, II, Esquire, to the Court, discussed in note 87, supra.

From that fair value finding it further follows that the $ 10.25 per share merger price was not a "fair price" within the meaning of the Delaware fiduciary duty case law beginning with Weinberger v. UOP, Inc. n102 Al-

though that, without more, is dispositive, the unfairness of the merger price rests upon more than that one bit of simple deductive logic. The overwhelming weight of the credible evidence of record also compels that conclusion.

n102 457 A.2d 701 (Del. 1983).

[*90]

The only competent evidence that the merger price was fair was the fairness opinion that Houlihan furnished to the Second Special Committee, and the testimony of Mr. Bayston in support of the fairness opinion rendered by his firm, Duff & Phelps. But whatever evidentiary force Houlihan's opinion might have had was totally undermined by the fact that (i) Houlihan never had the benefit of the June projections, and (ii) the defendants never called Houlihan, upon whose valuation the Special Committee and the board relied, to testify at trial in support of its valuation conclusion. The defendants have never explained their failure to do that. For these reasons, and because it was within the defendant's power to call Houlihan as a witness, n103 the only logical inference - and the inference this Court has drawn -- is that Houlihan's testimony would have been unfavorable to the defendant's position. n104 The RTFC's approximately $ 28 per share valuation of ECM -- which is credible because the RTFC relied on it in deciding to extend to Prosser a multimillion dollar loan to finance the Privatization -- was almost thrice the magnitude of the $ 10.25 per share value that Houlihan was willing [*91] to pronounce as fair. And even Duff & Phelps, the defendants' trial valuation expert, was apparently unable to opine that $ 10.25 per share was fair: that firm valued ECM at not less than $ 10.38 per share.

n103 The defendants do not contend that Houlihan was unavailable to testify.
n104 Demby v. State, 744 A.2d 976, 978-979 (Del. 2000) (citing Wheatley v. State, 465 A.2d 1110 (Del. 1983)).

The several infirmities that led the Court to reject the Duff & Phelps valuation have been discussed and need not be repeated here. One additional infirmity merits discussion, however, and that is Mr. Bayston's use of impermissible post-merger data in arriving at some of his conclusions. In his deposition Mr. Bayston conceded that he had relied on post-merger evidence in preparing his projections, including his CapEx assumptions:

2004 Del. Ch. LEXIS 70, *

Q. So that in making your assessment about the best estimate of the costs of the company going forward, you examined and took into account [*92] the company's cost experience in the period between the appraisal date and the date of the preparation of your report?

A. That's correct. n105

****

Q. Now, in formulating your more aggressive assumption for capital expenditures, did you take into account the company's capital expenditures experienced between the appraisal date and the date when you prepared your report?

A. I believe we looked at that issue. n106

n105 Bayston Dep. 286-87.
n106 Id. at 293.

Although at trial Bayston claimed that he misspoke on his deposition, n107 that recantation is not credible because if in fact Bayston misspoke, he did so repeatedly over the course of many deposition pages. Moreover, Bayston had extensive litigation-related contact with ECM's management, n108 which would have made it extremely difficult to avoid incorporating post-merger evidence in his valuation.

n107 Trial Tr. Vol. 1 (Bayston) 209, Vol. 2 (Bayston) 320, 323, 329.
[*93]

n108 Trial. Tr. Vol. 2 (Bayston) 252-253, 328-329 (discussions about capital expenditures); 333-334 (discussing extensive conversations with ECM management.)

Striving to portray Mr. Bayston's contacts with management as a strength, the defendants criticize Prof. Zmijewski for "not even attempt[ing] to talk to [ECM]

management in connection with his analysis." n109 But Prof. Zmijewski cannot fairly be faulted for doing what litigation experts in the valuation area customarily do: conducting careful due diligence using the sworn testimony and contemporaneous discovery record. What Zmijewski did not do in valuing ECM was to rely upon unsworn, post-merger conversations with management. Nor did Prof. Zmijewski rely upon post-merger data to determine the inputs on which his DCF analysis depended.

n109 Def. Consol. Ans. Post-trial Br. at 52.

F. Interest

Once the fair value of the dissenting shareholders' [*94] shares is ascertained, our appraisal statute requires the Court to determine "the fair rate of interest, if any" after considering "all relevant factors." n110 The interest may be simple or compound, and this Court has broad discretion to determine whether interest should be simple or compound, but the Court must explain its choice. n111 As the Chancellor recently stated in *Cede & Co. v. JRC Acquisition:*

This Court's decision in *Gonsalves v. Straight Arrow Publishers, Inc.* is an accepted method for determining the rate of interest in appraisal actions. *Gonsalves* rests on the principle that an interest award should serve two purposes. First, it should disgorge the respondent of any benefit it received from the use of the petitioner's funds. Second, the interest award should compensate the petitioner for the loss of the use of its money. The second purpose, however, is countenanced with the understanding that the election to 'reject the merger and to pursue appraisal does not shift to the corporation all responsibility for losses [the petitioner] may incur as a result of [its] inability to use the funds retained by the corporation' and that the petitioner can [*95] mitigate its losses and obtain perfect 'compensation for the loss of the use of their funds by borrowing the fair value of their shares.' *Gonsalves,* and several other decisions, have found that these twin purposes are served by

awarding interest by weighing equally the respondent's actual costs of borrowing and based upon an objective prudent investor standard, the petitioner's opportunity cost." n112

n110 *8 Del. C. § 262(h).*

n111 *8 Del. C. § 262(i); M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d at 527. Gonsalves v. Straight Arrow Publishers, Inc., 1999 Del. LEXIS 7, 725 A.2d 442 (Table), 1999 WL 87280 at * 4 (Del., Feb. 25, 1999).*

n112 *Cede & Co. v. JRC Acquisition, Corp., No. 18648, 2004 WL 286963, at * 12 (Del. Ch. Feb. 10, 2004) (internal citations omitted).*

Greenlight claims that it is entitled to an interest award of 22%, compounded daily, from the merger date. To further the [*96] compensatory purpose of the interest award, Greenlight argues, the Court should use Greenlight's actual rate of return on its invested capital – 37% – for the period beginning October 1, 1998. Because 37% is what Greenlight claims it would have earned on its appraisal award had that award been paid on the merger date, only that rate would restore Greenlight to the financial position it would have had if the merger price were entirely fair. To further the restitutionary purpose of an interest award, Greenlight urges the Court to use the interest rate that ECM pays to short term, unsecured creditors (a category that includes Greenlight in this appraisal). Since the date of the merger, that rate has been 7%. Weighting both rates equally, Greenlight arrives at a rate of 22% which, Greenlight urges, should be compounded daily.

The defendants insist that Greenlight is entitled to simple interest at 5.24%, or at most, interest at that rate compounded no more frequently than monthly. Although the defendants agree that the "restitutionary purpose of awarding interest is typically addressed by basing one half of the interest award on the corporation's cost of borrowing," n113 they contend [*97] that as of September 30, 1998, ECM's weighted average interest rate on its $ 190.4 million of debt was 6.59%.

n113 Defs' Consol. Post-Trial Br. at 110. *See Gilbert v. M.P.M Enters., Inc., 709 A.2d 663, 674 (Del. Ch., 1997); aff'd, 731 A.2d 790 (Del. 1999) and Chang's Holdings, S.A. v. Universal Chems. And Coatings, Inc., 1994 Del. Ch. LEXIS 222,*

*No. 16856, 1994 WL 681091, at * 2 (Del. Ch. Nov. 22, 1994).*

As for the compensatory purpose of an interest award, the defendants claim that because this Court has historically applied an objective "prudent investor" standard, *(viz.,* what a prudent investor would have achieved if it had invested the proceeds at the date of the merger) Greenlight's subjective claimed 37% return on its investments is irrelevant as a matter of law. In this case, the prudent investor rate, as determined by Mr. Bayston who relied on the mix of investments specified by Delaware case law, implied an interest rate of 5.54% as of the date of the Duff & Phelps [*98] report, and 3.88% as of the date of trial. Because both sides agree that borrowing costs and compensatory measures should be weighed equally, the appropriate rate of interest is 5.24% [(6.59% + 3.88%) / 2]. Finally, defendants argue, Greenlight cites no authority for its request that interest be compounded daily. Defendants urge that the interest award should be either simple interest or, if interest is compounded, the compounding should be no more frequent than monthly, consistent with the case law. n114

n114 *See ONTI, Inc. v. Integra Bank, 751 A.2d at 927-29 (interest compounded monthly); Hintmann v. Fred Weber, Inc., 1998 Del. Ch. LEXIS 26, 1998 WL 83052 (Del. Ch. Feb. 17, 1998) (same); Grimes v. Vitalink Communications Corp., 1997 Del. Ch. LEXIS 124, No. 12334, 1997 WL 538676, at * 13 (Del. Ch. Aug. 28, 1997).*

These colliding contentions generate four issues: (1) what was ECM's cost of borrowing, (2) what was Greenlight's opportunity cost, (3) based on those inputs, what is the appropriate rate [*99] of interest, and (4) should the form of the award be simple or compound interest, and if interest is compounded, over what interval? These issues are now addressed.

