**EXHIBIT 6**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - x

L.P. MATTHEWS, L.L.C.,                :

        Plaintiff,              :

    vs.                           : Civil Action

BATH & BODY WORKS, INC.;               : No. 04-1507 (SLR)

LIMITED BRANDS, INC.; KAO

BRANDS CO., (f/k/a THE                 :

ANDREW JERGENS COMPANY);

and KAO CORPORATION,                   :

        Defendants.            :

- - - - - - - - - - - - - - - x

Deposition of CHRISTOPHER T. RHODES, Ph.D., a witness

herein, called for examination by counsel for Defendant

in the above-entitled matter, pursuant to notice, the

witness being duly sworn by Robert M. Jakupciak, a

Notary Public in and for the District of Columbia, taken

at the offices of Robins, Kaplan, Miller & Ciresi, L.L.P.,

1801 K Street, N.W., Washington, D.C., 20006, at 9:00 a.m.,

on April 26, 2006, and the proceedings being taken down

by Stenotype by Robert M. Jakupciak, RPR.

2 (Pages 2 to 5)

Page 2

```
 1
 2  APPEARANCES:
 3  On behalf of the Plaintiff:
 4      JASON R. BURATTI, ESQUIRE
 5      Robins, Kaplan, Miller & Ciresi, L.L.P
 6      1801 K Street, N.W
 7      Washington, D.C., 20006
 8      (202) 736-2710
 9  On behalf of Limited Defendants:
10      JOHN F. WARD, ESQUIRE
11      Ward & Olivo
12      798 Third Avenue
13      New York, New York  10017
14      (212) 697-6262
15  On behalf of Kao Corporation:
16      STEPHEN G. BAXTER, ESQUIRE
17      RICHARD L. CHINN, ESQUIRE
18      Oblon, Spivak, McClelland
19      Maier & Neustadt, P.C.
20      1940 Duke Street
21      Alexandria, Virginia  22314
22      (703) 413-3000
```

Page 3

```
 1            C O N T E N T S
 2  THE WITNESS: CHRISTOPHER T. RHODES, Ph.D.
 3  EXAMINATION                      PAGE NO.
 4      By Mr. Baxter .................  4
 5
 6
 7
 8            E X H I B I T S
 9  RHODES EXHIBIT NUMBER            PAGE NO.
10  1   Curriculum Vitae ................  49
11  2   Rhodes Report ................... 109
12  3   Rhodes Updated Report ........... 109
13  4   '062 Patent ..................... 133
14  5   '485 Patent ..................... 150
15  6   Rhodes Responsive Report ........ 216
16
17
18
19
20
21
22
```

Page 4

```
 1  Whereupon,
 2          CHRISTOPHER T. RHODES, Ph.D.,
 3  called for examination by counsel for Defendant and
 4  having been duly sworn by the Notary Public, was
 5  examined and testified as follows:
 6      EXAMINATION BY COUNSEL FOR DEFENDANT
 7  BY MR. BAXTER:
 8      Q.   Good morning.
 9      A.   Good morning.
10      Q.   Could you please state your full name
11  for the record?
12      A.   Christopher Thomas Rhodes.  R-H-O-D-E-S.
13      Q.   Could you please state your current
14  address for the record?
15      A.   28 Prospect Avenue, Narragansett, Rhode
16  Island.
17      Q.   Is it Dr. Rhodes or Professor Rhodes or
18  Mr. Rhodes?
19      A.   Professor Rhodes is perfectly
20  satisfactory, thank you, sir.
21      Q.   My name is Steve Baxter, and I represent
22  the Kao defendants in this litigation.  Do you
```

Page 5

```
 1  understand that I'm going to be asking you a series
 2  of questions today?
 3      A.   I do.
 4      Q.   And do you understand that if at any
 5  time during the questioning you don't understand one
 6  of my questions, you have the right to ask me for an
 7  explanation?
 8      A.   I do.
 9      Q.   And do you understand that you have the
10  right to ask for a break at any time during the
11  deposition?
12      A.   I do.
13      Q.   Have you ever been deposed before?
14      A.   Yes.
15      Q.   How many times?
16      A.   I can't give you an exact number.
17      Q.   More than ten?
18      A.   I don't know.  I think probably about
19  ten.  I cannot be certain.
20      Q.   Have you ever -- have any of your prior
21  depositions been in the context of patent
22  litigation?
```

