IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LP MATTHEWS, L.L.C., | ) | **REDACTED PUBLIC VERSION** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1507-SLR |
| | ) | |
| BATH & BODY WORKS, INC.; LIMITED | ) | |
| BRANDS, INC.; KAO BRANDS CO. | ) | |
| (f/k/a THE ANDREW JERGENS | ) | |
| COMPANY); and KAO CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**LP MATTHEWS' OPENING MEMORANDUM SUPPORTING ITS
*DAUBERT* MOTION TO STRIKE THE EXPERT REPORT AND
EXCLUDE THE TRIAL TESTIMONY OF THE LIMITED
DEFENDANTS' PATENT LAW EXPERT, MICHAEL H. DAVIS**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19801
Office: 302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015

*Counsel for Plaintiff LP Matthews. L.L.C.*

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, D.C. 20006

Dated: June 27, 2006

## NATURE AND STAGE OF PROCEEDINGS

On December 8, 2004, plaintiff LP Matthews, L.L.C. ("LP Matthews") filed a
Complaint for patent infringement against defendants Kao Brands Company (formerly
known as The Andrew Jergens Company), Kao Corporation, Limited Brands, Inc., and Bath
& Body Works, Inc. (D.I. 1.) LP Matthews amended its Complaint on February 2, 2005.
(D.I. 5, 8.) This Court entered a Scheduling Order on June 9, 2005. (D.I. 39.) Expert
discovery closed on May 12, 2006. (D.I. 39 at 1.) *Daubert* motions must be filed by June
22, 2006. (*Id.* at 3.)

## SUMMARY OF THE ARGUMENT

LP Matthews submits this opening memorandum in support of its motion to strike the
expert report, opinions, and proffered trial testimony of defendants Limited Brands, Inc.'s
and Bath & Body Works, Inc.'s ("the Limited defendants") purported patent law expert,
attorney Michael H. Davis. The Limited defendants retained Mr. Davis to tell the jury "about
patent practices and procedures, both generally and as they relate to this case, and on various
patent issues" and '                         **REDACTED**

The Limited defendants bear the burden to prove invalidity,
and affirmative reports were due on February 28, 2006. (*See* D.I. 39, ¶ 2(c)(1)). But they did
not serve his report until March 31, 2006. Mr. Davis' report should be stricken on this basis
alone.

Mr. Davis' report contains general information about patent office procedure. But
Mr. Davis has never written or prosecuted a patent application, never appealed a case to the
Board of Patent Appeals and Interferences or the Federal Circuit, and never examined a
patent or worked at the patent office in any capacity. He has no experience from which he
can draw upon in order to opine about patent office practices and procedure. Even if he did,

he is unable to explain how jury instructions or other unbiased presentations — such as the Federal Judicial Center's videotaped "Introduction to the Patent System" — would not fully explain patent office procedures. Finally, his report also contains conclusions about claim construction of technical terms. But he has no technical background, and claim construction is a question of law for the Court.

For all of these reasons, his opinions are not admissible under *Daubert* or Rule 702 and they should not be presented to the jury.

## FACTUAL BACKGROUND

The United States Patent and Trademark Office ("PTO") issued United States Patent No. 6,063,062 ("the '062 patent") to Douglas Greenspan and Philip Low on November 5, 1991. The '062 patent claims compositions for cleaning human skin that contain orange oil, an oat ingredient, and a moisturizer. (Ex. A at 9:3-10:25)

On March 31, 2006, over a month after it was due, the Limited defendants served an "Expert Report of Professor Michael H. Davis." (Ex. B.) Mr. Davis had difficulty identifying what paragraphs of his report rebutted plaintiff's expert report (ex. C at 226-30); it turned out only two did: paragraphs 62 and 72. (*Id.* at 228-35.) While the remaining paragraphs in his report should be excluded *in limine*, they also are not relevant, so his entire report should be stricken and his testimony excluded at trial. There are 77 paragraphs (67 appears twice), and the proposed subject matter of the opinion begins at paragraph 14.

Paragraphs 14-67₁ provide general information about patent office procedure, including a recitation of legal principles of anticipation, obviousness, claim construction, utility, and the presumption of validity, including case cites and references to "hornbook law." The presentation is skewed toward the accused infringer and addresses the issues of anticipation (Ex. B at ¶ 48) and best mode (*Id.* at ¶ 45), which are not defenses in this

litigation. When asked how his proposed testimony on patent office procedure would assist the jury, Mr. Davis replied, "I think it helps. That's all I can say." (Ex. C at 12:9.) When asked why, he could only provide a generalization:

> A.   I think the jury should be fully informed. I mean, I think -- depending on what the judge lets them hear, I think they will be more fully informed if they hear my opinion than if they don't.

> Q.   Is there any other reason?

> A.   Not that I can think of.

(Ex. C at 12.) Further, Mr. Davis has never written a patent application, worked at the patent office, prosecuted a patent application, appealed a patent to the Board of Patent Appeals and Interferences (the "Board"), appealed a case to the Federal Circuit, or responded to an office action. (*Id.* at 45-47.) As such, he lacks any experience to draw on to testify on patent office procedure:

> Q.   What aspects of patent prosecution have you participated in directly?

> A.   Directly before the Patent Office? None.

(*Id.* at 47:17.)

Paragraphs 68-75 of Mr. Davis' report are specific to the case.[1] In those paragraphs, Mr. Davis interprets the orange oil and pH claim elements. (Ex. B at ¶ 68-69.) Mr. Davis is an attorney with no technical background. (See Ex. B at Exhibit B.) When asked how his opinions on claim construction would assist the jury, he replied "I think that it depends on if the judge just simply says, 'Look at these claims, and this is what they mean,' and says no more about anything else, perhaps. But I've never seen such a very simple jury instruction." (Ex. C at 10:15-19.) Remarkably, his testimony fails to acknowledge that this Court is more

---

[1] The paragraphs refer to claims 1 and 6 of the '062 patent. During his deposition, Mr. Davis was not sure which claims he had given opinions about. (Ex. C at 49.)

than sufficiently experienced with patent litigation to charge the jury on the Court's claim construction and patent office practice, while his own proposed testimony would only mislead and confuse the jury regarding issues of law on which they will be instructed by the Court.

Mr. Davis concludes that the patent office's examination of the '062 patent was inadequate, and that the patent therefore is invalid. (Ex. B at ¶ 70, 75.) That conclusion is unreasonably based on the Board's reprimand in a 1997 opinion of a *different examiner* in a different patent application and on misnumbered claims. (*Id.*) His opinion is merely conclusory and does not meet the requirements for admissibility set forth by *Daubert*.

Finally, Mr. Davis concludes that Dr. Rhodes relied on extrinsic evidence (¶ 72), although he doesn't identify that evidence. Again, his opinion is conclusory and fails to satisfy the standard for admissibility set by *Daubert*.

## ARGUMENT

Rule 702 imposes a special obligation upon a trial judge to ensure that proposed expert testimony will "assist the trier of fact" because that testimony is both "relevant" and "reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see Kuhmo Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999). To be relevant, expert opinion testimony must have a "valid … connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 592.

This Court's "Guidelines: Legal Expert Testimony in Patent Cases" states that "[i]n all patent cases, the court shows the video 'An Introduction to the Patent System' to the jurors in connection with its preliminary jury instructions." The Limited defendants have not offered any justification for departing from these long-standing guidelines. Indeed, at his

deposition, Mr. Davis could not identify a single reason why his proposed patent office procedure dissertation in paragraphs 14-67[1] would even be helpful to the jury. This is not surprising, because he lacks sufficient experience and expertise to aid the jury, and his "opinions" are skewed toward the accused infringer. Paragraphs 14-67[1] should therefore be stricken and the "opinions" excluded.

Mr. Davis' claim construction opinions in paragraphs 68-69 and his extrinsic evidence opinion in paragraph 72 also are not relevant. They impinge on the province of the judge to construe the claims as a matter of law, and, in any event, the claims will be construed by the Court prior to trial. (*See* D.I. 39.)

Finally, Mr. Davis' opinions on patent examination in paragraphs 70 and 75 are not relevant or admissible under *Daubert*. For patent infringement and validity issues, an opining expert should compare the construed claims to the allegedly infringing device or the prior art. *Catalina Marketing Int'l. v. Coolsavings, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002) ("After claim construction, the fact finder compares the properly construed claims to the accused device or process."). Instead of doing so here, Mr. Davis simply offers "expert" testimony that appears intended to do no more than cast aspersions on the patent examination process. Inadequate examination is not a ground for proving patent invalidity, and any such opinion will simply mislead, confuse and unfairly prejudice the jury. In any event, the Board's decision that ostensibly provides a basis for Mr. Davis' opinion is not admissible for the reasons stated in LP Matthews Opening Memorandum *Daubert* Motion to Strike the Expert Reports and Exclude the Trial Testimony of the Kao Defendants' Liability Expert Robert Y. Lochhead, also filed today.

## CONCLUSION

Because paragraphs 14-67 (the first one), 68-70, 73, and 75 do not meet the Supreme

Court's requirements for admissibility under *Daubert*, LP Matthews requests that this Court

grant LP Matthews' *Daubert* motion.

ASHBY & GEDDES

*/s/ John G. Day*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19801
Office: 302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Counsel for Plaintiff LP Matthews, L.L.C.*

*Of Counsel:*

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, D.C.  20006

Dated: June 22, 2006

170721.1

# EXHIBIT A

# United States Patent [19]

## Greenspan et al.

[11] Patent Number: 5,063,062

[45] Date of Patent: Nov. 5, 1991

[54] CLEANING COMPOSITIONS WITH ORANGE OIL

[75] Inventors: Douglas H. Greenspan, Louisville; Phillip A. Low, Littleton, both of Colo.

[73] Assignees: D. Greenspan; W. Ingram, both of Louisville, Calif.

[21] Appl. No.: 413,395

[22] Filed: Sep. 27, 1989

[51] Int. Cl.⁵ ............................................. A61F 13/00
[52] U.S. Cl. ............................... 424/443; 424/195.1; 424/401; 252/142; 514/783; 514/846
[58] Field of Search ............... 424/443, 401; 514/783

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,014,995 | 3/1977 | Juliano et al. | 514/783 |
| 4,531,487 | 8/1985 | Jones | 252/173 |
| 4,620,937 | 11/1986 | Dellutri | 252/162 |

### OTHER PUBLICATIONS

D. Limonene as a Degreasing Agent Richard L. Coleman, The Citrus Industry, vol. 56, No. 11, Nov., 1975, pp. 23–25.

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—James M. Spear
*Attorney, Agent, or Firm*—Timothy J. Martin

[57]                ABSTRACT

A cleaning composition for cleaning the skin contains orange oil, a pharmaceutically acceptable moisturizer and an emulsifying agent. Preferably the orange oil accounts for between 5% and 60% by volume, and it further preferred that the composition contains 40% orange oil by volume. The moisturizer is either glycerin, aloe vera, jojoba oil, safflower oil or a combination thereof. The emulsifying agent preferably is oatmeal. The composition is constituted to have a pH of between 4.5 and 6.0, and the composition may be packaged as moistened towellets in hermetic packets.

12 Claims, No Drawings

5,063,062

**1**

# CLEANING COMPOSITIONS WITH ORANGE OIL

## FIELD OF THE INVENTION

The present invention generally relates to cleaning compositions suitable for external application to human skin tissue in order to remove unwanted substances such as tar, caulking compounds, sealants, adhesives and the like. More specifically, however, the present invention is directed to a natural cleaning composition that utilizes only plant based ingredients. As such, the present invention is particularly adapted for cleaning non-water soluble products from the human skin in a safe, effective manner.

