IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LP MATTHEWS, L.L.C.,                    )
                                        )        **REDACTED PUBLIC VERSION**
                Plaintiff,              )
                                        )
        v.                              )        C.A. No. 04-1507-SLR
                                        )
BATH & BODY WORKS, INC.; LIMITED        )
BRANDS, INC.; KAO BRANDS CO.            )
(f/k/a THE ANDREW JERGENS               )
COMPANY); and KAO CORPORATION,          )
                                        )
                Defendants.             )

**LP MATTHEWS' OPENING MEMORANDUM SUPPORTING ITS *DAUBERT* MOTION
TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TRIAL TESTIMONY OF
THE KAO DEFENDANTS' LIABILITY EXPERT, ROBERT Y. LOCHHEAD**

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19801
Office: 302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Counsel for Plaintiff LP Matthews*

*Of Counsel:*

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Office: 800-553-9910

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, D.C. 20006
Office: 202-775-0725

Dated: June 27, 2006

## NATURE AND STAGE OF PROCEEDINGS

On December 8, 2004, plaintiff LP Matthews, L.L.C. ("LP Matthews") filed a

Complaint for patent infringement against defendants Kao Brands Company (formerly

known as The Andrew Jergens Company), Kao Corporation, Limited Brands, Inc., and Bath

& Body Works, Inc. (D.I. 1.)  LP Matthews amended its Complaint on February 2, 2005.

(D.I. 5, 8.)  This Court entered a Scheduling Order on June 9, 2005.  (D.I. 39.)  Expert

discovery closed on May 12, 2006.  (*Id.* at 1.)  *Daubert* motions must be filed by June 22,

2006.  (*Id.* at 3.)

## SUMMARY OF THE ARGUMENT

LP Matthews submits this opening memorandum in support of its motion to strike the

expert report, opinions, and proffered trial testimony of defendants Kao Brands Co.'s and

Kao Corporation's ("the Kao defendants") purported liability expert, Robert Y. Lochhead.

Dr. Lochhead's opinion that the '062 patent is obvious does not derive from any accepted

methodology.  Instead, he simply regurgitates a 1997 non-final decision of the Board of

Patent Appeals and Interferences (the "Board") handed down in an abandoned, continuation-

in-part patent application involving different claims, a different examination, and a different

burden of proof (the "CIP").  Dr. Lochhead's conclusory recitation is not made from the

perspective of a person of ordinary skill in the art at the time the patent application was filed,

includes no independent analysis or elaboration, and is not supported by any professional or

education-based knowledge of orange oil – Dr. Lochhead could not identify a single

chemical entity in orange oil other than d-limonene.  Thus, his opinions track an inadmissible

*post hoc* decision that did not consider the arguments made during the prosecution of the

'062 patent.

LP Matthews does not seek the exclusion of Dr. Lochhead's proposed expert testimony based on the *conclusions* he reached. Rather, this motion seeks to exclude his testimony based on the *inadequate methodology* he used. This distinction between inadequate methodology on the one hand, and the purported expert's conclusions on the other, lies at the heart of a proper *Daubert* inquiry.

## FACTUAL BACKGROUND

The United States Patent and Trademark Office ("PTO") issued United States Patent No. 6,063,062 ("the '062 patent") to Douglas Greenspan and Philip Low on November 5, 1991. The '062 patent claims compositions for cleaning human skin that contain orange oil, an oat ingredient, and a moisturizer. (Ex. A at 9:3-10:25)

On February 27, 2006, the Kao defendants served an "Expert Report of Robert Y. Lochhead, Ph. D." (Ex. B.) In that report, Dr. Lochhead "concluded that claims 6 and 9 of the '062 patent are unpatentable for the reasons set forth in the Board's decision." (Ex. B at 2.) In paragraphs 12(b)-(f), Dr. Lochhead discusses three prior art references, Coleman, Dellutri, and the 1969 Physician's Desk Reference. (*Id.* at 3-4.) They are the same references cited by the Board. (Ex. C at 9-11.) Dr. Lochhead's discussion is substantively the same as the Board for each reference – conclusory and without independent analysis or elaboration. (Compare Ex. B at 3-4 with Ex. C at 9-11.)

Dr. Lochhead's deposition testimony illustrates the problem with his lack of independent analysis. His Section 103 validity opinions (and the Board's decision) depend upon his analysis of the Dellutri and Coleman references that disclose d-limonene *and not* orange oil. (Ex. B.) His report does not say either reference discloses orange oil. The Board's decision does not say that either reference discloses orange oil. Dr. Lochhead

2

testified that neither Dellutri nor Coleman disclose orange oil to clean. (Ex. D at 101-102,[1] 125-38.[2])

The Board's opinion, and therefore Dr. Lochhead's report, seems to treat d-limonene as interchangeable with orange oil for purposes of invalidating the '062 patent. (Ex. B at 4-7.) Dr. Lochhead admits that the two substances are not the same. (Ex. D at 102:5-6.) He knew virtually nothing about orange oil before the case. (*Id.* at 104-05.) After being retained by the Kao defendants and preparing his expert report, he still knew very little – he could not even identify a single constituent of orange oil besides d-limonene at his deposition. (*Id.* at 104-06, see also 102-03.) He could not because he lacks any expertise about oranges or orange oil.

Finally, Dr. Lochhead's invalidity report does not address the Kao defendants' burden to prove obviousness by clear and convincing evidence. (*See* Ex. B.) That burden emanates from the presumption of validity owed an issued patent. By tracking the Board's decision, however, Dr. Lochhead actually applies the wrong burden – the Board's decision addressed an *application*, which does not benefit from the presumption.

## ARGUMENT

Rule 702 imposes a special obligation upon a trial judge to ensure that proposed expert testimony will "assist the trier of fact" because that testimony is both "relevant" and "reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *see Kuhmo Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999)(district court judge must "make certain that an expert, whether basing testimony upon professional studies or personal

---

[1] Dr. Lochhead testified the cleaning agent in the Coleman reference was d-limonene.

[2] Dr. Lochhead admitted that the cleaning agent in Dellutri was distilled d-limonene, which Dellutri defined as "citric oil." (Ex. D at 126.)

experience, employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). In fulfilling this screening function, the judge acts as the "gatekeeper" for proposed expert testimony. See *Zuchowicz v. U.S.*, 140 F.3d 381, 386 (2d Cir. 1998). This gatekeeping function requires a preliminary assessment "of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert* at 592-93.

