## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LP MATTHEWS, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1507 (SLR) |
| | ) | Honorable Sue L. Robinson |
| BATH & BODY WORKS, INC., | ) | JURY TRIAL DEMANDED |
| and | ) | |
| LIMITED BRANDS, INC., | ) | |
| and | ) | |
| KAO BRANDS CO. (f/k/a THE ANDREW | ) | |
| JERGENS COMPANY), | ) | |
| and | ) | |
| KAO CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS BATH & BODY WORKS, INC. AND LIMITED
## BRANDS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF

FOX ROTHSCHILD LLP
Francis G.X. Pileggi (Del. Bar No. 2624)
Sheldon K. Rennie (Del. Bar No. 3772)
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Phone: (302) 655-3667
Fax: (302) 656-8920

*Attorneys for Defendants Bath & Body Works, Inc.*
*and Limited Brands, Inc.*

OF COUNSEL:

John F. Ward
David M. Hill
Michael J. Zinna
WARD & OLIVO
708 Third Avenue
New York, New York 10017
Phone: (212) 697-6262
Fax: (212) 972-5866

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   NATURE AND STAGE OF THE PROCEEDING..........................................................2

III.  SUMMARY OF THE ARGUMENT .........................................................................2

IV.   STATEMENT OF FACTS ......................................................................................4

     A.    The Claims and Specification of the '062 Patent...............................................4

     B.    The Continuation-in Part Application of the '062 Patent ..................................6

V.    ARGUMENT .......................................................................................................7

    A.    The Governing Law on Claim Construction.................................................7

    B.    The Limited Defendants' Analysis of the Claim Terms ...........................9

       1.    "Cleaning Composition"....................................................................9

       2.    "Orange Oil" ...................................................................................11

       3.    "Emulsifying Agent" .......................................................................12

       4.    "Oat Grain Derivative Product".......................................................13

       5.    "Oatmeal" Means Rolled Oats Boiled in Water ...............................14

       6.    "Moisturizer" ..................................................................................15

       7.    "Inclusively" ...................................................................................16

VI.   CONCLUSION..................................................................................................17

# TABLE OF AUTHORITIES

**CASES**

*Hockerson-Halberstadt Inc. v. Avia Group International Inc.*, 222 F.3d 951 (Fed. Cir. 2000)......8

*In re Whiton*, 420 F.2d 1082 (CCPA 1970) ..............................................................16

*K-2 Corp. v. Salomon S.A.,* 191 F.3d 1356 (Fed. Cir. 1999) ..........................................8

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ..........................7

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004).................8, 9, 13

*Monsanto Co. v. Syngenta Seeds, Inc.*, 2006 U.S. Dist. LEXIS 27512
    (D. Del. May 10, 2006)..................................................................................14

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .......................7, 8, 12

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) .........7

*Southwall Technologies, Inc. v. Cardinal IG Company*, 54 F.3d 1570 (Fed. Cir. 1995) ............8, 9

*Spectrum Int'l Inc. v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998)...........................8

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167
    (Fed. Cir. 2002)..............................................................................................16

*Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir. 1996) ...........................7

**AUTHORITIES**

35 U.S.C. §112 .............................................................................................................11

## I.    INTRODUCTION

It's around 10:30 PM, long after quitting time, but Phillip Low is still installing windows at a job site, trying to finish up.  He had not stopped for dinner – there was nothing but an orange left in his lunchpail anyway.  Famished, with sealing caulk still on his hands, he rips into the orange and notices something unexpected.  The sealing caulk starts to dissolve in the juices from the fruit and the rind.

This is the discovery that led to the '062 patent.  Mr. Low then asks his business advisor, a man he knows has a degree in chemistry, for help.  Together, they develop an industrial-type cleaner for removing paint, caulk, tar and the like from the skin.  Living in Boulder, Colorado, they know the product must be "all natural."  In fact, although they test samples on their families and friends, they make sure their labels and advertising material state that no testing was performed on animals!  To pair with orange oil (and keep that oil from separating from any other components, i.e., to maintain an emulsion), they decide on oatmeal.  For whatever reason, their product – Healthy Kleaner – never takes off.

