# **EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| L.P. MATTHEWS, LLC, | ) | Civil Action No. 04-1507-SLR |
| Plaintiff, | ) | Jury Trial Demanded |
| vs. | ) | |
| BATH & BODY WORKS, INC., LIMITED BRANDS, INC., KAO BRAND CO. (f/k/a THE ANDREW JERGENS COMPANY), AND KAO CORPORATION, | ) | |
| Defendant. | ) | |

**Expert Report of Larry W. Evans**
**Pursuant to Rule 26(A)(2)(B), Fed. R. Civ. P.**

Pursuant to Rule 26(A)(2)(B), Fed. R.Civ. P., and on behalf of Plaintiff L.P. Matthews, LLC ("Matthews"), I submit the following report of my opinions in this matter. I reserve the right to supplement or modify the opinions expressed herein, as well as the basis for the opinions, depending upon the nature and content of the proofs which Defendants Bath & Body Works, Inc., et al. (BBW"), and Kao Brands Co., et al. ("Kao") present and depending upon any additional discovery or other information provided by either BBW or Kao in this matter.

## I. ENGAGEMENT AND COMPENSATION

1.      I have been engaged by counsel for Matthews to provide an expert opinion, with supporting analyses, on the subject of damages to which Matthews would

be entitled as compensation for BBW's and KAO's infringement of U.S. Patent No.

5,063.062 (the "'062 patent"). I am being compensated for my time with respect to

expert services provided to Matthews' counsel in this case at my normal billing rate of

$475.00 per hour. No part of my compensation depends on the outcome of this matter.

## II.    QUALIFICATIONS AS AN EXPERT WITNESS

2.    I have a B.S. in Chemical Engineering from Purdue University, and a Juris

Doctor degree from the George Washington University School of Law. I have been

admitted to practice before the United States Patent and Trademark Office since 1962 and

have been a member of the Minnesota Bar since 1965. I was born in Georgetown,

Indiana in 1939.

3.    For nearly 40 years, I have been involved in the licensing of patents,

trademarks and technology. I estimate that over those nearly 40 years, I have been

involved in the negotiation of more than 400 licenses, as licensor or as licensee. The

subject matter of these licenses has included: refining and petrochemical technology,

gasoline compositions, TBA (tires, batteries and accessories for service stations), foundry

products, coating methods and compositions, activated carbon health care products,

electrical connectors, batteries, capacitors, photovoltaics, compressors, food preparation

equipment, computer software, suspension systems for motor vehicles, ceramic housings

for catalytic converters and tow trucks. In most of my negotiations, I had business

responsibility as well as legal responsibility. My experience includes negotiations on six

continents and in more than 40 countries.

4.    Following my graduation from law school in 1965, I accepted

employment at the Minneapolis headquarters of Archer-Daniels-Midland Company

("ADM") as a patent attorney. Almost immediately thereafter, I became involved in the

licensing of patents and know-how. I was employed by ADM (and its successor in

-2-

interest, Ashland Chemical Co.) until 1970 when I accepted a position at The Standard
Oil Co. – Ohio ("Sohio").

5.     During 1970-1976, I was the individual within Sohio's Patent and License
Department who was primarily responsible for licensing Sohio's synthetic fiber
intermediate technology. I personally negotiated, during this period, more than 15 major
(multimillion dollar) licenses to utilize this technology. In 1973, I negotiated on behalf of
Sohio what was believed to have been the first technology license to China by a Western
company in return for a cash royalty following the resumption of friendly relations
between the United States and China. During this period, I also negotiated licenses in
other fields, including batteries and capacitors, photovoltaic cells, ceramics, molten metal
processing, glass-lined reactors, activated carbon, computer software and many other
technology fields.

6.     For 17 years, from 1976-March 31, 1993, I headed the corporate Patent
and License Department of Ohio and B.P. America ("BP") (following its acquisition of
Sohio in 1987), serving as Chief Patent Counsel and Vice-President of Licensing. During
this period, I supervised and, in many cases, personally handled more than 350 license
negotiations. Additionally, I was responsible for resolving (through negotiation,
arbitration or litigation) numerous patent disputes with licensees, competitors and
partners. My responsibility in these negotiations, for the most part, included business as
well as legal concerns. Sohio and BP America were fully integrated oil companies with
extensive retail service stations, car washes and gasoline only stations. Sohio/BP not
only sold automatic transmission fluid, but also serviced automatic transmissions in the
service facilities. Additionally, the two companies were deeply involved in cooperative
research and development with automobile manufacturers, seeking increased fuel
efficiency and reduced emissions. As Chief Patent Counsel and Vice President, I led my
department in the practice of preventative patent law, taking steps to ensure that the
companies did not infringe valid and enforceable patents of others. My department

-3-

monitored patents of our main competitors and of organizations that were conducting

research in areas of interest. Additionally, we conducted regular patent and intellectual

property seminars for R&D personnel, as well as engineers and business personnel. One

objective of the seminars was to increase our monitoring coverage. An important part of

the seminars, which were held at least two times per year, was to distribute and explain

the company's patent manual, which included basic facts and principles of patent law and

practice. As a longtime member of the Association of Corporate Patent Counsel

(A.C.P.C.), of which I became a member in 1976, other members and I regularly

exchanged views on these subjects and, in fact, exchanged copies of the manuals.

Subjects dealt with regularly at A.C.P.C. meetings included patent department operation

and preventative patent law.

      7.     The Patent and License Department at Sohio and BP was a profit center

from 1970 until 1989. My responsibility during this period extended to that of running a

very profitable business that generated substantial royalty and catalyst income to Sohio

and BP America. Reporting only to Sohio's and (BP's) Board of Directors, one of whom

was my direct supervisor, I established royalty rates and negotiated royalties for Sohio's

(and BP's) licensing out agreements. Additionally, my staff and I were given

responsibility from business unit heads to acquire technology and, in so acquiring, to

negotiate the terms of any licenses that were required. In most cases, the responsible

business delegated the business responsibility for such licenses to my department.

      8.     Beginning in 1968, I participated actively in an intellectual property

professional association known as The Licensing Executives Society. This activity began

with several speaking engagements. Topics centered around license agreements, process

licensing, determining royalties, licensing in developing countries, China licensing,

negotiation and related topics. In 1979, I was elected Secretary of LES USA/Canada, a

position I held through 1983. I then served as Vice-President in 1984, President-Elect in

1985, President in 1986 and Past-President in 1987. Throughout this period, I was a delegate to LES International (LESI).

9.     Following my progression through LES USA/Canada, I became more active in LES International, which is the international federal of national and regional LES Societies. I became a Committee Chairman in 1989, served as President-Elect in 1992, and as President in 1993. LESI now has more than 11,000 members from 28 national and regional Societies and from more than 60 countries. Almost all substantial licensing through the world is conducted by LES members (representing at least one side of the transaction). Without qualification, LESI is the most important organization in the world in the field of licensing and technology transfer.

10.     In May 2000 in Amsterdam, the Netherlands, I was awarded LESI's highest award, the Gold Medal for "leadership and service to the Society and to the licensing profession." I was the eleventh recipient (and fifth American recipient) of this award in the 35-year history of LESI.

11.     Following my departure from BP in April 1993, I joined the Chicago intellectual property law firm of Willian Brinks Hofer Gilson & Lione where I served as Counsel to the firm.

12.     I have published articles and presented speeches in the field of licensing more than fifty times throughout the world, in places such as Dublin, London, Zurich, Paris, Milan, Beijing, Xian, Shanghai, Guangzhou, Tokyo, Osaka, Sao Paulo, Rio de Janeiro, Buenos Aires, Caracas, Cancun, Mexico City, Stockholm, Gothenburg, Antwerp, Seoul, Prague, Oslo, Cape Town and throughout the United States. A list of my publications for the last ten (10) years is contained in the attached curriculum vitae, which is incorporated herein (Exhibit A).

13.     My professional activities are not confined to LES USA/Canada and LES International. I am also a former member of the Executive Committee of the International Intellectual Property Association, a member of the Advisory Board of the

Patent, Trademark and Copyright Institute at the Franklin Pierce Law Center, a former

Charter Member of the Board of the Intellectual Property Owners, Inc. (until my

departure from BP), a former Committee Chair of the American Bar Association (ABA)

Intellectual Property Section, and a former Chairman of the Intellectual Property

Committee of the Chemical Manufacturers Association.

   14. I also have been a frequent speaker at the Practicing Law Institute,

American Intellectual Property Law Association, LES, ABA-Intellectual Property

Section, various Intellectual Property Law Associations, China Business Council, Asia

Society, various educational institutions, and other civic, educational and professional

meetings. My topics have included licensing, drafting and enforcing license agreements,

interpretation of licensing clauses, valuation of technology, and negotiation. I have

taught the license negotiation course at the New York and San Francisco seminars on

licensing the technology transfer sponsored by LES USA/Canada on several occasions.

My speeches have included, *inter alia*, reciting experiences via case histories, presenting

arguments for legislative changes, and teaching practitioners how to license and how to

conduct license negotiations.

   15. My personal licensing experience at Sohio/BP included the licensing and

enforcement of several significant patents. I managed the companies' IP program, which

included pioneer patents and technology that supported licensing programs that generated

more than one billion dollars in income. As noted above after I left Sohio/BP, I advised

several smaller companies with respect to the protection and enforcement of their patent

portfolio. Since leaving the law firm, I have continued to counsel GE/RCA and Minolta.

Additionally, I have advised established companies and start-ups with respect to their IP

rights and licensing (both in and out) practices.

   16. During 2004, following my involvement as an expert in an arbitration

between Energy Conversion Devices' (ECD's) Ovonics subsidiary and Matsushita of

Japan, I counseled ECD and their partner Chevron Corporation in their license

negotiations with Matsushita and Toyota. These negotiations related to Matsushita's and Toyota's use of Ovonics' nickel metal hydride batteries in hybrid vehicles. The result of the negotiation was several agreements under which Ovonics' licensed the Japanese companies under its patents and technology relating to the history for a significant lump summand running royalties and the Japanese companies granted a royalty-free cross license to Ovonics and Chevron (with the right to sublicense) to all of their operational technology. This was indeed a major negotiation in which I was pleased to have had a significant role.