Although defendants argue that 6.59% was ECM's cost of borrowing, as Greenlight points out, that represents ECM's average, not its marginal, cost of short term unsecured debt, which was 7%. n115 According the Court finds that ECM's cost of borrowing was 7%.

n115 JX 235 at 26, Ex. 2B.

As for Greenlight's opportunity cost, *JRC Acquisition* and *Gonsalves* establish that that cost is to be determined on the basis of an objective "prudent investor" standard, not Greenlight's subjective claimed 37% investment return. The defendants argue that the prudent investor rate of return was 5.54% as of the date Duff & Phelps submitted its report and 3.88% at the time of the trial. Greenlight does not propose any alternative "prudent investor" rate of return. To err on the conservative side, the Court adopts 5.54% as the prudent investor rate of return. [*100]

The Delaware cases require that the interest rate be determined by weighting the cost of borrowing and the prudent investor rate of return equally. On that basis, the appropriate rate of interest on the appraisal award is determined to be 6.27%, running from the date of the Privatization merger." n116

n116 Computed as follows: 7.00% + 5.54% / 2 = 6.27%.

The final issue relating to interest is whether the interest should be simple or compound and if compounded, over what interval. Greenlight cites no authority or evidence that daily compounding is appropriate in this case. But, Greenlight, which is in the business of investing money, has nonetheless satisfied the Court that it would have been able to earn interest on its appraisal award on a compound basis. Moreover, the Court finds, as did the Chancellor in *JRC Acquisition*, that "the dual purpose of compensation and restitution may only be served by a compounding interval at least as frequent as one month." n117

n117 *JRC Acquisition, supra,* at * 15 (quoting *Grimes v. Vitalink Communications Corp., supra.,* 1997 WL 538676 at * 11). The defendants also concede that if interest is to be compounded, that the compounding be at one month intervals.

[*101]

Accordingly, interest on Greenlight's appraisal award shall be at the rate of 6.27%, compounded monthly, from the date of the merger to the date of judgment.

## IV. WAS THE TRANSACTION THE PRODUCT OF FAIR DEALING?

### A. Threshold Issues

An entire fairness analysis normally requires the Court to decide, in addition to whether the price paid in an interested merger was "fair," whether the merger was the product of "fair dealing." This case, however, raises three issues that must be confronted at the threshold. The first is whether this Court's determination that the merger price was not fair makes it unnecessary to engage in a "fair dealing" analysis. The Court concludes that a fair dealing analysis is required. The second issue is whether the plaintiffs are barred from asserting their fiduciary duty claims. The Court finds that they are not. The third issue is which side has the burden of proof. The Court determines that the burden falls upon the defendants. What follows is the basis for the Court's rulings on these threshold issues.

### 1. Is A Fair Dealing Analysis Required?

In this case, this Court's determination of ECM's "fair value" disposes of both Greenlight's appraisal action [*102] and the "fair price" aspect of the plaintiffs' fiduciary duty claim. The determination that price is not fair raises a preliminary, threshold question of whether in this case any "fair dealing" analysis need be undertaken at all. It is arguable that where (as here) the merger price is found to be unfair, it would be difficult, if not impossible, for the merger to be found "entirely fair" even if the process leading up to the merger involved fair dealing. n118 That supposition, if correct, would lead to the result that where the merger price is found not to be fair, that finding establishes, *ipso facto,* the unfairness of the merger, thereby obviating the need for any analysis of the process oriented issues. The Supreme Court has not yet addressed that question, however.

n118 *See Cinerama, Inc. v. Technicolor. Inc., 663 A.2d 1134, 1140 (Del. Ch. 1994), aff'd, 663 A.2d 1156 (Del. 1995)* ("Plainly in a cash-out merger, price is a dominant concern, most especially where the buyer already has voting control of the enterprise, such as a parent-sub merger.").

[*103]

What the Supreme Court has decided is that where an interested merger is found to be unfair and the corporation's charter has a *Section 102(b)(7)* exculpatory provision, this Court must then proceed to "identify the breach or breaches of fiduciary duty upon which liability [for damages] will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established." n119 That is, "when entire fairness is the applicable standard of judicial review, a determination that the director defendants are exculpated from paying monetary

damages can be made only *after the basis* for their liability has been decided." n120

n119 *Emerald Partners v. Berlin, 787 A.2d at 94* (quoting *Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1165 & n.16 (Del. 1995)).*
n120 *Id.* (emphasis in original).

That mandate, I find, is applicable here. In this case the defendants have raised a § 102(b)(7) exculpatory defense. In determining that [*104] the merger price was not fair, this Court did not address whether the unfairness was the product of a breach of fiduciary duty or if so, the nature or character of that duty. Accordingly, a "fair dealing" analysis is required in this case, if only to enable the Court to determine the "basis for the [defendants'] liability" for § 102(b)(7) exculpation purposes.

2. The "No Standing" Affirmative Defense

The defendants have interposed the affirmative defense that the plaintiffs lack standing to assert any fiduciary duty claims. That defense comes in two parts. First, the defendants concede that Greenlight has standing to assert fiduciary claims on behalf of the 750,300 ECM shares that it owns outright. The defendants argue, however, that Greenlight lacks standing to assert any claims on behalf of the former holders of 2,026,685 shares that sold to Greenlight their "litigation rights" to assert the fiduciary claims associated with those shares. n121 Second, the defendants claim that no former shareholders of ECM can recover anything in respect of any shares that they tendered into the tender offer or voted in favor of the merger. Neither argument, in this Court's view, withstands [*105] scrutiny.

n121 The assignments of litigation rights to Greenlight are found in the record at JX9.

(a) *The Litigation Rights Validity Issue*

The plaintiffs contend that Greenlight lacks standing to assert any claims based upon the assigned "litigation rights," because: (1) unliquidated fiduciary claims are not assignable as a matter of Delaware law and public policy, and (2) Greenlight purchased the litigation rights in violation of the parties' Confidentiality Stipulation in the appraisal action. Moreover (argue defendants), (3) if the assignments were invalidated, the litigation rights would not revert back to the assignors, *i.e.*, to the plaintiff class, because by selling these claims those stockholders

waived their right to assert their fiduciary claims and must therefore be excluded from the class.

Assuming without deciding that the defendants can be heard to challenge the validity of the assignments, n122 it is established Delaware law that choses in action that survive the death of the [*106] victim are validly assignable. n123 In this case, the choses in action are breach of fiduciary duty and fraud claims. Those claims survive to (or against) a personal representative under *10 Del. C. § 3701.* n124 For purposes of determining which claims are assignable and which are not, Delaware law does not distinguish between claims that are liquidated and those that are unliquidated.

n122 There is authority holding that only a party to the assignment can contest its validity *See Wagner v. United States, 573 F.2d 447 (7th Cir. 1978); Gamble v. Stevenson, 305 S.C. 104, 406 S.E.2d 350, 353 (S.C. 1991); 6A C.J.S. Assignments § 71 (1975).*
n123 *Industrial Trust Co. v. Stidham, 42 Del. 339, 3 Terry 339, 33 A.2d 159, 160-61 (Del. 1942); Garford Motor Truck Co. v. Buckson, 34 Del. 103, 4 W.W. Harr. 103, 143 A. 410, 411 (Del. Super. Ct. 1927).*
n124 *Section 3701* provides:

All causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive to and against the executors or administrators of the person to, or against whom, the cause of action accrued. . . .
All actions, so surviving, may be instituted or prosecuted by or against the executors or administrators of the person to or against whom the cause of action accrued.