**154**

1  Q. Anything else?
2  A. Yes. I've also seen a report from
3  Professor Young of Iowa on some pH measurements.
4  Q. I am --
5  A. I'm sorry.
6  Q. We probably both forgot. I did this a
7  long time ago. I'm really more interested in not
8  measuring pH or color, but skin cleaning.
9  A. You are absolutely right, counsel. You
10 did say that. I did forget. Mia culpa, mia maxima
11 culpa. Anything else on in vivo studies? I think
12 that's it.
13     MR. BURATTI: Mark the transcript for
14 me.
15 BY MR. BAXTER:
16 Q. The study from the prosecution history
17 that compared the efficacy of d-limonene with orange
18 oil, that didn't have any numerical results in it,
19 did it?
20 A. I don't know, because in the letter I've
21 seen from the patent attorney we don't actually have
22 the report in any detail. All I have seen is this

**155**

1  is what was found. So the trouble is I can't
2  testify to the full scope of that report.
3  Q. In fact, I may have used the word
4  report, but what I'm referring to is what you saw.
5  A. Yes. All I can tell you is that
6  apparently there were studies and these studies
7  showed a substantial or at least a significant
8  advantage in using orange oil rather than
9  d-limonene.
10 Q. You only saw the synopsis as presented
11 by the patent attorney and what you saw had no
12 numerical results; isn't that correct?
13 A. That is correct. Of course, counselor,
14 you will recall that in the deposition transcripts
15 for both Mr. Greenspan and Mr. Low, and these were
16 the people who were involved, they also referred to
17 it. So to that extent that wasn't secondhand
18 testimony.
19 Q. Did you cite that deposition testimony
20 in your expert report? Did you rely on that
21 deposition testimony in your expert report?
22 A. I think in the back of -- I hope in the

**156**

1  back.
2  Q. You may have --
3  A. Yes.
4  Q. -- listed the complete -- in fact, I'm
5  looking for this. In my updated one I see the
6  depositions of Jack Krause, David Story. Let me
7  look in the other report.
8      MR. BURATTI: I think they are in the
9  other report.
10 A. Yes. In the responsive report.
11 Q. It says I considered Dr. Lochhead's and
12 Mr. Carson's report. No. And the depositions of
13 Dr. Greenspan, Dr. Low -- off the record.
14     - - -
15     (Discussion off the Record.)
16     - - -
17 BY MR. BAXTER:
18 Q. I was just wondering if you had cited to
19 any page or line. Do you recall seeing any
20 numerical results in the deposition transcripts of
21 Messrs. Low or Greenspan?
22     MR. BURATTI: Objection to form. And if

**157**

1  you would like to see the documents, you can ask for
2  them.
3  A. In the absence of going through the
4  transcripts, I'm afraid I can't be more helpful.
5  Q. Sitting here today you just can't
6  remember?
7  A. I just can't remember.
8  Q. Now let me hand you a copy of U.S.
9  Patent 5,013,485, which we have marked as Rhodes
10 Exhibit Number 5. Can you identify Rhodes Exhibit
11 Number 5?
12 A. Yes, I can.
13 Q. I notice you cite that, I believe, as
14 Exhibit 4 on the very bottom of page 4 of your
15 updated report.
16 A. Can I just turn to that?
17 Q. Sure. I was going to do it for you.
18 But that's okay.
19 A. Page 4.
20 Q. The very bottom. Page 4, where it says
21 the claim term orange oil.
22 A. Yes.

158

1  Q.  Then you go on.
2  A.  I see. Yes.
3  Q.  So Rhodes Deposition Exhibit Number 5 is
4  Exhibit 4 of your updated expert report?
5  A.  Yes, sir. The numbers are beginning to
6  jump around a bit, but I think I'm on track at the
7  moment.
8  Q.  We will just try to keep it straight.
9  Now you say: Based on Rhodes Exhibit Number 5, I
10 conclude that orange oil can perform cleaning at
11 levels of 0.01 percent or lower. Do you see that?
12 A.  Correct. Yes, sir.
13 Q.  Aside -- first of all, when was the
14 first time you saw Rhodes Exhibit Number 5?
15 A.  I don't recall.
16 Q.  Was it during the course of this
17 litigation?
18 A.  Oh, yes. I had never seen that patent
19 before January '06.
20 Q.  Did you find that patent yourself?
21 A.  No, sir.
22 Q.  Was it provided to you by Mr. Buratti or