## BACKGROUND OF THE INVENTION

A wide variety of cleaning compositions are known for external application to skin tissue in order to remove dirt and unwanted materials. Among these cleaning compounds are the various hard and liquid soaps which may be used for cleaning human skin, especially the hands. However, numerous substances with which the hands may be soiled do not respond to ordinary soap compositions. Examples of substances that are difficult to remove include grease, tar, oils, ink, caulking materials, adhesives, sealants, gums, cosmetics and other non-water soluble products.

While some cleaning compositions have been developed for these materials, the typical cleaners are harsh and can damage the skin, especially after prolonged use. Examples of these compounds include turpentine, acetone, toluene and other petroleum based products as well as ammonia based products. These products, though, often damage the skin and otherwise exhibit a high level of toxicity. Further, if inhaled during use, these petroleum based products may cause respiratory damage. When absorbed through the skin, the petroleum based products can cause damage to the major organs of the body and can have a less serious side effect of drying and chaffing the skin where applied. Thus, it should be appreciated that, although petroleum is a naturally occurring product, it is not toxilogically healthy for the human body. Accordingly, there have been substantial efforts which have been made to find suitable alternative substances for skin cleaning. While some synthetically derived substances have been developed, many of these substances are medically suspect, and in some instances produce side effects making them unsuitable for use on a regular basis.

Orange oil, as a natural product derived from the rind of oranges, has been recognized in the past to have some cleaning capabilities. Prior to the present invention, however, it is not believed that the suitability of orange oil in cleaning human skin was realized. Orange oil by itself is a skin irritant that can cause inflammation of the tissues. When used by itself, fumes from orange oil may cause headaches, dizziness and other side effects. Accordingly, it has not been readily apparent that orange oil alone or in combination with other substances could prove effective in cleaning compounds otherwise difficult to remove from the tissues of the human skin. Rather, efforts in the past have been directed to the combination of orange oil with other cleaning solvents to produce floor cleaners, glass cleaners and the like.

From the foregoing, it should be appreciated that the thrust of prior development of skin cleaners, other than soap, have been directed to petroleum based products and ammonia based products and the industry has ig-

**2**

nored the potential for orange oil as a constituent of skin cleaning compounds. Despite the long felt need for better cleaners, the suitability of orange oil has thus not been recognized, and the inventors of the subject invention have found success by examining this substance contrary to the direction of inquiry adopted by the industry at large.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a new and useful compound for cleaning the human skin.

Another object of the present invention is to provide a skin cleaning compound suitable for cleaning non-water soluble products such as grease, caulking, adhesives, sealants, tar, oils, ink and the like.

Yet another object of the present invention is to provide a skin cleaning composition which is non-toxic.

It is a further object of the present invention is to provide a skin cleaning composition that is derived from natural vegetable and plant sources.

Still a further object of the present invention is to provide a skin cleaning composition that not only removes unwanted substances from the human skin but also acts to help clean and revitalize the human skin.

The present invention, then, provides a skin cleaning composition which is adapted for external use on human tissues. Broadly, this composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent. Preferably, the moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, and safflower oil. Further, it is preferred that the emulsifying agent also function as an emollient. Preferably the emulsifying agent is a natural grain derivative, preferably either oat gum or oatmeal. Further, it is preferred that the first, second, and third ingredients are selected and mixed in a ratio such that the resulting skin cleaning composition has a pH range of between 4.5 and 6.0 inclusively. To this end, a fourth ingredient in the form of a buffering compound may be added to the composition.

In the more specific composition according to the preferred embodiment, the cleaning composition comprises forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of the emulsifying agent and the pharmaceutically acceptable moisturizer. The preferred emulsifying agent in this composition is oatmeal, and the preferred moisturizer is a mixture of jojoba oil, aloe vera and glycerin mixed by volume of approximately two parts jojoba oil, two parts aloe vera and one part glycerin. It is further desired to use a small portion of safflower oil both as a moisturizer and to help form a stable emulsion.

These and other objects of the present invention will become more readily appreciated and understood from a consideration of the following detailed description of the preferred embodiment:

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention is directed to a cleaning composition utilized on skin tissues and having, as its cleaning ingredient, the commercially available substance known as orange oil derived from the rinds of oranges. In this broad form, the composition includes orange oil,

5,063,062

| 3 | 4 |

an emulsifying agent and a pharmaceutically acceptable moisturizer. In order to determine the preferred composition of the present invention, a series of samples having differing properties were evaluated to establish a desired range in pH and to establish the necessary proportion of orange oil to give suitable cleaning. These test samples are set forth below.

In their investigation of cleaning compositions according to the present invention, Applicants first investigated several compositions which were mixtures of orange oil, water, moisturizers and vitamin E. These samples were developed to test the cleaning properties of orange oil and to evaluate orange oil mixed with moisturizing agents. A test group of ten persons, male and female, were selected to subjectively evaluate the results of these samples. Initially, three such samples were prepared, and the compositions are set forth as Samples I–III, as follows:

### SAMPLE I

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 39 |
| Water | 33 |
| Glycerin* | 12 |
| Aloe Vera* | 12 |
| Jojoba Oil* | 3 |
| Vitamin E | 1 |

*Total Moisturizers accounted for approximately 27% by volume.

### SAMPLE II

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 34.5 |
| Water | 27.5 |
| Glycerin* | 17 |
| Aloe Vera* | 14 |
| Jojoba Oil* | 3.5 |
| Vitamin E | 3.5 |

*Total Moisturizers accounted for approximately 34.5% by volume.

### SAMPLE III

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 37 |
| Water | 26 |
| Glycerin* | 14.75 |
| Aloe Vera* | 14.75 |
| Jojoba Oil* | 3.5 |
| Vitamin E | 4 |

*Total Moisturizers accounted for approximately 33% by volume.

Prior to presenting these samples to the test group, Applicants tested the relative acidity of the samples since it was believed desirable to avoid a composition that was either too acidic or too basic. The result of this acidity measurement, correlated to the Samples, is set forth in Table I below:

### TABLE I

| Sample | pH (Approximate) |
|---|---|
| I | 4.5 |
| II | 5 |
| III | 4.7 |

In each of the cases of Samples I–III, the respective components were mixed and blended in an attempt to form an emulsion. An initial problem was noted with each of these Samples, however, in that the emulsion separated, that is, "broke" after approximately one to two days. Since it was fairly simple to re-blend the Samples, Samples I–III were submitted to the test group for evaluation. Generally, the results of the composition was excellent with each of Samples I–III readily removing polyurethane and silicone base caulking compounds, tars, grease, oil and adhesives; each of these industrial type substances are regarded as difficult to remove, from the human hands. All ten members of the test group reported comparable cleaning properties and reported that their hands were left soft after a two week period of using the compounds. Indeed, after two weeks of use, certain male members of the test group who had dry hands resulting from the use of other solvents noted substantial improvement in the texture and softness of their hands. No allergic reactions were reported by any members of the test group.

After determining that test Samples I–III performed adequately in cleaning the hands and in moisturizing the hands, it became necessary to determine whether the oil orange and moisturizer emulsion could be stabilized so that it would not break over a period of time. In order to determine if a natural ingredient could act as an emulsifying agent, the Applicants selected a grain base derivative as an emulsifying agent. To this end, Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier. Accordingly, two more test samples, Samples IV and V were prepared according to the compositions set forth below:

### SAMPLE IV

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 42.75 |
| Aloe Vera* | 7 |
| Jojoba Oil* | 3.5 |
| Safflower Oil* | 4 |
| Oatmeal Gum | 42.75 |

*Total Moisturizers accounted for approximately 14.5% by volume.

### SAMPLE V

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 36.5 |
| Aloe Vera | 14 |
| Jojoba Oil* | 14 |
| Glycerin* | 7 |
| Safflower Oil* | 0.5 |
| Oatmeal | 28 |

*Total Moisturizers accounted for approximately 35.5% by volume.

It may be noted that, in Samples IV and V, vitamin E and water were both omitted from the composition. However, it should be noted that both the oatmeal gum in Sample IV and the oatmeal in Sample V each contain a portion of water. In Sample IV, the oatmeal gum was prepared by boiling rolled oats in water and straining the resultant mass to remove the hulls. In Sample V, rolled oats were boiled in water and the resulting mass (containing approximately 50% water) was used to prepare the composition. Relatively equal parts of orange oil and oat derivatives were used and a small portion of safflower oil was included. Again, relative acidity was tested and it was found that Sample IV had a pH of approximately 5.0 while Sample V had a pH of 5.5.

Samples IV and V were submitted to the test group to evaluate cleaning effectiveness and moisturizing ability. Further, observation of the two compositions were

5,063,062

5

made to determine whether or not the emulsions broke. The results of this study determined that the emulsion of Sample IV broke after approximately seven days while the emulsion according to Sample V did not separate over any observed duration of time (several months). The test group observed that the cleaning properties of Samples IV and V were almost, but not quite, as effective as the cleaning properties of Samples I–III, but that the cleaning effectiveness was estimated at approximately 90% of Samples I–III. With respect to Sample IV, the test group reported that their hands did not roughen, but that the sample did not feel as comfortable when on the hands. With respect to Sample V, the test group reported that the emulsion both felt comfortable on the hands and left their hands soft after approximately five days of regular usage. In each case, the emulsions were able to clean all caulking materials and tars, including silicone and polyurethane based caulking compounds as well as oil and grease from the skin. Further tests were conducted on compositions similar to Sample V in the amount of orange oil was slightly increased while holding the amounts of the remaining ingredients constant until the emulsion broke. It was found that, with these compositions, the emulsion broke when orange oil accounted for approximately 38% by volume of the composition.

From the foregoing, Applicants determined that Sample V offered the best compromise among emulsion stability, cleaning effectiveness, and skin effect. Therefore, utilizing Sample V as a reference, Applicants adjusted the amount of orange oil (ignoring whether the emulsion broke) to determine an effective pH range wherein the composition felt comfortable on the human hands. A first set of samples set forth below as Samples VI–IX were prepared to be less acidic than Sample V, and a second set of test samples, set forth below as Samples X–XIII were tested for compositions having greater acidity than Sample V. Samples VI–IX were prepared by simply buffering Sample V with differing amounts of sodium bicarbonate. The resulting samples were buffered to have pH values according to Table 2 as follows:

TABLE 2

| Sample | pH (Approximate) |
|--------|------------------|
| VI     | 9.0              |
| VII    | 8.0              |
| VIII   | 7.0              |
| IX     | 6.0              |

Each of Samples VI–IX were evaluated by the test group. Samples VI and VII were reported to immediately make the hands dry upon first application of the respective composition and removal of the composition with water. With respect to Samples VIII and IX, the test group reported less drying than Samples VI and VII although more dryness of the hands was noted in comparison to test Sample V. These empirical observations lead Applicants to conclude that an acidity of at least pH 6.0 is desirable, that is, that the preferred composition should not be more basic than pH 6.0.

To evaluate test compositions for excess acidity, Applicants merely increased the amount of orange oil in test Sample V while holding the amounts of the remaining ingredients constant to obtain desired acidity levels according to Table 3, below:

6

TABLE 3

| Sample | pH (Approximately) |
|--------|--------------------|
| X      | 2.5                |
| XI     | 3.0                |
| XII    | 3.5                |
| XIII   | 4.0                |

Test Sample X had a volume percent of approximately 80% orange oil, Sample IX had orange oil of approximately 70% by volume, Sample XII had orange oil of approximately 60% by volume, and Sample XIII had orange oil of approximately 50% by volume.

It had previously been found that orange oil alone exhibited excellent cleaning properties, but left the hands feeling too dry and too astringent. With respect to Samples X–XIII, in each case no emulsion formed. The test group reported that each of Samples X–XIII had excellent cleaning properties, but the emulsions felt too astringent on the hands even after limited use. Applicants accordingly concluded that it was desirable that the emulsified composition have a pH that is approximately 4.5. Thus, Applicants further concluded that the composition according to the preferred embodiment of the present invention should have a pH of between 4.5 and 6.0, inclusively.