Dr. Lochhead applies no recognized methodology of any kind in paragraphs 12(b)-(f) of his report, instead simply regurgitating the Board's decision. For patent validity issues about which Dr. Lochhead opines, he should have compared the asserted claims to the prior art. *See Catalina Marketing Int'l. v. Coolsavings, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002) ("After claim construction, the fact finder compares the properly construed claims to the accused device or process."). Dr. Lochhead could not compare d-limonene and orange oil, for example, because he lacked any understanding of orange oil – whether from "professional studies or personal experience." *Kumho Tire*, 526 U.S. at 151. Dr. Lochhead's lack of knowledge about orange oil and his unwillingness to learn about it demonstrate that he has not, in this case, employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

By ignoring the numerous other chemically active molecules (like acids, esters, aldehydes, *etc.*) in orange oil, Dr. Lochhead could regurgitate the Board's apparent equation of d-limonene and orange oil. Dr. Lochhead, like the Board, did not consider the differences between d-limonene and orange oil or the applicant's arguments based on those differences that overcame virtually the same rejection early in the prosecution of the '062 patent. (*See* Ex. D at 140:6-9 (testifying that the board did not consider arguments in the '062 patent

prosecution).) Presumably, he did so because the Board's decision does not relate to the validity of the '062 patent, as explained below. Dr. Lochhead's opinion, whether it is the Board's or his own, lacks scientific merit and good grounds. *See Daubert* at 591 ("Proposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known."); *see also Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 975 (M.D. Tenn. 2002) (excluding expert testimony where expert "failed to employ reasonable principles and methods").

Dr. Lochhead's proposed testimony does not employ reasonable principles, lacks good grounds and independent analysis, and even lacks preparation on the primary element of the Kao defendants' defense – orange oil, a substance about which he knows virtually nothing. Accordingly, paragraphs 12(b)-(f) of Dr. Lochhead's report and his proposed testimony at trial in this case should be excluded.

### 1.     Dr. Lochhead's Opinion Is Based on Inadmissible Information

Paragraphs 12(b)-(f) and 13 should also be excluded because the Board's decision is not something that an expert witness would normally rely on – it is inadmissible and would mislead rather than help the trier of fact. In paragraph 13, Dr. Lochhead wrongly opines that the decision                              **REDACTED**

(Ex. B at 4-5.) First, the Board has no jurisdiction over issued patents. *See* 28 U.S.C. § 1338. Second, the Board's opinion concerns an application containing different information than the application that issued as the '062 patent.[3] Moreover, the Board's decision addresses a pending application without a

---

[3] A working example of this factor is the Board's reprimand of the CIP examiner for not performing an exhaustive search – including for searching only one subclass for prior art. (Ex. C at 6-7.) The examiner of the '062 patent, however, searched three different subclasses, 424/443, 424/401, and 514/783. (Ex. A at cover *Footnote continued on next page...*

presumption of validity – that burden is much lower than the clear and convincing standard that Dr. Lochhead was supposed to apply but did not address.

Third, the Board cannot decide questions of patentability unless the record is "fully developed before the Board." *See Perkins v. Kwon*, 886 F.2d 325, 328 (Fed. Cir. 1989); *Abbott Laboratories v. TorPharm, Inc.*, 300 F.3d 1367, 1379 (Fed. Cir. 2002) (Board decisions that are not "fully developed" have no preclusive effect). A *sua sponte* statement by the Board in a decision that was sent back to the examiner for more searching cannot have been "fully developed."[4] So the Board cannot have decided patentability for the CIP, let alone for the issued '062 patent (burdens of proof notwithstanding).

Consequently, the Board's decision fails to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Casoni*, 950 F.2d 893, 904 (3d Cir. 1991). As such, it is not relevant and is inadmissible.

The Board's decision is also unfairly prejudicial. Unfair prejudice is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Rutland*, 372 F.3d 543, 543 (3d. Cir. 2004) (quoting Rule

---

*... footnote continued from previous page*

page.) The Board's statements about the need for an expanded search do not, therefore, apply to the '062 patent. Neither does Dr. Lochhead's regurgitation of the Board's opinion. Notwithstanding that his opinion is that the '062 patent is invalid, Dr. Lochhead did not realize that the '062 patent examiner conducted a more thorough search when he filed his report. (See Ex. D at 173.)

[4] The limited relevance of the Board's decision is emphasized on the top of the front page: "THIS OPINION WAS NOT WRITTEN FOR PUBLICATION" and "not binding precedent on the Board," (Ex. C), which even Dr. Lochhead thinks means "it shouldn't be published in a law journal." (Ex. D at 139:11.) The applicants rigorously contested the Board's decision, pursuing both available avenues – appealing to the Board directly, or amending the application and submitting it once more to the examiner. *See* 37 C.F.R. 196 (b)(1). To address the Board's new Section 103 rejection, the applicants noted their disagreement with the Board's opinion and requested an opportunity to address the rejection along with any new prior art the examiner might find in the expanded prior art search suggested by the Board. And the applicants abandoned the CIP before the Board's *sua sponte* Section 103 rejection was resolved.

403 advisory committee note). The Board's opinion on the CIP is a normal but intermediate step in the middle of a course of patent office affairs. It triggered new rounds of argument and interaction with various branches of the patent office. But the statement of a Board identified to a lay person as the ultimate patent office appeals body would assuredly unduly influence a lay jury. That would unfairly prejudice the jury's decision of facts. The Board's opinion must be excluded on these grounds alone. *See, e.g., Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n. 13 (3d Cir. 2000) (excluding for "risk of misleading the jury and confusing the issues," the opinion of an expert witness which was "unsupported by a sufficient factual foundation," because the expert's opinion might carry a great deal of weight with a lay jury in complex matters.)

Admitting the decision would waste time and affect delay at trial. It also likely would unduly prejudice a jury unfamiliar with the intricacies of patent law. *See, e.g., Forrest v. Beloit Corp.*,  424 F.3d 344, 354 (3d Cir. 2005) (in Rule 403 analysis, court must balance probative effect against possible prejudicial effect). Thus, the Board's opinion must be excluded under Federal Rules of Evidence 401 and 403, as well as the law of this Circuit. And Dr. Lochhead should not be permitted to give the jury his opinions that are identical to the Board's opinion – that would only exacerbate the prejudicial effect of the decision without aiding the trier of fact.

## CONCLUSION

Because paragraphs 12(b)-(f) and 13 of Dr. Lochhead's opening report and the opinions therein do not meet the Supreme Court's requirements for admissibility, LP Matthews requests that this Court grant LP Matthews' *Daubert* motion.

ASHBY & GEDDES

*/s/ Lauren E. Maguire*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE  19801
Office: 302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
lmaguire@ashby-geddes.com

*Counsel for Plaintiff LP Matthews*

*Of Counsel:*

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, D.C.  20006

Dated: June 22, 2006

170717.1

# EXHIBIT A

# United States Patent [19]

Greenspan et al.