Now everything has changed.  Ownership of the patent has morphed from two guys trying to sell cleaning products to two lawyers looking to sell patent licenses.  Plaintiff LP Mathews, L.L.C. ("LPM" or "Plaintiff") was started when two lawyers each chipped in $7,000 to buy an option on the '062 patent.  Its only activity is the present lawsuit.

Claim interpretation has morphed as well.  The '062 patent clearly describes the Healthy Kleaner product, an orange oil based skin cleaner using oatmeal as a natural emulsifier and having a pH of 4.5 to 6.0 to approximate the pH of human skin.  In preferred embodiments (e.g., Samples IV, V and XIX) orange oil ranges from 36.5% to 42.75%, oat gum or oatmeal ranges from 28% to 42.75%, and the pH ranges from 5.0 to 5.5.

Now, the LP Matthews lawyers contend that the '062 patent covers products with trace amounts of orange oil (as low as 0.01%), even when that orange oil is added solely as fragrance, and scant amounts of any oat-based product, even when that oat-based product is not used as an emulsifier. And, the lawyers contend that the pH – clearly identified in the patent and claims as between 4.5 and 6.0 – should be expanded to at least 4.0 to 6.5.

In contrast to the LP Matthews lawyers, the Limited Defendants seek claim interpretations that are actually supported by the patent-in-suit.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

On December 8, 2004, Plaintiff, filed a Complaint against Limited Brands, Inc, Bath & Body Works, Inc., (collectively referred to as the "Limited Defendants"), KAO Brands Co. and KAO Corp. alleging infringement of United States Patent No. 5,063,062 ("the '062 patent") (Exhibit A to the Declaration of David M. Hill, Esq., in Support of Defendants Bath & Body Works, Inc. and Limited Brands, Inc.'s Opening Claim Construction Brief).[1] This Court entered a Scheduling Order on June 9, 2005. Fact discovery closed on January 26, 2006 and expert discovery closed on May 12, 2006. Opening claim constructions briefs are to be filed by June 29, 2006. (D.I. 39).

## III.    SUMMARY OF THE ARGUMENT

All of the Limited Defendants' proposed claim constructions come directly from the patent.

---

[1] The Exhibits referenced hereinafter as "Ex. __" are the exhibits attached to the Declaration of David M. Hill, Esq. in Support of Defendants Bath & Body Works, Inc. and Limited Brands, Inc.'s Opening Claim Construction Brief, filed concurrently herewith.

The '062 patent states that a "cleaning composition" is a composition "suitable for external application to human skin tissue in order to remove unwanted substances" (Ex. A, the '062 patent, Col 1 lns. 5-7) that is "particularly adapted for cleaning non-water soluble products" (Ex. A, the '062 patent, Col. 1, lns 11-14) and has "as little as 5% by volume of orange oil, although it was preferable to have … at least 25% orange oil."  (Ex. A, the '062 patent, Col. 6, lns. 56-61).  This comports with what the inventors believed their invention to be.  Co-inventor Phillip Low testified that the inventors tested compositions down to almost no orange oil and concluded that anywhere from 5% to 60% provided adequate cleaning while also being comfortable on the skin.  (Ex. B, Dep. of Phillip Low, pp. 26 and 86-87).  The '062 patent also states that "orange oil" is "a natural product derived from the rind of oranges."  (Ex. A, the '062 patent, Col. 1, lns. 50-52).

The '062 patent discusses the "emulsifying agent" as the primary ingredient added to form and stabilize an emulsion.  "In order to determine whether a natural ingredient could act as an emulsifying agent, the Applicants selected a grain base derivative as an emulsifying agent. To this end, Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier."  (Ex. A, the '062 patent, Col. 4, lns. 20-27; *see also* Col. 3, lns. 64-Col. 5, ln. 27 (discussing the various compositions which utilized oatmeal or oat gum as the emulsifying agent).  Indeed, other products were tried, but did not work.