17.    Additionally, while I was employed by Sohio and BP America, I was a member of several management committees of corporate divisions. As such, I was expected to be able to understand spreadsheets and "hurdle rates". In this regard, I attended a course offered by the company called "The Sohio Economic Evaluation Course". In this course, I was required to perform an economic evaluation of an actual project, calculating the DCF and "hurdle rate". The purpose was to prepare me to be able to understand the influence of varieties on the DCF and to read and understand spreadsheets.

18.    I have served as an expert witness in licensing matters on several occasions (see attached curriculum vitae, Exhibit A). Within the last several years, I have testified as an expert at trial on the following occasions: (1) *Chevron Chemical Co. v. Idemitsu Petrochemical Co., Ltd*, (2) *University of Washington v. Optiva Corp.*, Binding Arbitration (Seattle, Wa.), (3) *Phillips v. Exxon*, C.A. No. 9-638-JJF (D. Del.), (4) *Lever v. Procter & Gamble*, Federal Court Trial Division, File No. T-2534-85 (Toronto, Canada), (5) *Medtronic v. A. CS and Guidant*, C.A. No. 97-2459 JMR-FLN (D. Mn.), (6) *Plant Genetic Systems N.V. v. DeKalb Genetics Corp.* (D. Conn.), (7) *Guidant, et al. v. St. Jude Medical*, C.A. No. 1P96-1718-C.H.IG (S.D. Ind.), (8) *Chevron, et al. v. Crown, Cork & Seal*, C.A. No. 99-234-JJF (D. Del.), (9) *BBA Nonwovens, et al. v. Superior, et al.* C.A. No. 6:00 2764 13 (D.S.C.), (10) *MLMC Ltd v. Air Touch, et al.*, C.A. 99781 SLC

(D. Del.), (11) *Al-Site Corp., et al. v. VSI International*, C.A. 91-847, 92-201C and 941940 CW Highsmith (S.D. Fl.); (12) *Syndia Corp. v. The Gillette Co.*, C.A.01C2485 (E.D. Ill.); (13) *LinkCo. Vs. Fujitsu*, CA 00 Civ. 7242 (SS) (S.D.N.Y.); (14) *Nilssen v. Motorola*, Binding Arbitration before Judge James Davis (Chicago, Illinois); (15) *MercExchange v. e-Bay, et al.*, Case No. 2-01CV-736 (N.D. Va.); (16) *Tri/Strata Technologies v. ICN Pharmaceuticals Corp.*, Case No. 01-150 JJF (D. Del.); (17) *Aguao, et al. v. Universal Instruments*, C.A. No. H-02 1747 (S.D. Tex.); (18) *Norco v. Motorvac*, SA 02-876 AHS (ANx) (C.D. Cal.); (19) *Tri-Strata v. Mary Kay*, CA No. 01-127 JJF (D. Del.); and (20) *Nichols Inst. V. Scantibodies*, Case No. 02CV 00046 B(JMA) (S.D. Cal.).

19.      During the same period, I have also testified as an expert at depositions in the above cited cases and in the following additional cases:  (1) *Phillips Petroleum v. Tosco, et al.* C.A. No. 98-336-SLR (D. Del.); (2) *JVM Innovation Design v. Spalding and Evenflo*, C.A. No. C-1-97-528 (W.D. Ohio); (3) *Dow Chemical Co. v. Sumitomo Chemical Co.*, C.A. No. CV 10330 BC (E.D. Mich.); (4) *ACLARA v. Caliper*, C.A. No. 99-1968 CRB (N.D. Cal.); (5) *U.S. Filter, et al. v. Ionics*, C.A. No. 98-10541-REK (D. Ma.); (6) *Terabeam v. Dominion*, C00-1062C (W.D. Wash.); (7) *Dhuler, et al. v. MCMC*, C.A. 00-CVS-12333 & 12334 (Wake County N.C. Superior Court); (8) *British Telecom v. Prodigy*, C.A. 00-CIV-9451 (S.D.N.Y.); (9) *Borg-Warner v. N.V. G.*, C.A. 00-C-7470 (N.D. Ill.); (10) *Farmer, et al. v. Medo Industries, et al.*, Case No. 01-10248 LGB (S.D.Cal.); (11) *In re Gemstar Development Corporation Patent Litigation*, Master File No. MDL-1274-WBH; (12) *Synbiotics Corp. v. Agen Biomedical*, C.A. 03-CV-17708 (AJB) (S.D. Cal.); and (13) *Nilssen v. Universal Lighting Technology*, Civil Case No. 3:04-CV-00080 (M.D. Tenn.).

## III.    **PERFORMANCE OF ENGAGEMENT AND COMPENSATION**

20.      In performing my engagement, I reviewed pleadings and other court filings in this suit, documents provided to me by counsel, publicly-available information, other documents including judicial opinions and the patent-in-suit.   These items are

described in Exhibit B, attached hereto. I plan to rely upon the documents reviewed in this matter and demonstrative exhibits illustrating the points I have made in this report to support my testimony at trial.

## IV.    SUMMARY OF OPINIONS AND CONCLUSION

21.    I will testify that an owner of a U.S. patent has the right to exclude all others from making, having made, using, importing, selling or offering for sale the patented invention and that a U.S. patent owner may refuse to license others to any or all of these rights.

22.    I will also testify that, from my extensive experience in both licensing (both "in" and "out") that royalties have been based upon significant percentages of the total economic benefits projected at the time of the negotiation. Depending upon the relationship of the parties and the importance of the patents or technology to the licensor and licensee, the licensor's share of the projected total economic benefit can be substantial, and the licensor's share can be expressed as a lump sum representing the discounted value of a projected royalty stream. Under circumstances which I believe to have been present in this case, the "reasonable royalty" could represent a significant percentage of the value BBW and Kao expected to earn from its presumed infringement of Matthews' presumptively valid and enforceable '062 patent consistent with industry standards and the environment of the hypothetical negotiation as indicated below.

23.    I will testify with respect to the reasonable royalty that would have been adequate to compensate for BBW's and Kao's infringement of Matthews' '062 patent. My testimony and opinions will assume that the '062 Patent is valid, enforceable and infringed. I will testify, applying the Patent Statue (35 U.S.C. 284) that damages for BBW's and Kao's infringement in this case must be sufficient to compensate Matthews for the infringement but in no event less than a reasonable royalty for BBW's and Kao's infringement of the patent-in-suit. It is my understanding that the U.S. Court of Appeals of the Federal Circuit has accepted the concept of "hypothetical negotiations between a

willing licensor and a willing licensee", but the concept "must be carefully applied to

achieve a truly reasonably royalty." The Court has further stated that when "forced to

erect a hypothetical, it is easy to forget a basic realty – a license is fundamentally an

agreement by the patent owner not to sue the licensee. In a normal negotiation, the

potential licensee has three basic choices: forego all use of the invention, pay an agreed

royalty, or infringe the patent and risk litigation. The methodology presumes that the

licensee has made the second choice, when in fact it made the third.[1]

Further, Judge Markey (the first Chief Judgment of the CAFC) sitting by

designation in the 6th Circuit, observed:

> "Determination of a 'reasonable royalty' after infringement,
> like many devices in the law, rests on a legal fiction. Created
> in an effort to 'compensate' when profits are not provable,
> the 'reasonable royalty' device conjures a 'willing' licensor
> and licensee who likes Ghosts of Christmas Past are dimly
> seen as 'negotiating' a license.' There is, of course, no actual
> willingness of either side and no license to do anything, the
> infringer being normally enjoined...from further
> manufacturer, use, or sale of the patented product."[2]

Thus, my testimony will assume hypothetical negotiations between Matthews,

owner of a valid and enforceable patent, and BBW, on the one hand, presumed infringers

of the patent, just before the presumed infringements began.

24.     I expect to testify from an analysis of the factors set forth in *Georgia-*

*Pacific Corp. v. U.S. Plywood* Corp.[3] My analysis of these factors and considerations,

together with my experience in real-world licensing and patent infringement damages,

---

[1]   *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1575-76 (Fed.Cir.
1988).

[2]   *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1158-59 (6th Circ. 1978).
*See also Maxwell v. Baker,* 86 F.3d 1098 (Fed. Cir. 1996), *Rite Hite v. Kelley,* 56 F.3d
1538 (Fed. Cir. 1995), and *King Instruments Corp. v. Perego,* 65 F.3d 941 (Fed. Cir.
1995).

[3]   318 F. Supp. 1116 (S.D., N.Y. 1970), *modified and affirmed,* 446 F.2d 295 (2d Cir.
1971), *cert. denied,* 404 U.S. 870 (1971).

will be brought to bear in this case.  In this regard, I will consider also the fact that the parties are not truly willing, but are, in fact, a patentee and a presumed infringer.  The Federal Circuit has upheld the concept of "royalty for an infringer", at least in party, by the absurdity of a hypothetical negotiation between "willing parties", when the parties would not have reached agreement in the "real world".  Here, both BBW and Kao essentially ignored Matthews' notice letters and indicated no willingness to negotiate licenses to the patent-in-suit.

25.    In giving this testimony, I will rely, where appropriate, upon documents produced and on my general knowledge and experience in licensing.  My opinion may be supplemented if subsequent document production or testimony and evidence adduced in depositions or at trial lead to revisions or updating of this opinion. I will also rely, where appropriate, upon the expert witness statement(s) and testimony of Matthews' other witnesses.

26.    As can be seen from my curriculum vitae (Exhibit A), I have had a long career in licensing.  I expect to testify with respect to how licensing is done in actual practice (not as an academic exercise or via esoteric economic theories) and how royalties are actually negotiated based on nearly 40 years of experience and my knowledge of the methods used by other licensing executives in the negotiation of a reasonable royalty for the licensing of patents or other proprietary rights.  Additionally, I will apply my experience as a Chief Patent Counsel of a major industrial corporation not only with respect to licensing (both "in" and "out") but also in the practice of "preventative patent law", i.e. ensuring that the company does not knowingly infringe valid patents of others.  An appropriate and reasonable royalty under the circumstances is reached only after careful consideration of these factors.  The factors cited by the Court in the *Georgia-Pacific* case (cited above) are typical of factors which are considered by experienced negotiators in the negotiation of a reasonable royalty.