[*107]

Nor is there any basis for the defendants to argue that the assignments must be deemed invalid on public policy grounds because they are champertous. The short answer is that they are not champertous. Champerty requires "an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense." n125 Greenlight's purchase of the litigation rights was

not champertous, because Greenlight has always been involved in the litigation. Greenlight was a shareholder when the Privatization was announced; Greenlight was a member of the shareholder class and always had the right--and standing--to pursue an individual fiduciary duty remedy simultaneously with its appraisal action. Champerty cannot be charged against one with an interest in the matter in controversy. n126

n125 *Gibson v. Gillespie, 152 A. 589, 593 (Del. Super. Ct. 1928); see also Compaq Computer Corp. v. Horton, 631 A.2d 1, 5, n.1 (Del. 1993).*
n126 *Cede & Co. v. Technicolor, Inc., 542 A.2d 1182 (Del. 1988).*

[*108]

The defendants next urge that Greenlight should be denied standing to sue because it purchased the litigation rights in violation of Paragraph 2 of the Confidentiality Stipulation, which provides that:

Discovery Material shall be used solely for purposes of this litigation, and shall not be used for any other purpose, including, without limitation, any business or commercial purpose, provided, however, that Discovery Material may be used in connection with any litigation among the parties relating to the merger between [ECM] and [ICC] . . . effective as of October 19, 1998. n127

n127 D.I. 19 in Appraisal Action, Par. 2.

Specifically, the defendants contend that Greenlight "used" confidential Discovery Material to purchase the litigation rights in violation of the quoted paragraph. Although Greenlight did possess confidential information, the defendants have not shown that Greenlight used that information in acquiring the litigation rights. Even if Greenlight did use Discovery Material, [*109] the defendants have not established that such use was prohibited by the Confidentiality Stipulation, which permitted Discovery Material to be used in both the Appraisal Action ("this litigation") and in "any litigation relating to the Merger" (*i.e.,* the fiduciary duty action challenging that Merger). Nor have the defendants shown that Greenlight disclosed confidential Discovery Material

publicly in the marketplace, or otherwise failed to abide by the Confidentiality Stipulation terms.

Finally, the defendants have suffered no prejudice as a result of the assignment of the litigation rights, because those rights belonged to the members of the class. Absent an assignment, the defendants would have had to defend against those claims asserted on behalf of the class in any event. Thus, the defendants can hardly claim cognizable prejudice as a result of the assignment of those same claims to one member of the class that elected to sue individually. n128

n128 Stated another way, if the Court granted defendants the relief they seek, the assignments would be void and the right to recover would revert to the class. A failed assignment of claims does not (as defendants assert without support), *constitute a waiver* of those claims. The defendants would still pay the same amount in damages; there would simply be a different name on the check. Not allowing the class member-assignors to recover would give the defendants a windfall for no valid factual or legal reason.

[*110]

(b) *The Waiver Issue*

The defendants next urge that members of the ECM shareholder class who tendered into the first step tender offer, or who voted for the Privatization merger, waived their right to challenge the fairness of that transaction. This argument is flawed, because it presupposes that the shareholders who tendered or voted made a fully informed decision based on full disclosure. As found elsewhere in this Opinion, that is not the case, because the defendants violated their duty of disclosure to the stockholders of ECM in several respects. On that basis alone the defendants' argument must be rejected. n129

n129 *Bershad v. Curtiss-Wright Corp., 535 A.2d 840 (Del. 1987)* (acquiescence requires an informed act). For that same reason, the Court rejects the defendants' argument that the Class members who accepted the benefits of the merger must be deemed to have acquiesced in the merger. As Vice Chancellor Strine held in *Clements v. Rogers, 790 A.2d 1222 (Del. Ch. 2001),* a plaintiff who accepts the merger consideration could not have acquiesced where she knew some, but not all of the material facts. The

predicament in which Class of former ECM shareholders found themselves was indistinguishable from *Clements.*

[*111]

### (c) *The Burden of Proof Issue*

The final threshold issue is which side has the burden of proof. Both sides agree that because the Privatization is a self-dealing transaction of which the majority stockholder stands on both sides, entire fairness is the standard of review *ab initio.* n130 The only question is whether the burden of proof, which normally falls upon the defendants, has shifted to the plaintiffs in this particular case.

---

n130 *Emerald Partners v. Berlin, supra, 787 A.2d at 92, 97.*

---

The defendants argue that the burden of establishing that the merger was not entirely fair has shifted to the plaintiffs, because the merger was approved by both an informed independent committee of disinterested directors and an informed majority of minority stockholders. n131 The short answer is that the merger was not approved by a committee of independent directors who were properly informed or independent of Prosser, nor was it approved by an informed vote of a majority of ECM's minority [*112] stockholders.

---

n131 *Kahn v. Lynch Communications Sys., Inc., 638 A.2d 1110, 1117 (Del. 1994).*

---

In an entire fairness context, where the predicate for a burden-shifting argument is that the merger was negotiated by a special committee, the defendants must establish to the satisfaction of a carefully scrutinizing court, that the special committee was "fully informed." n132 As discussed more fully elsewhere in this Opinion, the Special Committee and a majority of ECM's minority shareholders voted to approve the merger, but their votes were not fully informed. A highly material fact was not disclosed either to the Special Committee or to the minority stockholders, namely, that the most recent projections -- the June projections -- had been provided to Prosser and his financial advisor (Prudential) and his lender (RTFC) but not to the Special Committee. Members of the Special Committee testified that they and Houlihan should have been provided with the June Projections. n133

Moreover, the June [*113] Projections were not disclosed in the proxy statement, and the proxy disclosures relating to that issue falsely and misleadingly suggested that the shareholders were being provided with all of the projections to which Prosser and his advisers had been privy. The portion of the proxy statement that contained the March projections (identified therein only as Company projections) stated:

> Although the Company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LCC], the purchaser [ICC] is making these projections available to all stockholders. n134

---

n132 *Id. at 1120.*

n133 Trial Tr. Vol. 7 (Vondras) 1296, 1351-52; Vol. 4 (Goodwin) 751; Vol. 5 (Goodwin) 929-30. Mr. Vondras testified that the Special Committee "was deprived of information that [he] would have considered important in [his] assessment of . . . Prosser's offer" and that the Committee and Houlihan "...should have had the most current data, and it would have used that in their analysis. Would it change the...numbers? May or may not have. I don't know, but they should have had that data." Trial Tr. Vol. 7 (Vondras) 1351-52.

[*114]

---

n134 JX 155 at SC4128.

---

As more fully discussed *infra*, the proxy statement and the tender offer documents omitted to disclose other material facts as well. The material omission relating to the June Projections, however, is sufficient, in and of itself, to undermine the informed character of the Special Committee approval that is a predicate to shifting the burden of proof in an entire fairness case.