159

1  somebody at Robins Kaplan?
2  A.  I think it was Mr. Buratti who provided
3  it to me, yes.
4  Q.  Do you have any basis other than Rhodes
5  Exhibit Number 5 to believe that orange oil can
6  perform cleaning at levels of 0.01 percent or lower?
7  A.  Yes, I do.
8  Q.  Can you tell us those?
9  A.  Certainly. In the '062 patent itself,
10 the patentees report studies in which they go down
11 to orange oil concentrations at 5 percent. And if I
12 may just turn to the '062 patent.
13 Q.  You may want to turn to column 6.
14 A.  Thank you. It tells us that the
15 effectiveness of the products, of the cleaning
16 ability, was reduced. It could still remove
17 cosmetic products. It wasn't good or as effective
18 at removing caulking compounds and so on.
19         So the first thing I know, looking at
20 the patent, we have got products which contain a
21 number of different concentrations of the oil. And
22 certainly if you look at the claim, we are talking

160

1  about orange oil up to 45 percent, and within the
2  patent itself we see data going down to 5 percent
3  which has still got cleaning properties but not as
4  good as higher concentrations.
5         So the first thing I can do as a
6  scientist who has worked on emulsions, skin lotions,
7  is carry out an extrapolation procedure and say,
8  well, it will certainly be, still be effective at
9  lower concentrations. It may require a little
10 longer application, but an extrapolation procedure.
11 So that's the first approach I can use.
12        The second approach I can use is my
13 knowledge of the use of surfactants and of solvents,
14 knowing that surfactants in particular are very
15 active even at very low concentrations, and so I
16 know that the limits of the effectiveness of the
17 teachings of the '062 patent are going to be much
18 lower than 5 percent. And I believe that in the
19 prosecution file history, that when the patent was
20 first submitted, in fact there was an indication
21 that the product would be effective at quite low
22 concentrations.

161

1         But where I found the patent that you
2  just put before me, the '485 patent, particularly
3  useful was I already knew that the teachings would
4  be useful well below 5 percent. This patent gave me
5  a lower limit, which was very much in line with what
6  I had previously hypothesized.
7         So the '485 patent was confirmatory in
8  nature. And I found it very useful in that sense.
9  Q.  Does the '062 patent itself report any
10 testing of a cleaning composition which contains
11 less than 5 percent orange oil?
12 A.  I think I've already told you the lowest
13 concentration reported in the '062 patent is 5
14 percent.
15 Q.  Do you know why or how the number 5
16 percent was arrived at?
17        MR. BURATTI: Objection to form.
18 A.  Could you rephrase that question,
19 please, counsel?
20 Q.  Do you know how -- strike that. Do you
21 know how the inventors arrived at the number 5
22 percent?

242

```
 1   _____
 2         CHRISTOPHER T. RHODES, Ph.D.
 3
 4
 5   SUBSCRIBED and SWORN TO before me this _____ day of
 6   _____, 2006.
 7
 8
 9
10
11
12
13
14   _____
15         NOTARY PUBLIC
16
17
18
19
20
21   My Commission expires: _____
22   UNITED STATES OF AMERICA  )
```

243

```
 1                       ss:
 2   DISTRICT OF COLUMBIA    )
 3        I, ROBERT M. JAKUPCIAK, an RPR and Notary
 4   Public within and for the District of Columbia do
 5   hereby certify:
 6        That the witness whose depostion is
 7   hereinbefore set forth, was duly sworn and that the
 8   within transcript is a true record of the testimony
 9   given by such witness.
10        I further certify that I am not related to
11   any of these parties to this action by blood or
12   marriage and that I am in no way interested in the
13   outcome of this matter.
14        IN WITNESS WHEREOF, I have hereunto set my
15   hand this _____ day of _____, 2006.
16
17              _____
18
19   My Commission Expires:
20   December 14, 2008
21
```

### 353

1  tissue?
2  A. It's an interesting question. I suppose
3  whether you would consider the -- if it's dead, it
4  is certainly no longer a living tissue. Is it part
5  of my body still? I would say that the dead skin is
6  now unwanted tissue and is no longer part of the
7  essence of me. But I think we are getting outside
8  colloid science. We are getting into rather
9  teleological areas.
10  Q. Fair enough. How about at the end of
11  claim 6, you see it mentions that there is a pH
12  within the range of 4.5 to 6, inclusively?
13  A. Yes, sir.
14  Q. Period. What does inclusively mean to
15  you?
16  A. It tells me that if someone reading this
17  patent took the level as being exactly -- if someone
18  came up with a product that is outside that range,
19  the range being from 4.5 to 6, if they came up with
20  a product outside that range, they have infringed
21  the patent, inclusive.
22       MR. WARD: Could you read that back?