As noted in the above examples, the emulsions according to Sample V broke at approximately 38% orange oil by volume. In order to evaluate cleaning properties as a function of percent volume of orange oil, additional samples were prepared wherein the weight percentages of the ingredients other than orange oil was held constant while the amount of orange oil was varied to provide differing volume percentages of orange oil. Accordingly, Samples XIV–XVII were prepared to have volume percents of orange oil approximately 5%, 10%, 15% and 25%, respectively. In each case, the emulsions were stable. These Samples XIV–XVII were given to the test group to subjectively evaluate cleaning effectiveness. With respect to Sample XIV, the test group reported that cleaning properties were substantially reduced; Sample XIV could not effectively clean tar or caulking compounds. Indeed, Sample XIV was only effective in removing cosmetics from the skin. Sample XV eventually was able to remove silicone caulking compounds but was unable to remove polyurethane caulkings or tar. With respect to Sample XVI, the test group reported about 50%–60% of the cleaning effectiveness of Sample V with no marked increase in benefits in skin softening. Sample XVII was reported to have approximately 80% of the cleaning effectiveness of Sample V in removing all of the tested materials, but again there was no report of skin enhancements over Sample V.

From these tests, Applicants concluded that, with respect to cosmetics, a composition according to the present invention could have as little as 5% by volume of orange oil although it was preferable to have a cleaning composition having at least 25% by volume of orange oil.

To determine whether the moisturizers had any effect on the composition or whether pH was the dominant skin effecting property, Applicants prepared yet another sample, Sample XVIII, wherein 100% orange oil was buffered with sodium bicarbonate so that it had a pH of 5.5. This Sample XVIII was tested and it was determined that it was exceptionally drying and astrin-

5,063,062

7

gent on the human hands. Indeed, Sample XVIII proved almost as drying and astringent as Sample X.

In order to increase the amount of orange oil, Applicants further tested a variation on Sample V wherein both the amount of orange oil and the amount of oatmeal were increased while the amount of moisturizers was decreased. This Sample XIX, was prepared as follows:

### SAMPLE XIX

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 40.5 |
| Aloe Vera* | 7.75 |
| Jojoba Oil* | 7.75 |
| Glycerin* | 4.5 |
| Safflower Oil* | .5 |
| Oatmeal | 39 |

*Total Moisturizers accounted for 20.5% by volume.

From Sample XIX, it was concluded that orange oil could be increased, along with a corresponding increase in an oat grain derivative, until approximately 45% by volume of orange oil was included in the composition. Any amount of orange oil in excess of this amount would result in the diminishment of moisturizers so as to negate the softening effect of the hand cleaning composition according to the preferred invention.

Other samples, set forth below as Samples XX–XXIII were prepared utilizing other materials. These samples are as follows:

### SAMPLE XX

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Olive Oil | 25 |
| Jojoba Oil | 25 |
| Baking Soda | Trace |

### SAMPLE XXI

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Glycerin | 50 |

### SAMPLE XXII

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Aloe Vera | 50 |

### SAMPLE XXIII

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 12.5 |
| Vitamin E | 87.5 |

Sample XX was found to have a pH of approximately 8.5. While Sample XX was deemed effective in cleaning, there was some reduction of cleaning effectiveness over Sample V and the composition left a dryness when wiped off of the skin. Further, the emulsion broke almost immediately. With respect to Samples XXI and XXII, both samples left a sticky residue on the hands but were approximately equal in cleaning effectiveness to Sample V. Sample XXI had a pH a little greater than 2.0 while Sample XXII had a pH of approximately 3.5.

8

It was thus observed that aloe vera had some buffering effect on the acidity of the orange oil. Each of Samples XXI and XXII were highly astringent and left the test groups hands dry after washing with water. With respect to Sample XXIII, again this sample proved effective in removing cosmetics, but the sample was not effect in removing heavier, industrial substances such as caulking compounds, adhesives, tars and the like. The orange oil and Vitamin E, however, did mix without separation and a resulting acidity of pH 5.0.

From the information derived form all of the aforementioned samples, Applicants determined that glycerin and safflower oil are both desirable in the preferred compositions. On one hand glycerin appears both to stabilize the emulsion and perform as a moisturizer while, on the other hand, safflower oil appears to act as an emulsion stabilizer, as an emulsifying agent and as a moisturizer.

According to the above, Applicants prefer the compositions set forth in Sample V and Sample XIX for use in cleaning unwanted materials from human skin. In order to test administration of the preferred composition, Applicants applied the compound directly to the skin as a liquid emulsion and removed the emulsion from the hands by washing with water. In addition, Applicants were successful in soaking towellets, formed of standard absorbent material such as paper, cloth and the like, in the liquid emulsion so that a towellet would become impregnated with the cleaning composition. These towellets can be hermetically sealed in standard foil packages, as known in the industry, so that the user can simply remove from the skin any of the described unwanted materials with a pre-moistened towellet. This is particularly useful in situations where water is not readily available. Further, individualized packets of pre-moistened towellets are convenient for portability and on-the-job use.

From the foregoing, the inventors have concluded that a suitable skin cleaning composition can be prepared wherein the skin composition has a first ingredient of between 5% and 60% by volume of orange oil, a second ingredient being a pharmaceutical acceptable moisturizer for human skin and a third ingredient being an emulsifying agent. Preferably, the moisturizer is either one or more of a group of moisturizes selected from the following: glycerin, aloe vera, jojoba oil, safflower oil. However, other pharmaceutically acceptable moisturizers are within the scope of this invention as could be developed without undue experimentation by the ordinarily skilled chemist according to the teachings of the present invention. One example of such a moisturizer is glycerin stearate. These other compositions are thus intended, unless otherwise specifically limited, to be encompassed by the general phrase "moisturizer" both in this specification and in the appended claims. In any event, it is preferred that the resultant composition have a pH between 4.5 to 6.0 and can be so buffered if necessary by the utilization of aloe vera or a buffering agent, such as baking soda.

Accordingly, the present invention has been described with some degree of particularity directed to the preferred embodiment of the present invention. It should be appreciated, though, that the present invention is defined by the following claims construed in light of the prior art so that modifications or changes may be made to the preferred embodiment of the present inven-

9
5,063,062
10

tion without departing from the inventive concepts contained herein.

We claim:

1. A skin cleaning composition adapted for external use on human tissues, comprising a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent in the form of an oat grain derivative product.

2. A skin cleaning composition according to claim 1 wherein said moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, and safflower oil.

3. A skin cleaning composition according to claim 1 wherein said oat grain derivative product is one of oat gum and oatmeal.

4. A skin cleaning composition according to claim 1 wherein said first, second and third ingredients are selected and mixed in a ratio such that the resulting skin cleaning composition has a pH range of between 4.5 to 6.0, inclusively.

5. A skin cleaning composition according to claim 1 including as a fourth ingredient a buffering compound in a proportion such that the resulting composition is pH balanced within a range of 4.5 to 6.0, inclusively.

6. A skin cleaning composition for external use on human tissues, comprising orange oil, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as an emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively.

7. A skin cleaning composition according to claim 5 including a buffering compound.

8. A skin cleaning composition according to claim 5 wherein said moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, safflower oil and glycerol stearate.

9. A cleaning composition for use on human skin comprising forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of oatmeal and a pharmaceutically acceptable moisturizer.

10. A cleaning composition according to claim 8 wherein said moisturizer is a mixture of jojoba oil, aloe vera and glycerin.

11. A cleaning composition according to claim 1 wherein said mixture includes by volume two parts jojoba oil, two parts aloe vera and one part glycerin.

12. A cleaning composition according to claim 9 wherein said mixture includes safflower oil.

* * * * *

# EXHIBIT B

**REDACTED**

# EXHIBIT C

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF DELAWARE

3   --------------------------------x

4   LP MATTHEWS, L.L.C.,

5                    Plaintiff,

6                                   Civil Action No.

7       -against-                   04-1507-SLR

8   BATH & BODY WORKS, INC.,

9   LIMITED BRANDS, INC., KAO BRANDS CO.

10  (f/k/a THE ANDREW JERGENS COMPANY),

11  and KAO CORPORATION,

12                   Defendants.

13  --------------------------------x

14                  May 11, 2006

15                  9:11 a.m.

16       Videotaped Deposition of MICHAEL H. DAVIS,

17  taken by the Plaintiff, pursuant to Notice, at the

18  offices of Ward & Olivo, 708 Third Avenue, New York,

19  New York, before David Levy, CSR, a Notary Public of

20  the State of New York.

21

22

---

1   A P P E A R A N C E S:

2       ROBINS, KAPLAN, MILLER & CIRESI LLP

3       Attorneys for Plaintiff

4           Suite 100

5           1801 K Street, N.W.

6           Washington, D.C. 20006-1307

7       BY:   JASON R. BURATTI, ESQ.

8                 -and-

9           ROBERT A. AUCHTER, ESQ.

10

11      WARD & OLIVO

12      Attorneys for Defendants

13          708 Third Avenue

14          New York, New York 10017

15      BY:   JOHN F. WARD, ESQ.

16

17  ALSO PRESENT:

18      KEVIN GALLAGHER, Videographer

19

20

21

22

---

1   ------------------ I N D E X ------------------

2   WITNESS             EXAMINATION BY       PAGE

3

4   MICHAEL H. DAVIS    MR. BURATTI          5

5

6   INFORMATION REQUESTS        LINE      PAGE

7   DIRECTION NOT TO ANSWER     15        94

8   REQUEST                               208

9   REQUEST                     13        211

10

11  DEPOSITION EXHIBITS (DAVIS)        FOR IDENT.

12

13  1  Board of Appeals decision Bates    93

14     numbered DG 5319 through 5333

15

16  2  Expert report of Michael Davis     142

17

18

19

20

21

22

---

1       VIDEOGRAPHER:  We're now going on the record at

2   approximately 9:11 a.m.  This is the videotape

3   deposition of the witness Michael H. Davis, taken in

4   the U.S. District Court for the District of Delaware.

5   The case number is 04-1507-SLR, LP Matthews L.L.C.,

6   vs. Bath & Body Works, Inc., et al.

7       The deposition is being held today, May 11, 2006

8   at the offices of Ward & Olivo, 708 Lexington Avenue,

9   New York, New York.  I'm Kevin Gallagher, the

10  videographer.  The court reporter is David Levy. We're

11  both from the independent firm of Henderson Legal

12  Services.

13      Counsel will now identify themselves for the

14  record.

15      MR. BURATTI:  Jason Buratti for Plaintiff LP

16  Matthews.

17      MR. AUCHTER:  Robert Auchter for Plaintiff LP

18  Matthews.

19      MR. WARD:  John Ward for the Defendants Bath &

20  Body Works, et al.

21      VIDEOGRAPHER:  Mr. Levy will swear in the

22  witness.

1      M I C H A E L   H.   D A V I S , having been

2    duly sworn by the Notary Public, was examined and

3    testified as follows:

4    EXAMINATION

5      BY MR. BURATTI:

6      Q.    Good morning, Professor Davis.  I've got

7    an air conditioner behind me.  I've had a little bit

8    of trouble hearing you before we started the

9    deposition.  So if you'll just --

10          MR. WARD:  Feel free to turn that off

11   if you prefer.

12          MR. BURATTI:  We'll see how it goes.

13     Q.    Professor Davis, what opinions about

14   factual issues will you give at trial in this case?

15     A.    Without being exhaustive, I'd have to

16   refer to my report on -- on the validity of the

17   patent.

18     Q.    Okay.  Tell me about the factual issues

19   that you will give testimony about at trial that you

20   can remember without your report.

21     A.    Factual issues?

22     Q.    Factual issues.

1      A.    I guess the most important factual issues

2    are the -- is the language of the patent and

3    statements made there, the limitations stated there,

4    and the claims.

5      Q.    Anything else you can think of?

6      A.    Not offhand.

7      Q.    What factual issues about the language of

8    the patent will you give opinions about at trial?