[11] Patent Number: 5,063,062

[45] Date of Patent: Nov. 5, 1991

[54] **CLEANING COMPOSITIONS WITH ORANGE OIL**

[75] Inventors: Douglas H. Greenspan, Louisville; Phillip A. Low, Littleton, both of Colo.

[73] Assignees: D. Greenspan; W. Ingram, both of Louisville, Calif.

[21] Appl. No.: 413,395

[22] Filed: Sep. 27, 1989

[51] Int. Cl.$^5$ .................................... A61F 13/00
[52] U.S. Cl. ............................ 424/443; 424/195.1; 424/401; 252/142; 514/783; 514/846
[58] Field of Search ................ 424/443, 401; 514/783

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | | |
|---|---|---|---|---|
| 4,014,995 | 3/1977 | Juliano et al. | | 514/783 |
| 4,533,487 | 8/1985 | Jones | | 252/173 |
| 4,620,937 | 11/1986 | Dellutri | | 252/162 |

**OTHER PUBLICATIONS**

D. Limonene as a Degreasing Agent Richard L. Cole-

man, The Citrus Industry, vol. 56, No. 11, Nov., 1975, pp. 23-25.

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—James M. Spear
*Attorney, Agent, or Firm*—Timothy J. Martin

[57] **ABSTRACT**

A cleaning composition for cleaning the skin contains orange oil, a pharmaceutically acceptable moisturizer and an emulsifying agent. Preferably the orange oil accounts for between 5% and 60% by volume, and it further preferred that the composition contains 40% orange oil by volume. The moisturizer is either glycerin, aloe vera, jojoba oil, safflower oil or a combination thereof. The emulsifying agent preferably is oatmeal. The composition is constituted to have a pH of between 4.5 and 6.0, and the composition may be packaged as moistened towelles in hermetic packets.

12 Claims, No Drawings

5,063,062

1

# CLEANING COMPOSITIONS WITH ORANGE OIL

## FIELD OF THE INVENTION

The present invention generally relates to cleaning compositions suitable for external application to human skin tissue in order to remove unwanted substances such as tar, caulking compounds, sealants, adhesives and the like. More specifically, however, the present invention is directed to a natural cleaning composition that utilizes only plant based ingredients. As such, the present invention is particularly adapted for cleaning non-water soluble products from the human skin in a safe, effective manner.

## BACKGROUND OF THE INVENTION

A wide variety of cleaning compositions are known for external application to skin tissue in order to remove dirt and unwanted materials. Among these cleaning compounds are the various hard and liquid soaps which may be used for cleaning human skin, especially the hands. However, numerous substances with which the hands may be soiled do not respond to ordinary soap compositions. Examples of substances that are difficult to remove include grease, tar, oils, ink, caulking materials, adhesives, sealants, gums, cosmetics and other non-water soluble products.

While some cleaning compositions have been developed for these materials, the typical cleaners are harsh and can damage the skin, especially after prolonged use. Examples of these compounds include turpentine, acetone, toluene and other petroleum based products as well as ammonia based products. These products, though, often damage the skin and otherwise exhibit a high level of toxicity. Further, if inhaled during use, these petroleum based products may cause respiratory damage. When absorbed through the skin, the petroleum based products can cause damage to the major organs of the body and can have a less serious side effect of drying and chaffing the skin where applied. Thus, it should be appreciated that, although petroleum is a naturally occurring product, it is not toxilogically healthy for the human body. Accordingly, there have been substantial efforts which have been made to find suitable alternative substances for skin cleaning. While some synthetically derived substances have been developed, many of these substances are medically suspect, and in some instances produce side effects making them unsuitable for use on a regular basis.

Orange oil, as a natural product derived from the rind of oranges, has been recognized in the past to have some cleaning capabilities. Prior to the present invention, however, it is not believed that the suitability of orange oil in cleaning human skin was realized. Orange oil by itself is a skin irritant that can cause inflammation of the tissues. When used by itself, fumes from orange oil may cause headaches, dizziness and other side effects. Accordingly, it has not been readily apparent that orange oil alone or in combination with other substances could prove effective in cleaning compounds otherwise difficult to remove from the tissues of the skin. Rather, efforts in the past have been directed to the combination of orange oil with other cleaning solvents to produce floor cleaners, glass cleaners and the like.

From the foregoing, it should be appreciated that the thrust of prior development of skin cleaners, other than soap, have been directed to petroleum based products and ammonia based products and the industry has ig-

2

nored the potential for orange oil as a constituent of skin cleaning compounds. Despite the long felt need for better cleaners, the suitability of orange oil has thus not been recognized, and the inventors of the subject invention have found success by examining this substance contrary to the direction of inquiry adopted by the industry at large.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a new and useful compound for cleaning the human skin.

Another object of the present invention is to provide a skin cleaning compound suitable for cleaning non-water soluble products such as grease, caulking, adhesives, sealants, tar, oils, ink and the like.

Yet another object of the present invention is to provide a skin cleaning composition which is non-toxic.

It is a further object of the present invention is to provide a skin cleaning composition that is derived from natural vegetable and plant sources.

Still a further object of the present invention is to provide a skin cleaning composition that not only removes unwanted substances from the human skin but also acts to help clean and revitalize the human skin.

The present invention, then, provides a skin cleaning composition which is adapted for external use on human tissues. Broadly, this composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent. Preferably, the moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, and safflower oil. Further, it is preferred that the emulsifying agent also function as an emollient. Preferably the emulsifying agent is a natural grain derivative, preferably either oat gum or oatmeal. Further, it is preferred that the first, second, and third ingredients are selected and mixed in a ratio such that the resulting skin cleaning composition has a pH range of between 4.5 and 6.0 inclusively. To this end, a fourth ingredient in the form of a buffering compound may be added to the composition.

In the more specific composition according to the preferred embodiment, the cleaning composition comprises forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of the emulsifying agent and the pharmaceutically acceptable moisturizer. The preferred emulsifying agent in this composition is oatmeal, and the preferred moisturizer is a mixture of jojoba oil, aloe vera and glycerin mixed by volume of approximately two parts jojoba oil, two parts aloe vera and one part glycerin. It is further desired to use a small portion of safflower oil both as a moisturizer and to help form a stable emulsion.

These and other objects of the present invention will become more readily appreciated and understood from a consideration of the following detailed description of the preferred embodiment:

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention is directed to a cleaning composition utilized on skin tissues and having, as its cleaning ingredient, the commercially available substance known as orange oil derived from the rinds of oranges. In this broad form, the composition includes orange oil,

5,063,062

3

an emulsifying agent and a pharmaceutically acceptable moisturizer. In order to determine the preferred composition of the present invention, a series of samples having differing properties were evaluated to establish a desired range in pH and to establish the necessary proportion of orange oil to give suitable cleaning. These test samples are set forth below.