The only "oat grain derivative products" mentioned in the '062 patent are oatmeal and oat gum.  "The Applicants selected a grain base derivative as an emulsifying agent.  To this end, Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier." (Ex. A, the '062 patent, Col. 4, lns. 22-27).  No other oat grain derivative products are disclosed by the Applicants, which ultimately caused the Board of Patent Appeals and Interferences to reject a

3

claim in a related application using the term "grain derivative product" under 35 U.S.C. § 112 as

not being enabled by the narrow specification. (Ex. C, 4/15/97 Board of Appeals' Decision, p. 8).

The '062 patent discusses the "emulsifying agent" as the primary ingredient added to

form and stabilize an emulsion.  "In order to determine whether a natural ingredient could act as

an emulsifying agent, the Applicants selected a grain base derivative as an emulsifying agent. To

this end, Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier."  (Ex. A,

the '062 patent, Col. 4, lns. 20-27; *See also* Col. 3, lns. 64-Col. 5, ln. 27 (discussing the various

compositions which utilized oatmeal or oat gum as the emulsifying agent).

The '062 patent defines the term "oatmeal" as "rolled oats boiled in water."  (Ex. A, the

'062 patent, Col. 4, lns. 57-60).

Finally, the '062 patent uses the term "inclusively" to mean including but not exceeding

the endpoints of a range. "The composition is constituted to have a pH of between 4.5 and 6,

inclusively."  (Ex. A, the '062 patent, Abstract).


## IV.      STATEMENT OF FACTS

### A.      The '062 Patent

The '062 patent, entitled "Cleaning Compositions with Orange Oil," issued on

November 5, 1991, from an application filed on September 27, 1989.  The catalyst for the

invention was co-inventor Phillip Low's observation that the juices from an orange he

was eating were dissolving the sealing caulk on his hands. (Ex. B, Dep. of Phillip Low,

pp. 11-17).  After consulting his business advisor, the industrial-type cleaner disclosed in

the '062 patent was developed.

The '062 patent, filed as an application on September 27, 1989, issued on November 5, 1991 with twelve (12) claims, of which only independent Claims 6 and 9 are asserted in this case. Claims 6 and 9 read as follows:

> 6. A skin cleaning composition for external use on human tissues, comprising orange oil, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as an emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively. (Ex. A, the '062 patent, Col. 10, lns. 1-6).

> 9. A cleaning composition for use on human skin comprising forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of oatmeal and a pharmaceutically acceptable moisturizer. (Ex. A, the '062 patent, Col. 10, lns. 13-17).

In order to determine the bounds of a suitable cleaning composition according to their invention, the Applicants evaluated various compositions and their respective physical properties to determine which combinations would effect cleaning. (*See generally* Ex. A, the '062 patent, Col. 3-Col. 8). These tests analyzed the amount of orange oil needed in the composition, the amount and type of natural product required to form an emulsion, and the effective pH range of a cleaner. (*See* Ex. A, the '062 patent, Col. 3-Col. 8).

With regard to the effective amount of orange oil, the Applicants concluded that:

> With respect to cosmetics, a composition according to the present invention could have as little as 5% by volume of orange oil although it was preferable to have a cleaning composition having at least 25% by volume of orange oil. (Ex. A, the '062 patent, Col. 6, lns. 56-61)

Regarding emulsifiers, the Applicants selected grain base derivatives (i.e., oatmeal gum and oatmeal) as the primary emulsifying agent. (Ex. A, the '062 patent., Col. 4, lns 22-27) (emphasis added). The Applicants' tests revealed that these two

substances could perform as primary emulsifiers.  (Ex. A, the '062 patent, Col. 4, ln. 27 -
Col 5 ln. 27).  The patent does not indicate that any other substances were tested or that
the Applicants knew other grain base derivatives would work as primary emulsifiers in
their composition.  ('062 patent, Col. 4, ln. 27 - Col 5 ln. 27).