27.    This matter concerns the presumed infringement (by BBW and Kao) of Matthews' presumptively valid and enforceable '062 patent.  I understand that the '062 patent broadly covers skin-cleaning compositions comprising:

    a)  orange oil,

    b)  a moisturizer, and

    c)  an emulsifying agent derived from oat grain, e.g., oatmeal.

Among the advantages of the patented compositions are that they are suitable for cleaning non-water soluble products; they are non-toxic; they also are derived from natural sources; and that they not only remove unwanted substances from human skin but also act to help clean and revitalize human skin.  (See '062 patent, column 2, lines 10-25.)

## V.    OPINION RE REASONABLE ROYALTY DAMAGES OWED BY BBW

28.    I will testify in view of the above, that (pursuant to 35 U.S.C. section 284) a reasonable royalty for BBW's infringement of he '062 patent would have been based on the total sales by BBW of products presumed to infringe the presumptively valid and enforceable '062 patent.  My opinion is supported by my belief that the '062 patent is fundamental to the manufacture and sale of skin-cleansing compositions containing orange oil and an oat grain derivative.  I have seen no evidence advanced by BBW relating to the availability of acceptable, non-infringing substitutes to the orange oil-containing skin-cleansing and moisturizing products claimed in the '062 patent.  Under the circumstances, Matthews has the clear right (under the statute) to be fully compensated for any damages resulting from BBW's infringement.

29.    Based on my review of the information I have received (to date), my analysis of this matter utilizing the factors set forth in the *Georgia-Pacific* case (See Exhibit C, attached hereto), and my more than 40 years of experience in negotiating IOU's of license agreements, I expect to testify that, at the time of the hypothetical

negotiation (mid-1999), BBW would have agreed to pay to Matthews/Greenspan a reasonable royalty of at least 6-8% of its revenue from its sales of infringing products.

30.    BBW's infringing products and its infringing revenue and profits are listed in attached Exhibit D.  As can be seen from the Exhibit, BBW's net sales as of about the end of 2004 (see Exhibit D (showing approximate date of last sale)) have totaled $81,828,607.94.  Its net infringing profit has totaled $65,626,521.94, reflecting an average profit margin of about 80%.

31.    BBW has produced four agreements involving royalties paid for patent licenses involving cosmetic preparations.  Three of the agreements involved patent licenses granted by P&G to BBW.  The agreements with P&G are as follows:

    a)    December 23, 2002 – P&G licensed five patents, seven patent applications and related know-how concerning "hand and body lotion products".  The license was a "sole" license, meaning that while P&G could practice the claims of the patents and patent applications, it could not grant a license to any other company in BBW's licensed field.  The license also included P&G's know-how.  The royalty rates specified in the license are as follows:

    (i)    4% for sales up to $16 million of body lotion products and up to $9 million of hand lotion products;

    (ii)    4.5% of sales from $16 million to $32 million of body lotion products and from $9 million to $18 million of hand lotion products; and

    (iii)    5% of all sales over $32 million of body lotion products and $18 million of hand lotion products.

The agreement also required a minimum royalty of 50 cents per unit (25 cents for travel size).

    b)    On March 25, 2004, P&G licensed a patent application relating to "in-shower body lotion products" to BBW.  This license was also a sole license.  The royalty terms in this agreement are as follows:

        (i)    4% for sales up to $12 million per year;

        (ii)    4.5% of sales over $12 million up to $24 million per year;

        (iii)    5% of all sales over $24 million up to $36 million;

        (iv)    5.5% of sales over $36 million up to $48 million per year; and

        (v)    6% of sales over $48 million per year.

The royalty rates would be reduced by 1% if BBW pays more than $.04 per ounce for unfragranced licensed product.

    c)    On October 31, 2005, P&G licensed relevant patents and know-how for "hair care products" on a non-exclusive basis.  Royalty rates provided in the agreement were as follows:

        (i)    3% on sales up to $30 million per year; and

        (ii)    4% on sales over $30 million per year.

The terms in these agreements would inform the hypothetical negotiator that conventional arm's length royalty rates in the cosmetic products industry range from 3 to 6% of sales of licensed products.

In the fourth agreement, BBW obtained a license from Disperse, Ltd. for "cost-effective alternatives to emulsions" on April 19, 2001.  The original license called for a royalty of 0.25 to 1.25 cents per ounce.  On April 1, 2004, the agreement was amended.  The 2004 amendment called for a royalty rate from 1.0 to 2.5% of sales, depending upon the level of sales of licensed products.  The license was non-exclusive (after 18 months) and included both patent rights and know-how.

I have also reviewed agreements between BBW and Guest Supply, Inc. (BBW 007570-7595).  These agreements are not instructive with respective to the terms of the

-14-

hypothetical license between BBW and Matthews/Greenspan. Additionally, the Test
Market Agreement between BBW and Davies Gate LLC (BBW 007596-7606) is neither
relevant nor instructive with respect to the hypothetical negotiation.

      32.    Matthews acquired the '062 patent in an agreement, dated January 15,
2004 (LPM 000015-35), from The Greenspan Co.("Greenspan"). Greenspan was a
company founded by Douglas Greenspan, one of the co-inventors of the '062 patent. The
agreement called for an initial payment of $10,000.00, the first $100,000 of revenue from
licensing the patent, 17.5% of all revenues over $100,000 from licensing the patent and a
"royalty" payment of 8% of revenue from any commercialization by Matthews of the
products covered by the claims of the patent. Thus, this agreement is evidence of a
reasonable royalty rate of 8% for licensing the '062 patent and would most likely have
been the rate requested by Greenspan in a mid-1999 negotiation. Incidentally, Greenspan
had at the time commercialized formulations covered by the '062 patent and were
licensed by Matthews to continue to manufacture and sell the products following the
assignment on a royalty-free basis.

      33.    The royalty terms in the three P&G – BBW license agreements discussed
above support the "at least 6-8%" royalty rate conclusion noted in Paragraph 29 above.
As the Federal Circuit noted in their decision in *Maxwell v. Baker* (cited above in
paragraph 23):

> "This hypothetical negotiation is often referred to as a willing licensor and
> licensee negotiation. However, as are previously stated in *Rtie-Hite* (also cited in
> paragraph 23 above), this is an "absurd" characterization of the determination (of
> a reasonable royalty) when the two parties were previously unable to come to an
> agreement."

      34.    There is no evidence that the fact that the P&G licenses included know-
how had any impact on the royalty rates charged. Mr. Krause, BBW's 30(b)(6) witness
with respect to licensing issues, testified that " (T)echnical is always secondary to

consumer" (transcript, 50:7-8). An important consideration to BBW (and to licensees in general) is whether or not the existence of the licensed patent would prevent them from making a selling a desired product without a license. In the present case, the '062 patent would have that effect, i.e., the claims of the '062 patent block third parties from making and selling orange oil- and oat grain derivative-containing cosmetic preparations.

35.     There is likewise no evidence that the "sole" nature of the 2002 and 2004 P&G licenses caused an increase in the royalty rates charged. In these agreements, BBW is granted sole licenses in "the specialty beauty care retail channel". That is, P&G could license the patents in other distribution channels; it could also practice the patent in BBW's field and in all other fields.

36.     In the *Maxwell* case, the District Court instructed the jury to answer two separate questions as to the amount of the reasonable royalty damages awarded. The first asked for the jury to determine a reasonable royalty for the infringement, and the second asked for the amount of additional damages suffered by the patentee, i.e., a "surcharge" for the infringement. The jury determined the reasonable royalty as "X%" and the total damages, i.e., the "reasonable royalty" plus the "surcharge", as "2 times X%". The Federal Circuit affirmed the decision, i.e., the reasonableness of the instruction. In other words, the Federal Circuit affirmed the conclusion that in a hypothetical negotiation between a patentee and a presumed infringer, the added leverage of the patentee could double the reasonable royalty which would have been negotiated at arms' length between truly willing parties. In the present case, if it is assumed that a "reasonable royalty" is from 3-6%, the hypothetically-negotiated royalty would be from 6-12%. Assuming that the infringing products were relatively high margin products (here more than 80%) and that the '062 patent was "fundamental" to orange oil- and oat grain derivative-containing skin-cleansing products, it is my opinion that the hypothetically-negotiated rate would be at least 10% of infringing revenue.

-16-

37.    A well-known "rule-of-thumb" in arm's length licensing is that licensors are entitled to receive approximately ¼ to 1/3 of the profit realized (or expected) by the licensee from the use of the licensed patent or technology.  In the present case, it appears that at least part of the more than 80% profit margin enjoyed by BBW with respect to the accused products was due to BBW's fragrances and merchandizing (See Krause deposition, transcript 94:13-20).  However, in view of the fact that the '062 patent is a fundamental patent covering all cosmetic formulations containing oat grain derivative products and effective amounts of orange oil, it is my opinion that a substantial portion of BBW's 82% profit margin from the accused products should be attributed to its infringement of the '062 patent; that is, BBW would not have had available to it acceptable non-infringing alternatives to the accused products, products that were needed by BBW to complete its line of cosmetic preparations.

38.    As noted above, the royalty rates indicated in the P&G licenses are instructive with respect to arm's length rates in the hand and body lotions industry.  The added leverage (which would have been enjoyed by Matthews/Greenspan resulting from the validity, enforceability and infringement presumptions) would support a higher rate, e.g. 6-8% or more.  Additionally, the "at least 6-8% of infringing revenue" rate is confirmed by my analysis of the *Georgia Pacific* factors (see Exhibit C).

39.    As noted above, BBW has produced no evidence of acceptable non-infringing alternatives to the orange oil- and oat grain derivative- containing compositions covered by the '062 patent.  This fact further supports the reasonable royalty rate suggested above.