The defendants argue that the burden must shift, nonetheless, because the minimum tender condition, *i.e.*, the condition that a majority of the minority shareholders tender into the offer, was the functional equivalent of a shareholder ratification of the transaction. But no Delaware case has held that burden-shifting can be accomplished by a tender of shares rather than by an actual vote. Nor should a tender be treated as the equivalent of an informed vote. Shareholders cannot be deemed to

have ratified board action unless they are afforded the opportunity to express their approval of the precise conduct being challenged. n135 Stockholders have materially different interests at stake [*115] when tendering, as opposed to voting their shares. In considering whether to tender, stockholders must evaluate the risk of being left worse off, *i.e.*, left vulnerable to being frozen out at an even lower price, if the other stockholders were to tender into an inadequate offer. As Vice Chancellor Strine incisively observed in *In re Pure Resources S'holders Litig:*

> Indeed, many commentators would argue that the tender offer form is more coercive than a merger vote. In a merger vote, stockholders can vote no and still receive the transactional consideration if the merger prevails. In a tender offer, however, a non- tendering shareholder faces an uncertain fate. That stockholder could be one of the few who holds out, leaving herself in an even more thinly traded stock with little hope of liquidity and subject to a § 253 merger at a lower price or at the same price or...at a later (and, given the time value of money, a less valuable) time. n136

n135 *In re Santa Fe Pac. S'holders Litig.,* 669 A.2d 59, 69 (Del. 1995); see also, In re Cencom Cable Income Partners, L.P., 2000 Del. Ch. LEXIS 90, No. 14634, 2000 WL 640676, at * 5 (Del. Ch. May 5, 2000) ("Ratification can effectively occur only where the specific transaction is clearly delineated to the investor whose approval is sought and that approval has been put to a vote.").

**[*116]**

n136 *808 A.2d 421,* 442-43 (Del. Ch. 2002), appeal refused, 2002 Del. LEXIS 630 (Del. 2002) (footnotes omitted).

Accordingly, the burden of proving fair dealing remains with the defendants.

The preliminary issues having been decided, the Court turns next to the substantive fair dealing questions.

**B. Fair Dealing Analyzed**

A fair dealing analysis requires the Court to address "issues of when the transaction was timed, how it was initiated, structured, negotiated, and disclosed to the board, and how director and shareholder approval was obtained." n137

n137 *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 937 (Del. 1985).*

**1. Timing, Initiation and Structure**

Our courts have recognized that a freeze-out merger of the minority proposed by the majority stockholder is inherently coercive. n138 Where, as here, the freeze-out merger is initiated by the majority stockholder, that [*117] fact, even though not dispositive, is evidence of unfair dealing.

n138 *See In re Pure Resources, Inc. S'holders Litig, supra, 808 A.2d at 436; Kahn v. Lynch Communication Systems, Inc., supra, 638 A.2d at 1116.*

Another circumstance that evidences the absence of fair dealing is where the transaction is timed in a manner that is financially disadvantageous to the stockholders and that enables the majority stockholder to gain correspondingly. n139 This case is the diametric opposite of *Jedwab v. MGM Grand Hotels, Inc.,* where this Court found that the timing of a merger was not unfair because there was no "persuasive indication . . . that from the minority's point of view this [was] a particularly poor time to liquidate their investment." n140 Here, the evidence of unfair timing could not be more persuasive. Prosser's initial proposal was to merge Innovative into a wholly owned subsidiary of ECM. That would have benefited ECM stockholders and enabled them to remain as investors [*118] in a larger merged company. Because ECM's stock price was depressed, Prosser abandoned that proposal at the eleventh hour and "flipped" the deal for his sole personal benefit to take advantage of the temporarily and artificially depressed stock price. That stock price then became the "floor" for the equally depressed and unfair Privatization price, and benefited Prosser to the same extent that it disadvantaged the minority stockholders who were now being squeezed out of the enterprise.

n139 *509 A.2d 584 (Del. Ch. 1986).*

n140 *Id.* at 598.

In addition to, and apart, from the unfairness of its initiation and timing, the transaction was also unfairly structured, in that Prudential and Cahill, the firms that had been retained as advisors to ECM in the initially Proposed (but later abandoned) Merger, were co-opted by Prosser to serve as his advisors. That switch was unfair to ECM, because during ECM's entire existence, Prudential and Cahill had been its advisers and they possessed [*119] material nonpublic information about ECM's values, business and prospects. As such, Prudential and Cahill were in the best position to represent the interests of the ECM minority. Those same advisers were now switching sides to represent interests that were adverse to that same minority.

At a minimum, ECM's board (including Prosser) or the Special Committee should have insisted that Prudential and Cahill remain as advisors to ECM, and that Prosser retain other financial and legal advisors. Failing that, the board - or at the very least the Special Committee - should have insisted that Prudential and Cahill recuse themselves from the negotiations. By doing neither, ECM was deprived of the advantage of knowledgeable advisors. That advantage was conferred upon ECM's controlling stockholder and to-be-adversary in the transaction - Prosser. There is no evidence that either the full board or the Special Committee ever considered that issue.

2. The Adequacy of the Minority Shareholders' Representation

(a) *The Independence Of The Board And Of The Special Committee*

A critical aspect of any fair dealing analysis is the adequacy of the representation of the minority stockholders' [*120] interests. In this case, that issue is particularly critical, because a majority of the ECM board members were not independent of Prosser, making it necessary to appoint a Special Committee to negotiate on the minority stockholders' behalf. Unfortunately, a majority of the Special Committee members also lacked independence, and the one Committee member who arguably was independent did not function effectively as a champion of the minority's interests.

Besides Prosser, the ECM board had six members, all of whom Prosser had directly appointed: Raynor, Ramphal, Muoio, Goodwin, Vondras, and Todman. It is undisputed that Prosser, whose wholly-owned entity was the acquirer of ECM's minority interest, was conflicted. But, most of the remaining directors also had disabling conflicts because they were economically beholden to Prosser. Directors who "through personal or other relationships are beholden to the controlling person[]" lack independence from that person. n141

n141 *Aronson v. Lewis, 473 A.2d 805, 815 (Del. 1984); see Beam v. Stewart, 845 A.2d 1040,* No. 501, 2003, Slip. Op. at 12 (Del. Mar. 31, 2004).

[*121]

Raynor, who was Prosser's long time lawyer, was clearly conflicted. In 1996, 1997, and 1998, virtually one hundred percent of the legal fees that Raynor generated for his law firm were attributable to work he performed for Prosser and Prosser-owned entities. Before 1996, the percentage of total fees represented by work Raynor performed for Prosser was always greater than fifty percent. From 1987 through 1998, ATNI and its affiliates, and thereafter ECM and its affiliates, were the largest single client of Raynor's firm. n142 In 1998, the year of the Privatization, Raynor became "of counsel" at his firm and was put on a retainer arrangement wherein ATNCo paid compensation of $ 25,000 per month to Raynor, and $ 5,000 per month to his firm, to cover Raynor's office rental cost. That amount represented all of Raynor's compensation for 1998. n143 Raynor also served as a Prosser nominee to the ATNI board, and as a director of Innovative, ECM, ATNCo and Vitelco. n144 As a highly paid consultant to, and later full-time employee of, Prosser and his companies, Raynor was clearly beholden to Prosser and, thus, not independent. n145

n142 Raynor Dep. (June 12, 2001) at 25-28. In 1997, Raynor's law firm, Raynor, Rensch & Pfeiffer, was paid $ 479,000 for legal services provided to ECM and its predecessor. JX1S5 at SC4176. In 1996, the firm was paid $ 533,000 for its legal services. JX254 at G893.

[*122]

n143 *Id.* at 30-32.
n144 *Id.* at 21, 29.
n145 *See In re Maxxam, Inc., 659 A.2d 760, 773-74 (Del. Ch. 1995).*

If further evidence of non-independence were needed, in July 1998 -during ECM's consideration of the Privatization proposal -- Prosser agreed to pay Raynor $ 2.4 million over a five year period as compensation for his past services. There was no negotiation over that fee - - Raynor requested $ 2.4 million and Prosser agreed to it. Nor was the $ 2.4 million compensation arrangement ever disclosed to the ECM board, Compensation Com-

mittee or the Special Committee, yet Raynor voted as an ECM director to approve the Privatization. n146 That disclosure omission was highly material. Goodwin testified that the $ 2.4 million payment arrangement should have been disclosed to the board. n147 For Raynor to have participated in the board's Privatization deliberations and vote as an ECM director without disclosing this contemporaneously negotiated compensation arrangement, was misleading to Raynor's fellow directors and a breach of his fiduciary duty [*123] owed to them and to ECM.

n146 JX 159; Raynor Dep. at 38-39, 61; Trial Tr. Vol. 10 (Prosser) 1834-36; Vol. 5 (Goodwin) 966; Vol. 7 (Vondras) 1732; Vol. 7 (Ramphal) 1444-45.

n147 Trial Tr. Vol. 5 (Goodwin) 966-67.