### 354

1  I'm sorry, I didn't catch the end of that. Just
2  read back the answer. You know what? We are just
3  about out of tape. So I'll take a look at it. Take
4  a quick break.
5       VIDEOGRAPHER: The time is 12:08. We
6  are going off the record with tape number two.
7       - - -
8       (Recessed at 12:08 p.m.)
9       (Reconvened at 12:20 p.m.)
10      - - -
11      VIDEOGRAPHER: The time is 12:20 and we
12  are back on the record with the beginning of tape
13  number three.
14      MR. WARD: Could you read back the last
15  question and answer, please?
16      - - -
17      (Whereupon the following portion of the
18  testimony was repeated by the Court Reporter:
19      QUESTION: What does inclusively mean to
20  you?
21      ANSWER: It tells me that if someone
22  reading this patent took the level as being

### 355

1  exactly -- if someone came up with a product that is
2  outside that range, the range being from 4.5 to 6,
3  if they came up with a product outside that range,
4  they have infringed the patent, inclusive.)
5       - - -
6  BY MR. WARD:
7  Q. I'm a little confused by that answer.
8  A. Counselor, I think when I gave it I was
9  very confused. May I try again?
10  Q. Let's.
11  A. Right. It makes it very clear that
12  anything within 4.5 to 6 is dead meat. But then I
13  think by using the word inclusively, they are
14  referring to the precision of the measurement. And
15  that what would be -- you might well read it as, as
16  being 4.5 plus or minus the error involved in
17  determining the pH and 6, plus or minus or, of
18  course, minus doesn't come in here. So it would be
19  adding the error in.
20      So I think this is where they are
21  indicating, as they have in the rest of the patent,
22  that their pH values are not exact. They are not

### 356

1  precise I should say, they are not precise to say
2  two decimal figures, so by putting inclusively, they
3  are saying be aware of the fact that there will be
4  some error. We are talking about approximate pH.
5       And so they are saying, as I read the
6  patent, that the precision is no better than
7  plus/minus half a pH unit, that when you come to
8  look at this you should interpret this as going from
9  4, above 4, and below 6.5.
10  Q. Now, I'm going to tell you that in
11  patent terms, and as you say, you are not a patent
12  lawyer, I've generally seen the term inclusively
13  used to mean that the end points of the range are
14  included. But you are not reading it that way?
15  A. Okay. What you are telling me is this.
16  I think you are telling me. That if we didn't have
17  the word inclusively, it would be say 4.51 to 5.99?
18  Q. There is case law to that effect.
19  A. Okay. As I've already said, I am not a
20  patent lawyer, and to the extent this is a legal
21  question, I can't answer it.
22  Q. No. I asked you how you read it and I

**357**

1  think you answered my question. And just to briefly
2  go over the reason that you add half a point to
3  either end of the range?
4     A.   Half a pH unit. Yes.
5     Q.   Uh-huh.
6         MR. BURATTI: Objection to form. Is
7  there a question?
8     Q.   Yes. Just if you could briefly --
9     A.   Oh, I'm sorry.
10    Q.   If you could briefly explain why it was
11 that you added a half point into the pH range on
12 either end?
13    A.   Throughout the patent there are a number
14 of pH values indicated. Now, with the exception of
15 one, which is in Table 1 where it tells me a pH of
16 4.7, all the other values are either an exact pH
17 value with nothing on the right of the decimal point
18 or they are exactly half a pH unit.
19        In no case is there, for example, the
20 second decimal unit given to us. If the patentees
21 had been using a pH meter, I would have expected to
22 see two decimal points in the values that they

**358**

1  record.
2         Additionally, I note that in the tables
3  where they give the pH, at the head of the pH values
4  it says very clearly approximate. So when I read
5  that I say to myself, this is strongly indicating to
6  me that the method of determining pH used by the
7  patentees was a colorimetric one, probably using pH
8  test papers, and with that type of technique it is
9  not very precise. It may be accurate, but it is not
10 very precise, and a precision of plus/minus half a
11 pH unit is reasonable.
12        So that's how I come to this point that
13 when they are talking about pH values, they are
14 saying approximate. Although they don't actually
15 say so in the patent, I take all their values, in my
16 mind I see plus/minus half a pH unit.
17    Q.   Now, in your experience in testifying in
18 patent matters have you had occasion to analyze
19 claims that discuss ranges?
20    A.   Well, I have obviously met with claims
21 before and I have given my opinion as a colloid
22 scientist, as a scientist. The interpretation has