9      A.    Without being exhaustive, the most

10   important probably are the language that specifies the

11   pH range, requirement of having orange oil of a

12   certain amount.  I'm not sure what else.

13     Q.    What statements made in the patent will

14   you give opinions about at trial that are factual

15   issues?

16     A.    No, I said that the statements themselves

17   are factual.  The entire patent document is a fact

18   upon which I would base some of -- a lot of my

19   opinions.

20     Q.    Which opinions about factual issues will

21   you give at trial that are based on statements in the

22   patent?

1      A.    Again, without being exhaustive, I think

2    some of the most important might be that the limits

3    clearly identified in the specification are applicable

4    to the claims themselves.  Among those limits would

5    be, again, the requirement that the patented product

6    contains a certain percentage of orange oil and that

7    the pH range be between the range that is clearly

8    stated in the document itself.

9      Q.    Okay.  So that the statements in the

10   patent and the language of the patent then, in your

11   prior answer, were the same thing; do I understand

12   that correctly?

13     A.    I'm not sure what you're saying.

14     Q.    Your answer was, the language of the

15   patent, the statements in the patent, the limitations

16   and the claims, it sounds as though all of these are

17   relating to the same two factual issues that you're

18   saying exist and that you'll give opinions about, the

19   pH limitation and the orange oil limitation.  Do I --

20     A.    Those are two important issues that

21   immediately appear in the specification and claims.

22     Q.    Aren't those questions of claim

1    construction that you're describing right now?

2      A.    They certainly are important to claim

3    construction, yes.

4      Q.    Claim construction is a matter of law.

5      A.    Yes, absolutely.

6      Q.    What opinions about the orange oil claim

7    limitation are factual issues that you're going to

8    give opinion testimony about at trial?

9      A.    I'm not sure what you mean by that.

10     Q.    Well, I'm trying to identify what opinions

11   you're going to give at trial that are going to assist

12   a fact-finder.  And your answers so far have driven to

13   interpretation of the orange oil claim element and the

14   pH claim element; is that a fair characterization?

15     A.    They go directly to interpretation, yes.

16     Q.    Have you seen the scheduling order in this

17   case?

18     A.    I don't think I've seen the scheduling

19   order.

20     Q.    Are you aware, though, that there will be

21   a Markman hearing prior to trial?

22     A.    I assume there has to be.

```
1       Q.   And that the claims will be interpreted
2   prior to trial?
3       A.   Yes.
4       Q.   How is your testimony about the orange oil
5   claim element going to assist the trier of fact
6   at trial?
7       A.   I think that my opinion might help the
8   trier of fact understand the importance that derives
9   naturally from the Patent Office granting a patent in
10  a case like this with specifications and claims that
11  relate to another in that way.
12      Q.   How is that going to help the trier of
13  fact determine infringement?
14      A.   I think that it perhaps will help the
15  trier of fact understand the importance of how those
16  claims limitations are in -- in interpreting the
17  claims themselves.
18      Q.   Why won't a jury instruction about what
19  the claims mean take care of that?
20      A.   I think if the jury instruction
21  incorporated language about how the Patent Office
22  operates and the importance of recognizing how the
```

9

```
1   procedures result in those -- those claims, it could
2   help the jury decide accurately.  And my opinion, I
3   suppose, would inform that.
4       Q.   But if the claims have been interpreted
5   and the court instructs the jury what the claims mean,
6   doesn't the jury just have to read the claims as
7   interpreted by the court onto the accused products?
8       A.   I think that depends on how the judge were
9   to instruct the jury.  And I haven't seen the
10  instructions yet.
11      Q.   Okay.  If the judge instructs the jury
12  what the claims mean, doesn't the jury as a finder of
13  fact just have to read the claims on the accused
14  products?
15      A.   Again, I think that it depends on if the
16  judge just simply says, "Look at these claims, and
17  this is what they mean," and says no more about
18  anything else, perhaps.  But I've never seen such a
19  very simple jury instruction.
20      Q.   How is the finder of fact going to read
21  the claims interpreted by the judge onto the accused
22  products?  How does that work?
```

10

```
1       A.   I think at the Markman hearing, when the
2   judge decides on what the claims mean, that kind of
3   information is essential.
4       Q.   So is your opinion, then, to inform the
5   judge or the finder of fact?
6       A.   I think ultimately it is to inform the
7   finder of fact.
8       Q.   How does Patent Office procedure help the
9   jury read interpreted claims onto accused products?
10      A.   I think that -- I'm sorry, could you
11  repeat the question?
12      Q.   You've just explained that jury
13  instructions about patent office procedure would
14  assist the jury in determining infringement.
15      A.   Right.
16      Q.   Right?  How does Patent Office procedure
17  help the jury to do its factual findings of an
18  interpreted claim reading on an accused product?
19      A.   I think eventually the jury is going to
20  hear testimony from the inventor and others who worked
21  with the inventor, and I think my opinion might shed
22  some light on how what they claim, what they said
```

11

```
1   happened relates to the ultimate -- ultimate patent
2   itself.
3       Q.   You said "I think my opinion might shed
4   some light on how what they claim, what they said
5   happened relates to the ultimate patent itself."
6       How does that help the jury?  How does
7   understanding Patent Office procedure help the jury
8   determine infringement?
9       A.   I think it helps.  That's all I can say.
10      Q.   Why?
11      A.   I think the jury should be fully informed.
12      I mean, I think -- depending on what the judge
13  lets them hear, I think they will be more fully
14  informed if they hear my opinion than if they don't.
15      Q.   Is there any other reason?
16      A.   Not that I can think of.
17      Q.   How does Patent Office procedure help the
18  jury determine factual issues of validity?
19      A.   Only of validity?  It depends on what the
20  ultimate evidence is on validity.
21      Q.   Are you going to give any opinions at
22  trial about factual issues concerning validity?
```

12

1    A.   I think so.

2    Q.   You think so?

3    A.   I mean, it depends on what the judge

4 allows but I think I'm prepared to offer testimony on

5 that.

6    Q.   What facts?

7    A.   On the events that led up to the

8 prosecution of the patent, the events that occurred

9 within the Patent Office, the events that occurred

10 with respect to the continuation involved. I'm not

11 sure what else.

12    Q.   What issues that are facts that need to be

13 determined at trial in this case are you going to give

14 opinions about?

15    A.   Repeat the question, please? Sounds like

16 the same question, that's why I'm asking.

17    Q.   Let me ask it differently, then. Are

18 there any other factual issues that you consider to be

19 issues for the fact finder to determine at trial in

20 this case that you will give opinions about?

21    A.   I'm not sure. I said it without being

22 exhaustive. I stated some. I'd have to refer to my

13

1 report to see others.

2    Q.   Okay. So in your opinion, the prosecution

3 of the patent in suit is a factual issue that the jury

4 needs to determine?

5    A.   It may become relevant about what was

6 stated and what happened, et cetera.

7    Q.   How?

8    A.   I'm sorry, you'd have to ask that -- how

9 what?

10    Q.   How can the prosecution of the patent in

11 suit become an issue that the jury needs to determine?

12    A.   Well, as I said already, I think it is the

13 same question. I think that the better informed the

14 jury is, the better and more accurate the eventual

15 jury verdict will be. I think that judges in patent

16 courts especially have been very liberal and afforded

17 a certain amount of reasonableness or flexibility in

18 terms of experts' testimony in IP cases. And I think

19 the goal of that basically is to fully inform the jury

20 and obtain the most accurate result, a concern that's

21 been seriously discussed by the patent bar and their

22 clients for decades, the desire to have a more

14

1 accurate jury determination.

2    Q.   How is informing the jury about the Patent

3 Office procedure going to result in a more accurate

4 jury determination at trial?

5    A.   I just think a fully informed jury is

6 better.

7    Q.   How is it going to make for more accurate

8 jury determinations of fact?

9    A.   I just think the more the jury knows about

10 what transpired, the more accurate the jury's verdict

11 will be. And obviously, it will depend on the judge's

12 instructions in the end.

13    Q.   Are there any other reasons that you think

14 that your opinion testimony in this regard will make

15 for a more accurate jury determination of facts that

16 are at issue in this case?

17    A.   I can't think of any at the present time.

18    Q.   Is it your opinion that the nature of

19 Patent Office procedure is a factual issue that the

20 jury needs to determine in this case?

21    A.   Yes, I think that's one of the most basic

22 reasons that juries, that courts are curious about

15

1 this, yes.

2    Q.   How is Patent Office procedure a question

3 of fact concerning the validity of the patent in suit

4 that the jury needs to determine?

5    A.   I think it informs the jury on -- on what

6 was done at different times, at important times, and

7 how it was performed.

8    Q.   And in your opinion, those are questions

9 of fact that the jury will need to determine at trial

10 in this case?

11    A.   May be, yes.

12    Q.   May be, or are?

13    A.   May be, may not be. Again, I think it

14 depends on how the judge reacts, and what the eventual

15 instructions are.

16    Q.   How the judge reacts to what?

17    A.   To the case itself, to my testimony, and

18 to the facts as they remain after -- after the various

19 hearings are over and the trial begins.

20    Q.   You've reviewed most of the documents that

21 are extant in the case today. In your opinion, as the

22 case is currently postured, how would your opinion

16

1   about Patent Office procedure inform the jury's
2   determination of facts concerning the validity of the
3   patent?
4       A.   One rather important one, I think, is that
5   the Board of Patent Appeals decided the continuation
6   with respect to at least one claim that's virtually
7   identical to the issues in this case, and indicated
8   quite clearly that it was invalid for obviousness.
9       Q.   We'll come back to the board opinion. But
10  that wasn't exactly a response to my question.
11      I want to know how testimony about the Patent
12  Office procedure will inform the jury's determination
13  of underlying facts concerning validity. Are you
14  saying that you're going to --
15      A.   You're asking me, instead of my opinion
16  about validity, to ask about my opinion about civil
17  procedure, basically. You're asking me to give
18  additional legal advice about what would be proper and
19  admissible at a trial. And that's not what my --
20  that's not what my expertise involves. Whether the
21  judge will decide one way or another it is admissible
22  depends on legal issues about which I'm not sure I --

17

1   I certainly wasn't asked to render my opinion on that.
2       Q.   On legal issues?
3       A.   On that particular legal issue. On the
4   admissibility of evidence at a trial.
5       Q.   I'm actually not asking anything --
6       A.   Sorry, I thought --
7       Q.   Let's make sure that we're communicating
8   well about this. I want to know about issues of
9   disputed fact that the trier of fact will have to
10  determine at trial in this case that you're going to
11  give opinions about. And so far, I think we've got
12  claim construction and Patent Office procedure.
13      A.   Patent Office procedure in a very broad
14  sense, yes.
15      Q.   Okay. What genuine issues, what issues of
16  fact that the jury will have to determine at trial in
17  this case, are you going to give opinions about?
18      A.   I think the report speaks for itself.
19  Again, unless -- if you're really asking me whether
20  something is admissible at trial, then I -- I'm not
21  an expert on that. Any opinion I gave you about what
22  was admissible at trial would be like my -- an opinion

18

1   on Constitutional law. It may be admissible or not.
2       Q.   I'm not asking about admissibility. I'm
3   asking about issues of fact. The jury is going to
4   determine issues of fact at trial, right?
5       You have to respond in words for the reporter.
6       A.   Yes.
7       Q.   Thank you. And those issues of fact are
8   going to be on the validity of the patent, for one.
9       A.   Is that a question? That was a statement.
10      Q.   I'm sorry, I used inflection.
11      A.   Okay, I can't --
12      Q.   Fair enough.
13      A.   That's true.
14      Q.   Okay. And there's going to be issues of
15  fact that the jury has to determine about
16  infringement; is that right?
17      A.   Yes. I assume so.
18      Q.   And so I'm asking, what factual issues of
19  validity are you going to give opinions about that are
20  going to be disputed in this case at trial and
21  determined by the fact-finder.
22      A.   I -- I already said basically the