In their investigation of cleaning compositions according to the present invention, Applicants first investigated several compositions which were mixtures of orange oil, water, moisturizers and vitamin E. These samples were developed to test the cleaning properties of orange oil and to evaluate orange oil mixed with moisturizing agents. A test group of ten persons, male and female, were selected to subjectively evaluate the results of these samples. Initially, three such samples were prepared, and the compositions are set forth as Samples I–III, as follows:

### SAMPLE I

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 39 |
| Water | 33 |
| Glycerin* | 12 |
| Aloe Vera* | 12 |
| Jojoba Oil* | 3 |
| Vitamin E | 1 |

*Total Moisturizers accounted for approximately 27% by volume.

### SAMPLE II

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 34.5 |
| Water | 27.5 |
| Glycerin* | 17 |
| Aloe Vera* | 14 |
| Jojoba Oil* | 3.5 |
| Vitamin E | 3.5 |

*Total Moisturizers accounted for approximately 34.5% by volume.

### SAMPLE III

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 37 |
| Water | 26 |
| Glycerin* | 14.75 |
| Aloe Vera* | 14.75 |
| Jojoba Oil* | 3.5 |
| Vitamin E | 4 |

*Total Moisturizers accounted for approximately 33% by volume.

Prior to presenting these samples to the test group, Applicants tested the relative acidity of the samples since it was believed desirable to avoid a composition that was either too acidic or too basic. The result of this acidity measurement, correlated to the Samples, is set forth in Table 1 below:

### TABLE 1

| Sample | pH (Approximate) |
|---|---|
| I | 4.5 |
| II | 5 |
| III | 4.7 |

In each of the cases of Samples I–III, the respective components were mixed and blended in an attempt to form an emulsion. An initial problem was noted with each of these Samples, however, in that the emulsion separated, that is, "broke" after approximately one to

4

two days. Since it was fairly simple to re-blend the Samples, Samples I–III were submitted to the test group for evaluation. Generally, the results of the composition was excellent with each of Samples I–III readily removing polyurethane and silicone base caulking compounds, tars, grease, oil and adhesives; each of these industrial type substances are regarded as difficult to remove, from the human hands. All ten members of the test group reported comparable cleaning properties and reported that their hands were left soft after a two week period of using the compounds. Indeed, after two weeks of use, certain male members of the test group who had dry hands resulting from the use of other solvents noted substantial improvement in the texture and softness of their hands. No allergic reactions were reported by any members of the test group.

After determining that test Samples I–III performed adequately in cleaning the hands and in moisturizing the hands, it became necessary to determine whether the oil orange and moisturizer emulsion could be stabilized so that it would not break over a period of time. In order to determine if a natural ingredient could act as an emulsifying agent, the Applicants selected a grain base derivative as an emulsifying agent. To this end, Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier. Accordingly, two more test samples, Samples IV and V were prepared according to the compositions set forth below:

### SAMPLE IV

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 42.75 |
| Aloe Vera* | 7 |
| Jojoba Oil* | 3.5 |
| Safflower Oil* | 4 |
| Oatmeal Gum | 42.75 |

*Total Moisturizers accounted for approximately 14.5% by volume.

### SAMPLE V

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 36.5 |
| Aloe Vera | 14 |
| Jojoba Oil* | 14 |
| Glycerin* | 7 |
| Safflower Oil* | 0.5 |
| Oatmeal | 28 |

*Total Moisturizers accounted for approximately 35.5% by volume.

It may be noted that, in Samples IV and V, vitamin E and water were both omitted from the composition. However, it should be noted that both the oatmeal gum in Sample IV and the oatmeal in Sample V each contain a portion of water. In Sample IV, the oatmeal gum was prepared by boiling rolled oats in water and straining the resultant mass to remove the hulls. In Sample V, rolled oats were boiled in water and the resulting mass (containing approximately 50% water) was used to prepare the composition. Relatively equal parts of orange oil and oat derivatives were used and a small portion of safflower oil was included. Again, relative acidity was tested and it was found that Sample IV had a pH of approximately 5.0 while Sample V had a pH of 5.5.

Samples IV and V were submitted to the test group to evaluate cleaning effectiveness and moisturizing ability. Further, observation of the two compositions were

5,063,062

| 5 | 6 |

made to determine whether or not the emulsions broke. The results of this study determined that the emulsion of Sample IV broke after approximately seven days while the emulsion according to Sample V did not separate over any observed duration of time (several months). The test group observed that the cleaning properties of Samples IV and V were almost, but not quite, as effective as the cleaning properties of Samples I–III, but that the cleaning effectiveness was estimated at approximately 90% of Samples I–III. With respect to Sample IV, the test group reported that their hands did not roughen, but that the sample did not feel as comfortable when on the hands. With respect to Sample V, the test group reported that the emulsion both felt comfortable on the hands and left their hands soft after approximately five days of regular usage. In each case, the emulsions were able to clean all caulking materials and tars, including silicone and polyurethane based caulking compounds as well as oil and grease from the skin. Further tests were conducted on compositions similar to Sample V were in the amount of orange oil was slightly increased while holding the amounts of the remaining ingredients constant until the emulsion broke. It was found that, with these compositions, the emulsion broke when orange oil accounted for approximately 38% by volume of the composition.

From the foregoing, Applicants determined that Sample V offered the best compromise among emulsion stability, cleaning effectiveness, and skin effect. Therefore, utilizing Sample V as a reference, Applicants adjusted the amount of orange oil (ignoring whether the emulsion broke) to determine an effective pH range wherein the composition felt comfortable on the human hands. A first set of samples set forth below as Samples VI–IX were prepared to be less acidic than Sample V, and a second set of test samples, set forth below as Samples X–XIII were tested for compositions having greater acidity than Sample V. Samples VI–IX were prepared by simply buffering Sample V with differing amounts of sodium bicarbonate. The resulting samples were buffered to have pH values according to Table 2 as follows:

TABLE 2

| Sample | pH (Approximate) |
|--------|------------------|
| VI | 9.0 |
| VII | 8.0 |
| VIII | 7.0 |
| IX | 6.0 |

Each of Samples VI–IX were evaluated by the test group. Samples VI and VII were reported to immediately make the hands dry upon first application of the respective composition and removal of the composition with water. With respect to Samples VIII and IX, the test group reported less drying than Samples VI and VII although more dryness of the hands was noted in comparison to test Sample V. These empirical observations lead Applicants to conclude that an acidity of at least pH 6.0 is desirable, that is, that the preferred composition should not be more basic than pH 6.0.