Regarding the appropriate pH for the composition, the Applicants concluded that
the invention "should have a pH between 4.5 and 6.0, inclusively."  (Ex. A, the '062
patent at Col. 6 lns. 25-26).

Thus, a clear reading of the patent itself indicates that the inventors concluded
that: (1) the cleaning composition must contain 5% or more orange oil; (2) the only
acceptable primary emulsifying agents  were oatmeal or oatmeal gum; and (3) the pH of
the composition must be within the range of 4.5 – 6.0.  The patent does not support
another interpretation.


B.    The Continuation-in Part Application of the '062 Patent

On November 4, 1991, the Applicants filed a continuation-in-part application of
the '062 patent, which was assigned application number 07/786,804 ("the '804
application").

In a first Office Action dated April 6, 1992, the Examiner rejected the claims , in
part because of the term "oat grain derivative" as being indefinite under 35 U.S.C. § 112.
(Ex. F, Office Action dated April 6, 1992, p. 2).  In response, the Applicants noted that
the term "oat grain derivative product" means a product "selected from the group
consisting of oat gum and oatmeal."  (Ex. G, Office Action Response dated July 15,
1992, p. 2).

After several additional Office Actions and Responses not pertinent here, the Examiner maintained his rejections and the Applicants appealed to the Board of Patent Appeals at the Patent and Trademark Office (the "Board").  Among other things, the Applicants reiterated that the primary emulsifier is formulated from a grain derivative product such as oatmeal or oatmeal gum.

Unfortunately for the Applicants, the Board affirmed several of the Examiner's 35 U.S.C. § 112 rejections, including the rejection that the independent claims were not enabled under 35 U.S.C. § 112, first paragraph as being nonenabled.  (Ex. C, Board's Decision on Appeal, p. 8).

Faced with the Board's comments, the Applicants opted to let the '804 application go abandoned.


V.     **ARGUMENT**

A.     <u>The Governing Law on Claim Construction</u>

Claim construction is a question of law which the court must decide with the guide of well-established guidelines and principles of patent law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*) (*aff'd* 517 U.S. 370 (1996)). Claim terms must be construed in a manner consistent with what the applicant actually invented.  *See, e.g., Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  Thus, courts focus primarily on three sources of evidence:  (1) the words of the claims; (2) the patent specification; and (3) the prosecution history, all of which are intrinsic.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

A proper claim construction inquiry will start with the patent's claims because it is "a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the applicant is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312. Any functional language in a claim "is, of course, an additional limitation in the claim." *K-2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1363 (Fed. Cir. 1999).

Courts, however, do not read the claims in a vacuum. Indeed, the specification "is always highly relevant to the claim construction analysis. ' *Phillips*, 415 F.3d at 1315. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*; *Vitronics Corp.*, 90 F.3d at 1582.

The prosecution history "provides evidence of how the PTO and the inventor understood the patent." *Phillips,* 415 F.3d 1303 at 1317. An applicant's "statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation." *Microsoft Corp. v. Multi-Tech Sys., Inc*., 357 F.3d 1340, 1350 (Fed. Cir. 2004); *see Southwall Technologies, Inc. v. Cardinal IG Company*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). Statements made to obtain allowable claims can be critical to claim interpretation of seemingly clear language in the claims or specification. *Vitronics*, 90 F.3d at 1582; *Hockerson-Halberstadt Inc. v. Avia Group International Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000) (holding that the prosecution history "disclaimed a particular interpretation of groove, thereby modifying the term's ordinary meaning"); *Spectrum Int'l Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998) ("by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection"). In other words, "the prosecution history limits the interpretation of claim terms so as to exclude any

8

interpretation that was disclaimed during prosecution." *Southwall Tech.,* 54 F.3d at 1576. The prosecution history "was created by the applicant in attempting to explain and obtain the patent[,]" and "can often inform the meaning of the claim language by demonstrating . . . whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Statements made by the applicant in related cases are also significant. Since "any statement of the applicant in the prosecution of a related application as to the scope of the invention would be relevant to claim construction," statements made during the prosecution history of a later-issued patent application are relevant to earlier-issued patents sharing common specifications. *Microsoft Corp.,* 357 F.3d at 1350.