40.    The hypothetical negotiation between Matthews/Greenspan and BBW takes place within the following framework:

a)    The negotiation occurs just prior to BBW's first launch of accused products (i.e. mid-1999);

b)    The '062 patent is presumptively valid, enforceable and infringed;

    c)      Both Matthews/Greenspan and BBW are aware of BBW's expected sales revenue and profit ("it is a poker game with the cards face up" – to paraphrase the words of the *Georgia Pacific* court);

    d)      The parties must reach agreement for a license commensurate with the scope of BBW's infringement; and

    e)      BBW comes to the hypothetical negotiation as an infringer, not as a "willing licensee", and Matthews/Greenspan comes to the negotiation as the owner of a valid and enforceable patent that will be infringed by BBW, not as a "willing licensor".

41.    The hypothetical negotiation would have found the parties (Matthews/Greenspan and BBW) in the following bargaining positions:

    a)      <u>Matthews/Greenspan</u>:

        (i)     owner of a presumptively valid and enforceable patent which would be infringed by BBW's manufacture and sale of accused products;

        (ii)    aware of BBW's irrevocable infringement of the '062 patent by its manufacture and sale of its accused products;

        (iii)   aware that BBW, if it wished to manufacture and sell orange oil- and oat grain derivative-containing skin-cleansing products and, thus, complete its line of cosmetic preparations, had to infringe the '062 patent, i.e. it had no acceptable non-infringing alternatives available to it; and

        (iv)   aware that BBW would have believed it had to have an orange oil- and oat grain derivative-containing skin-cleansing product in order to maintain its competitive position.

b)  <u>BBW</u>

(i)  aware that it had to have an orange oil- and oat grain derivative-containing product in its line of cosmetic preparations and, thus, that it had to infringe the claims of the '062 patent;

(ii)  aware that the '062 patent covers all effective orange oil- and oat grain derivative-containing skin cleansing formulations;

(iii)  aware that the '062 patent was presumptively valid and enforceable and that BBW's accused products would infringe it; and

(iv)  aware that the hypothetical negotiation must result in a license commensurate with BBW's infringement.

The hypothetical negotiators would have been aware of each others' bargaining positions, and the negotiations would have reflected the impact of the leverage each would have had. All relevant factors would have been considered by the hypothetical negotiators.

42.  In view of the relative bargaining positions of Matthews/Greenspan and BBW, and, following an analysis of the *Georgia Pacific* factors (see Exhibit C), it is my opinion that the hypothetical negotiation would have resulted in a license from Matthews to BBW that would have required BBW to pay a reasonable royalty of at least 10% of its sales of infringing products.

43.  Attached to this report, as Exhibit C, is my factor-by-factor analysis of this matter utilizing the factors set forth in the Georgia Pacific case (cited above in paragraph 24). I am prepared to testify that a reasonable royalty for BBW's infringement of the '062 patent owned by Matthews/Greenspan would have been a royalty rate of at least 6-

8% of BBW's infringing revenue from its sales of accused products. The total damages owed by BBW would thus be at least 6-8% of BBW's sales of accused product.

## VI.    BBW'S WILLFUL INFRINGEMENT

44.    Counsel for Matthews have also asked me to review the record in this case in order to render an opinion as to whether or not BBW took appropriate steps to satisfy its obligations to avoid infringing the '062 patent and thus whether or not BBW willfully infringed the '062 patent.

45.    In conducting this analysis, I have relied upon information revealed in BBW's document production and the testimony of its 30(b)(6) witness, Mr. Konstantinos Lahanas. Among the items I have reviewed are (1) Matthews' notice to BBW, dated Dec. 23, 2004, (2) its complaint, dated Dec. 8, 2004, (3) BBW's counsel's reply, dated January 4, 2005, and (4) subsequent correspondence, including e-mails between January 11, 2005 and February 16, 2005.

46.    Mr. Lahanas, BBW's 30(b)(6) witness, testified that he "didn't know the '062 patent existed until this litigation" (transcript 874:4-5). He indicated that the first of BBW's accused products were launched "eight years ago" and "I'm guessing. '97, maybe." (transcript, 878:4-8). When questioned about BBW's activities following Matthews' notice letter, he testified:

a)    he didn't know if BBW obtained an opinion of counsel (transcript 884:8-10);

b)    with respect to due diligence, he indicated only that BBW responded to Matthews' discovery requests. As far as he knew, they did nothing else (transcript 886:12 to 889:22). This was again confirmed in the following testimony:

"Q. In addition to engaging in the discovery process of this litigation, has BBW taken any other action after learning of the '062 patent to avoid potentially infringing that patent?

A. Other than?

Q. Other than?

A. What?

Q. Other than engaging in discovery process in this action, in this litigation.

A. Not thus far, that I know of."  (Transcript, 898:19 to 899:8)

Later, in the deposition, Mr. Lahanas testified that "BBW sought advice from Ward & Olivo" (transcript, 902:910).  However, there was no indication in BBW's privilege log of an opinion from Ward & Olivo or from any other law firm.

47.    Mr. Lahanas further testified that counsel provided "No factual information other than discovery information" (transcript 906:2-4) and no prior art to the '062 patent (transcript 909:5-7).

48.    Thus, from BBW's records and its 30(b)(6) testimony, I can conclude that BBW:

a)    took no action after learning of the '062 patent other than respond to the discovery and minimally conduct a Rule 11 investigation;

b)    apparently "sought advice" from Ward & Olivo but did not ask for or obtain an opinion with respect to the validity, enforceability or infringement; and

c)    neither obtained nor were provided prior art with respect to the '062 patent.

49.    Based on my more than 40 years of patent practice experience and my more than 17 years of experience as a chief patent counsel of a major U.S. industrial corporation, I am aware of the steps which are normally taken by a corporation when it becomes aware of a patent or patents which it may potentially infringed.  These steps, if taken in good faith, also provide the corporation with a defense to a charge of willful infringement.  The steps are:

a)   obtain a <u>competent</u> opinion of counsel indicating non-infringement, invalidity or unenforceability;

b)   obtain the opinion as soon as the company becomes aware of the patent(s) and its (their) actual or potential use by the company; and

c)   reasonably rely on its opinion.

That is, a company that becomes aware of a third party patent(s) which may be infringed by the company <u>must</u>, in order to avoid a finding of willful infringement (and, in fact, to ensure that its products or processes will not infringe the patents of others) obtain <u>as soon as reasonably possible</u>, a <u>competent</u> opinion of counsel on which the company can <u>rely</u> as a good faith indication of non-infringement, invalidity or unenforceability.

50.   Here, there is no indication that an opinion was sought even after the lawsuit was filed and no evidence that BBW considered prior art.  In fact, there is no evidence that BBW did anything other than comply with discovery requests after it became aware of the '062 patent.

51.   Under the totality of the above circumstances, it is my considered opinion that BBW willfully failed to fulfill its duty to avoid infringing the '062 patent.  BBW virtually ignored Matthews' 062 patent; instead, it continued to manufacture and sell its very profitable orange oil- and oat grain-containing products.  Apparently, BBW was willing to "roll the dice" in the litigation.  Assuming infringement, enforceability, and validity are proven at trial, it is my opinion that the totality of circumstances indicates that BBW's conduct failed to rise to the level one would expect of a responsible corporation and that its infringement was therefore willful.

## VII.   <u>OPINION RE KAO'S DAMAGES</u>

# <u>REDACTED</u>

**<u>REDACTED</u>**

**<u>REDACTED</u>**

## REDACTED

**<u>REDACTED</u>**

**REDACTED**

**<u>REDACTED</u>**

**REDACTED**

## **<u>REDACTED</u>**

# **REDACTED**

IX.    <u>POSSIBLE REVISIONS OR SUPPLEMENTATION TO THIS OPINION</u>

73.    As of today, this report represents my best opinion regarding the matters set forth above.  In the event that additional information or testimony becomes available, I ay find it appropriate to revise or supplement my opinions, analysis or conclusions.  I understand that I may also be called upon to provide an opinion and expert testimony in rebuttal to any opinions or proofs adduced by BBW or Kao in this matter.

Dated:  February 28, 2006

Respectfully submitted,

Larry W. Evans

A

# Larry W. Evans - C.V.

3811 Via Del Campo
San Clemente, CA  92673
949-218-4378 (Phone/Fax)
E-Mail: LWEvans @ MSN.Com

### PERSONAL

Born October 4, 1939 at Georgetown, Indiana
Married since 1964, three adult children.

### EDUCATION

- B.S. – (Ch.E) 1961 – Purdue University
- J.D. – (Law) 1965 – The George Washington University

### BAR ADMISSIONS

- USPTO – 1962
- Minnesota – 1965
- U.S. Court of Appeals for Federal Circuit
- U.S. District Court (Minnesota and Arizona)

### PRACTICE

- Domestic and International Intellectual Property Licensing
- Preparation and Negotiation of License Agreements
- International Business Transactions
- Dispute Resolution
- Service as an Expert Witness

### PROFESSIONAL ACTIVITIES

- Licensing Executives Society (USA and Canada):
  - Past President - 1986-87
  - President - 1985-86
  - President-Elect.-1984-85
  - Vice President - 1983-84
  - Secretary - 1980-83
  - Int'l Delegate - 1980-Present
  - Chairman – Endowment Fund Committee – 1987-1990
  - Chairman – China Licensing Committee – 1996-1998
  - Co-Chairman – Symposium Committee – 1988-1998
  - Co-Editor – Law and Business of Licensing – 1998
  - Chairman – Licensing Achievement Award Committee 1997-1998
  - Speaker – Tech Transfer Seminar – 1980-1986; 1990-1994; 1996-1998; 2002-2003
  - Chairman – Long Range Planning Committee – 1993-1995

# Larry W. Evans – C.V.
## Page 2

### PROFESSIONAL ACTIVITIES (CONT'D)

- Licensing Executives Society International:
  - President Elect. – 1992
  - President – 1993
  - Past President – 1994
  - Chairman – Long Range Planning Committee – 1994-1996
  - Prepared LESI Strategic Plan – 1995
  - Chairman – Endowment Committee – 1995-1997
  - Gold Medal Recipient – 1999, Chairman, Gold Medal Committee, 2000-2004
- American Bar Association (PTC Section) – Past Chairman – China Committee.
- American Intellectual Property Law Association.
- Association of Corporate Patent Counsel.
- Chemical Manufacturers Association (Past Chairman of I.P. & Licensing Committee).
- International Intellectual Property Association, the U.S. Chapter of AIPPI (Member of the Executive Committee, 1987-2001).
- National Training Center-Dalian, China (Member of the Advisory Board).
- The Patent, Trademark & Copyright Research Foundation (Member of the Advisory Council, 1984-2002).