Ramphal was similarly beholden to Prosser. Ramphal was originally introduced to Prosser by his son-in-law, Sir Ronald Sanders, who had a consulting arrangement with Prosser at that time. Like Sanders, Ramphal also fell into a lucrative consultancy with Prosser. In 1993 and 1994, Ramphal was paid consulting fees of $ 140,000 in both years, and in 1995 he was paid $ 120,000. On average, those amounts represented 22.5% of Ramphal's total income for that period. n148 Those amounts were in addition to the $ 30,000 directors' fee that Ramphal received annually. n149 Moreover, in 1998, Ramphal received $ 115,000 for his service on the ECM Board and special committees. n150

n148 Trial Tr. Vol. 7 (Ramphal) 1386-87; Ramphal Dep. 33-34.

[*124]

n149 Ramphal Dep. at 34.

n150 Trial Tr. Vol. 7 (Ramphal) 1390.

Given these undisputed facts, the defendants have not shown that Ramphal was independent of, i.e., not beholden to, Prosser, and the Court affirmatively finds that he was not. n151 That finding is strengthened by the fact that the consulting arrangement of Ramphal's son-in-law, Sanders, with Prosser would be put at risk if Ramphal, as a Special Committee member, took a position overly adversarial to Prosser. n152 Finally, both Sanders

and Ramphal were appointed as directors of Innovative after the Privatization had been completed. n153

n151 See Kahn v. Tremont Corp., 694 A.2d 422, 430 (Del. 1997) (purportedly "independent" director found beholden to majority stockholder where, three years previously, company had retained his consulting services for $ 10,000 per month and more than $ 325,000 in bonuses); Kahn v. Dairy Mart Convenience Stores, Inc., 1996 Del. Ch. LEXIS 38, No. 12489, 1996 WL 159628, at *6 (Del. Ch. Mar 29, 1996) (holding that consulting agreement may render independent director too beholden to management to remain independent).

[*125]

n152 See Harbor Fin. Partners v. Huizenga, 751 A.2d 879, 889 (Del. Ch. 1999) (a director has a disabling conflict where the director's decision could advance economic or career opportunities of a family member).

n153 Trial Tr. Vol. 7 (Ramphal) 1422; Ramphal Dep. 17, 35-36, 58.

Muoio was also a consultant to a Prosser entity and beholden to Prosser. As of mid-1997, Muoio was on an annual $ 200,000 retainer for providing banking/financial advisory services, n154 and he viewed Prosser as a source of additional future lucrative consulting fees. In March 1998, Muoio sought up to an additional $ 2 million for serving as financial adviser on a potential acquisition by ECM of CoreComm Inc. That effort was unsuccessful only because the acquisition ultimately never took place. n155

n154 JX 144 at EC22472.

n155 Muoio Dep. at 16-17.

Lastly, Goodwin, Vondras and Todman received annual [*126] directors' fees of $ 100,000, a generous amount given that ECM's board met only three or four times in 1998. n156 Goodwin and Vondras each also received $ 50,000 and $ 15,000 for their service on the Special Committee. n157 The $ 115,000 Vondras received in 1998 for serving on ECM's board and Special Committee represented approximately 10% of his income for that year. n158

n156 Trial Tr. Vol. 7 (Ramphal) at 1390; Muoio Dep. 18.

n157 JX 140 at EC5950.

n158 Trial Tr. Vol. 7 (Vondras) 1288-89, 1376.

Although the directors' fees received by Goodwin, Vondras and Todman would not, without more, necessarily constitute a disabling financial interest, n159 the record shows that all three of these directors - indeed, all the board defendants - expected to continue as directors of Prosser entities and benefit from the substantial compensation which accompanied that status. In fact, all of ECM's directors except Muoio were appointed to the Innovative board after the Privatization. That expectation, [*127] coupled with the fact that his director and committee fees represented a sizeable portion of his income, was sufficient to vitiate Vondras' independence for purposes of considering objectively whether the Privatization was fair to the minority stockholders.

n159 Grobow v. Perot, 526 A.2d 914, 923, n.12 (Del. Ch. 1987), aff'd, 539 A.2d 180 (Del. 1988).

The director defendants claim that they did not know they would be invited to join the Innovative board after the Privatization closed in October 1998. The evidence shows otherwise. During the negotiations over the Privatization, the ECM directors were told that they would continue on with the company "in its new incarnation." n160 The Merger Agreement generated by the board's counsel in connection with the Privatization disclosed that the board defendants would remain directors of the surviving corporation. The Special Committee, through its counsel, received drafts of that Merger Agreement as early as July 17, 1998, before [*128] they voted to approve the transaction. n161

n160 Goodwin Dep. Oct. 19, 2001 at 5.

n161 JX155 at SC4236; SC4111.

In summary, the Court finds that a majority of the full board of ECM (Prosser, Raynor, Ramphal, Vondras, and Muoio) were beholden to Prosser and, thus, were not independent of him. The Court further finds that a majority of the Special Committee (Ramphal and Vondras) were beholden to, and therefore not independent of,

Prosser, leaving Goodwin as the only arguably independent Committee member and Todman as the only arguably independent non-Committee director. As previously found, Goodwin, as Committee chair, did almost all of the Committee's work himself. Unfortunately, the work that Goodwin performed in that role, including his negotiations with Prosser, were fatally compromised and, consequently, inadequate to represent the interests of ECM's minority shareholders effectively. n162

n162 As former Justice (then Vice Chancellor) Hartnett appropriately observed in Lewis v. Fuqua, 502 A.2d 962, 967 (Del. Ch. 1985), in addressing the independence of a special litigation committee appointed to review a derivative action, "if a single member committee is to be used, the member should, like Caesar's wife, be above reproach." Here, as in Fuqua, Goodwin's "past and present associations raise a question of fact as to his independence" (502 A.2d at 967), which, given the burden of proof, would ordinarily be resolved against Goodwin's independence. The Court assumes, without deciding, however, that Goodwin was independent, but nonetheless concludes on other grounds that the Special Committee was not an effective representative of the minority stockholders' interests.

[*129]

(b) The Committee's Ineffectiveness As The Minority's Representative

There are several reasons why Mr. Goodwin's efforts as the Special Committee's chairman, and as its sole functioning member, were doomed to failure.

The first is that Prosser withheld the June projections, and knowledge of their existence, from the Committee and its advisors, Houlihan and Paul Hastings. As a consequence, Goodwin and Houlihan were deprived of information that was essential to an informed assessment of the fair value of ECM and of the gross inadequacy of merger price Prosser was offering. Thus disabled, Goodwin was not in a position to negotiate vigorously for a substantial increase in Prosser's opening offer ($ 9.125 per share) or, alternatively, to make a considered judgment to shut down the negotiations, thereby preventing the Privatization from going forward at all. That nondisclosure, without more, was enough to render the Special Committee ineffective as a bargaining agent for the minority stockholders.

Second, Prosser misled Goodwin by falsely representing that $ 10.25 per share was already straining the

2004 Del. Ch. LEXIS 70, *

limits of the financing available to him. In fact, Prosser's financing would have [*130] enabled him to increase his offer to $ 11.40 per share, and the record evidence indicates that the RTFC was willing to lend him more, based on its implied valuation of ECM as conservatively worth about $ 28 per share. n163 There is no evidence that Goodwin knew of Prosser's financing arrangements or the RTFC's valuation (for merger financing purposes) of ECM.

n163 *See* Reed Dep. Mar. 16, 2000 at 162-53, 171; Prosser Dep. June 7, 2000 at 93-96; JX 167 at RTFC 698, 720. That is not to suggest that the level at which the deal could be financed is a measure of ECM's fair value. Any such suggestion would be contrary to Delaware law and to the fair value determinations in this case. *See Smith v. Van Gorkom, 488 A.2d 858, 890-891 (Del. 1985)* (holding that price at which a leveraged buy-out of a corporation was financially feasible was not determinative of the corporation's fair value). The import of this nondisclosure is that it evidences Prosser's intent to deprive the Special Committee of any real utility as a bargaining agent for the ECM minority.