**359**

1  been made by lawyers. And some of the arguments
2  pertaining to ranges, they have gone over my head, I
3  don't understand them fully. They are legal
4  matters. But, yes, to answer your question, I have
5  testified before on points about ranges.
6     Q.   Have you noticed in these instances that
7  these ranges are usually broad?
8         MR. BURATTI: Objection to form.
9     A.   Well, I have testified in some patent
10 cases on behalf of the patent holder and in some
11 cases on the behalf of someone who is trying to
12 invalidate the patent. And obviously I've been
13 given different interpretations perhaps because of
14 that.
15        I don't understand all the legal
16 niceties and I must admit until a few minutes ago
17 I've now learned something from you counselor, that
18 I didn't know that if the word inclusive didn't come
19 at the end you would shave a little bit off that
20 range.
21    Q.   We will argue anything.
22    A.   Well, but quite seriously, all I can say

**360**

1  is I come to this as a colloid scientist. I look at
2  these pH terms and these are how I read it. In
3  terms of the claims interpretation, that is for you
4  gentlemen, and of course the Court.
5     Q.   All right. I can say that when I draft
6  a claim, not that I do it too often anymore, but
7  when I draft a claim I would already include my
8  extensions in the range.
9     A.   I see.
10    Q.   But that again is a legal matter, and
11 you are not here to discuss that.
12        But I do have some other questions about
13 this pH range and we will do it in reference to the
14 '062 patent. So if you still have it in front of
15 you, there is a couple of things I wanted to ask.
16    A.   Yes, sir.
17    Q.   First, have you noticed in your review
18 of the '062 patent that there is a particularly
19 preferred embodiment?
20        MR. BURATTI: Objection; form.
21    A.   I do remember that there are a number of
22 points when it talks about preferably and most

457

```
 1          - - -
 2          MR. BURATTI: All right. Dr. Rhodes
 3  referred earlier today to some e-mails that he had
 4  seen in preparation for his deposition. I'm going
 5  to mark those as Rhodes Exhibit 7. It's a March 3,
 6  2006 e-mail from Mike -- from Jason Buratti to Mike
 7  Spero, S-P-E-R-O, and copying Mike Zinna and a group
 8  e-mail styled LP Matthews; a March 15, 2006 e-mail
 9  from Jason Buratti to Mike Spero, copying Mike Zinna
10  and LP Matthews.
11          I'm going to mark as Rhodes 8 a two-page
12  document containing the calculations that correspond
13  to these sections in Dr. Rhodes's report that deal
14  with the limited defendant's accused products that
15  Dr. Rhodes prepared himself.
16              (Rhodes Exhibit No.
17               7 and 8 were marked
18               for identification.)
19
20          MR. BURATTI: We can go off the record.
21          (Whereupon, at 4:06 p.m. the taking of
22  the instant deposition recessed.)
```

458

```
 1
 2
 3        _____
 4         CHRISTOPHER T. RHODES, PH.D.
 5
 6
 7  SUBSCRIBED and SWORN TO before me this _____ day of
 8  _____, 2006.
 9
10
11
12
13
14
15
16
17
18        _____
19              NOTARY PUBLIC
20
21
22  My Commission expires: _____
```

459

```
 1  UNITED STATES OF AMERICA  )
 2                             ss:
 3  DISTRICT OF COLUMBIA      )
 4          I, ROBERT M. JAKUPCIAK, an RPR and Notary
 5  Public within and for the District of Columbia do
 6  hereby certify:
 7          That the witness whose deposition is
 8  hereinbefore set forth, was duly sworn and that the
 9  within transcript is a true record of the testimony
10  given by such witness.
11          I further certify that I am not related to
12  any of these parties to this action by blood or
13  marriage and that I am in no way interested in the
14  outcome of this matter.
15          IN WITNESS WHEREOF, I have hereunto set my
16  hand this _____ day of _____, 2006.
17
18              _____
19
20  My Commission Expires:
21  December 14, 2008
22
```