19

1   relationship between the claims, the various elements
2   of the claims, the limits in the claims, and what
3   happened within the Patent Office and its procedures.
4       Q.   Anything else?
5       A.   I'd have to look at the report again. But
6   I...
7       Q.   What factual issues of infringement are
8   you going to give opinions about that are going to be
9   at issue at trial and determined by the fact-finder?
10      A.   I think that depends on what factual
11  issues remain at the time of trial.
12      Q.   If trial were today, what factual issues
13  of infringement would you give opinions about?
14      A.   If trial were today? Again, I'd have to
15  look at the list. I think there's probably a half of
16  dozen or more issues. But certainly among the most
17  important are the flexibility or lack of it in the --
18  in the limits in the claims; the importance of what
19  the specification says about what the product is; what
20  occurred in the Patent Office, especially with respect
21  to the Board of Appeals that you don't want to discuss
22  now, but still nevertheless shows that the patent is

20

1    Q.    The common law gives force to patents,
2    though, isn't that right?
3    A.    I don't think so, no.  I think the common
4    law has nothing to do with patents.  In fact, I think
5    the patent law, as I think maybe I said in my report,
6    is generally opposed to any kind of monopoly.
7    Q.    Right.  But if the common law has nothing
8    to do with patents, then how does whether or not the
9    common law disfavors monpolies bear on this case?
10   A.    I don't know.  I'm not sure I said that
11   the common law bears on this case.  It bears on patent
12   law generally.  To that extent, it bears on this case.
13   Q.    I'm confused.
14   A.    I'll be glad to help you.  Ask me a
15   question.  I'll give you an answer.
16   Q.    Does the common law have anything to do
17   with patents?
18   A.    Patents are a specific exception to the
19   common law.
20   Q.    So the common law favors patents?
21   A.    Patents are an exception to the common
22   law.  The most that you can say is that -- that the

1    reason the legislature is required is because it does
2    something that is disfavored by the common law and as
3    a result, you have a conflict between the common law
4    disfavor of monpolies and the legislative grant.  And
5    consistent with that and principles of statutory
6    construction, you would then conclude that patents
7    should at least be very, very narrowly interpreted and
8    circumscribed.
9    Q.    And that question of interpretation of a
10   patent, that's a question of law.
11   A.    Certainly, interpretation of a patent
12   involves questions of law.
13   Q.    In your report, you wrote that, "It has
14   been held that such minimal evidence as even one
15   missing prior art reference is sufficient to overcome
16   the presumption of validity."
17   A.    In the right case, yes.
18   Q.    What case?
19   A.    I don't know.
20   Q.    You said it has been held, though.
21   A.    Yes.  I'd have to look it up.  I'm quite
22   aware of having read that in a case, maybe more than

1    one, but certainly, one.  And I was surprised to see
2    that.
3    Q.    Do you know whether or not the case where
4    you read that involved a cumulative reference?
5    A.    No, I don't remember what it was.
6    Q.    But you agree that if it had involved a
7    cumulative reference, then that wouldn't have overcome
8    the presumption?
9    A.    You know, overcoming a presumption is a
10   very complex evidentiary question.  If what you're
11   saying is that it must have been a weakly-supported
12   patent in order for a prior art to overcome it,
13   generally that's true, although it would depend on
14   what the reference was.
15   Q.    If it's a very complex evidentiary
16   question about whether or not one missing prior art
17   reference is sufficient to overcome the presumption of
18   validity, how is it that in an opinion that you give,
19   that one missing prior art reference wouldn't unduly
20   influence the jury one way or the other with respect
21   to the determination that would overcome the
22   presumption?

1    MR. WARD:  You can answer that if you
2    understand --
3    Q.    Do you understand that question?
4    A.    I picked out a few parts that I think I
5    understand --
6    Q.    Let me ask it again, then, just to be
7    clear.  Actually, I'm going to withdraw the question.
8    We'll come back to that, I'm sure, repeatedly.
9    You can't think of any case right now off the
10   top of your head where it has been held that such
11   minimal evidence as even one missing prior art
12   reference is sufficient to overcome the presumption?
13   A.    No, but I remember having seen it quite
14   specifically because it arose in a case I was working
15   on.
16   Q.    So you can't tell me any of the details
17   about the holding that you're thinking of or that you
18   read about?
19   A.    No.
20   Q.    That resolved the very complex question of
21   evidence concerning --
22   A.    It didn't resolve the very complex

5/11/2006 Davis, Michael

1  question. It was a very complex question as to
2  whether it would rebut the presumption.
3      Q.    How many patents have you prosecuted?
4      A.    On my own, none.
5      Q.    How many patents have you assisted in the
6  prosecution of?
7      A.    Probably a dozen, I'd say.
8      Q.    Were you one of the attorneys prosecuting
9  the patent?
10     A.    No.
11     Q.    Were you a technical expert with respect
12  to the patents?
13     A.    I have been asked for advice and
14  assistance when people have been prosecuting patents.
15     Q.    For clients of yours?
16     A.    No, by firms.
17     Q.    As a, kind of as a consultant, you mean?
18     A.    Yes.
19     Q.    What was the technology in those patents?
20            MR. WARD:  If you're allowed to
21  discuss it.
22     A.    I think I've had patents in a wide variety

45

5/11/2006 Davis, Michael

1  of technologies. And I can speak about them
2  cumulatively as involving mechanical patents, computer
3  patents, electronic patents. I think I've even had
4  some drug patents.
5      Q.    Drug compositions?
6      A.    Something involving -- I don't know,
7  probably Patent Office procedure as opposed to the
8  underlying product itself, that's all.
9      Q.    Have you ever written a patent
10 application?
11     A.    No.
12     Q.    How many patents have you appealed to the
13 Board?
14     A.    None.
15     Q.    Have you ever appealed a patent to the
16 Federal Circuit?
17     A.    No.
18     Q.    Did you sit on any patent cases while you
19 were clerking in the District of Colorado?  It was the
20 District of Colorado?
21     A.    Yes.  Yes, we did.
22     Q.    You were the law clerk on patent cases?

46

5/11/2006 Davis, Michael

1      A.    Yes.
2      Q.    How many?
3      A.    Probably a couple.  Not more than two.
4      Q.    Have you ever written a patent claim?
5      A.    Not that was prosecuted before the office,
6  no.
7      Q.    But you've written other patent claims?
8      A.    I have consulted on it and I have, of
9  course, written claims in seminars and classes and
10 things like that. But never -- never for the Patent
11 Office itself.
12     Q.    Have you ever amended claims?
13     A.    Not myself, no.
14     Q.    Have you ever responded to an office
15 action?
16     A.    Not by myself, no.
17     Q.    What aspects of patent prosecution have
18 you participated in directly?
19     A.    Directly before the Patent Office? None.
20            MR. BURATTI:  Let's take a break.
21            VIDEOGRAPHER:  We're now going off the
22 record at approximately 10:09 a.m.

47

5/11/2006 Davis, Michael

1            (Recess taken.)
2            VIDEOGRAPHER:  We're now going back on
3  the record at approximately 10:25 a.m.
4  EXAMINATION (Cont'd.)
5  BY MR. BURATTI:
6      Q.    In your report at paragraph 68, you
7  conclude that claims 1 and 6 of the '062 patent would
8  require limitation of these claims to compounds that
9  contain at least five percent orange oil in order to
10 perform the required demonstrable skin cleaning
11 function.
12        Is that your opinion today?
13     A.    Yes.
14     Q.    Do you have any opinion about the orange
15 oil claim element of claim 9?
16     A.    Yes, I believe the same applies to it.
17     Q.    Is that stated anywhere in your report?
18     A.    I do not believe it does say that.
19     Q.    Was that an oversight or --
20     A.    I am not sure.  I believe I was asked to
21 address claims 1 and 6 but it may have been an
22 oversight.

48

1    Q.    Are you familiar with the doctrine of

2    claim differentiation?

3    A.    Yes.

4    Q.    Does that apply on a claim-by-claim basis,

5    that doctrine?

6    A.    I believe so.

7    Q.    Is there any difference in your opinion

8    between the orange oil claim element of claim 1 and

9    the orange oil claim element of claim 6 as those

10   claims are written in the '062 patent?

11   A.    I would have to read it over again. They

12   should.

13        MR. BURATTI:    I don't think we need to

14   mark the '062 patent.

15        MR. WARD:    No, we have multiple copies

16   in the record.

17        MR. BURATTI:    It's also, I think, an

18   exhibit to Mr. Davis' report.

19   Q.    I've just handed you a copy of the '062

20   patent, Greenspan, et al.  That's the patent in suit.

21        The question pending is, is there any

22   difference in your opinion between the orange oil

                                                    49

1    claim element of claim 1 and the orange oil claim

2    element of claim 6 as those claims are written in the

3    '062 patent?

4    A.    As they are written in just the language

5    of the claims, they seem to be different, yes.

6    Q.    What's the difference?

7    A.    This is, you're talking about 1 and 6?

8    Q.    Yes.  What's the difference?

9    A.    Aside from some, what could arguably be

10   called minor differences in phrasing, there are

11   differences with respect to the percentage of stated

12   orange oil volume, differences between the explicitly

13   stated pH range, and I believe there's also -- as I

14   say, there's some differences in phraseology but I'm

15   not sure it's definitive.  Let's see -- those would

16   certainly be the major differences.

17   Q.    I'm actually just focusing on the orange

18   oil limitation right now.

19   A.    Okay.

20   Q.    What's the orange oil claim limitation on

21   claim 1 of the '062 patent?

22   A.    Specifically in claim 1, it says five and

                                                    50

1    60 percent by volume.

2    Q.    Sorry, between five and 60 percent by

3    volume of orange oil?

4    A.    Yes.

5    Q.    And what's the orange oil claim element of

6    claim 6?

7    A.    Explicitly in claim 6, it's just stated,

8    orange oil.

9    Q.    Is there any explicit lower limitation in

10   claim 6 of the orange oil?

11   A.    In the language of claim 6 itself, there

12   is no limit on the amount of orange oil.

13   Q.    So as written, there's a difference

14   between claim 1 and 6 with respect to the orange oil

15   claim element?

16   A.    Yes.

17   Q.    What's the orange oil claim element of

18   claim 9?

19   A.    In claim 9, the orange oil amount is 45

20   percent or less by volume.

21   Q.    And is there any explicit lower

22   limitation, lower volume limitation in claim 9?

                                                    51

1    A.    There is shockingly not any limit at all.

2    Q.    In claim 9?

3    A.    In claim 9.

4    Q.    Can the doctrine of claim differentiation

5    apply on an element-by-element basis?  Let me rephrase

6    that.

7        Does the doctrine of claim differentiation

8    apply to a claim element across claims in a patent?

9    A.    I guess the elements would be what would

10   differentiate them, sure.

11   Q.    In this case, of the '062 patent, is there

12   differentiation between the orange oil claim element

13   of claim 1 as written and the orange oil claim element

14   of claim 6 as written?

15   A.    Yes.

16   Q.    In this case of the '062 patent, is there

17   a differentiation of the orange oil claim element of

18   claim 1 as written and the orange oil element of claim

19   9 as written?

20   A.    Yes.

21   Q.    What's the ordinary meaning of the orange

22   oil claim element of claim 6?