To evaluate test compositions for excess acidity, Applicants merely increased the amount of orange oil in test Sample V while holding the amounts of the remaining ingredients constant to obtain desired acidity levels according to Table 3, below:

TABLE 3

| Sample | pH (Approximately) |
|--------|--------------------|
| X | 2.5 |
| XI | 3.0 |
| XII | 3.5 |
| XIII | 4.0 |

Test Sample X had a volume percent of approximately 80% orange oil, Sample IX had orange oil of approximately 70% by volume, Sample XII had orange oil of approximately 60% by volume, and Sample XIII had orange oil of approximately 50% by volume.

It had previously been found that orange oil alone exhibited excellent cleaning properties, but left the hands feeling too dry and too astringent. With respect to Samples X–XIII, in each case no emulsion formed. The test group reported that each of Samples X–XIII had excellent cleaning properties, but the emulsions felt too astringent on the hands even after limited use. Applicants accordingly concluded that it was desirable that the emulsified composition have a pH that is approximately 4.5. Thus, Applicants further concluded that the composition according to the preferred embodiment of the present invention should have a pH of between 4.5 and 6.0, inclusively.

As noted in the above examples, the emulsions according to Sample V broke at approximately 38% orange oil by volume. In order to evaluate cleaning properties as a function of percent volume of orange oil, additional samples were prepared wherein the weight percentages of the ingredients other than orange oil was held constant while the amount of orange oil was varied to provide differing volume percentages of orange oil. Accordingly, Samples XIV–XVII were prepared to have volume percents of orange oil approximately 5%, 10%, 15% and 25%, respectively. In each case, the emulsions were stable. These Samples XIV–XVII were given to the test group to subjectively evaluate cleaning effectiveness. With respect to Sample XIV, the test group reported that cleaning properties were substantially reduced; Sample XIV could not effectively clean tar or caulking compounds. Indeed, Sample XIV was only effective in removing cosmetics from the skin. Sample XV eventually was able to remove silicone caulking compounds but was unable to remove polyurethane caulkings or tar. With respect to Sample XVI, the test group reported about 50%–60% of the cleaning effectiveness of Sample V with no marked increase in benefits in skin softening. Sample XVII was reported to have approximately 80% of the cleaning effectiveness of Sample V in removing all of the tested materials, but again there was no report of skin enhancements over Sample V.

From these tests, Applicants concluded that, with respect to cosmetics, a composition according to the present invention could have as little as 5% by volume of orange oil although it was preferable to have a cleaning composition having at least 25% by volume of orange oil.

To determine whether the moisturizers had any effect on the composition or whether pH was the dominant skin effecting property, Applicants prepared yet another sample, Sample XVIII, wherein 100% orange oil was buffered with sodium bicarbonate so that it had a pH of 5.5. This Sample XVIII was tested and it was determined that it was exceptionally drying and astrin-

5,063,062

**7**

gent on the human hands. Indeed, Sample XVIII proved almost as drying and astringent as Sample X.

In order to increase the amount of orange oil, Applicants further tested a variation on Sample V wherein both the amount of orange oil and the amount of oatmeal were increased while the amount of moisturizers was decreased. This Sample XIX, was prepared as follows:

### SAMPLE XIX

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 40.5 |
| Aloe Vera* | 7.75 |
| Jojoba Oil* | 7.75 |
| Glycerin* | 4.5 |
| Safflower Oil* | .5 |
| Oatmeal | 39 |

*Total Moisturizers accounted for 20.5% by volume.

From Sample XIX, it was concluded that orange oil could be increased, along with a corresponding increase in an oat grain derivative, until approximately 45% by volume of orange oil was included in the composition. Any amount of orange oil in excess of this amount would result in the diminishment of moisturizers so as to negate the softening effect of the hand cleaning composition according to the preferred invention.

Other samples, set forth below as Samples XX–XXIII were prepared utilizing other materials. These samples are as follows:

### SAMPLE XX

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Olive Oil | 25 |
| Jojoba Oil | 25 |
| Baking Soda | Trace |

### SAMPLE XXI

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Glycerin | 50 |

### SAMPLE XXII

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Aloe Vera | 50 |

### SAMPLE XXIII

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 12.5 |
| Vitamin E | 87.5 |

Sample XX was found to have a pH of approximately 8.5. While Sample XX was deemed effective in cleaning, there was some reduction of cleaning effectiveness over Sample V and the composition left a dryness when wiped off of the skin. Further, the emulsion broke almost immediately. With respect to Samples XXI and XXII, both samples left a sticky residue on the hands but were approximately equal in cleaning effectiveness to Sample V. Sample XXI had a pH a little greater than 2.0 while Sample XXII had a pH of approximately 3.5.

**8**

It was thus observed that aloe vera had some buffering effect on the acidity of the orange oil. Each of Samples XXI and XXII were highly astringent and left the test groups hands dry after washing with water. With respect to Sample XXIII, again this sample proved effective in removing cosmetics, but the sample was not effect in removing heavier, industrial substances such as caulking compounds, adhesives, tars and the like. The orange oil and Vitamin E, however, did mix without separation and a resulting acidity of pH 5.0.

From the information derived form all of the aforementioned samples, Applicants determined that glycerin and safflower oil are both desirable in the preferred compositions. On one hand glycerin appears both to stabilize the emulsion and perform as a moisturizer while, on the other hand, safflower oil appears to act as an emulsion stabilizer, as an emulsifying agent and as a moisturizer.

According to the above, Applicants prefer the compositions set forth in Sample V and Sample XIX for use in cleaning unwanted materials from human skin. In order to test administration of the preferred composition, Applicants applied the compound directly to the skin as a liquid emulsion and removed the emulsion from the hands by washing with water. In addition, Applicants were successful in soaking towelettes, formed of standard absorbent material such as paper, cloth and the like, in the liquid emulsion so that a towelette would become impregnated with the cleaning composition. These towelettes can be hermetically sealed in standard foil packages, as known in the industry, so that the user can simply remove from the skin any of the described unwanted materials with a pre-moistened towelette. This is particularly useful in situations where water is not readily available. Further, individualized packets of pre-moistened towelettes are convenient for portability and on-the-job use.

From the foregoing, the inventors have concluded that a suitable skin cleaning composition can be prepared wherein the skin composition has a first ingredient of between 5% and 60% by volume of orange oil, a second ingredient being a pharmaceutical acceptable moisturizer for human skin and a third ingredient being an emulsifying agent. Preferably, the moisturizer is either one or more of a group of moisturizes selected from the following: glycerin, aloe vera, jojoba oil, safflower oil. However, other pharmaceutically acceptable moisturizers are within the scope of this invention as could be developed without undue experimentation by the ordinarily skilled chemist according to the teachings of the present invention. One example of such a moisturizer is glycerin stearate. These other compositions are thus intended, unless otherwise specifically limited, to be encompassed by the general phrase "moisturizer" both in this specification and in the appended claims. In any event, it is preferred that the resultant composition have a pH between 4.5 to 6.0 and can be so buffered if necessary by the utilization of aloe vera or a buffering agent, such as baking soda.