It is against this backdrop of claim construction guidelines that this Court should interpret the disputed claim terms.

B.      The Limited Defendants' Analysis of the Claim Terms

As set forth in the Joint Claim Construction, several terms from the asserted claims of the '062 patent are to be construed. (D.I. 229). These terms include: "cleaning composition" (both Claims 6 & 9); "orange oil" (both Claims 6 & 9); "oatmeal" (Claim 9); "moisturizer" (both Claims 6 & 9); "oat grain derivative product" (Claim 6); "emulsifying agent" (Claim 6); and "inclusively" (Claim 6). (D.I. 229).

1.      "Cleaning Composition"

Both Claims 6 and 9 call for a "cleaning composition." The intrinsic evidence essentially compels that this term be interpreted as a composition for removing unwanted

9

non-water soluble substances from the skin, having as little as 5% orange oil, but

preferably at least 25% orange oil:

> The present invention generally relates to cleaning compositions suitable for external application to human skin tissue in order to remove unwanted substances such as tar, caulking compounds, sealants, adhesives and the like. (Ex. A, the '062 patent, Col. 1, lns. 5-9).

> The present invention is particularly adapted for cleaning non-water soluble products from the human skin in a safe, effective manner. (Ex. A, the '062 patent, Col. 1, lns. 11-14).

> Another object of the present invention is to provide a skin cleaning compound to suitable for cleaning non-water soluble products such as grease, caulking, adhesives, sealants, tar, oils, ink and the like. (Ex. A, the '062 patent, Col. 2, lns. 12-15).

A lower orange oil limit of at least 5% is equally well-defined[2]:

> Broadly, this composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent. (Ex. A, the '062 patent, Col. 2, lns. 25-33).

> Applicants concluded that, with respect to cosmetics, a composition according to the present invention could have as little as 5% by volume of orange oil although it was preferable to have a cleaning composition having at least 25% by volume of orange oil. (Ex. A, the '062 patent, Col. 6, lns. 56-61).

In fact, the preceding quote, and other remarks in the specification could lead one

of skill in the art to conclude that a "cleaning composition" according to the invention

would require considerably more than 5% orange oil. For example, Sample XXIII,

containing 12.5% orange oil, provided only marginal results: "[w]ith respect to Sample

XXIII, again this sample proved effective in removing cosmetics, but the sample was not

---

[2] Plaintiff acknowledges that Claims 6 and 9 contain a minimum percentage of orange oil. However, rather than properly relying on intrinsic evidence, Plaintiff attempts to establish a minimum percentage of 0.01% by resorting to irrelevant extrinsic evidence and mischaracterized witness deposition testimony.

effect [sic] in removing heavier, industrial substances such as caulking compounds, adhesives, tars and the like." (Ex. A, the '062 patent, Col. 8, lns. 4-8).  Indeed, most of the reported samples contain almost 40% orange oil.  And any amount of orange oil lower than 5% is wholly unsupported by the specification.[3]

Based on all of their testing, the inventors concluded that: "[f]rom the foregoing, the inventors have concluded that a suitable skin cleaning composition can be prepared wherein the skin composition has a first ingredient of between 5% and 60% by volume of orange oil, a second ingredient being a pharmaceutical acceptable moisturizer for human skin and a third ingredient being an emulsifying agent." (Ex. A, the '062 patent, Col. 8, lns. 39-46).

Under the circumstances, the Limited Defendants proposed interpretation of "cleaning composition" is arguably broader than what the intrinsic evidence can support.