### PROFESSIONAL EMPLOYMENT HISTORY

- 1961-1965    ADAMS, FORWARD & MCLEAN – WASHINGTON, D.C
  Student Associate, Patent Agent

- 1965-1968    ARCHER, DANIELS, MIDLAND COMPANY – MINNEAPOLIS, MINNESOTA
  - Patent and Licensing Attorney.
  - Responsible for all areas of intellectual property practice, including extensive licensing.

- 1968-1970    ASHLAND CHEMICAL, HOUSTON, TEXAS
  Chemical Company acquired in 1968 by Ashland Oil Co.
  - 1968-1970 – Division Patent & License Counsel.

- 1970 to April 1993    B.P. AMERICA – (FORMERLY STANDARD OIL COMPANY) CLEVELAND, OHIO
  - 1970-1976 – Patent and License Counsel.
  - 1976-1993 – Director, Patent and License Department and Vice President, B.P. Chemical Co., Inc. (Formerly Sohio Chemical Company).
  - Devoted almost all practice from 1970 to 1976 to licensing of Sohio's world-famous acrylonitrile process patents technology and other technologies.
  - 1976-1993 – Managed all intellectual property lawyers at BP America and continued a personal active role in company's more significant licensing activity.
  - More than $1 billion in royalty income and catalyst profit realized through these licensing projects.
  - Sohio/BP America licensing has been a world-wide activity (e.g.- North & South America, Europe, Asia and Africa) establishing important personal and business contacts throughout the world.

- Was the first American to successfully license technology to the P.R.C. The 1973 license has been followed by eight additional licenses and innumerable personal contacts.

# Larry W. Evans – C.V.
## Page 3

### *PROFESSIONAL EMPLOYMENT HISTORY (CONT'D)*

- April 1993 to    WILLIAN, BRINKS, HOFER, GILSON AND LIONE
  Dec. 31, 1995

    - Practice included domestic and international technology licensing, preparation
      and negotiation of license agreements, dispute resolution and service as an
      expert witness.

- Jan. 1996 to    SOLO PRACTICE – IP AND LICENSING CONSULTANT
  Present

    - Practice includes all aspects of IP management and licensing and service as an
      expert witness in intellectual property litigation.

### *CAREER HIGHLIGHTS*

See Attachments.

### *PUBLICATIONS AND SPEECHES*

See Attachments.

# Larry W. Evans – C.V.

## *CAREER HIGHLIGHTS*

During 1970-1976, Mr. Evans was responsible for licensing Sohio's world-famous acrylonitrile technology (recognized by many in the industry as the most successful chemical-licensing program in the world). He personally negotiated more than 15 licenses throughout the world during this period. In 1973, Sohio was the first American company to license technology to China following the resumption of friendly relations.

From 1976 to 1993, Mr. Evans headed the Patent and License Department of Sohio and of BP America, (following BP's acquisition of Sohio in 1987). During this period, Mr. Evans supervised and, in many cases, personally handled licenses of significant technology. Additionally, he was responsible for resolving (through negotiation, arbitration or litigation) high profile disputes with licensees, competitors and partners.

Sohio's/BP America's License Department was a profit center until 1989 and Mr. Evan's responsibility extended to that of running a business that generated royalty and catalyst income exceeding $1 billion to Sohio and BP America during the 1970-1989 period.

Beginning in 1968, Mr. Evans participated in the Licensing Executives Society (LES). This activity began with several speaking engagements. Topics centered around process licensing, royalties, license agreements, licensing in developing countries, China licensing, and related fields. In 1979, Mr. Evans was elected Secretary of LES USA/Canada, a position he held through 1983. He then served as Vice-President in 1984, President-Elect in 1985, President in 1986 and Past-President in 1987. Throughout this period he was a delegate to LES International.

Following his progression through LES USA/Canada, Mr. Evans became more active in LES International, which is the international federation of national and regional LES Societies. He became a Committee Chairman in 1989, in 1992 served as President-Elect and in 1993 as President of LES International. LES International (LESI) has more than 12,000 members from 30 national and regional Societies and more than 60 countries. In October, 1999, Mr. Evans was voted by the LESI Board of Delegates to receive the highest honor of LES, the Gold Medal for outstanding service and leadership in the licensing profession. He received the award in ceremonies held in Amsterdam, The Netherlands in May 2000. Almost all substantial licensing is conducted by LESI members (on at least one side of the transaction). Without qualification, it can be said that LESI is the most important organization in the world in the field of licensing and technology transfer.

Mr. Evans joined the Chicago intellectual property law firm, Willian, Brinks, Hofer, Gilson & Lione in April 1993 as Counsel to the firm. While at Willian Brinks, he specialized in domestic and international licensing, preparation and negotiation of licensing agreements, international business transactions, dispute resolution and service as an expert witness (e.g. in licensing and damages).

Beginning in January 1996, Mr. Evans initiated his present practice as an Intellectual Property and Licensing Consultant continuing to specialize in the above areas.

# Larry W. Evans – C.V.

## *PUBLICATIONS AND SPEECHES*

"Current Trends in Domestic and International Licensing; When Should New Technology be Licensed?" Practicing Law Institute, New York, November 1977.

"Process Licensing; Turning Patents and Technology into Money", Licensing Law and Business Institute, February-March, 1979; The Law and Business of Patent and Know How Licensing, 1983.

"Evaluation, Selection of Technology", les Nouvelles, June 1981.

"Packaging and Valuation of Technology", LES USA/Canada NYC Seminar, 1983 (also given at AMA Seminars in San Francisco (1982), New York (1982) and New York (1981).

"When Should New Technology be Licensed?; Pricing the Technology, *The Law and Business of Patent and Know-How Licensing*", 6th Edition, 1983.

"To License or Not-The View of a U.S. Corporation", LES Tokyo, Japan, 1983.

"Pricing and Packaging the Technology", Practicing Law Institute Technology Licensing Program, December 1984, January, 1987 and February 1988.

"International Licensing of Chemical Processes; Practical Considerations – Industrialized, 3rd World and COMECON Countries", LES USA/Canada Meeting, Palm Springs, California, 1984.

"License Your Technology Abroad", Cleveland World Trade Association, Cleveland, 1984 and 1979.

"How Large Companies Treat Technology", Cleveland World Trade Association, 1985, 1988.

"Licensing Success at Standard Oil", ABA Annual Meeting, NYC, 1986.

"Language, Political & Cultural Hurdles in International Licensing", LES International Conference, Dublin, 1986.

"Establishing Reasonable Royalties", LES USA/Canada Seminar, Ottawa, 1986.

"Negotiation Do's and Don'ts", Intellectual Property Symposia, Marco Island, FL, 1986.

"Licensing Disincentives in Brazil", *les Nouvelles*, December 1986.

"Trade Secrets in Patent & Technology Licensing", Practicing Law Institute Protecting Trade Secrets Program, May 1986.

"International Licensing", International Law Institute, Washington, D.C., 1987.

"Licensing in China", LES Switzerland Seminar, Zurich, 1987.

"China Licensing", LES USA/Canada-China Seminar, Washington, 1987.

"Why, What & How to License", Intellectual Property Symposium, Marco Island, FL 1987.

# Larry W. Evans – C.V.

### PUBLICATIONS AND SPEECHES (CONT'D)

"The Ten Commandments of a Successful Licensee", Intellectual Property Symposium, Marco Island, FL, 1987.

"Licensing in China", Association of Corporate Patent Counsel Meeting, Ft. Lauderdale, 1987.

"The Licensing of Trade Secrets and Know-How", LES USA/Canada Annual Meeting, Marco Island, FL, 1988.

"Observations of a China Licensing Veteran", Asia Society, New York, 1988.

"Licensing in China: One Company's Experience and Prognosis", LES International Conference, Sydney, 1988.  (Also given in New Hampshire, 1986)

"Process Licensing for Licensors and Licensees", LES China Seminar, Beijing, 1988.

"A Licensing Success Story... or Why Licensing is Often the Best Alternative", Albany Law School Annual Conference on Intellectual Property, Matthew Bender, 1988.

"Licensing with Japanese Companies-Resolving Disputes and Misunderstanding", LES Annual Meeting, Maui, Hawaii, 1989.

"Value of Patents", Les Argentina Seminar, Buenos Aires, 1989.

"Financing of Licensing and Joint Ventures in China", LES International Conference, Stockholm, 1989.

"How a Corporation Regards Patents", University of North Carolina, Chapel Hill, 1989.

"Licensing Success Story", Association for Corporate Growth, Cleveland, 1989.

"Trade Secrets in Patent & Technology Licensing: Negotiating and Drafting the License Agreement", Licensing Executives Society Annual Meeting (April-May, 1989).

"Key License Clauses for Technology License Agreements", Practicing Law Institute Technology Licensing Program, January 1989 (Repeated 3 Times).

"Licensing from Standpoint of a Large Multi-National Corporation", LES China First Annual Meeting, Shanghai, 1990.

"Licenses and Joint Ventures in the U.S.", Marketing in the USA, Program for Yugoslavian Businessman, Cleveland State University, 1990.

"Trade Secrets and their Protection from the Owner's/Corporation's Standpoint", LES Argentina Seminar, Buenos Aires, 1990.

"Case History:  Commercializing Acrylonitrile Technology", LES International Conference, Rio de Janeiro, 1990.

"Licensing is Good for Business", Seminar for Small Business, U.S. Small Business Administration, Cleveland, 1990.

# Larry W. Evans – C.V.

***PUBLICATIONS AND SPEECHES (CONT'D)***

"An Introduction to Intellectual Property and Licensing", International Executive Program, State University of New York at Buffalo, 1991.

"How to Get a Patent That Really Protects You", National Inventors Hall of Fame Inventors Showcase, Akron, 1991.