[*131]

Third, and finally, Goodwin was careless, if not reckless, by routing all of his communications with the other Special Committee members through Eling Joseph, Prosser's secretary. The result was to give Prosser access to the Committee's confidential deliberations and strategy. That inexplicable method of channeling communications to Goodwin's fellow Committee members further confirms the severe information imbalance that existed between the two "bargaining" sides. In fact, there was no effective bargaining, because Prosser held all the cards and misled Goodwin into believing that he (Goodwin) and the Committee's financial advisor (Houlihan), possessed all the information that was material to negotiating a fair price. Nothing could have been further from the truth.

3. The Adequacy of the Board And Shareholder Approvals

The fourth and final aspect of fair dealing concerns the adequacy of the board and shareholder approvals of the challenged transaction. In this case, those approvals were uninformed and, accordingly, of no legal consequence.

It is undisputed that the Privatization was approved by a unanimous vote of all ECM directors, with Prosser

abstaining, at a board of directors' [*132] meeting held on August 17, 1998. n164 The board's approval was not informed, however, because the voting board members were ignorant of the existence of the June Projections and of the inadequacy of the Houlihan valuation that was based upon the March projections.

n164 JX 33.

Moreover, Raynor, who was conflicted, voted in favor of the Privatization but did not disclose to the other voting board members, the $ 2.4 million compensation payout arrangement that he had recently negotiated with Prosser. As previously found, that nondisclosure was material.

By not disclosing these facts, Prosser and Raynor violated the fiduciary duty of disclosure they owed to their fellow directors of ECM. n165

n165 *Weinberger v. UOP, Inc., supra, 457 A.2d 701.*

The approval of the transaction by a majority of the minority shareholders [*133] was also legally ineffective, because the misdisclosures and omissions in the disclosure documents sent to shareholders in connection with the Privatization rendered that vote uninformed. Those misdisclosures and omissions also violated the fiduciary duty of disclosure owed by ECM's majority stockholder and by the ECM directors who were responsible for the accuracy of those documents. n166 The plaintiffs claim several disclosure violations, but the Court need address only three of them.

n166 *Id., see also Lynch v. Vickers Energy Corp., 383 A.2d 278 (Del. 1977).*

First, the Proxy Statement omitted to disclose to the minority shareholders the existence of the June projections and the fact that those projections had been furnished to Prudential and the RTFC, but were withheld from the Special Committee and its advisors. That omission was materially misleading, not only in its own right but also because the proxy statement contained affirmative representations that the public was being provided [*134] with the same projections to which Prosser was

privy. The section of the proxy statement containing the March projections (identified there only as "Company projections") disclosed that "[a]lthough the company does not as a matter of course publicly disclose projections as to future revenues or earnings, because they were received by Mr. Prosser and the parent [ICC, LLC], the purchaser [ICC] is making these projections available to all stockholders." n167 Those misdisclosures were highly material because knowledge of the June projections would have enabled the shareholders to understand ECM's intrinsic worth and the extent of the market's undervaluation of their company.

n167 JX 155 at SC4128.

Second, the disclosure documents misled minority stockholders about the Special Committee's and the board's independence from Prosser. The Schedule 14D-9, which was disseminated in connection with the first-step tender offer, disclosed the members of the Special Committee and their compensation, but not their [*135] consulting relationships or retainer agreements with other Prosser entities. n168 Specifically, there was no disclosure of Raynor's or Ramphal's long-standing financial relationships with Prosser, including Raynor's $ 2.4 million payout arrangement for past services and Ramphal's significant consulting arrangements or his conflict concerning the economic and career prospects of his son-in-law. Nor was there disclosure of Muoio's consulting fee arrangement that had resulted in payments to him of hundreds of thousands of dollars. Also, because of their role as negotiators on behalf of the minority stockholders, the prior consulting relationships of Ramphal should have been disclosed. n169 The disclosure documents misleadingly suggested that the Special Committee, and perhaps a majority of the entire board, were independent. In fact, that was not true.

n168 JX 251 at SC 4288-89; see also JX155 at SC4108-09.
n169 See Clements v. Rogers, 790 A.2d 1222, 1242-43 (Del. Ch. 2001).

[*136]

Third, that disclosure violation was compounded by the false disclosure that a majority of the board that approved the Privatization were members of the Special Committee. n170 In fact, only six of the board's seven members voted to approve the transaction, n171 and only

three of those six were members of the Special Committee. Three is not a majority of seven. Also not disclosed was the related fact that ECM's and the Committee's original advisors who had been retained to represent the interests of all shareholders in the initially Proposed (but later abandoned) Merger, had been co-opted by Prosser and were now working against the minority stockholders whose interests that they were originally hired to further.

n170 JX251 at SC4295.
n171 JX33.

In short, the disclosure documents were crafted to reassure the minority stockholders that their interests had been effectively represented by a Special Committee of directors who were independent of Prosser and his entities on the other side of the [*137] transaction. That impression was materially false and misleading and was sufficient, without more, to render the approving vote of the stockholders uninformed. n172

n172 See Clements v. Rogers, 790 A.2d 1222, 1242-43 (Del. Ch. 2001) (accuracy of disclosures concerning the independence and effectiveness of a special negotiating committee are of particular importance were the transaction is with a controlling stockholder).

****

For all these reasons, the Court finds that the Privatization transaction, and the $ 10.25 per share merger price that has been adjudicated as unfair, were the product of unfair dealing. Accordingly, the Court concludes that the Privatization was not entirely fair to the minority stockholders of ECM. Having so found, the Court must now assess the liability consequences of that determination.

## V. THE DEFENDANTS' FIDUCIARY DUTY BREACHES AND LIABILITY THEREFOR

Having concluded that the Privatization was not entirely fair, the Court must next determine the nature [*138] of the fiduciary duty violation--whether of care, loyalty, or good faith--that resulted in the unfair transaction. n173 Under Emerald Partners v. Berlin, n174 that is necessary to enable the Court to adjudicate which (if any) of the director defendants is liable for money damages, because ECM's § 102(b)(7) charter provision exculpates those directors found to have violated solely

their duty of care from liability for money damages. Article Seventh of ECM's Certificate of Incorporation provides:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. n175

n173 That determination is required only for purposes of the fiduciary duty class action, not the appraisal. As the Court has found, the defendant that is solely liable in the appraisal proceeding is the surviving corporation in the merger, i.e., Innovative. That entity is liable to Greenlight for $ 38.05, plus interest, for each ECM share for which appraisal was sought.

[*139]

n174 787 A.2d 85 (Del. 2001).
n175 Stipulation and Order, P164, at p.20.

By its terms, Article Seventh does not apply to fiduciaries other than directors. Thus, Article Seventh does not apply to Prosser in his capacity as ECM's controlling stockholder, or to ICC or Innovative, the entities that Prosser controlled and through which he effected the Privatization. Prosser, as majority stockholder, breached his duty of loyalty to Greenlight and the plaintiff shareholder class, by eliminating ECM's minority stockholders for an unfair price in an unfair transaction that afforded the minority no procedural protections. For that breach of duty Prosser is liable to Greenlight and the shareholder class. So also are the two Prosser-controlled entity defendants, Innovative and ICC, which were the mechanisms through which Prosser accomplished the Privatization. Those entities are liable for having aided and abetted Prosser's breach of fiduciary duty. n176

n176 Weinberger v. Rio Grande Industries, Inc., 519 A.2d 116 (Del. Ch. 1986); Gilbert v. El Paso Co., 490 A.2d 1050, 1057 (Del. Ch. 1984). One of the requirements for "aiding and abetting" liability is the third party's "knowing participation" in the directors' breach of fiduciary duty. In that case, Prosser's knowledge must be attributed to the entities that he controlled and used to effectuate his breaches of duty.