                                                    52

5/11/2006 Davis, Michael

1   A.   It's really difficult to say.  It depends
2   on what you mean by ordinary vs. extraordinary.  One
3   might say that one atom of orange oil would be enough.
4   That just defies common sense.  So if you mean
5   ordinary in terms of common sense, it would be quite
6   different.
7   Q.   What's the ordinary meaning of the orange
8   oil claim element of claim 9?
9   A.   You mean the amount?  Or --
10  Q.   Yes.
11  A.   Or the definition -- I think the ordinary
12  meaning would be that it would be up to a maximum of
13  45 percent by volume down to some meaningful lower
14  limit.
15  Q.   Same with respect to the lower limit in
16  claim 6?
17  A.   Yes.
18  Q.   Interpretation of the orange oil claim
19  element of claim 6 is a question of law for the court;
20  isn't that right?
21  A.   Yes.
22  Q.   And interpretation of the orange oil claim

63

5/11/2006 Davis, Michael

1   element of claim 9 is also a question of law for the
2   court to resolve, isn't that right?
3   A.   Yes.
4   Q.   Interpretation of the pH claim element of
5   claim 6 is a question of law for the court to resolve;
6   isn't that right?
7   A.   Yes.
8   Q.   Your report contains an opinion about the
9   interpretation of the orange oil claim element of
10  claim 6; isn't that right?
11  A.   In part, certainly.
12  Q.   Sorry, does your report contain an opinion
13  about the interpretation of the orange oil claim
14  element of claim 6 that is factual?
15  A.   I think it probably does.  I think it's a
16  mixed question of fact and law.  You've asked me about
17  the interpretation itself.  It certainly involves a
18  legal determination.
19  Q.   And in your opinion, that legal
20  determination requires importation of a limitation
21  from the specification; is that correct?
22  A.   Effectively, yes.

64

5/11/2006 Davis, Michael

1   Q.   And for claim 9, your interpretation of
2   the orange oil claim element also requires importation
3   of a limitation from the specification; isn't that
4   correct?
5   A.   In effect, yes.
6   Q.   Okay.  What are all your bases for
7   importing that limitation in terms of Federal Circuit
8   law into claim 6?
9   A.   I guess you start with the basic
10  proposition that the claims are to be read in light of
11  the specification.
12  Q.   Isn't it a basic proposition that the
13  claims are supposed to be interpretable according to
14  their ordinary meaning?
15  A.   If it's clear from the claims in an
16  unambiguous fashion, and there's no doubt about the
17  meaning, then you rely on the claims themselves, yes.
18  Q.   What doubt about the meaning of the orange
19  oil claim element in claim 6 exists that justifies
20  importing a limitation from the specification?
21  A.   I think the incompatibility of claim 6
22  with the language of the specification makes it clear

55

5/11/2006 Davis, Michael

1   that you have to, in one way or another, square the
2   inconsistency.
3   Q.   I'm asking a different question.  What
4   doubt about the meaning of the orange oil claim
5   element in claim 6 justifies importing a limitation
6   from the specification?
7   A.   Well, you can't read the claim without
8   first reading the specifications.  Having read the
9   specifications, the notion in claim 6 that you need
10  effectively no orange oil is just a laughable
11  proposition.
12  Q.   So in your opinion, then, claim 6 covers a
13  composition that contains effectively no orange oil?
14  A.   It could if read literally on its face.
15  And that's why I'm saying it becomes ambiguous,
16  requiring resort to the specification.
17  Q.   What's ambiguous about the claim term
18  "orange oil" in claim 6?
19  A.   Well, having read the specification, it's
20  clear that an insignificant amount of orange oil would
21  not be consistent with the invention and therefore,
22  there has to be more than some minimum amount of

56

1  So my question is, if I put "patents" in there where
2  it says monoplies, is it true that patents are
3  disfavored by the common law and our legal system?
4      A.    No, I think the legal system I'm talking
5  about is the common law legal system.  It doesn't
6  include the legislature.
7      Q.    Okay.  So patents are disfavored by the
8  common law and our legal system, not counting the
9  legislature, or not including the legislature.
10     A.    In the sense in which this is written,
11 concentrating on the common law, you would not include
12 the legislature.
13     Q.    Are patents disfavored by courts?
14     A.    Very often.
15     Q.    How so?
16     A.    Every time a court limits the extent of a
17 patent, every time they construe its terms strictly,
18 every time they put the burden on the patentee; they
19 are not favoring it, but in fact disfavoring it.  They
20 could favor it by granting an unlimited doctrine of
21 equivalence, and all sorts of other doctrines that
22 they have not adopted.

1      Q.    How is telling the jury that patents are
2  disfavored by the common law and our legal system
3  except for the legislature, going to assist them in
4  finding facts in this case?
5      A.    Well, first of all, I didn't say that
6  patents are treated that way.  That was your extension
7  to the use of -- your syllogism.  I said that
8  monoplies are disfavored by the common law and it's
9  important for juries to understand, I would think,
10 when they are instructed by the judge to construe the
11 language or whatever it is, or to apply infringement
12 very strictly and it explains why they are supposed to
13 do that.
14     Q.    How is that going to help them with
15 explicit instructions about what a claim means to
16 apply the meaning of the claim to the accused product?
17     A.    That, again, would depend on what the
18 judge's instructions were.  I don't think we've seen
19 them yet.
20     Q.    If the judge gives an instruction that
21 monoplies are disfavored by the common law and our
22 legal system, would an opinion about your first

1  assumption be necessary for the jury?
2      A.    I think that's exactly why expert
3  testimony might be indulged by various courts because
4  obviously, they wouldn't give that kind of
5  instruction, but they might think it's relevant for
6  the jury to hear it.
7      Q.    Why wouldn't a judge give that
8  instruction?
9      A.    I'm not sure he wouldn't.
10     Q.    Why would a judge give that instruction?
11     A.    If he thought it would help the jury reach
12 an accurate conclusion.
13     Q.    How would it do that?
14     A.    I'm not sure.
15     Q.    How does your first assumption that a
16 patent is a monopoly and that monoplies are disfavored
17 by the common law and the legal system render your
18 analysis more understandable to the fact finder?
19     A.    It would explain the -- the tenor of my --
20 of my opinion, my conclusions.
21     Q.    Anything else?
22     A.    Not that I can think of right now.

1      Q.    How does your first assumption that the
2  patent grant is a monopoly and monoplies are disfavored
3  by the common law and our legal system except for the
4  legislature render the reasons for your conclusions
5  more clear?
6      A.    I didn't say "except for the legislature,"
7  okay?  We discussed it.  If you want to start engaging
8  in that kind of detail you'd want to also exclude the
9  executive.  So obviously the legal system doesn't
10 include the president, also.  Although he certainly
11 has effects on it.  Now that we have that straight,
12 what's the question again?
13     Q.    How does your first assumption that a
14 patent grant is a monopoly, and monoplies are
15 disfavored by the common law and our legal system
16 wherein the legal system does not include the
17 executive or the legislature --
18     A.    Right.
19     Q.    -- render the reasons for your conclusions
20 more clear?
21     A.    Because I think it explains why the courts
22 have been very reluctant to indulge patentees who have

```
 1   inadequately drawn their claims or who have written
 2   patent applications which are inaccurate or
 3   inconsistent, understanding that it will help -- would
 4   help a fact-finder apply those doctrines in the way
 5   they were meant to be. Otherwise they make no sense.
 6       Q.   Why doesn't the adversarial system that is
 7   associated with the presentation of all this
 8   information to the fact-finder assure that each side
 9   of the story will be presented?
10       A.   I think in fact that -- I'm not sure I
11   agree with this, but that's one of the major issues in
12   jury trials in patent cases.  It's been a major point
13   of contention whether there even should be a jury
14   trials, and the -- the one of the reasons offered, a
15   major reason is that juries aren't competent.  They
16   don't understand this.  So it seems to me that giving
17   them information, especially basic information, might
18   cure that if you're going to insist on having jury
19   trials in patent cases.
20       Q.   Are you familiar with the videotape that's
21   used at a lot of trials that provides a background on
22   Patent Office practice that's been prepared by an
```

```
 1   independent group?  I can't remember the name of it.
 2   Do you know the videotape I'm t lking about?
 3       A.   I've heard about it  I've never seen it.
 4       Q.   You've never seen ...
 5       A.   No.
 6       Q.   Do you think that a general primer on the
 7   patent law that provides a comprehensive overview of
 8   Patent Office practice objectively prepared by an
 9   independent third party that'r   an expert
10   associated with a particular pa t, would have the
11   same impact in informing the ju  hat your opinions
12   were concerning Patent Office p  tice?
13       A.   I almost don't under and your question.
14   I'm not even sure -- especiall   m not sure what you
15   mean by "independent."  After   you having raised the
16   adversarial system, I would thi  that generally we
17   would want both sides to offer  eir views.  If you
18   can really hypothesize an indep ndent body, I'm not
19   sure who that would be, I don't know how to answer
20   that.
21       Q.   Are you familiar w h any consulting firms
22   that -- well, you do consultin  work, right?
```

```
 1       A.   Yes.
 2       Q.   And you do consulting work on Patent
 3   Office practice.
 4       A.   Yes.
 5       Q.   Have you ever mediated?
 6       A.   No.
 7       Q.   Have you ever been involved in a
 8   mediation?
 9       A.   I'm not sure.  I mean, I've heard disputes
10   and I've given advice but I'm not sure whether they
11   are in mediation or a trial. Probably not, but I'm not
12   sure.
13       Q.   Would a special master taken on by the
14   court in this case to provide a simple overview of
15   Patent Office practice consistent with the basic
16   tenets of our opinions about Patent Office practice
17   provide the same information that you would provide to
18   the jury?
19       A.   There obviously is the risk to the
20   adversarial system, but if they are going to use my
21   statements, may might as well just have me.  I don't
22   know what else to say.
```

```
 1       Q.   How do you feel th.   ur affiliation with
 2   the Limited defendants would a    he jury?
 3       A.   I would think object   y they would have
 4   to consider that.
 5       Q.   What subjective ef    ght it have? What
 6   subjective effect on the jury w   ur affiliation
 7   with the Limited defendants hav   u were to give
 8   testimony during the trial com    atent Office
 9   procedure?
10       A.   Depending on their      to the party,
11   I would suppose it would be ei    tive or
12   negative.
13       Q.   But not neutral?
14       A.   Might be neutral.       what we have
15   juries for.
16       Q.   Does the Supreme C       t conducts
17   an infringement analysis, apply     ns you
18   made concerning monopoly?
19       A.   Absolutely, yes.
20       Q.   Is it always explic
21       A.   Almost never.
22       Q.   Has it ever been ex
```

1   back up. I have offered about twelve, maybe a little
2   more, maybe 16 written opinions, and only actually
3   appeared in court four times, I think.
4        Q.    How many of those 16 or so cases have gone
5   to trial?
6        A.    Probably three but I'm not sure. Most
7   cases settle anyway. So the ones I'm involved with
8   where I'm hired to write a report, I don't think are
9   any different. They all, they generally settle.
10        Q.    You mean three more than the four times
11   that you gave testimony, or --
12        A.    No, the four times I gave testimony, at
13   one point or another, they settled, I think. I'm not
14   sure. I don't remember a verdict. Maybe one went to
15   a verdict. I'm not sure. Two at least.
16        Q.    Two times you've testified at trial?
17        A.    That went to verdict, I think, yes.
18        Q.    Two?
19        A.    Maybe more, I don't know.
20        Q.    How many cases --
21        A.    Maybe four times I've testified. I can
22   only think of two that really reached a verdict that

1   didn't settle even at that point.
2        Q.    You testified at trial?
3        A.    Yeah.
4        Q.    How many times have you not been permitted
5   to testify at trial?
6        A.    I was never excluded from -- never reached
7   -- I never was subject of an order not to testify.
8        Q.    Were you ever limited in your opinions?
9        A.    It goes back a ways. I -- in the written
10   thing or in terms of testimony? When I testified,
11   there were certainly objections and either the judge
12   upheld them or didn't.
13        MR. BURATTI:    Let's flip the tape and
14   then I'll ask more.
15        VIDEOGRAPHER:    We're now going off the
16   record at approximately 2:21 p.m. End of
17   tape 3.
18        (Recess taken.)
19        VIDEOGRAPHER:    We're now going on the
20   record at approximately 2:23 p.m., beginning
21   of tape 4.
22

1   EXAMINATION (Cont'd.)
2   BY MR. BURATTI:
3        Q.    You said there were certainly objections
4   and either the judge upheld them or didn't. Are there
5   times when the judges upheld objections that limited
6   your testimony?
7        A.    I'm sure.
8        Q.    When?
9        A.    I don't know. I'm just -- I'm sure that
10   it must have happened. I have no specific
11   recollection.
12        Q.    You have a case list for me, right?
13        A.    There must have been one, yes.
14        Q.    Well, I know you provided it to him. I
15   don't have it with me and it's not in your report, so
16   -- I think, is it?
17        A.    It's not in the report. It was in
18   supplemental something or other, that was provided.
19        Q.    How many times were you retained as an
20   expert for an accused infringer?
21        A.    I think I represented only accused
22   infringers but I can't be absolutely certain.