Accordingly, the present invention has been described with some degree of particularity directed to the preferred embodiment of the present invention. It will be appreciated, though, that the present invention is defined by the following claims construed in light of the prior art so that modifications or changes may be made to the preferred embodiment of the present inven-

5,063,062

9
10

tion without departing from the inventive concepts contained herein.

We claim:

1. A skin cleaning composition adapted for external use on human tissues, comprising a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent in the form of an oat grain derivative product.

2. A skin cleaning composition according to claim 1 wherein said moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, and safflower oil.

3. A skin cleaning composition according to claim 1 wherein said oat grain derivative product is one of oat gum and oatmeal.

4. A skin cleaning composition according to claim 1 wherein said first, second and third ingredients are selected and mixed in a ratio such that the resulting skin cleaning composition has a pH range of between 4.5 to 6.0, inclusively.

5. A skin cleaning composition according to claim 1 including as a fourth ingredient a buffering compound in a proportion such that the resulting composition is pH balanced within a range of 4.5 to 6.0, inclusively.

6. A skin cleaning composition for external use on human tissues, comprising orange oil, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as an emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively.

7. A skin cleaning composition according to claim 5 including a buffering compound.

8. A skin cleaning composition according to claim 5 wherein said moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, safflower oil and glycerol stearate.

9. A cleaning composition for use on human skin comprising forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of oatmeal and a pharmaceutically acceptable moisturizer.

10. A cleaning composition according to claim 8 wherein said moisturizer is a mixture of jojoba oil, aloe vera and glycerin.

11. A cleaning composition according to claim 1 wherein said mixture includes by volume two parts jojoba oil, two parts aloe vera and one part glycerin.

12. A cleaning composition according to claim 9 wherein said mixture includes safflower oil.

* * * * *

30

35

40

45

50

55

60

65

# EXHIBIT B

# REDACTED

# EXHIBIT C

EXHIBIT A                                    APR 1 8 1992

### THIS OPINION WAS NOT WRITTEN FOR PUBLICATION

The opinion in support of the decision being entered today (1) was not written for publication in a law journal and (2) is not binding precedent of the Board.

Paper No. 28

### UNITED STATES PATENT AND TRADEMARK OFFICE

### BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

Ex parte DOUGLAS H. GREENSPAN
and PHILLIP A. LOW

**MAILED**

APR 1 5 1997

Appeal No. 95-2450
Application 07/786,804[1]

PAT.&T.M. OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

### ON BRIEF

Before CAROFF, WILLIAM F. SMITH, and GRON, Administrative Patent Judges.

WILLIAM F. SMITH, Administrative Patent Judge.

### DECISION ON APPEAL

This is an appeal under 35 U.S.C. § 134 of the final rejection of claims 1 through 3, 5 through 21, and 25, all the claims remaining in the application. Claims 1, 17, and 25 are illustrative of the subject matter on appeal and read as follows:

---

[1] Application for patent filed November 4, 1991. According to appellants, the application is a continuation-in-part of Application 07/413,395, filed September 27, 1989, now U.S. Patent No. 5,063,062.

1

Appeal No. 95-2450
Application 07/786,804

1.    A method of externally treating human skin including the steps of:

applying to said skin a composition having a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin including a plant material such as plant oils and plant extract and a third ingredient being an emulsifying agent in the form of a grain based derivative.

17.    A method for treating acne on human skin comprising the step of applying a composition including forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of an emulsifying agent in the form of a grain based derivative, and a pharmaceutically acceptable moisturizer including plant material such as plant oils and plant extract to said acne on the human skin.

25.    A cleaning product comprising a towellet [sic] formed of an absorbent material, said towellet [sic] being impregnated with a cleaning composition and hermetically sealed in a packet member wherein said cleaning composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer including a plant material such as plant oils and plant extract, for human skin and a third ingredient being a grain based emulsifying agent in the form of an oat grain based derivative product.

The references relied upon by this merits panel are:

Dellutri                 4,620,937               Nov. 4, 1986

R.L. Coleman, "D-Limonene As A Degreasing Agent," Citrus Industry, pp. 23-25 (November 1975).

2

Appeal No. 95-2450
Application 07/786,804

Physicians' Desk Reference (PDR 1989)[2], pp. 665-66 (24th ed., Medical Economics, Inc., New Jersey, 1969).

Physicians' Desk Reference (PDR 1989)[3], p. 655 (43rd ed., Medical Economics Inc., New Jersey, 1989).

The examiner has not relied upon prior art in rejecting the claims on appeal. Rather, claims 1 through 3, 5 through 21, and 25 stand rejected under 35 U.S.C. § 112, first paragraph, as being nonenabled by the supporting specification and under 35 U.S.C. § 112, second paragraph, as being indefinite. We reverse the rejection under the first paragraph of the statute and affirm the rejection under the second paragraph of the statute. We also make new grounds of rejection under 37 CFR § 1.196(b), as well as raise several issues which require the examiner's attention upon return of the application file.

Enablement Rejection

The examiner's concern centers around the third ingredient set forth in claim 1, i.e., "an emulsifying agent in the form of a grain based derivative." The only reason given in support of this rejection by the examiner appears at page 2 of the Answer

---

[2]  We rely upon the entries appearing on these pages for Acnaveen bar, Acnaveen Cream, Aveeno® Bar, Aveeno® Colloidal Oatmeal, Aveeno® Lotion, Aveeno® Oilated, Avenol™ Bath Additive and Emulave™ Bar.

[3]  We rely upon the entry for Massengill® Medicated Soft Cloth Towelette.

3

Appeal No. 95-2450
Application 07/786,804

where the examiner states that "the disclosure is enabling only for claims limited to the emulsifiers being derived from grains such as corn, rice, wheat, barley and oats."

By now it is well settled that the examiner bears the initial burden of providing reasons why a supporting disclosure does not enable a claim. In re Marzocchi, 439 F.2d 220, 223, 169 USPQ 367, 369 (CCPA 1971). Here, the examiner has only stated that undue experimentation would be required to practice the invention as claimed. The examiner has not relied upon any facts in support of this conclusion. Consequently, the examiner's holding of nonenablement is unsupported on this record. We reverse the rejection.