2.      "Orange oil"

Claim 6 requires "orange oil" and Claim 9 requires "forty-five percent (45%) or less by volume orange oil. (Ex. A, the '062 patent, Col. 10, lns. 1-15).  The '062 patent discloses that  "orange oil" is the non-water soluble liquid derived from the rind of oranges.  Indeed, the '062 patent states that "[o]range oil, as a natural product derived from the rind of oranges, has been recognized in the past to have some cleaning capabilities." (Ex. A, the '062 patent, Col. 1, lns. 50-52).

In the '062 patent, the patentees also state that, with respect to the source of orange oil, "[t]he present invention is directed to a cleaning composition utilized on skin

---

[3] Any construction of a cleaning composition which utilizes less than 5% orange oil forms the basis for our Motion for Summary Judgment under 35 U.S.C. § 112, filed concurrently with this brief.

11

tissues and having, as its cleaning ingredient, the commercially available substance

known as orange oil derived from the rinds of oranges." (Ex. A, the '062 patent, Col. 2,

lns 64-67). Moreover, both parties' experts agree that orange oil, as understood in the art,

is non-water soluble. (*See* Updated Expert Report of Christopher T. Rhodes, p. 4)

(Exhibit H) (*see also* Rebuttal Expert Report of John Carson, pp. 10-11) (Exhibit I); s*ee*

*also Phillips*, 415 F.3d 1318 (stating that resort to extrinsic evidence such as expert

testimony can be useful "to ensure that the court's understanding of the technical aspects

of the patent is consistent with that of a person of ordinary skill in the art.").

As defined by the '062 patent, "orange oil" means the non-water soluble liquid

derived from the rind of oranges.


3.      "Emulsifying agent"

The '062 patent uses the term "emulsifying agent" to describe the primary

ingredient added to form and stabilize an emulsion. Claim 6 of the '062 patent requires

"an oat grain derivative product <u>as an emulsifying agent</u>." (Ex. A, the '062 patent, Col.

10, lns. 3-4) (emphasis added).

The Applicants noted that maintaining an emulsion is not easy:

An initial problem was noted with each of these Samples, however, in that
the emulsion separated, that is "broke" after approximately one to two
days. (Ex. A, the '062 patent, Col. 3, lns. 65-69).

The Applicants claimed to have solved this problem by utilizing oatmeal or

oatmeal gum.

In order to determine if a natural ingredient could act as an emulsifying
agent, the Applicants selected a grain base derivative as an emulsifying
agent. To this end, Applicants tested oatmeal gum and oatmeal to act as
the primary emulsifier. (Ex. A, the '062 patent, Col. 4, lns. 20-27; *See*

*also* Col. 3, lns. 64-Col. 5, ln. 27 (discussing the various compositions which utilized oatmeal or oat gum as the emulsifying agent)).

The only emulsifying agents disclosed in the '062 patent are oatmeal and oatmeal gum. Further, oatmeal and oatmeal gum are used separately, never in combination further supporting the Limited Defendants' proposed construction.

4.    "Oat grain derivative product"

Claim 6 requires an "oat grain derivative product." (Ex. A, the '062 patent, Col. 10, lns. 3-4). The '062 patent plainly provides that the only suitable oat grain derivatives contemplated by the inventors are oatmeal and oat gum. (*See* Ex. A, the '062 patent, Col. 4, lns. 22-27). In particular, the '062 patent states that "[i]n order to determine if a natural ingredient could act as an emulsifying agent, the Applicants selected a grain base derivative as an emulsifying agent. To this end, Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier." (Ex. A, the '062 patent, Col. 4, lns. 22-27).