"Licensing: Why, What, Who & How?" A Strategy for Profits Conference-Licensing From Research to Marketing, Middleburgh Heights, Ohio, 1991.

"A Corporate View of Proven vs. Unproven Technology", American Chemical Society Symposium, Atlanta, 1991.

"Technology Dispute Resolution in the U.S.: A Practical Perspective", Canada-U.S. Law Institute Conference, Cleveland, Ohio, 1991.

"China Business: Past, Present and Future", Forecast '91. The U.S.-China Business Counsel Meeting, Washington, D.C., 1991.

"LES International: What is it? What is its role?", LES Portugal Seminar, Lisbon, 1993.

"The Impact of the Anti-Trust Laws on Patent and Know-How Licensing", Tokyo AIPPI Conference, 1992 (repeated at the LES International Conference, Berlin, 1993).

"Lessons Learned from 20 Years of Licensing to China", U.S.-China Business Counsel, Washington, D.C., June 1993.

"The Determination of Damages in a Patent Infringement Litigation in the United States", LES-Japan Seminar, Tokyo, 1993.

"Licensing in the New World Order-Practical Aspects of Licensing, Cross-Licensing and Strategic Alliances in Today's World", LES-Japan Seminar, Tokyo, 1993 and LES-Scandinavia Conference, Gothenburg, 1993.

"A Licensing Success Story", LES-China Seminar, Beijing, 1993.

"Licensing in the New World Order-Implications for U.S. Competitiveness", University of Pennsylvania, 1993.

"A Licensing Success Story", LES-Korea/AIPPI Korea Seminar, Seoul, Korea, 1993.

"Case History of Successful Licensing", *les Nouvelles,* Journal of the Licensing Executives Society, Vol. XXVIII, No. 2, June 1993.

"Licensing of Technology/Trade Secrets", Joint Seminar, LES-Germany, LES-Hungary, January 1994.

"BP's Futile Attempt to License Synthetic Fiber Intermediate Technology to Iran", Symposium of the American Foreign Service Association, Washington, D.C., March 1994.

# Larry W. Evans – C.V.

## PUBLICATIONS AND SPEECHES (CONT'D)

"Licensing in China:  A perspective of a Twenty Year Veteran", *Licensing Law and Business Report*, March-April 1994.

"International Licensing Case History", Licensing in Europe for 2002, 6th LES-European Conference, Delft, The Netherlands, April 1994.

"Licensing of Trade Secrets and Know-How", Trade Secrets Law Institute, Washington, D.C., April 13-16, 1994.

"EC Competition Law and Block Exceptions for Technology Licensing", Spring Meeting of AIPLA, Cleveland, Ohio, April 1994.

"Reflections of a China Licensing Veteran", 1994, LES International Conference, Beijing, China, May 1994.

"Licensing in the Pacific Rim", Franklin Pierce Law Center, Advanced Licensing Institute, Concord, New Hampshire, 1994, 1995, 1996, 1997 and 1998.

"A 20-Year Perspective on Petrochemical Licensing to China", LES USA & Canada Annual Meeting, Hawaii, October 1994.

"Risks and Rewards from International Licensing", AIPPI International Symposium, Seoul, Korea, November 2-4, 1994.

"Licensing:  Key Clauses, Risks and Rewards", Traverse City Conference, Business Law Section-Michigan Bar, May 12, 1995.

"Licensing in China, the Perspective of a 20-Year Veteran", The Southwestern Legal Foundation, Symposium on Private Investments Abroad, Dallas, TX, June 20-21, 1995.

"Licensing in the Pacific Rim", Franklin Pierce Law Center, Advanced Licensing Institute, Concord, New Hampshire, July 1995.  (Repeated 1996).

"Licensing in Asia", AIPPI International Symposium, Seoul, Korea, November 9, 1995.

"China Licensing:  The Effect of Culture on East-West License Negotiation", LES South Africa Annual Meeting, Capetown, South Africa, January 26, 1996.

"Negotiation Techniques", LES Technology Transfer Seminar, New York City and San Francisco, 1995, 1996, 1997 and 1998.

"Industry and Universities:  Friends or Foes?", LES-AUTM Summer Institute, July 1996.

"The Impact of the Anti-Trust Laws on Patent and Know-How Licensing", LES International Symposium, Seoul, Korea, October 1996.

# Larry W. Evans – C.V.

*PUBLICATIONS AND SPEECHES (CONT'D)*

"The Impact of NAFTA on Licensing into Mexico", LESI Conference, Canada, 1997 and AICLE Meeting, September 1997.

"Turning Patents and Technology into Money", *Licensing Law and Business Report*, Clark Boardman Callahan, 1979.

"Evaluation and Selection of Technology", *les Nouvelles*, June 1981.

"Pricing and Packaging of Technology", Practicing Law Institute, New York, 1984 (This talk was given two or three times).

"Licensing Disincentives in Brazil", *les Nouvelles*, December 1986.

"Observations of a China Licensing Veteran", Asian Society, New York, October 12, 1988 (May not have been published).

"What LESI is Today and What it Stands For", *les Nouvelles*, June 1993.

"Case History of Successful Licensing", les Nouvelles, June 1993.

"Reflections of a Licensor to China", les Nouvelles, December 1994.

"Licensing in China: A Perspective of a China Licensing Veteran", Licensing Law and Business Report, March-April 1994.

"Risks and Rewards From International Licensing", *Licensing Law and Business Report*, March-April 1995.

"Key Licensing Clauses", Practicing Law Institute, 1987-1990.

"The Japanese Patent Law: One of the Major Non-Cash Trade Barriers Between Japan and the U.S.", Testimony before the Senate Finance Committee, The Licensing Law Handbook, Clark Boardman Callahan, 1996.

*The LES Licensing Guide to Licensing Best Practices*, 2002 (John Wiley & Sons) – authored chapter titled "Challenges of Licensing to and from China and Hong Kong".

"Licensing to and from Japan" – LES Workshop Presentation (2001)

"Patent Valuation from a Business & Legal Perspective" – LES Workshop Presentation (2002)

"Challenges and Opportunities of Licensing to and from Emerging Economies" (2003) Oslo, Norway

Larry Evans Case List (5 years)

<u>TRIAL TESTIMONY</u>

- *Chevron Chemical Co. v. Indemitsu Petrochemical Co., Ltd,* Binding Arbitration (L.A.)
- *University of Washington v. Optiva Corp.,* Binding Arbitration (Seattle, WA)
- *Phillips v. Exxon,* C.A. No. 98-638-JIF (D. Del.)
- *Lever v. Procter & Gamble,* Federal Court Trial Division, File No. T-2534-85 (Toronto, Canada)
- *Medtronic v. A.C.S. and Guidant,* C.A. No. 97-2459 JMR-FLN (D. Mini.)
- *Plant Genetic Systems N.V. v. DeKalb Genetics Corp.* (D. Conn.)
- *Guidant, et al. v. St. Jude Medical,* C. A. No. IP96-1718-C.H.IG (S.D. Ind.)
- *Chevron, et al. v. Crown, Cork & Seal,* C.A. No. 99-234-JJF (D. Del.)
- *BBA Nonwovens, et al. v. Superior, et al.,* C.A. No. 6:00 2764 13 (D.S.C.)
- *MLMC Ltd. v. Air Touch, et al.,* C.A.99781 SLC (D. Del.)
- *Al-Site Corp. et al. v. VSI International,* C.A. 91-847, 92-201C and 941940 CW Highsmith (S.D. Fl.)
- *Syndia Corp. v. The Gillette Co.,* C.A. OIC2485 (E.D. Ill.)
- *LinkCo v. Fujitsu,* CA 00 Civ. 7242 (SAS) (S.D.N.Y.)
- *Nilssen v. Motorola,* Binding Arbitration before Judge James Davis (Chicago, Illinois)
- *MercExchange v. e-Bay, et al.,* Case No. 2:01-CV-736 (N.D. Va.)
- *TriStrata Technologies v. ICN Pharmaceuticals Corp.,* Case No. 01-150 JJF (D. Del.)
- *Aguao, et al. v. Universal Instruments,* C.A. No. H-02-1747 (S.D. Tex.)
- *Norco v. Motorvac,* 5A.02-876 AHS (ANx) (C.D.CA)
- *Tri-Strata v. Mary Kay,* CA No. 01-127-JJF (D. Del.)
- *Nichols Inst. v. Scantibodies,* Case No. 02 CV 000468 (TMA) (S.D.CA)

<u>DEPOSITION TESTIMONY</u>

- *Phillips Petroleum v. Tosco, et al.,* C.A. No. 98-336-SLR (D. Del.)
- *JVM Innovation Design v. Spalding and Evenflo,* C.A. No. 98-336-SLR (D. Del.)
- *Dow Chemical Co. v. Sumitomo Chemical Co.,* C.A. No. CV 10330 BC (E.D. Mich.)
- *ACLARA v. Caliper,* C.A. No. 99-1968 CRB (N.D. Cal.)
- *U.S. Filter, et al. v. Ionics,* C.A. No.98-10541-REK (D. Mass.)
- *Terabeam v. Dominion,* COO-1062C (W.D. Wash.)
- *Dhuler, et al. v. MCNC,* C.A. 00-CVS-12333 & 12334 (Wake County N.C. Superior Court)
- *British Telecom v. Prodigy,* C.A. 00-CIV-9451 (S.D.N.Y.)
- *Borg-Warner, v. N.Y.G.,* C.A. 00-C-7470 (MD. 111.)
- *Farmer, et al. v. Medo Industries, et al.,* Case No. 01-10248 LGB (S.D.C.A.)
- *In re Gemstar Development Corporation Patent Litigation,* Master File No. MDL-1274-WBH
- *Synbiotics Corp. v. AgenBiomedical,* C.A. 02-CV-17708 (AJB) (S.D. Cal.)
- *Nilssen v. Universal Lighting Tech.,* Civil Case No. 3:04-CV-00080, D.C.M.D. Tenn.
- *Laser Dynamics v. BenQ, et al.,* C.A. No. 2:03-CV-00437, E.D. Tx.