[*140]

The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.

Prosser is liable in his capacity as a director for breach of his duty of loyalty, conduct that is not exculpated under Article Seventh. Prosser is also liable on the basis that he "derived an improper personal benefit" from the Privatization transaction - which is another exception to the exculpatory coverage of Article Seventh.

Raynor also is liable for breaching his fiduciary duty of loyalty — conduct that is excluded from the exculpatory shield of Article Seventh. Raynor did not personally and directly benefit from the unfair transaction (as did Prosser), but Raynor actively assisted Prosser in carrying out the Privatization, and he acted to further Prosser's interests in that transaction, which were antithetical to the interests of ECM's minority stockholders.

Raynor acted in concert with Prosser, who was the source of Raynor's livelihood, to "flip" the transaction from a merger of Innovative into ATNCo, to a going private merger of ECM into Innovative. n177 [*141] Raynor also assisted Prosser and Innovative in obtaining RTFC financing for the Privatization n178 at the time when Raynor was still serving on the First Special Committee, ostensibly to safeguard the interests of ECM's minority stockholders. n179 After the Second Special Committee was formed, Raynor attended a meeting with Prosser and two ECM officers and the RTFC to discuss issues relating to the structuring of the revised deal. n180 Finally, on July 20, 1998, Opus Capital Partners ("Opus") sent a letter to Goodwin, complaining that the initial $ 9.125 price was too low and should be around $ 30. n181 This letter was somehow "leaked" to Cahill, Prudential, and Raynor, n182 and Raynor reported the contents of the Opus letter to the RTFC, editorializing that "Opus-biggest [shareholder with] dissenting opinion on buy back bought in @$ 6 or $ 7/share [but] believes should be valued @ $ 30 per share." n183

2004 Del. Ch. LEXIS 70, *

n177 JX155 at SC4110; Raynor Dep. 171-173.
n178 JX184 at RTFC1474.
n179 Trial Tr. Vol. 10 (Prosser) at 1796-97.
n180 JX 187 at RTFC5145-46.
n181 JX 32.

[*142]

n182 JX 280; JX 106; JX 186 at RTFC5135.
n183 JX 186 at RTFC5135; Reed Dep. 153.

Although Raynor did not benefit directly from the transactions, his loyalties ran solely to Prosser because Raynor's economic interests were tied solely to Prosser and he acted to further those economic interests. Accordingly, Raynor is liable to Greenlight and the shareholder class for breaching his fiduciary duty of loyalty and/or good faith. n184

n184 The Court employs the "and/or" phraseology because the Delaware Supreme Court has yet to articulate the precise differentiation between the duties of loyalty and of good faith. If a loyalty breach requires that the fiduciary have a self-dealing conflict of interest in the transaction itself, as at least one commentator has suggested, then only Prosser is liable on that basis. Raynor would be liable for violating his duty of good faith for consciously disregarding his duty to the minority stockholders. See Hillary A. Sale, Delaware's Good Faith, 89 Cornell L. Rev. 456 (2004). On the other hand, if a loyalty breach, does not require a self-dealing conflict of interest or receipt of an improper benefit, then Raynor would be liable for breaching his duties of loyalty and good faith. See Strassburger v. Earley, 752 A.2d 557 (Del. Ch. 2000) (director whose conduct in a transaction evidences loyalty solely to employer whose interests were adverse to the corporation held to have violated his duty of loyalty). The Court need not decide that definitional issue, because under either definition, Raynor's conduct amounted to a non-exculpated breach of fiduciary duty.

[*143]

The Court also concludes, albeit with reluctance, that Muoio is similarly liable, even though Muoio's conduct was less egregious than that of Prosser and Raynor. Unlike Raynor, Muoio did nothing affirmatively to assist

Prosser in breaching his fiduciary duties of loyalty and good faith. Like his fellow directors, Muoio was also not independent of Prosser.

Muoio is culpable because he voted to approve the transaction even though he knew, or at the very least had strong reasons to believe, that the $ 10.25 per share merger price was unfair. Muoio was in a unique position to know that. He was a principal and general partner of an investment advising firm, with significant experience in finance and the telecommunications sector. From 1995 to 1996, Muoio had been a securities analyst for, and a vice president of, Lazard Freres & Co. in the telecommunications and media sector. From 1985 to 1995, he was a securities analyst for Gabelli & Co., Inc., in the communications sector, and from 1993 to 1995, he was a portfolio manager for Gabelli Global Communications Fund, Inc. n185

n185 Pretrial Stip. and Order, P's 40-42.

[*144]

Hence, Muoio possessed a specialized financial expertise, and an ability to understand ECM's intrinsic value, that was unique to the ECM board members (other than, perhaps, Prosser). Informed by his specialized expertise and knowledge, Muoio conceded that the $ 10.25 price was 'at the low end of any kind of fair value you would put," n186 and expressed to Goodwin his view that the Special Committee might be able to get up to $ 20 per share from Prosser. n187 In these circumstances, it was incumbent upon Muoio, as a fiduciary, to advocate that the board reject the $ 10.25 price that the Special Committee was recommending. As a fiduciary knowledgeable of ECM's intrinsic value, Muoio should also have gone on record as voting against the proposed transaction at the $ 10.25 per share merger price. Muoio did neither. Instead he joined the other directors in voting, without objection, to approve the transaction.

n186 Muoio Dep. at 175.
n187 Goodwin Dep. Sept. 6, 2001 at 47.

ECM's directors other [*145] than Prosser and Raynor could plausibly argue that they voted for the transaction in reliance on Houlihan's opinion that the merger term price was fair. In Muoio's case, however, that argument would be implausible. Muoio's expertise in this industry was equivalent, if not superior, to that of Houlihan, the Special Committee's financial advisor.

2004 Del. Ch. LEXIS 70, *

That expertise gave Muoio far less reason to defer to Houlihan's valuation. Knowing (or at least having very strong reasons to suspect) that the price was unfair, why, then, would Muoio vote to approve this deal? The only explanation that makes sense is that Muoio, who was seeking future business opportunities from Prosser, decided that it would disserve his interests to oppose Prosser and become the minority's advocate.

Admittedly, divining the operations of a person's mind is an inherently elusive endeavor. Concededly, the possibility exists that Muoio's decision was driven not by his overriding loyalty to Prosser, but by a sincere belief that the $ 10.25 price was minimally fair, even if not the fairest or highest price attainable. But in this case that possibility is not sufficient to carry the day, because to establish a director's exculpation [*146] from liability under 8 Del. C. § 102(b)(7), the burden falls upon the director to show that "[his] failure to withstand an entire fairness analysis is *exclusively* attributable to a violation of the duty of care." n188 Muoio has not carried that burden.

n188 *Emerald Partners v. Berlin*, 787 A.2d at 98 (italics added).

The credible evidence persuades the Court that Muoio's conduct is explainable in terms of only one of two possible mindsets. The first is that Muoio made a deliberate judgment that to further his personal business interests, it was of paramount importance for him to exhibit his primary loyalty to Prosser. The second was that Muoio, for whatever reason, "consciously and intentionally disregarded" his responsibility to safeguard the minority stockholders from the risk, of which he had unique knowledge, that the transaction was unfair. n189 If motivated by either of those mindsets, Muoio's conduct would have amounted to a violation of his duty [*147] of loyalty and/or good faith. n190 Because Muoio has not established to the satisfaction of the Court, after careful scrutiny of the record, that his motivation was of a benign character, he is not exculpated from liability to Greenlight and the shareholder class.

n189 *See In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).
n190 *See* note 184, *supra.*

That leaves the four remaining directors -- Goodwin, Ramphal, Todman, and Vondras -- whose conduct, while also highly troublesome, is far more problematic from a liability standpoint than that of Prosser, Raynor, and Muoio. Like Raynor and Muoio, those directors (except possibly Goodwin) were not independent of Prosser, they all voted for the Privatization, and none had a personal conflicting financial interest in, or derived a personal benefit from, that transaction to the exclusion of the minority stockholders.