1   Certainly is the vast bulk.
2        Q.    Have you ever been retained as an expert
3   as an patentee?
4        A.    I -- I can't remember doing so. And if I
5   believe -- it would be a vast minority.
6        Q.    How many times have you been retained as
7   an expert?
8        A.    About a dozen times. Maybe a little more.
9        Q.    Eighteen?
10        A.    Maybe 18.
11        Q.    Have you ever opined that a patent claim
12   should be given its ordinary meaning?
13        A.    Oh, I'm sure, yes.
14        Q.    Do you remember when?
15        A.    I think we just had one this past year or
16   two, when we were insisting that the ordinary meaning
17   should govern, I'm just not sure. I'd have to see
18   what it was.
19        Q.    Representing an accused infringer?
20        A.    Probably yes.
21        Q.    Do you remember the claim language?
22        A.    No. No, I don't.

1   Q.   Roughly?

2   A.   Not even roughly.

3   Q.   Remember the videotape we were talking

4   about a moment ago?  It's by the Federal Judicial

5   Conference.

6   A.   If you tell me I'm in that, I'm going to

7   be very surprised.

8   Q.   You'd remember that?

9   A.   No, I'd just be surprised if they made a

10  movie and didn't tell me.

11  Q.   Rights to publicity, are those rights to

12  exclude, by the way?

13  A.   They probably are.

14  Q.   If they are monopolistic?

15  A.   If they are that, probably are

16  monopolistic as well.

17  Q.   Are they disfavored by the common law?

18  A.   The Supreme Court has said they should be.

19  I'm going to side with the Supreme Court on this one.

20  Q.   Do you remember the Vanna White case?

21  A.   Yeah.

22  Q.   Do you think that that was a strict

185

1   construction?

2   A.   No, that wasn't Kozinski, was it?  I think

3   Kozinski eventually came back and criticized that.

4   Was it Kozinski?  And later on he said something about

5   -- it certainly was, but I think in fact that same

6   judge uttered another opinion shortly thereafter that

7   makes you question how -- and he was quite explicit

8   that it had to be strictly done in a later decision,

9   but I'm not sure what it was.

10  Q.   In the later decision?

11  A.   Yes.

12  Q.   Was the first decision wrong, in your

13  opinion?

14  A.   Was it Kozinski?  Because if it is, I'm

15  reluctant to say it was wrong.  I don't like him much,

16  but he's a very smart guy.

17  Q.   Reluctant or not --

18  A.   So I could just say he probably was not

19  wrong if it was his decision.

20  Q.   Was the later decision wrong?

21  A.   Certainly not.

22  Q.   So neither decision was wrong but they are

186

1   not consistent.

2   A.   I don't think they are inconsistent.  I

3   think that -- I bet you dollars to donuts that he

4   later on wrote another opinion where he emphasized

5   even more that things had to be construed strictly, in

6   words to that effect.

7   Q.   Are you aware of any jurisprudence on this

8   issue that went from more strict to less strict?

9   A.   This is where I think it gets a little

10  delicate.  I think underlying it all, it's always

11  strict.  But the courts have gone back and forth on a

12  number of issues because of the problems that poses.

13  And we have things like -- like from, in the doctrine

14  of equivalence, went back and forth a couple of times

15  with a more and less strict approach to it.

16  Q.   Was it more correct in your opinion when

17  the doctrine of equivalence was more strictly applied

18  than less strictly applied?

19  A.   I don't think I could say that one was --

20  I don't think I could even say here that things are

21  more or less correct.  The question is, what is the

22  state of the law at a particular time, and that's what

187

1   you do.

2   Q.   Has the law concerning claim construction

3   as it applies in this case changed since the time you

4   executed this report, that is, Davis Exhibit 2?

5   A.   I don't think so, but I'm not sure.  I

6   mean, something could have come down that I missed.

7   Q.   Can it change again before you give

8   testimony at trial, that law?

9   A.   Now, I'm wary of just saying "that law."

10  What law?

11  Q.   The law of claim construction.

12  A.   It could.

13  Q.   The law of strict construction as a

14  function of disfavor of monpolies?

15  A.   I think the common law doctrine of

16  strictly construing the patent monopoly could not

17  change.  How the courts go about it might cycle a bit.

18  Q.   Might cycle a lot.  Do you agree?

19  A.   I think it might cycle a bit.

20  Q.   Your second assumption, and I'm, I think

21  it's your second assumption, to help clear this up for

22  me, is what appears to be in paragraph 6 the ex parte

188

1 nature of the patent process. Is that a fair
2 statement?
3      A.    Is what a fair statement?
4      Q.    Well, it says you make, in paragraph 4,
5 you may you make certain assumptions. Then it says
6 that you state the exceptions explicitly. Then you
7 say, "The patent grant is a monopoly for which the
8 public pays a certain price."
9            Is that your only assumption?
10     A.    There may be other assumptions.
11     Q.    What are the other assumptions?
12     A.    I said there may be. If I read the entire
13 report, I will tell you when I come across an
14 assumption. I'll be happy to do that.
15     Q.    Let's take a look first at, you say, those
16 assumptions, in paragraph 4, you say, "Those
17 assumptions are usually implicit," et cetera, "So it
18 is better to state those assumptions explicitly: The
19 patent grant is a monopoly for which the public pays a
20 certain price."
21           What are the other assumptions that you're
22 referring to in that sentence?

1      A.    I'm not sure except that that is the
2 central one and from that flow a lot of other things,
3 I suppose.
4      Q.    Paragraph 6, why is it extremely important
5 to recognize the ex parte nature of the patent process
6 in the context of this case?
7      A.    Because I think the ex parte nature of the
8 process makes the responsibility of the patentee to
9 carefully draft his documents much more clear.
10     Q.    Does the ex parte nature of the patent
11 process affect the facts that the jury will have to
12 find at trial concerning the validity of the '062
13 patent?
14     A.    I think that that's a relatively
15 uncontroversial point, that the juries -- the fact-
16 finder is entitled to understand where and how the
17 patent came about.
18     Q.    But my question is, how does the ex parte
19 nature of the patent process inform the factual
20 findings about the validity of the '062 patent?
21     A.    I think in the context, for instance, of
22 the pH range, it's good to know that the patentee

1 wasn't somehow forced to choose these numbers, freely
2 chose the numbers, had an absolutely unrestricted
3 right to choose different numbers, and had the ability
4 to expand them beyond what he wanted. That seems to
5 be an important fact to understand.
6      Q.    Doesn't that go to claim interpretation of
7 that claim element?
8      A.    I think it goes certainly to claim
9 interpretation. But it might go to infringement as
10 well.
11     Q.    How does that go to infringement exactly?
12     A.    I think that would depend on what actual
13 -- what the judge actually instructed. But I think
14 that for the jury to understand the nature of the
15 patent would better allow them to judge infringement
16 or non-infringement. I think it would.
17     Q.    How would the jury's understanding of the
18 nature of the patent better allow them to judge
19 infringement or non-infringement in this case?
20     A.    I think it's very much like having a deed.
21 To be said, "Well, I own from the outhouse to the
22 well" is one thing. To know that the deed that was

1 filed with the registrar says this is something else.
2      Q.    But you already said that the jury doesn't
3 need an expert to tell them about a deed, right?
4      A.    I didn't say they don't need -- I said
5 they don't need an expert to understand it, but it is
6 important to know that it was a deed, and not just
7 somebody's bare claim.
8      Q.    Does the jury need someone in that
9 situation to tell them what a deed is?
10     A.    I think we're going through already-
11 plowed fields. The nature of the real property is so
12 different than the right to put compositions of
13 oatmeal and whatever, is so different that the jury
14 might need something in one where they wouldn't need
15 it in the other.
16     Q.    But how does that help them determine
17 infringement?
18     A.    I just said that it might help to know the
19 nature of what they are determining -- what's alleged
20 to be infringing, in order to know that it was
21 infringed.
22     Q.    So the jury might need something in the

1  make in its infringement determination?

2      A.    They -- they could be relevant facts, but

3  I don't know.

4      Q.    Must the jury find them as facts?

5      A.    In many cases not.

6      Q.    In this case.

7      A.    I'm not sure in this case.

8      Q.    What about the parts of a patent and their

9  respective purposes, are they a fact finding that the

10  jury must make in its validity determinations?

11     A.    Parts of the patent?  What was the

12  previous question?

13     Q.    It's the same question for validity.

14     A.    Oh, okay.  So it would depend on the case.

15     Q.    The parts of the patent and their

16  respective purposes are not a fact issue in this case,

17  are they?

18     A.    See, what you're asking me to do is to

19  give testimony about what is relevant and not in a

20  trial.  And that's not my area of competence, but I

21  can tell you about patent law practice and procedures.

22     Q.    I'm asking, is there an issue of disputed

---

1  fact presently in this case that is the parts of a

2  patent and their respective purposes?

3      A.    No one is arguing about what the parts of

4  a patent are.

5      Q.    Right.  Is anyone arguing about the

6  difference between dependent and independent claims?

7      A.    At this stage, no.

8      Q.    Are the parties arguing about how and why

9  the scope of claim changes during the examination

10  process?

11  .  A.    I -- that could become an issue, but I'm

12  not sure it is now.

13     Q.    In fact the scope of the claims is a

14  question of law.  It's decided in claim

15  interpretation.

16     A.    Interpretation of the claims is clearly a

17  question of law.

18     Q.    Are the parties disputing how and why

19  claims are sometimes cancelled during the examination

20  process?

21     A.    They are not disputing it but it may be

22  important.

---

1      Q.    Are the parties disputing what examiners

2  consider to be prior art?

3      A.    I don't think so.  But it sometimes

4  becomes important.

5      Q.    But it's not disputed in this case.

6      A.    It could become disputed, I'm not sure.

7  At this point, there isn't any issue joined on that.

8      Q.    I'm going to jump down to L now, "The

9  legal principles for determining literal

10  infringement," which is one of the explanations you

11  intend to give the jury, or you expect to give the

12  jury.

13           Why wouldn't the jury instruction on the

14  legal principles for determining literal infringement

15  do?

16     A.    I don't know.

17     Q.    I'm going to go on to N.  Why won't jury

18  instructions on the legal principles for determining

19  invalidity based upon obviousness as per 35 U.S.C.

20  Section 103 do in this case?

21     A.    Why won't they do?  They may not do if the

22  judge decides that the jury should hear more,

---

1      Q.    So right now, you don't know?

2      A.    It's up to the judge.

3      Q.    Why won't jury instructions do for

4  explaining the legal principles for determining

5  invalidity based on a failure to clearly identify the

6  subject matter claimed as the invention, as per 35

7  U.S.C. Section 112.0 in this paragraph?

8      A.    I have to tell my students that you have

9  to have a verb in a sentence.  I'm not sure what the

10  verb is there.

11     Q.    Why won't jury instructions do --

12     A.    Do.

13     Q.    One of those --

14     A.    Trick questions here.  Jury instructions

15  won't do if the judge decides they won't do.  It is

16  not a question of "don't doing."  The judge may think

17  it is fair that the parties offer the evidence that

18  they think they need.