## Definiteness Rejection

As set forth at page 3 of the Answer, the examiner is of the opinion that the terms "plant material" and "plant extract" are vague and indefinite.

As set forth in In re Moore, 439 F.2d 1232, 1235, 169 USPQ 236, 238 (CCPA 1971) "the definiteness of language employed must be analyzed—not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art." [Footnote omitted.] Here, the examiner has not attempted to read the claim in light of the supporting specification. Thus, the examiner has not properly considered the issue of claim definiteness.

4

Appeal No. 95-2450
Application 07/786,804

However, appellants have compounded the examiner's error in responding to this rejection. They have done so by attempting to incorporate a specification limitation in the claims. Specifically, appellants argue at page 7 of the Appeal Brief that reading the claims in light of the specification "makes clear the recited 'plant extract' is meant to be relatively pure aloe vera plant extract." Reading claim 1 as being limited in this manner is legal error. In re Zletz, 893 F.2d 319, 321-22, 13 USPQ2d 1320, 1321-22 (Fed. Cir. 1989).

Consequently, we affirm the rejection under 35 U.S.C. § 112, second paragraph, because the record provides adequate reasons to question the metes and bounds of the phrase "plant extract."

### New Grounds of Rejection Under 37 CFR § 1.196(b)

Under the provisions of 37 CFR § 1.196(b) we make the following new grounds of rejection.

1. Introduction.

We express our concern that the claims on appeal have not been adequately examined in the first instance by the examiner. As set forth above, the examiner did not appear to apply the relevant legal standards used in determining whether claims are in compliance with the requirements of 35 U.S.C. § 112, first and second

5

Appeal No. 95-2450
Application 07/786,804

paragraphs. For reasons set forth below, the claims on appeal do not comply with these sections of the statute.

Furthermore, it does not appear that the prior art has been adequately searched. The examiner has not applied prior art against any of the claims on appeal. The administrative record of this file indicates that the examiner searched a single class and subclass. It does not appear that the examiner sought to determine whether any of the specific components used in the compositions in the claimed methods and products were used either individually or in combination with other ingredients for the purpose of treating human skin or any of the specific conditions set forth in the claims. As is apparent from a reading of the specification, a key aspect of the present invention is the use of oatmeal to treat human skin. The examiner's search of the single subclass apparently did not result in any relevant prior art regarding the use of oatmeal in treating human skin. This merits panel has not undertaken a complete independent search of the subject matter on appeal. This is the examiner's responsibility in the first instance. However, a brief consultation of standard reference texts such as the Physician's Desk Reference readily uncovered significant prior art regarding the use of oatmeal in skin care products. If appellants elect the option under 37 CFR § 1.196(b) to re-open prosecution in front of the examiner, the examiner should expand the prior art search beyond the single subclass that has been searched and ensure that all

6

Appeal No. 95-2450
Application 07/786,804

relevant prior art regarding the use of the individual components of the present

invention has been uncovered and considered.

2. Definiteness.

Claims 1 through 3, 5 through 21, and 25 are rejected under 35 U.S.C. § 112,

second paragraph, as being indefinite.

a.    The claims are indefinite to the extent the independent claims, claims 1,

17, and 25, require the use of a "plant material such as plant oils and plant extract."

The use of the phrase "such as" raises the question as to whether plant oils and plant

extract are exemplary or limiting.  In other words, it is not clear whether the claims are

open to plant material other than plant oils and plant extract.  See Ex parte Remark, 15

USPQ2d 1498, 1500 (Bd. Pat. App. & Int. 1990).

b.    The scope of claims 15 and 16 is unclear.  Claim 15 limits the method of

claim 1 so that the "composition is operative . . . to reduce the peeling of the human

skin resulting from . . . sunburn."  Claim 16 limits the method of claim 1 so that "said

composition is operative to repel insects from human tissue."  It is not clear what if

anything needs to be done to the composition of claim 1 in order to make it "operative"

for these purposes.  For example, it is not clear from this record whether appellants

intend claim 16 to be limited to a composition having 20% citrus oil as disclosed at

pages 23-24 of the specification.  Clarification is required.

7

Appeal No. 95-2450
Application 07/786,804

c.    Claims 17 through 21 are indefinite in that claim 17 is directed to a

method for treating acne on human skin while dependent claims 18 through 21 are

directed to compositions. Thus, it is unclear which preamble is correct, i.e., do

appellants intend claims 17 through 21 to be directed to a method or a composition?

Also, it is not clear whether claims 18 through 21 further limit claim 17 as required by

the fourth paragraph of § 112.


2.  Enablement

    Claims 1, 2, 5 through 17, and 19 through 21 are rejected under 35 U.S.C.

§ 112, first paragraph, as being nonenabled by the supporting specification.

    The emulsifier of these claims is to be in the form of a grain based derivative.

The supporting specification of this application indicates in the paragraph which

bridges pages 9-10 that wheat and oats are the grains most preferred to serve as a

source of emulsifying agents. However, this portion of the supporting specification then

states that wheat did not provide the desired texture to the composition. Thus, it

appears that appellants are admitting in this portion of the supporting specification that

wheat based derivatives are not useful as the emulsifying agent in the present

invention. Therefore, the supporting specification does not appear to provide sufficient

information to determine without undue experimentation which grain based derivatives

are suitable for use.

8

Appeal No. 95-2450
Application 07/786,804

3. Prior art.

     a.    Claims 1 through 3 and 5 through 18 are rejected under 35 U.S.C. § 103.
As evidence of obviousness we rely upon Coleman, Dellutri, and PDR 1969.

     These claims read on treating human skin either broadly or for the stated
purposes with a composition which comprises orange oil, aloe vera extract, and
oatmeal. The orange oil ingredient is present in an amount between 5% and 60% by
volume.

     Coleman describes the use of d-limonene obtained from citrus oils, such as
orange oil, as a hand cleaner. As seen from the formulation set forth on page 24 of
Coleman, emollients or moisturizers such as stearic acid, oleic acid, and lanolin are
conventionally used in combination with d-limonene. As seen in the paragraph which
bridges pages 24-25 of the reference, citrus oil-containing compositions were preferred
because they cause less skin irritation and had a pleasant odor.

     Dellutri also describes cleaning agents that can be used as a hand cleaner
which include d-limonene obtained from orange oil. Significantly, the distilled citric oil
used as a source of d-limonene in this reference should be between 20% and 90% of
the liquid volume of the cleaning agent mixture. See column 2, lines 19-26 of the
reference. Also note that aloe vera extract may be used as an optional ingredient. See
column 3, lines 23-38 of the reference. As set forth in this portion of the reference, the
aloe vera extract serves to protect the user's hands and reduces the risk of irritation.