The '062 patent does not disclose any other natural grain based products that can serve as emulsifiers. Indeed, in a related patent application filed prior to issuance of the '062 patent, the Applicants were forced to specify oatmeal and oat gum as the only oat grain derivative products to overcome an indefiniteness rejection. Statements made during the prosecution history of a later-issued patent application are relevant to earlier-issued patents sharing common specifications. *See Microsoft Corp.,* 357 F.3d at 1350. Here, the Examiner rejected a claim (substantially the same as Claim 1 of the '062 patent) directed at a composition comprising, *inter alia*, "an emulsifying agent" that is "an oat grain derivative product" as being indefinite. In response, the Applicants amended the claim to specify that the oat grain derivative products were oatmeal and oat gum. In

13

short, neither the '062 patent nor the later filed continuation-in-part application supported anything else.

After repeatedly being rejected by the Examiner, the Applicants appealed to the Board of Patent Appeals at the United States Patent and Trademark Office (the "Board"). The Board agreed with the Examiner that the only oat grain derivatives that were enabled by the specification were oatmeal and oat gum.  The Board stated:

> the supporting specification does not appear to provide sufficient information to determine without undue experimentation which grain based derivatives are suitable for use.

(Ex. C, p.8).

It is well settled that "the scope of the [patent] claims must be less than or equal to the scope of the enablement."  *Monsanto Co.*, 2006 U.S. Dist. LEXIS 27512, *16 (D. Del. May 10, 2006).  Accordingly, the only grain derivatives supported by the specification in compliance with 35 U.S.C. §112 are oatmeal and oatmeal gum.

### 5.     "Oatmeal"

Claim 9 requires "oatmeal."  (Ex. A, the '062 patent, Col. 10, ln. 16).  The '062 patent defines "oatmeal" as oats that have been boiled in water.  (Ex. A, the '062 patent, Col. 4, ln. 58).  The Applicants tested the emulsification potential of oatmeal gum and oatmeal in Samples IV and V, respectively.  (Ex. A, the '062 patent, Col 4, lns. 24-65). In preparing the oat gum samples, Applicants stated, "the oatmeal gum was prepared by boiling rolled oats in water and straining the resulting mass to remove the hulls." (Ex. A, the '062 patent, Col. 4, lns. 54-56).  In preparing the oatmeal sample, Applicants stated, "rolled oats were boiled in water and the resulting mass (containing about 50% water)

was used to prepare the composition." (Ex. A, the '062 patent, Col. 4, lns. 56-59)

(emphasis added)..  In other words, oatmeal *is* rolled oats boiled in water.[4]

Thus, the Limited Defendants submit that the term "oatmeal" should be defined as

the '062 patent defines it - rolled oats that have been boiled in water.


6.    "Moisturizer"

Claims 6 and 9 both require a "pharmaceutically acceptable moisturizer."   ( See

Ex A Col. 10, lns 2-3, 16-17).  The '062 patent only uses moisturizers that are naturally

occurring moisturizing substances.  The specification specifically notes that the invention

is a "natural" cleaning composition that utilizes only plant and vegetable sources.  The

patent states, "the present invention is directed to a natural cleaning composition that

utilizes only plant based ingredients."  (Ex. A, the '062 patent, Col. 1, lns. 9-11).  Indeed,

it was an object of the invention of the '062 patent to "provide a skin cleaning

composition that is derived from natural vegetable and plant sources."  (Ex. A, the '062

patent, Col. 2, lns. 18-20).  Consistent with the intention to have an all-natural product,

the moisturizers disclosed in the '062 patent are all naturally occurring substances.  (*See*

Ex. A, the '062 patent, Col. 2, lns. 51-54).

As such, one of ordinary skill in the art would appreciate that the meaning of the

term "moisturizer" as used in the '062 patent is "a naturally occurring moisturizing

substance."

---

[4] The Applicants used the term "oatmeal" again in the '804 application in a consistent matter,
stating "oatmeal is prepared by boiling rolled oats in water."

7.    "Inclusively"

The use of the terms "inclusive" and "inclusively" are so common in patent claiming that little discussion is necessary -- particularly since the usage in the '062 patent is consistent with conventional claim drafting techniques.