B

## Exhibit B

BBW

000674 – 000741
000742 – 000786
000787 - 000832
000833 – 000879
000880 – 000924
000925 – 000964
000965 – 001010
001011 - 001057
001058 - 001149
001150 - 001227
008687 - 008688

KBC

000075 – 000136
000137 – 000198
000199 – 000257
000258 – 000316
000317 – 000372
000373 – 000424
000889

Deposition Transcript of Konstantinos M. Lahanas (1/27/06) pages 871-910 including Exhibits
Deposition Transcript of David Story (1/6/06) pages 86-117, 158-251 including Exhibits
Deposition Transcript of Jack Krause (1/24/06) including Exhibits
Deposition Transcript of Kevin Wadhams (1/24/06) including Exhibits
Deposition Transcript of Phil Wood (1/25/06) including Exhibits
Deposition Transcript of Erin Elliott (1/26/06) including Exhibits
Exhibits Kao 16, 17, 32, 35, 36, and 47 from Deposition of David Story (1/6/06)
Counsel for Plaintiff's 12/23/04 letter to Neil S. Fiske attaching U.S. Patent No. 5,063,062 and the Notice of Infringement of U.S. Patent No. 5,063,062
Counsel for Limited defendants' 1/4/05 facsimile to Counsel for Plaintiff
Counsel for Plaintiff's 1/11/05 letter to Counsel for Limited defendants
Counsel for Limited defendants' 1/18/05 facsimile to Counsel for Plaintiff
Counsel for Plaintiff's 4/8/05 letter to Counsel for Limited defendants attaching Counsel for Plaintiff's 12/23/04 letter to Neil S. Fiske and Michael Zinna's 2/16/05 email to Jason Buratti
Counsel for Plaintiff's 12/23/04 letter to William Gentner attaching U.S. Patent No. 5,063,062 and Plaintiff's Complaint for Patent Infringement and Demand for Jury Trial
Counsel for Defendant Kao/KBC's 1/7/05 facsimile to Counsel for Plaintiff
Counsel for Plaintiff's 1/12/05 letter to Counsel for Defendant Kao/KBC
Counsel for Defendant Kao/KBC's 1/21/05 facsimile to Counsel for Plaintiff
Counsel for Plaintiff's 1/21/05 letter to Counsel for Defendant Kao/KBC
Counsel for Plaintiff's 1/26/05 letter to Counsel for Defendant Kao/KBC
Counsel for Defendant Kao/KBC's 1/27/05 facsimile to Counsel for Plaintiff
Counsel for Plaintiff's 2/2/05 letter to Counsel for Defendant Kao/KBC
Counsel for Defendant Kao/KBC's 2/3/05 facsimile to Counsel for Plaintiff
Counsel for Plaintiff's 2/4/05 letter to Counsel for Defendant Kao/KBC
Counsel for Defendant Kao/KBC's 2/7/05 facsimile to Counsel for Plaintiff
Counsel for Defendant Kao/KBC's 2/18/05 e-mail to Counsel for Plaintiff attaching (1) the master formula for the Cúrel lotion and (2) certificates of analysis and material safety sheets provided by the suppliers of the oatmeal extract and orange oil.
File Wrapper for U.S. Patent 5,063,062
File Wrapper for Continuation-In-Part
U.S. Patent No. 5,063,062
U.S. Patent No. 5,013,485

C

Exhibit C

Analysis of *Georgia Pacific* Factors

| | Factor | Analysis re BBW | Analysis re Kao |
|---|---|---|---|
| 1. | The royalties received by the patentee for the licensing of the patents-in-suit, providing or tending to prove an established royalty. | • The patent-in-suit has not been licensed.<br>• No impact on royalty rate. | |
| 2. | The rates paid by the license for the use of other patents comparable to the patents-in-suit | • BBW licensed various patents at arm's length from P&G for royalty rates from 3% to 6%.<br>• These rates establish a floor for the rates in the hypothetical negotiation. | |
| 3. | The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold. | • The license would have been non-exclusive and unlimited as to field or territory.<br>• This factor would tend to increase the royalty rate. | **REDACTED** |
| 4. | The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that monopoly | • Matthews would have been willing to grant a license to BBW but would have insisted on receiving royalties commensurate with the value of the 062 patent. | |

| | Factor | Analysis re BBW | Analysis re Kao |
|---|---|---|---|
| 5. | The commercial relationship between the licensors and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter. | • The parties are not competitors.<br>• Matthews was a patent owner willing to license.<br>• This factor would not have an impact on the royalty rate. | **REDACTED** |
| 6. | The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales. | • BBW's ability to sell orange oil-containing skin-cleansing and skin softening cosmetics most likely would have enhanced BBW's ability to sell unpatented products.<br>• This factor would have likely increased the royalty rate. | |
| 7. | The duration of the patent and the term of the license. | • The '062 patent will expire on September 27, 2009.<br>• No impact on the royalty rate. | |
| 8. | The established profitability of the product made under the patent, its commercial success, and its current popularity | • The accused products enjoyed a greater than 80% profit margin.<br>• This factor would increase the royalty rate. | |
| 9. | The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results. | • The '062 patent was fundamental to cosmetic preparations containing effective amounts of orange oil.<br>• The obvious success of the accused products is an indication of the utility and advantages of the technology | |

| | Factor | Analysis re BBW | Analysis re Kao |
|---|---|---|---|
| | | • covered by the '062 patent.<br>• This factor would have increased the royalty rate. | |
| 10. | The nature of the patented invention the character of the commercial embodiment of it as owned and produced by the licensor, the benefits to those who have used the invention. | • Matthews had not commercialized the orange oil-containing cosmetic formulations prior to the hypothetical negotiation.<br>• The factor would have reduced the royalty rate somewhat. | |
| 11. | The extent to which the infringer has made use of the inventions; and any evidence probative of the value of that use. | • BBW's infringing revenue as of _____ was $71,922,934.40 and its profit was $59,454,675.32 (about 83%).<br>• This factor would have increased the royalty rate. | **REDACTED** |
| 12. | The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous invention. | • The four agreements produced by BBW indicate that arms' length royalty rates in the industry range from 3% to 6%.<br>• This factor would have insured that the royalty rate would exceed the 3-6% conventional range. | |
| 13. | The portion of the realizable profit that should be accredited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the | • A portion of BBW's profit was no doubt due to its fragrance technology and marketing expertise.<br>• However, without a license to the '062 patent, BBW could not have manufactured or sold the orange oil-containing formulations accused in this | |

| | Factor | Analysis re BBW | Analysis re Kao |
|---|---|---|---|
| | infringer. | case.<br>• This factor would not have impacted the royalty rate. | |
| 14. | The opinion testimony of qualified experts. | • The court and jury will consider my opinion. | |
| 15. | The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time of infringement began) if both had been reasonably and voluntarily trying to reach agreement, that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license. | • BBW comes to the hypothetical negotiation as a resumed infringer of Matthews' presumptively valid and enforceable '062 patent, and thus would have been expected to pay a royalty greater than the rates that are conventional in the industry (See e.g., *Maxwell v. Baker*, cited above).<br>• BBW's high profit margin (greater than 80%) in the accused products would have been known to Matthews.<br>• The impact of the above factors and the increased leverage Matthews would have had as compared to an arms' length licensor would have resulted in a royalty rate of at least 10% of infringing sales. | **REDACTED** |