The conduct of these four directors differs from that of Raynor and Muoio, in that there [*148] is no evidence that any of those four affirmatively colluded with Prosser to effectuate the Privatization, or that they otherwise deliberately engaged in conduct disloyal to the minority stockholders' interests. Nor have the plaintiffs shown that any of those directors knew or had reason to believe, that the merger price was unfair.

This is not intended to suggest that these directors covered themselves in glory, or merit commendation, for the manner in which they discharged their responsibility as fiduciaries. But it is to say, and this Court after considerable reflection finds, that there is no persuasive evidence that the fiduciary violations of the ECM directors other than Prosser, Raynor, and Muoio implicated conduct more egregious than breaches of their duty of care.

A logical starting point in the analysis is first to consider the conduct of the members of the Second Special Committee: Goodwin, Ramphal and Vondras. Because Ramphal was located in London and Vondras in Indonesia, they never met in person with each other or with Goodwin, who became the Committee's sole working member. Put differently, all Committee initiatives and decisions were made initially by Goodwin, subject [*149] to concurrence by Ramphal and Vondras, who on all relevant issues willingly deferred to Goodwin and relied upon his recommendations, both as to the Committee's process and the transaction price.

Although Goodwin negotiated a merger price ($ 10.25 per share) that this Court has found to be unfair, there is no persuasive evidence that Goodwin knew or should have known that this was the case. Primarily, that is because critical information was withheld from Goodwin, from the other Committee members, from and their financial advisor, Houlihan. Based upon information that in material respects was incomplete, Houlihan opined that the negotiated price was fair, and there is no evidence that Goodwin, who had negotiated the price with Prosser, had reason to believe otherwise.

This is not to say that Goodwin carried out this process with the care that would be expected of someone of his distinguished background and accomplishments. No justification has been shown for Goodwin communicating with the other Committee members through Ms. Joseph, the secretary of the minority stockholders' negoti-

ating adversary, Prosser. That misstep constituted a violation of Goodwin's duty of care and resulted [*150] in critical information being leaked to the other side. But, that fiduciary breach was of no actionable consequence, because Goodwin had all along been deprived of material information that both he and Houlihan needed to negotiate a fair price. Consequently, even if Goodwin had maintained adequate security arrangements, there is no basis to conclude that the result would have been any different.

The plaintiffs insist, however, that Goodwin's fiduciary violations were of a character far more egregious than duty of care violations. Plaintiffs urge that: (1) Goodwin (as well as Ramphal and Vondras) were financially not independent of Prosser and were motivated to do whatever was needed to remain in Prosser's good graces, (2) Goodwin willingly acceded to retaining the Special Committee's\ legal and financial advisors from among candidates that had been selected by Prosser or his advisors, (3) Goodwin's "negotiations" with Prosser were nothing more than a scripted minuet wherein Goodwin, on behalf of the Committee, would bargain for a negligible price increase, (4) that bargaining, coupled with the gilt-edged credentials of all three Committee members, would create a credible record of [*151] "arm's length" negotiations sufficient to survive entire fairness review. Goodwin's decision to route his communications through Ms. Joseph was, plaintiffs argue, further dramatic evidence that his true loyalties were to serve Prosser and his interests. This conduct, plaintiffs insist, violated Prosser's (and Ramphal's and Vondras's) fiduciary duties of loyalty and/or good faith -- conduct that is not exculpated under Article Seventh.

It is correct (and this Court has found) that with the possible exception of Goodwin, none of the Committee members was independent of Prosser, that viewed with perfect hindsight the magnitude of the negotiated price increase was negligible, and that Goodwin permitted his communications with Ramphal and Vondras to be routed through Prosser's secretary. In quite different circumstances that might establish a violation of the duties of good faith and/or loyalty, especially since the burden of establishing exculpation falls upon the directors seeking exculpation. But here that procedural burden does not help the plaintiffs, because the evidence, viewed as a whole, fails to establish a *prima facie* case of bad faith or disloyalty that these directors [*152] would be called upon to negate or disprove.

More specifically, although Goodwin, Ramphal and Vondras, because of their relationship to Prosser, might have been motivated to aid Prosser in his scheme to force out ECM's minority at an unfair price, there is no evidence that they actually engaged in such improperly motivated conduct, or otherwise acted with disloyal intent.

To be sure, Goodwin's conduct may fairly be described as having violated his duty of care. And, given the non-independence of Ramphal and Vondras, their wholesale abdications to Goodwin of their responsibility as Committee members to take an active and direct role in the process, also bespeaks a failure to observe the requisite due care. n191 But negligent or even gross negligent conduct, however misguided, does not automatically equate to disloyalty or bad faith. There is no evidence that Goodwin, Ramphal and Vondras intentionally conspired with Prosser to engage in a process that would create the illusion, but avoid the reality, of arm's length bargaining to obscure the true purpose of benefiting Prosser at the expense of the minority stockholders.

n191 *See Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 368 (Del. 1993)* ("We have stated that a director's duty of care requires a director to take an active and direct role in the context of a sale of a company from beginning to end.")

[*153]

Nor, in these circumstances, did those directors' conduct amount to a breach of their fiduciary duty to act in good faith. Although the Supreme Court has yet to define the precise conduct that would actionably violate that duty, this Court has recently held that directors can be found to have violated their duty of good faith if they *"consciously and intentionally disregard[] their responsibilities,* adopting a 'we don't care about the risks' attitude concerning a material corporate decision." n192 Here, there is no evidence that Goodwin, Ramphal, or Vondras acted with conscious and intentional disregard of their responsibilities, or made decisions with knowledge that they lacked material information. Because the conduct of those director defendants was, solely and at most, a violation of their duty of care, they are exculpated from liability under Article Seventh.

n192 *In re Walt Disney, 825 A.2d at 289* (italics in original). Elaborating on that formulation, the Chancellor observed that directors actionably violate their duty of good faith if they *"knew that they were making material decisions without adequate information and without adequate deliberation, and . . . they simply did not care if the decisions caused the corporations and its stockholders to suffer injury or loss." Id.*

[*154]

The foregoing analysis and conclusion are equally applicable to the seventh director, Todman. The circumstance that differentiates Todman from Goodwin, Ramphal and Vondras is that Todman played no role in the negotiation of the merger terms, his sole involvement being to cast his vote as a director in favor of the Privatization. Because (unlike Muoio) there is no evidence that Todman knew or had reason to suspect that the price was unfair, it may fairly be concluded that he voted for the transaction in reliance upon the pronouncements by Houlihan and the Special Committee that the merger price was fair. Accordingly, it serves no purpose for the Court to determine whether or not Todman's conduct amounted to a breach of his duty of care, because in either case the record evidence compels the finding that Todman committed no violation of his duty of loyalty or his duty of good faith. Accordingly, Todman is not liable, either because he has not been shown culpable in any respect, or because at most his conduct would have amounted to a breach of his duty of care, for which Todman would be exculpated under Article Seventh.

## VI. CONCLUSION

For the reasons set forth above:

(1) In [*155] the appraisal action, Innovative, as the surviving corporation, is liable to Greenlight in the amount of $ 38.05 per share for each of the 750,300 shares that are subject to the appraisal, plus interest at the rate of 6.27%, compounded monthly, from the date of the merger to the date of the judgment.

(2) In the fiduciary duty action, defendants Innovative, ICC, Prosser, Raynor and Muoio are jointly and severally liable to the plaintiff class and to Greenlight (in its capacity as holder of litigation rights assigned by former ECM shareholders) in an amount equal to $ 27.80 per share. n193

n193 $ 27.80 per share is equal to the difference between the fair value of ECM on the merger date ($ 38.05 per share) and the merger price paid to the ECM minority shareholders ($ 10.25 per share).

Counsel shall confer and submit an agreed form of Final Order and Judgment implementing the rulings made in this Opinion.