19     Q.    Point Q in paragraph 10, that's a question

20  of law, right?

21     A.    Q?

22     Q.    Q, as in "quince."

1    A.    I think so, yes.

2    Q.    And point R, whether the claims of the

3  asserted patent properly interpreted require that pH

4  be limited to the range 4.5 to 6 and the amount of

5  orange oil be at least five percent, that's a question

6  of law.

7    A.    I think that's a question of law, yes.

8    Q.    What patent is underlying the CIP in this

9  case as you state in paragraph, subparagraph (s) of

10  paragraph 10?

11    A.    It probably should say "underlying

12  invention."

13    Q.    Okay.

14    A.    But I'm really obviously referring to the

15  parent patent. So it could be either.

16    Q.    How long did you spend reviewing the

17  continuation in part application?

18    A.    It was part of the several hours I devoted

19  to it. I remember reading it more than once.

20    Q.    Was there any new information in the

21  specification of that application?

22    A.    Yes, there was.

1    Q.    I want to go through each of the points in

2  paragraph 10 and what I'd like to know is, for each of

3  those points, is whether there's an opinion by

4  plaintiff's expert that's being rebutted.

5    A.    Which expert?

6    Q.    Any of plaintiff's experts. You reviewed

7  our reports.

8    A.    Yes, but I'm not aware that you have a

9  legal expert.

10    Q.    So in other words, you can say with

11  blanket statement that no opinion in paragraph 10 is

12  offered at this point to rebut any opinion by

13  plaintiff's expert?

14    A.    I don't think that's true. I think I

15  actually addressed some of the mistakes made by the

16  technical experts on the plaintiff's side.

17    Q.    Can you show me where that is?

18    A.    No, I'm not sure I can.

19    Q.    You're not sure you can?

20    A.    No, I'm not sure I included it in the

21  report, but if I did, it's there.

22    Q.    Well then let me go through each one. What

1  opinion by plaintiff's expert is being rebutted by

2  your expected explanation of point A in paragraph 10?

3    A.    I think the expert, the plaintiff's expert

4  made either explicit or implicit assumptions. He

5  actually stated he was directed to understand what the

6  nature of the patent was by counsel and I think that

7  it was either misexplained or misunderstood. And I'd

8  have to read his report, and I could go through very

9  happily his report and point out his mistakes.

10    Q.    You're speaking of Dr. Rhodes?

11    A.    I'm not sure.

12    Q.    I'm going to hand you Dr. Rhodes' updated

13  expert report.

14            (Handing document to witness.)

15    Q.    It was previously marked as Rhodes 3.

16            (Witness perusing document.)

17    A.    I think that on page 7 to 8, where the

18  witness conveys his understanding of the doctrine of

19  equivalence, he first correctly states the test is

20  element by element. But then he erroneously concludes

21  that the entire product, as opposed to elements, are

22  equivalents, I guess a relatively serious error.

1            The question is not whether the products

2  perform substantially the same function but whether

3  the equivalent elements perform the same function.

4    Q.    Where is that in your report?

5    A.    And that renders his entire conclusions

6  invalid.

7    Q.    Where is that in your report?

8    A.    In my report?

9    Q.    Yes. Where is that --

10    A.    It's not in my report. I said it wasn't

11  --

12    Q.    Do you offer any rebuttal in your report

13  of any opinion by --

14    A.    I said if I were to -- expect -- what was

15  the question on section -- on paragraph 10?

16    Q.    Right.

17    A.    And it was how I would -- and what was the

18  subparagraph?

19    Q.    I want to know where in your expert report

20  there's a rebuttal of any expert of any

21  plaintiff's experts.

22    A.    I think that in my report much

5/11/2006 Davis, Michael

1   more clearly that the doctrine of equivalence has to
2   be done element by element.
3        Q.   Where do you rebut Rhodes' expert report
4   in your report?
5        A.   I guess paragraph 62, perhaps.
6        Q.   Where does that say it rebuts Dr. Rhodes'
7   report?
8        A.   Does it have to say it rebuts in order to
9   rebut, because it doesn't say it rebuts.  It just
10  does.
11       Q.   Paragraph 62 says, "The Supreme Court has
12  mandated that the doctrine of equivalence be applied
13  through an element-by-element basis and not on a
14  claim-by-claim basis."
15       A.   Um-hum.
16       Q.   So this implicitly rebuts Dr. Rhodes'
17  report, in your opinion?
18       A.   I think it comes awfully close to
19  explicitly, but certainly implicitly, yes.
20       Q.   Did you write it for the purpose of
21  rebutting, this paragraph, for the purpose of
22  rebutting his report?

229

5/11/2006 Davis, Michael

1        A.   I think it's probably several purposes.
2   One was to clarify it and prevent misunderstanding.
3        Q.   Sorry, did you write paragraph 62?
4        A.   Yeah.
5        Q.   Did you write it to rebut Chris Rhodes'
6   report?
7        A.   I said among other things, it was to
8   inform generally, to make sure I cover the terrain
9   that this mistaken description of the doctrine covered
10  and to inform whoever was reading it.
11       Q.   Does any other paragraph in your report
12  besides 62 rebut plaintiff's expert reports?
13       A.   I'm not sure.  But if you want to take
14  some time, I can read the entire report and see.
15       Q.   Take your time.
16            (A pause in the proceedings.)
17       A.   What was the question again?
18       Q.   Does any other paragraph besides 62 of
19  your report rebut Plaintiffs' expert report?
20       A.   No, it was just with respect to this one
21  part of his report.  You're asking me whether any part
22  of my report rebuts all parts of his report, or just

230

5/11/2006 Davis, Michael

1   this one error?
2        Q.   Let me try --
3        A.   Then I have to read his report over again,
4   too.
5        Q.   Let me try to help, okay?  Paragraph 72
6   says, "The plaintiff's expert report of Rhodes
7   impermissibly utilizes extrinsic evidence in the form
8   of deposition testimony," et cetera, et cetera, et
9   cetera.
10       A.   Where I am -- what do we have here?
11       Q.   Right.
12       A.   Seventy-two.
13       Q.   So in paragraph 72 -- let me ask a
14  slightly different question.  Right?
15       A.   Okay.
16       Q.   So there you wrote --
17            VIDEOGRAPHER:  You lost your mike.
18       Q.   Is there anywhere other than paragraph 72
19  in your report that you address the Rhodes report?
20       A.   Explicitly?
21       Q.   Directly.
22       A.   Well, I've already pointed out one that

231

5/11/2006 Davis, Michael

1   does directly rebut, contradict his definition of the
2   doctrine of equivalence.  So this is another part.
3   And now you're asking me in addition to those two
4   parts, what?
5        Q.   Well, I'm actually asking you, first,
6   with respect to -- well, explicitly, first explicitly,
7   is there any other paragraph besides 72 in your entire
8   report that addresses any of plaintiff's expert
9   opinions?
10       A.   I think if I stated his name it would be
11  explicit.  Otherwise, it doesn't mean that, for
12  instance, the one we just referred to, doesn't
13  directly address the misinformation he conveyed or
14  that was conveyed to him.  I'd have to read his report
15  again and start spotting -- I'm not sure that there
16  were many others.  There may be.  I remember both of
17  these.
18            (A pause in the proceedings.)
19       A.   Well, so those which specifically address
20  his language about the doctrine of equivalence are
21  those that we already pointed to --
22       Q.   Paragraph 62?

232

5/11/2006 Davis, Michael

1     A.    Is it 62? Yes. And then peripherally, I
2  think paragraph 5, I think 15, 16, 17, but only
3  peripherally, as I say, and maybe even 30 -- no, is it
4  30? No, I don't think it applies to -- 5, 15, 16 and
5  17, I think.
6     Q.    Not thirty?
7     A.    I don't think so. Well, again, very
8  peripherally.
9     Q.    How peripherally?
10    A.    Very peripherally.
11    Q.    And then 72, right?
12    A.    72, where was that --
13    Q.    That was the one -- I'm sorry, I thought
14 -- were you finished, Professor Davis?
15    A.    I think so -- no, 72 does not address the
16 doctrine of equivalence on the element-by-element
17 analysis. This addresses a different error that
18 Rhodes made, or --
19    Q.    I want to make sure that you're
20 understanding what I'm asking. I'm asking where your
21 report rebuts expert opinion given in reports,
22 affirmative reports by plaintiff LP Matthews.

233

5/11/2006 Davis, Michael

1           MR. WARD:  Not limited to just the
2  Rhodes report that we're looking at.
3           MR. BURATTI:  Yes, he limited my question
4  down to the Rhodes report on doctrine of equivalence,
5  and I want to know what portions of this --
6     A.    As I said, none of them were explicitly
7  designed for that purpose but some obviously had that
8  effect.
9     Q.    Okay.
10    A.    And I'm trying to give you ones that do
11 have that effect.
12    Q.    Where does your report rebut expert
13 opinion given in opening expert reports by Plaintiffs'
14 experts?
15    A.    Opening expert reports?
16    Q.    Yes.
17    A.    Is that quoting from somewhere?
18    Q.    I'm just rereading the question. Where in
19 your report do you rebut expert opinion given in
20 plaintiff's opening expert reports by Christopher
21 Rhodes and Larry Evans?
22    A.    I'm not sure about Evans because I haven't

234

5/11/2006 Davis, Michael

1  seen it in a while. But what I've told you about the
2  reports so far is probably a reasonable and
3  substantial summary of Rhodes.
4     Q.    Take a look at page 1 of your report,
5  Davis 2.
6     A.    Um-hum.
7     Q.    You've got an opening paragraph that
8  identifies yourself and then explains the purposes of
9  this report.
10    A.    Um-hum.
11    Q.    Just take a minute to read through that
12 whole paragraph for me.
13          (A pause in the proceedings.)
14    A.    All right.
15    Q.    Is that opening paragraph of your report
16 true and accurate?
17    A.    I believe so, yes.
18    Q.    Is it complete?
19    A.    Yes, I believe so.
20    Q.    The last sentence says, the reason that
21 you have been asked to prepare the report, and the
22 second point there is, "Certain conclusions I have

235

5/11/2006 Davis, Michael

1  reached regarding the prosecution, validity and scope
2  of the '062 patent which conflict with the opinions
3  expressed in the reports prepared by the Plaintiffs'
4  experts, Larry Evans and Christopher Rhodes," right?
5     A.    Um-hum.
6     Q.    Did I read that correctly?
7     A.    Yes.
8     Q.    Did Mr. Evans give any opinion regarding
9  the prosecution of the '062 patent?
10    A.    I don't know. I'd have to read the report
11 again.
12    Q.    You don't remember?
13    A.    I don't remember.
14    Q.    You remember he was the damages expert.
15    A.    Yes.
16    Q.    We have an opinion about damages.
17    A.    I did not render opinion about damages.
18    Q.    Right. Mr. Evans' opinion was about
19 damages?
20    A.    Yes.
21    Q.    Do damages depend on the prosecution of
22 the '062 patent?

236

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2006, the attached **REDACTED PUBLIC VERSION OF LP MATTHEWS' OPENING MEMORANDUM SUPPORTING ITS** *DAUBERT* **MOTION TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TRIAL TESTIMONY OF THE LIMITED DEFENDANTS' PATENT LAW EXPERT, MICHAEL H. DAVIS** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esquire                                    HAND DELIVERY
Potter Anderson & Corroon, LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801

Arthur I. Neustadt, Esquire                                    VIA ELECTRONIC MAIL
Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
1940 Duke Street
Alexandria, VA  22314

Francis G.X. Pileggi, Esquire                                  HAND DELIVERY
Fox Rothschild LLP
Suite 1300
919 North Market Street
Wilmington, DE  19801

John Ward, Esquire                                             VIA ELECTRONIC MAIL
Ward & Olivo
708 Third Avenue
New York, NY  10017


                                                    */s/ Lauren E. Maguire*
                                        _____
                                                    Lauren E. Maguire