Appeal No. 95-2450
Application 07/786,804

PDR 1969 is relied upon as evidence that colloidal oatmeal has long been used to treat skin in general and for treating skin conditions such as acne, sunburn, rashes, dermatitis, and poison ivy. The Acnaveen® Bar and Cream are formulated using colloidal oatmeal and other ingredients to clean oily skin and scalp in treating acne. Anti-pruritic and anti-irritative activities are attributed to the soothing effects of the colloidal oatmeal. Those formulations also have had their pH adjusted to approximate that of normal skin.

The entry for Aveeno® Bar indicates that colloidal oatmeal is useful in treating dermatitis. The entry for Aveeno® Colloidal Oatmeal indicates that the colloidal oatmeal by itself is useful in treating poison ivy, diaper rash, and atopic dermatitis. Note that the entry for Aveeno® Lotion indicates that that product containing colloidal oatmeal is useful in providing systematic relief of sunburn, poison, and other skin conditions. The remaining entries relied upon provide further evidence that colloidal oatmeal is a well-known additive in skin care compositions to provide relief from itching and irritation.

On the basis of the combined disclosures of these three references, we hold that one of ordinary skill in the art would have found it obvious to treat human skin with a composition which comprises orange oil, aloe vera extract, and colloidal oatmeal. As seen from Dellutri, the hypothetical person of ordinary skill in the art would have understood that such compositions should have a high volume percentage of orange

10

Appeal No. 95-2450
Application 07/786,804

oil. That hypothetical person would have fully understood and expected at the time of

the present invention that treating human skin with a composition which comprises

orange oil, aloe vera extract, and colloidal oatmeal would be soothing and help

alleviate itching and irritation. Specifically, the hypothetical person would have found it

obvious to use such a composition to treat damaged skin as claimed including skin

which has been burned, acne, rashes, and poison ivy.

    In regard to the requirements of claims 5 and 6 that the resulting composition

have a pH range of between 4.5 to 6.0, optionally through use of a buffering compound,

we point to the disclosure in PDR 1969 that skin care compositions should be adjusted

to have a pH approximate to that of normal skin. Thus, the pH of the resulting

composition is a result effective variable and would routinely be optimized by one of

ordinary skill in the art. In re Boesch, 617 F.2d 272, 276, 205 USPQ 215, 219 (CCPA

1980).

    As to the requirement of claim 15 that the composition is "operative" to reduce

peeling skin resulting from sunburn, we point out that the claim does not require any

affirmative step or ingredient beyond applying the composition of claim 1.

    In regard to claim 16, it appears that the only requirement for the composition to

be "operative" to repel insects is that the composition contain 20% citrus oil. This is an

amount specifically suggested by Dellutri.

11

Appeal No. 95-2450
Application 07/786,804

b.    Claim 25 is rejected under 35 U.S.C. § 103.  As evidence of obviousness, we rely upon Coleman, Dellutri, and PDR 1969 as applied above, and PDR 1989.

We held above that Coleman, Dellutri, and PDR 1969 would have suggested to one of ordinary skill in the art a skin treating composition which comprises orange oil, aloe vera extract, and oatmeal.  Claim 25 is directed to a cleaning product which comprises a towelette formed of an absorbent material being impregnated with such a cleaning composition.  We rely upon PDR 1989 only for its disclosure of the well known fact that skin care compositions were conventionally impregnated on a soft cloth towelette and hermetically sealed in packet member at the time of the present invention.

Thus, on the basis of these four references together, we hold that the subject matter of claim 25 would have been obvious to one of ordinary skill in the art.

## OTHER ISSUES

We have not included claims 19 through 21 in the new grounds of rejection since these claims require, _inter alia_, the use of jojoba oil, glycerin and safflower oil.  In researching this case, as suggested above, the examiner should be especially watchful for relevant prior art that would establish that these three compounds have been used in skin care products.  We emphasize that by not including these claims in the new grounds of rejection we are not indicating that the subject matter of these claims is

12

Appeal No. 95-2450
Application 07/786,804

patentable. That determination will have to be made by the examiner after the relevant

prior art has been reviewed.

### TIMES FOR RESPONSES

Any request for reconsideration or modification of this decision by the Board of

Patent Appeals and Interferences based upon the same record must be filed within one

month from the date hereof. 37 CFR § 1.197.

With respect to the new rejections under 37 CFR § 1.196(b), should appellants

elect the alternate option under that rule to prosecute further before the Primary

Examiner by way of amendment or showing of facts, or both, not previously of record, a

shortened statutory period for making such response is hereby set to expire two months

from the date of this decision. In the event appellants elect this alternate option, in

order to preserve the right to seek review under 35 U.S.C. §§ 141 or 145 with respect

to the affirmed rejection, the effective date of the affirmance is deferred until conclusion

of the prosecution before the examiner unless, as a mere incident to the limited

prosecution, the affirmed rejection is overcome.

If the appellants elect prosecution before the examiner and this does not result

in allowance of the application, abandonment or a second appeal, this case should be

returned to us for final action on the affirmed rejection, including any timely request for

reconsideration thereof.

13

Appeal No. 95-2450
Application 07/786,804

No time period for taking any subsequent action in connection with this appeal

may be extended under 37 CFR § 1.136(a).

<u>AFFIRMED-IN-PART – 37 CFR § 1.196(b)</u>

Marc L. Caroff.
Administrative Patent Judge

)
)
)
)
)
)
)
)
)
)
)
)
)

BOARD OF PATENT

APPEALS AND

INTERFERENCES

William F. Smith
Administrative Patent Judge

Teddy S. Gron
Administrative Patent Judge

14

Appeal No. 95-2450
Application 07/786,804


Timothy J. Martin, P.C.
9250 W. 5th Avenue, Suite 200
Lakewood, CO  80226

15

# EXHIBIT D

# REDACTED

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2006, the attached **REDACTED PUBLIC VERSION OF LP MATTHEWS' OPENING MEMORANDUM SUPPORTING ITS** *DAUBERT* **MOTION TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TRIAL TESTIMONY OF THE KAO DEFENDANTS' LIABILITY EXPERT, ROBERT Y. LOCHHEAD** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esquire                                 HAND DELIVERY
Potter Anderson & Corroon, LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801

Arthur I. Neustadt, Esquire                                 VIA ELECTRONIC MAIL
Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
1940 Duke Street
Alexandria, VA  22314

Francis G.X. Pileggi, Esquire                               HAND DELIVERY
Fox Rothschild LLP
Suite 1300
919 North Market Street
Wilmington, DE  19801

John Ward, Esquire                                          VIA ELECTRONIC MAIL
Ward & Olivo
708 Third Avenue
New York, NY  10017

/s/ Lauren E. Maguire
_____

Lauren E. Maguire