The Abstract of the '062 patent states that "[t]he composition is constituted to have a pH of between 4.5 and 6.0." (Ex. A, the '062 patent, Abstract).  Early patent caselaw questioned whether such a disclosure covered the endpoints, i.e., 4.5 and 6.0, or only the values that are mathematically "between" the endpoints.  To avoid any argument, patent attorneys have traditionally added "inclusive" or "inclusively" after a recited range to make it clear that the endpoints should be included.[5]  The use of this terminology has become so pervasive that it has spread to many other areas as well.  For example, a recent Environmental Protection Agency rule relating to engine emissions states "[t]he specified ranges are inclusive.  For example, a specified range of 0.98-1.02 for fna means $0.98 </= n[1] </= 1.02$".  For those of us whose math skills may have deteriorated somewhat, this translates into English as "0.98 is less than or equal to n[1] which is less than or equal to 1.02".

The '062 patent supports just such an interpretation: "Applicants adjusted the amount of orange oil (ignoring whether the emulsion broke) to determine an effective pH range wherein the composition felt comfortable on the human hands." (Ex. A, the '062 patent, Col. 5, lns. 31-35).  To do so, the inventors tested compositions with a pH of 6.0, 7.0, 8.0, and 9.0, respectively.  (Ex. A, the '062 patent, Col. 5, lns. 35-61).  The results of

---

[5]  See, eg., *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167 (Fed.Cir. 2002)("Groups 3a to 7a, inclusive, and 3b through 7b, inclusive, of the Periodic Table of Elements"); *In re Whiton*, 420 F.2d 1082 (CCPA 1970)("n is an integer from 4 to 8 inclusively and R is an alkylene group having from 4 to 7 carbon atoms, inclusively").

these evaluations were clear:  "These empirical observations lead Applicants to conclude that an acidity of at least pH 6.0 is desirable."  (Ex. A, the '062 patent, Col. 5, lns. 60-63).

Similarly, to determine the lower endpoint of the range, the inventors evaluated compositions with a pH of 2.5, 3.0, 3.5, and 4.0.  (Ex. A, the '062 patent, Col. 5, ln. 64-Col. 6, ln. 27).  These compositions "felt too astringent on the hands even after limited use."  (Ex. A, the '062 patent, Col. 6, lns. 19-20).  In other words, based on these tests, a composition with a pH of about 4.0 or lower was also unacceptable.  In this manner, applicants zeroed in on the range that was just right: "Applicants accordingly concluded that it was desirable that the emulsified composition have a pH that is approximately 4.5."  (E. A, Col. 6, lns. 22-23).

Thus, the term "inclusively" is plainly used in the '062 patent to mean "including but not exceeding the endpoints of the range 4.5 to 6.0".

## VI.    CONCLUSION

For the foregoing reasons, the Limited Defendants respectfully request that the Court construe the claims in accordance with the meanings advanced herein.

Respectfully submitted,

FOX ROTHSCHILD LLP

Dated:  June 29, 2006                  By:___/s/ Sheldon K. Rennie_____
                                       Francis G.X. Pileggi (Del. Bar No. 2624)
                                       Sheldon K. Rennie (Del. Bar No. 3772)
                                       Fox Rothschild, LLP
                                       Suite 1300
                                       919 North Market Street
                                       Wilmington, Delaware  19801
                                       Phone: (302) 655-3667
                                       Fax: (302) 656-8920
                                       E-mail: fpileggi@foxrothschild.com

E-mail: srennie@foxrothschild.com

OF COUNSEL:

John F. Ward
David M. Hill
Michael J. Zinna
WARD & OLIVO
708 Third Avenue
New York, New York 10017
Phone: (212) 697-6262
Fax: (212) 972-5866
E-mail: wardj@wardolivo.com
E-mail: hilld@wardolivo.com
E-mail: zinnam@wardolivo.com

*Attorneys for Defendants*
Bath and Body Works, Inc.
Limited Brands, Inc.