D

**Accused Product Profit Information**

| Product | SKU | Net Sales | Total Costs | Net Profit | Total Sales | Total Costs | Total Profit |
|---|---|---|---|---|---|---|---|
| Bath & Body Works Mango Mandarin Creamy Body Wash | 55218805 | $40,728.52 | $11,112.79 | $29,615.73 | $42,774.65 | $11,524.90 | $31,249.75 |
| | 53308566 | $4,987,657.26 | $1,007,011.59 | $3,980,645.67 | $5,182,236.87 | $1,006,560.75 | $4,175,676.12 |
| | 55271692 | $1,624,643.78 | $337,377.51 | $1,287,266.27 | $1,686,676.10 | $350,024.28 | $1,336,651.82 |
| True Blue Spa Better Lather Than Never Bubble Bath and Shower Cream | 55308728 | $739,198.55 | $187,400.51 | $551,798.04 | $760,817.40 | $192,530.92 | $568,286.48 |
| | 45316335 | $488,872.41 | $114,033.96 | $374,838.52 | $502,231.04 | $116,845.70 | $385,385.34 |
| Bath & Body Works Cool Citrus Basil Creamy Body Wash | 45300671 | $4,712,135.83 | $1,036,655.06 | $3,675,480.07 | $4,872,466.37 | $1,066,156.57 | $3,806,309.80 |
| | 55178880 | $1,055,597.44 | $239,498.15 | $816,101.29 | $1,117,775.30 | $251,451.36 | $866,323.94 |
| | 55231976 | $1,713,019.87 | $384,289.94 | $1,328,729.93 | $1,802,179.59 | $403,099.80 | $1,399,079.79 |
| | 55310114 | $1,223,776.70 | $319,100.93 | $904,675.77 | $3,185,947.02 | $333,965.33 | $2,851,981.69 |
| Bath & Body Works Mango Mandarin Skin Refining Body Scrub | 55179164 | $581,502.94 | $141,248.65 | $440,254.29 | $598,913.23 | $122,412.94 | $476,500.29 |
| | 55418524 | $583,534.51 | $203,280.22 | $380,254.29 | $616,933.00 | $212,385.42 | $404,547.58 |
| Bath & Body Works Mango Mandarin Skin Renewal & Anti-Aging Body Wash | 55370073 | $772,412.96 | $297,790.32 | $474,622.64 | $816,933.00 | $346,583.74 | $470,349.26 |
| | 55369987 | $889,499.29 | $332,367.72 | $557,131.57 | $926,631.94 | $307,982.56 | $618,649.38 |
| Bath & Body Works Mango Mandarin Body Lotion | 55418663 | $823,430.44 | $262,220.31 | $561,210.13 | $851,378.50 | $269,161.14 | $582,217.36 |
| | 51307422 | $16,638,766.41 | $1,933,625.14 | $13,705,161.47 | $16,366,766.55 | $2,004,002.97 | $14,362,763.58 |
| | 51307587 | $2,060,805.96 | $283,002.12 | $1,777,803.84 | $2,100,394.77 | $272,001.41 | $1,828,393.36 |
| | 51312873 | $20,807.36 | $3,289.14 | $17,518.22 | $26,273.73 | $3,883.68 | $22,390.05 |
| | 51218825 | $4,495,357.91 | $497,893.27 | $3,997,464.64 | $4,706,217.45 | $519,263.39 | $4,186,954.06 |
| Bath & Body Works Cool Citrus Basil Body Lotion | 51294357 | $20.50 | $2.66 | $17.84 | $24.33 | $3.80 | $20.53 |
| | 51307396 | $4,806,676.71 | $705,157.89 | $4,103,518.82 | $5,247,092.28 | $721,469.71 | $4,525,622.57 |
| | 51177596 | $6,960,938.54 | $796,930.54 | $6,164,008.00 | $7,283,406.44 | $828,971.87 | $6,454,434.57 |
| | 51177896 | $1,575,866.44 | $198,537.13 | $1,377,327.31 | $1,610,711.83 | $202,682.74 | $1,408,029.09 |
| | 51196506 | $558,111.40 | $101,906.94 | $461,204.46 | $571,310.12 | $104,603.66 | $466,706.46 |
| Bath & Body Works Mango Mandarin Hand Repair & Healing Hand Cream | 51370349 | $366,177.19 | $53,197.50 | $312,979.69 | $372,999.80 | $54,845.00 | $318,154.80 |
| | 51417891 | $2,329,906.22 | $548,590.23 | $1,781,315.99 | $2,400,055.90 | $561,910.22 | $1,838,145.68 |
| Bath & Body Works Mango Mandarin Skin Repair & Healing Body Butter | 51418023 | $1,766,234.05 | $514,149.88 | $1,252,084.17 | $1,820,391.43 | $527,160.28 | $1,293,231.15 |
| | 51370200 | $384,293.00 | $77,010.83 | $307,282.17 | $396,728.71 | $89,334.45 | $307,394.26 |
| Pure Simplicity Salt Toning Body Balm | 59336047 | $727,981.83 | $182,565.76 | $545,416.07 | $768,774.19 | $193,409.92 | $575,364.27 |
| Murad Resurgence Sheer Luster Day Moisture SPF 15 | 41556317 | $0.00 | $0.00 | $0.00 | $5.00 | $2.50 | $2.50 |
| Murad Resurgence Age-Diffusing Serum | 63395244 | $37,688.18 | $18,310.50 | $19,547.68 | $43,866.25 | $21,235.50 | $22,630.75 |
| Murad Resurgence Age-Balancing Night Cream | 63395309 | $22,723.23 | $11,103.30 | $11,619.93 | $28,663.23 | $12,910.05 | $15,753.18 |
| Murad Skin Perfecting Lotion | 63393149 | $66,484.11 | $30,798.00 | $35,686.11 | $72,674.45 | $33,655.95 | $39,018.50 |
| Murad Acne Spot Treatment | 63393712 | $149,591.32 | $70,048.80 | $79,542.52 | $154,581.24 | $73,836.00 | $80,745.24 |
| Burt's Bees Citrus Facial Scrub | 59320702 | $99,447.33 | $53,197.50 | $46,249.83 | $102,269.48 | $54,845.00 | $47,424.48 |
| Burt's Bees Orange Essence Facial Cleanser | 59320414 | $144,815.67 | $54,533.50 | $90,282.17 | $151,096.89 | $77,692.50 | $73,404.39 |
| True Blue Spa Good Clean Foam Face Wash | 59320444 | $1,031,729.89 | $240,858.72 | $790,871.22 | $1,065,402.33 | $247,394.88 | $818,007.45 |
| Ginger Rejuvenating Body Scrub | 45379152 | $2,269,163.80 | $680,415.03 | $1,588,748.77 | $2,354,182.99 | $704,933.19 | $1,649,249.80 |
| Everlasting Flower Night Nourisher* | 59364522 | $188,265.69 | | $188,265.69 | $193,833.63 | | $193,833.63 |
| Oat Oil-Control Face Moisturizer | 56414103 | $1,620,978.20 | $51,471.00 | $1,569,507.20 | $1,744,169.90 | $55,272.00 | $1,688,897.90 |
| Burdock Root Skin Mattifier | 59326654 | $2,213,445.11 | $495,094.29 | $1,718,350.82 | $2,383,129.59 | $529,234.42 | $1,853,895.17 |
| Ginger Rejuvenating Shower Foam | 59326735 | $1,128,194.54 | $180,992.88 | $947,201.66 | $1,189,364.12 | $190,518.04 | $998,846.08 |
| Ginger Rejuvenating Body Lotion | 59362072 | $1,541,803.52 | $630,814.61 | $910,988.91 | $1,608,489.55 | $650,457.33 | $958,032.22 |
| Fig Hydrating Body Balm | 59362046 | $2,858,062.47 | $931,065.25 | $1,932,016.22 | $3,023,282.70 | $962,622.09 | $2,060,640.61 |
| Ginger Rejuvenating Body Balm | 59386034 | $1,658,219.61 | $378,056.64 | $1,280,162.97 | $1,741,901.15 | $396,052.80 | $1,345,848.35 |
| Fig Hydrating Hand & Nail Cream | 59386021 | $1,401,408.13 | $324,359.36 | $1,077,048.77 | $1,458,690.15 | $336,672.96 | $1,122,017.19 |
| Ginger Rejuvenating Hand & Nail Cream | 59326573 | $1,537,400.26 | $396,838.57 | $1,140,561.69 | $1,588,620.30 | $409,421.23 | $1,179,199.07 |
| | 42449289 | $188,285.69 | $51,319.81 | $135,945.88 | $193,833.63 | $52,718.85 | $141,114.78 |
| **Total** | | **$81,828,607.94** | **$16,202,086.00** | **$65,626,521.94** | **$87,535,382.96** | **$16,507,734.30** | **$71,027,648.66** |

*Production information did not include cost information for sky 59364522

**Accused Product Last Sale Information**

| Product | SKU | Date of Last Sale | |
|---|---|---|---|
| Bath & Body Works Mango Mandarin Creamy Body Wash | 55218805 | December | 2004 |
| | 53308566 | September | 2005 |
| | 55271826 | September | 2005 |
| | 55308728 | September | 2005 |
| True Blue Spa Better Than Never Bubble Bath and Shower Cream | 45316335 | August | 2005 |
| | 45306671 | August | 2005 |
| Bath & Body Works Cool Citrus Basil Creamy Body Wash | 55178880 | August | 2005 |
| | 55231976 | August | 2005 |
| | 55310114 | August | 2005 |
| | 55179164 | August | 2005 |
| Bath & Body Works Mango Mandarin Skin Refining Body Scrub | 55418524 | September | 2005 |
| Bath & Body Works Mango Mandarin Skin Renewal & Anti-Aging Body Wash | 55370073 | September | 2005 |
| | 55389987 | September | 2005 |
| Bath & Body Works Mango Mandarin Body Lotion | 55418663 | September | 2005 |
| | 51307422 | September | 2005 |
| | 51307587 | September | 2005 |
| | 51312873 | September | 2005 |
| | 51218825 | September | 2005 |
| | 51294344 | December | 2003 |
| Bath & Body Works Cool Citrus Basil Body Lotion | 51294357 | August | 2004 |
| | 51307396 | September | 2005 |
| | 51178596 | September | 2005 |
| | 51178994 | September | 2005 |
| | 51196536 | August | 2005 |
| Bath & Body Works Mango Mandarin Hand Repair & Healing Hand Cream | 51370349 | September | 2005 |
| | 51477891 | September | 2005 |
| Bath & Body Works Mango Mandarin Skin Repair & Healing Body Butter | 51418023 | September | 2005 |
| | 51370200 | September | 2005 |
| Pure Simplicity Salt Toning Body Balm | 59386047 | September | 2005 |
| Murad Resurgence Sheer Lustre Day Moisture SPF 15 | 41558317 | January | 2004 |
| Murad Resurgence Age-Diffusing Serum | 63395244 | September | 2005 |
| Murad Resurgence Age-Balancing Night Cream | 63395309 | September | 2005 |
| Murad Skin Perfecting Lotion | 63393149 | September | 2005 |
| Murad Acne Spot Treatment | 63393712 | September | 2005 |
| Burt's Bees Citrus Facial Scrub | 59320702 | September | 2005 |
| Burt's Bees Orange Essence Facial Cleanser | 59320414 | September | 2005 |
| True Blue Spa Good Clean Foam Face Wash | 45379152 | September | 2005 |
| Ginger Rejuvenating Body Scrub | 59362061 | August | 2005 |
| Everlasting Flower Night Nourisher | 59364522 | September | 2005 |
| Oat Oil-Control Face Moisturizer | 56414103 | September | 2005 |
| Burdick Root Skin Mattifier | 59326654 | September | 2005 |
| Ginger Rejuvenating Shower Foam | 59326735 | September | 2005 |
| Ginger Rejuvenating Body Lotion | 59326272 | September | 2005 |
| Fig Hydrating Body Balm | 59362045 | September | 2005 |
| Ginger Rejuvenating Body Balm | 59386034 | September | 2005 |
| Fig Hydrating Hand & Nail Cream | 59386021 | September | 2005 |
| Ginger Rejuvenating Hand & Nail Cream | 59326573 | September | 2005 |
| | 42449289 | September | 2005 |

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of February 2006, the attached **EXPERT REPORT OF LARRY W. EVANS PURSUANT TO RULE 26(A)(2)(B), FED. R. CIV. P.** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esquire                           U.S. MAIL
Potter Anderson & Corroon, LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951

Arthur I. Neustadt, Esquire                           FAX (not exhibits) AND U.S. MAIL
Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
1940 Duke Street
Alexandria, VA  22314

Francis G.X. Pileggi, Esquire                         U.S. MAIL
Fox Rothschild LLP
Suite 1300
919 North Market Street
Wilmington, DE  19899

John Ward, Esquire                                    FAX (not exhibits) AND U.S. MAIL
Ward & Olivo
708 Third Avenue
New York, NY  10017

Jason R. Buratti