**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LP MATTHEWS, L.L.C., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 04-1507 (SLR) |
| ) | JURY TRIAL DEMANDED |
| BATH & BODY WORKS, INC., ) | |
|   and ) | |
| LIMITED BRANDS, INC., ) | |
|   and ) | |
| KAO BRANDS CO. (f/k/a THE ANDREW ) | |
| JERGENS COMPANY), ) | |
|   and ) | |
| KAO CORPORATION, ) | |
| ) | |
|     Defendants. ) | |

**DEFENDANTS BATH & BODY WORKS, INC. AND LIMITED
BRANDS, INC.'S ANSWERING BRIEF IN OPPOSITION
TO LP MATTHEWS' *DAUBERT* MOTION TO STRIKE THE
EXPERT REPORTS AND EXCLUDE THE TRIAL TESTIMONY OF
THE LIMITED DEFENDANTS' LIABILITY EXPERT JOHN C. CARSON**

FOX ROTHSCHILD LLP
Francis G.X. Pileggi (Del. Bar No. 2624)
Sheldon K. Rennie (Del. Bar No. 3772)
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Phone: (302) 655-3667
Fax: (302) 656-8920

*Attorneys for Defendants Bath & Body
Works, Inc. and Limited Brands, Inc.*

OF COUNSEL:

WARD & OLIVO
John F. Ward
David M. Hill
Michael J. Zinna
708 Third Avenue
New York, New York 10017
Phone: (212) 697-6262
Fax: (212) 972-5866

**TABLE OF CONTENTS**

NATURE AND STAGE OF PROCEEDINGS ...................................................................1

SUMMARY OF THE ARGUMENT .............................................................................1

STATEMENT OF THE FACTS ..................................................................................3

ARGUMENT .........................................................................................................7

    A. Mr. Carson Is Qualified To Render Expert Testimony......................................7

    B. Mr. Carson's Opinions Are Based On Good Grounds .....................................8

    C. Plaintiff Mischaracterizes Facts And Deposition Testimony ..........................14

CONCLUSION ....................................................................................................15

i

## **TABLE OF AUTHORITIES**

**Cases**

*Daubert v. Merrell Dow Pharma.*, 509 U.S. 579 (1993) ......................................... 2, 13, 15

*Eclipse Elec. v. Chubb Corp.*, 176 F.Supp.2d 406 (E.D. Pa. 2001) .................................. 13

*In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) ...................... 11, 12

*Izumi Products Co. v. Koninklijke Philips Electronics N.V.*, 315 F.Supp.2d 589 (D. Del.
    2004) ....................................................................................................... 2, 7-11, 13

*Johnson & Johnson v. W.L. Gore & Assoc., Inc.*, 436 F.Supp. 704 (D. Del. 1977) ......... 14

*Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802 (3d Cir. 1997) ..................................... 14

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) ......................................... 10, 13

*O'Connell v. LeBloch*, 2000 Del. Super. LEXIS 128 (April 19, 2000) ............................ 15

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ................................................ 13, 14

*Schneider v. Fried*, 320 F.3d 396 (3d Cir. 2003) .............................................................. 13

*Standard Oil Co. v. Montedison, S.p.A.*, 664 F.2d 356 (3d Cir. 1981) ............................. 14

*United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985) ................................................ 13

*Waldorf v. Shuta*, 142 F.3d 601 (3d Cir. 1998) .............................................................. 7, 8

**Statutes**

Fed. R. Evid. 702 ........................................................................................................ 8, 10

## NATURE AND STAGE OF PROCEEDINGS

On December 8, 2004, plaintiff LP Matthews, Inc. ("LPM" or "plaintiff"), filed a Complaint against Bath & Body Works, Inc, Limited Brands, Inc. (collectively "the Limited Defendants"), KAO Brands Co., and KAO Corp. alleging infringement of the United States Patent No. 5,063,062 ("the '062 patent"). (D.I. 1). This Court entered a Scheduling Order on June 9, 2005. (D.I. 39). Fact discovery closed on January 26, 2006 (*Id.* at 1) and expert discovery closed on May 12, 2006. (*Id.* at 3). Daubert motions and opening briefs were filed on June 22, 2006. (*Id.*). Answering Briefs are due by July 7, 2006. (*Id.*).

## SUMMARY OF THE ARGUMENT

LPM seeks to prove its case using a strategy that does not include any scientific data to back up its infringement allegations. In fact, LPM has offered none of its own evidence of infringement. At the heart of this litigation rests certain claim elements of the '062 patent[1] that must be proven: a (1) cleaning composition including (2) an amount of orange oil sufficient to be a (primary) cleaner, (3) an oat grain derivative product or oatmeal as a primary emulsifying agent, (4) a pharmaceutically acceptable moisturizer, and (5) pH of the composition within in the range of 4.5 to 6.0, inclusively (Claim 6 only). This fatal flaw in LPM's strategy yields one result – it has not met its burden of proof for infringement.[2] This omission is especially apparent because LPM cannot even refute the expert testimony of John Carson, M.S., who presents tested scientific data that, not surprisingly, disproves LPM's unsupported allegations of infringement.

---

[1] LPM asserts Claims 6 and/or 9 against twenty-seven (27) Limited Defendants' products.
[2] LPM must prove each and every element of Claims 6 and 9 are met by the accused products.

1

Since LPM miscalculated its tactic and believed it could merely allege scientific theories that would support its position, it now finds itself backed against a wall facing actual scientific data and results that disprove its allegations: (1) orange oil in an amount less than 5%, and certainly less than 1%, does not clean, (2) the oat ingredients in the Limited Defendants' products, if any, are not emulsifying agents in the miniscule amounts in which they are present, (3) actual pH measurements of most of the accused products are outside the claimed range, and (4) orange oil is not a better cleaning agent than d-limonene. LPM cannot refute any of this evidence other than through the unsubstantiated claims of the inventors or its expert. As such, it is left with attacking Mr. Carson's actual scientific tests and analyses, something LPM's expert failed to do – probably because LPM knew the results would be damaging to its case.

Mr. Carson, with his thirty-plus years of experience in formulation chemistry and product design, is clearly qualified to give expert opinion testimony regarding a cleaning composition and its ingredients. Mr. Carson's testing and methodology comport with the requirements set forth in *Daubert*. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). They are reliable, based on valid data, and have "good grounds" sufficient to meet the reliability requirements for expert testimony per Rule 702. *Izumi Products Co. v. Koninklijke Philips Electronics N.V.*, 315 F.Supp.2d 589, 600-601 (D. Del. 2004).

LPM misrepresents facts and excerpts of deposition testimony to no avail and its motion should be denied.

**STATEMENT OF THE FACTS**

The application for the '062 patent, entitled CLEANING COMPOSITIONS WITH ORANGE OIL, was filed by Douglas H. Greenspan and Phillip A. Low on September 27, 1989. (LP Ex. A; the '062 patent, Cover Page).[3] Claims 6 and 9 of the '062 patent, the claims asserted in this case, read as follows:

> 6. A skin cleaning composition for external use on human tissues, comprising orange oil, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as an emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively. (LP Ex. A, Col. 10, lns. 1-6).

> 9. A cleaning composition for use on human skin comprising forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of oatmeal and a pharmaceutically acceptable moisturizer. (LP Ex. A, Col. 10, lns. 13-17).

Notably, in an Office Action Response dated September 18, 1990, the Applicants of the '062 patent noted the alleged "higher cleaning properties" of orange oil in comparison to d-limonene:

> Applicants have found that undistilled orange oil has higher cleaning properties when used in a composition than distilled d-limonene. Applicants have tested the compositions produced according to the ranges of the present application wherein an equal weight percent of d-limonene was substituted for the orange oil. In each case, the orange oil based composition had superior cleaning properties than the identical composition with an equivalent amount of d-limonene substituted for the orange oil. (Ex. A; 9/18/80 Office Action Response, p. 2).[4]

---

[3] Exhibits referenced as "LP Ex.___" refer to the Exhibits attached to LP Matthews' Opening Memorandum in Supporting its *Daubert* Motion to Strike the Expert Reports and Exclude the Trial Testimony of the Limited Defendants' Liability Expert, John C. Carson. (D.I. 236).
[4] "Ex. A" is attached hereto.

3

The Limited Defendants offer their technical expert, John Carson, M.S., to support their defenses and counterclaims on non-infringement, invalidity of the '062 patent under 35 U.S.C. §§ 102, 103, and 112, and unenforceability due to inequitable conduct committed by the patentees during prosecution of the application that led to the '062 patent before the United States Patent and Trademark Office ("PTO").

As an initial matter, the Limited Defendants and plaintiff agree that the level of ordinary skill in the art as it relates to the '062 patent is either a bachelor's degree in chemistry or the equivalent through some combination of educational and practical experience. (LP Ex. B, p. 4; LP Ex. D, p. 2). In his reports, plaintiff's expert, Christopher Rhodes, suggests that a person of ordinary skill in the art would be a person with "an educational background that at least is equivalent to an associate's degree in chemistry or a related discipline. Apart from education, a person skilled in the art has at least one-two years experience in the formulation of comparable products." (LP Ex. D, p. 2).

Mr. Carson has a Bachelors of Science Degree in Chemistry, a Masters of Science Degree in Chemistry, and a Masters of Business Degree. (LP Ex. B, App. A). Further, Mr. Carson has over thirty-five (35) years experience in personal care product creation, design, formulation, testing, development, and project management, including for products similar to those at issue in this case. (LP Ex. B, p. 2, App. A). He has also published articles, a book chapter on Cosmetic Emollients, and is listed as an inventor on fourteen (14) United States patents. (LP Ex. B, p. 2, App. A). Mr. Carson teaches courses on topics such as emulsion technology, product formulations, and raw materials.

(LP Ex. B, App. A). Mr. Carson's professional expertise includes using d-limonene (the primary component of orange oil) in products. (LP Ex. E, 322: 9-19).

Mr. Carson's experiments all follow scientific methodology and have good grounds. (LP Ex. B, App. D; LP Ex. C, App. B (methodologies applied in testing for pH, emulsification and orange oil cleaning ability)). Standards, both objective and subjective, exist in the field for measuring pH and for determining the emulsifying ability of a product. Mr. Carson's testing adheres to principles and methodology of the scientific community. (LP Ex. B, App. D; LP Ex. C, App. B). He used quantitative measurements to test the pH of the accused products.[5] (LP Ex. C, App. B). Where necessary (i.e., the cleaning experiments), Mr. Carson employed reliable inferences based on his knowledge and experience. (LP Ex. B, App. D; LP Ex. C, App. B). He applied standards in the methodology of each step in the cleaning test, as well as the pH and emulsion tests. (LP Ex. B, App. D; LP Ex. C, App. B).

During his deposition, Mr. Carson testified to these standards and adhered to these standards in conducting his experiments.

> Mr. Buratti: Do they ever subjectively evaluate any other criteria of products that were formulated at Croda?
>
> Mr. Carson: Yes. One of the tests when you're developing products is to use them on yourself. So you routinely take products home. You routinely are taking a shampoo or a conditioner.
>
> .... I haven't bought another commercial shampoo in decades. I make my own. And it's one of the advantages. So I am continually testing new products. And the

---

[5] When conducting his pH tests, Mr. Carson used an Orion Research digital analyzer Model 501 with a Sensorex® combination pH electrode. (LP Ex. C, App. B-2).

5

> people in the laboratories do the same things.
>
> It's – it's encouraged. It's how you find out about products. It's how you learn what the differences are. And there are standard testing methodologies that are used." (LP Ex. E, 21:3-22).

Mr. Carson later reiterated that subjective tests, such as the visual observation tests he performed, are considered standard methodology in laboratories for, *inter alia*, evaluating the emulsifying ability of products:

> Mr. Buratti: Were there instrumental methods by which you could have measured whether or not an emulsion was formed in part of the solution?
>
> Mr. Zinna: Objection to form.
>
> Mr. Carson: Yes, there are.
>
> Mr. Buratti: Did you consider using instrumental methods to measure whether or not an emulsion was formed in your D-3 or D-4 experiments?
>
> Mr. Carson: Yes, I did. *But the conventional methodology is to use visual observation.* (LP Ex. E, 321:21-322:8) (emphasis added).

Further corroboration for the standard methodology, Mr. Carson employed and its acceptance in the community is found in his Rebuttal Expert Report (LP Ex. C), wherein he cites to peer reviewed publications to support his analysis and use of Critical Micelle Concentration ("CMC") values for the oat ingredients found in the accused products to determine whether they form an emulsion in a system. (LP Ex. C, pp. 4-5). Mr. Carson applied a pH standard test methodology (i.e., USP procedure No. USP 29 <791>) to measure the pH of the accused products. (LP Ex. C, App. B). The methodology for testing the cleaning ability of orange oil in comparison to d-limonene (as described in

Appendices D-1 through D-4 of Mr. Carson's Opening Report) also follows a standard scientific method: each protocol presents a hypothesis, uses the same materials and methods for each of the experiments, and is followed by a concise and accurate description reporting the results observed from the experiment. (*See* LP Ex. B, App. D). Furthermore, Mr. Carson repeated the tests as necessary to "help corroborate the data." (LP Ex. E, 34:16-22, 357: 8-14).[6] These tests provided sufficient data to compare with co-inventors Greenspan and Low's statements to the PTO in the '062 patent file history.

In sum, Mr. Carson followed accepted scientific methodology based on valid reasoning and reliable data in performing the experiments and forming his opinions on which is prepared to testify in this matter.[7] (LP Ex. B, App. D; LP Ex. C, App. B).

## ARGUMENT

### A.    Mr. Carson Is Qualified To Render Expert Testimony

Mr. Carson is qualified to give expert opinion(s) on the '062 patent and its validity, the cleaning composition it claims and its individual claim elements because he has "specialized knowledge" in these technical area(s). *Izumi Products*, 315 F.Supp.2d at 600. His academic background and practical experience go far beyond the minimal threshold that the expert must have more knowledge than the average juror. *Id.* (*quoting Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). (LP Ex. B, App. A). In fact, Mr. Carson has extensive experience in developing creams and personal care products, the

---

[6] Plaintiff agrees that the number of tests an expert runs is not relevant for excluding expert testimony. (*See* LPM's Answering Mem. Opp'n Mot. Exclude Expert Test. Christopher T. Rhodes, p. 5) (D.I. 264).

[7] In contrast to Mr. Carson, plaintiff's expert, Christopher Rhodes, performs no tests whatsoever to support his conclusion that the Limited Defendants' accused products infringe Claims 6 and/or 9 of the '062 patent. (*See generally*, LP Ex. D).

7

precise products accused of infringement, as well as in Emulsion Technology to further qualify him as an expert on the areas set forth in his report. (LP Ex. B, App. A). LPM inserts Mr. Carson's deposition testimony and uses scant case law in a futile attempt to disqualify him as an expert. It mischaracterizes portions of the testimony by taking it out of context.

The '062 patent relates to orange oil, oatmeal and oat products acting as emulsifiers specifically in a cleaning composition. Expert qualification requires an understanding of how these components function in a cleaning composition. *Izumi Products*, 315 F.Supp.2d at 601 ("Rule 702 expert testimony must fit the issues in the case."). A citrus or orange oil expert or oat expert is the type of expert LPM is apparently arguing is necessary for this case. However, such an expert will not necessarily have the requisite knowledge on cleaning compositions to opine as to the value of orange oil or oat in a cleaning solution.

It is undisputable that Mr. Carson has the requisite background to opine on the area of product formulations and the use of orange oil, moisturizers or oat products contained therein. Mr. Carson has the knowledge and practical experience to read documents related to this field of technology, understand the contents of the documents and form opinions as to what they disclose to a person of skill in the art at the time of the invention. (LP Ex. B, App. A). *Waldorf*, 142 F.3d at 625.

B.     Mr. Carson's Opinions Are Based On Good Grounds

An expert opinion will be based on 'good grounds' and considered reliable in the eyes of the court if it is "based on the 'methods and procedures of science' rather than on

8

'subjective belief or unsupported speculation.'" *Izumi Products*, 315 F.Supp.2d at 600. Here, Mr. Carson used objective tests based on reliable scientific methodology, for example, repeating patentees' testing, and using a combination of objective and subjective steps in a carefully designed procedure. (LP Ex. B, App. D; LP Ex. C, App. B (methodologies applied in testing for pH, emulsification and orange oil cleaning ability)). (*See also* LP Ex. E, 367:20-368:18, 21:3-22,[8] 322:4-8). It is LPM's expert, Christopher Rhodes, who uses "subjective belief or unsupported speculation." The scientific methods and procedures for all of the testing Mr. Carson performed are reliable. (LP Ex. B, App. D, LP Ex. C, App. B).

### *Mr. Carson's pH Testing is Reliable*

Mr. Carson's pH testing followed the generally accepted standards in the scientific community and is within the realm of the "reliable" factors. (LP Ex. C, App. B-1). *See Izumi Products*, 315 F.Supp.2d at 600-601 (enumerating the factors the Court considers). Mr. Carson used an Orion Research digital analyzer Model 501 with a Sensorex® combination pH electrode. (LP Ex. C, App. B-2). His method for calibrating and measuring the solutions is accepted in the general scientific community, and this methodology for measuring pH of solutions has been put to many non-judicial uses. In many cases, to ensure an accurate reading, he recorded pH measurements of the products more than once. (LP Ex. C, App. B). Mr. Carson's own qualifications add to the reliability of the method, as he has been performing similar testing for over thirty years. (LP Ex. B, App. A). Mr. Carson's pH testing is based on reliable methods and data, and

---

[8] Subjective evaluation of products is "encouraged. It's how you find out about products. It's how you learn what the differences are. And there are standard testing methodologies that are used."

meets the evidentiary threshold of Rule 702. *Izumi Products*, 35 F.3d at 601 (*citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.").

### *Mr. Carson's Emulsion Tests Are Reliable*

Mr. Carson also applied a standard technique used in laboratories to determine the ability of a product to emulsify. (LP Ex. E, 321:21-322:8). This technique is established to be reliable, and has been put to non-judicial uses. (LP Ex. E, 302:9-303:12; and 322:4-8).[9] The method includes a testable hypothesis: whether the listed oat products act as emulsifiers in the composition. Mr. Carson's own extensive qualifications and expertise in the area of Emulsion Technology further supports a finding that his emulsion tests follow scientific methodology and are reliable. (LP Ex. B, App. A).

In addition to using the above methodology, Mr. Carson also analyzed the CMC values for each of the oat products, and compared those values to the actual known concentration of the oat ingredient in each of the accused products. (LP Ex. C, pp. 4-5, 15-16). This method of analyzing emulsification ability of an ingredient is supported by peer review publications. (LP Ex. C, pp. 4-5). Mr. Carson did not need to determine the CMC for each oat ingredient. Instead, he confirmed that each oat ingredient was at a concentration that was below its CMC. (LP Ex. C, p. 16, n. 15).

---

[9] Mr. Buratti:   Did you consider using instrumental methods to measure whether or not an emulsion was formed in your D-3 and D-4 experiments?
  Mr. Carson:   Yes, I did. But the conventional methodology is to use visual observation.

10

<u>*Mr. Carson's Cleaning Tests Comparing Orange Oil to d-limonene*</u>

Mr. Carson's opinion that orange oil does not clean better than d-limonene is based on good grounds. *Izumi Products*, 315 F.Supp.2d at 600-601. The hypothesis Mr. Carson tested was whether the inventors of the '062 patent made true and accurate statements to the PTO. Specifically, the Applicants stated:

> Applicants have found that undistilled orange oil has higher cleaning properties when used in a composition than distilled d-limonene. Applicants have tested the compositions produced according to the ranges of the present application wherein an equal weight percent of d-limonene was substituted for the orange oil. In each case, the orange oil based composition had superior cleaning properties than the identical composition with an equivalent amount of d-limonene substituted for the orange oil. (Ex. A, p. 2).

To test this hypothesis, Mr. Carson merely performed tests similar to those described in the '062 patent – for it was those tests[10] that the inventors performed and used as a basis for the statement to the PTO. Accordingly, Mr. Carson simply repeated the tests and methods for testing orange oil and d-limonene in the cleaning compositions as disclosed in the '062 patent. (*See generally*, LP Ex. A).

Mr. Carson's method also had a prior, non-judicial use – the patentees themselves conducted these tests for the purpose of obtaining the '062 patent. (*See generally*, LP Ex. A; *see also*, Ex. A).

Mr. Carson used standards at various stages of his testing to control the techniques' operation(s). *See In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 757 (3d Cir. 1994) (existence of standards to control technique's operation is very

---

[10] Or at the very least, inventors used similar testing conditions. The patent reveals their level of expertise and their method to a sufficient degree by which Mr. Carson was able to make this determination as a person of ordinary skill in the art.

11

important).  By repeating the methodology disclosed in the '062 patent, Mr. Carson followed the most reliable and accurate method for testing the hypothesis.  Mr. Carson's methods were actually more reliable and less subjective than the standards employed by applicants of the '062 patent.  Mr. Carson controlled all the experiments and performed each step consistently.  (*See*, e.g., LP Ex. E, 89: 4-11).[11]  Mr. Carson kept records, detailed descriptions of the results and a photographic record of the results.  (LP Ex. B, App. D).  The substrate he used, tiles, lends an additional level of reliability because he can control the environment better than a person's skin, which while being the substrate used by the applicants, is naturally variable.  Mr. Carson consistently used the same methodology in applying dirt, caulk and cosmetics to the tiles, and consistently applied the testing solution with either orange oil or d-limonene to these tiles.  (LP Ex. E, 367:20-368:18).  Mr. Carson repeated the tests where necessary.  (LP Ex. E, 357:11-14, 34:16-22)[12].  Clearly these standards demonstrate a reliable method that is at the very least more so than the Applicants' subjective method relying on individuals to perform each step as well as evaluate the cleaning ability of the orange oil on an individual basis with no standards.  (*See generally*, LP Ex. A).

       The mere difference in opinion between Dr. Rhodes and Mr. Carson is more appropriate for the jury to weigh in its evaluation of the evidence, and it is not an appropriate basis for a *Daubert* motion.  *See Paoli II*, 35 F.3d at 746.

---

[11] Mr. Buratti:  Did you use a control that was just rinsed with water?
  Mr. Carson:  Yes, I did.  It's not included in the report – which is why I'm laughing - because it didn't show any significant effects.
                What I used – it was actually several controls for was to control my test methodology.  Which Dr. Rhodes took exception to.
[12] Mr. Buratti:  So then you rerun it a few times to make sure there isn't a difference?
  Mr. Carson:  As I said, you may.  There are other options.  It would depend on how – how good you thought the test methodology was.

The Supreme Court articulated in its discussion of Rule 702 that some areas of litigation are "too particular or of too limited interest" to have been previously tested. *Daubert*, 509 U.S. at 593.  In addition, the cleaning ability of undistilled orange oil versus d-limonene is a narrow focus of research, and it is unlikely to find any published data in this particular technical area. *Id.*  The lack of published data or peer review has no implication on this matter. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (peer review or publication is not dispositive or a *sina qua non*).  In this case, allegedly only Greenspan and Low performed tests on orange oil and d-limonene – and this was the basis for the patent and their main claim to fame before the PTO.  The most relevant and applicable tests are the alleged tests that Greenspan and Low conducted in creating the patented invention and applying for the patent.

Even plaintiff agrees that the number of tests an expert runs is not relevant for excluding expert testimony.  (*See* LPM's Answering Mem. Opp'n Mot. Exclude Expert Test. Christopher T. Rhodes, p. 5) (D.I. 264) ("expert's testimony is not rendered unreliable simply because the expert conducted few or no independent tests." *Eclipse Elec. v. Chubb Corp.*, 176 F.Supp.2d 406, 412 (E.D. Pa. 2001)).  Mr. Carson's reliance on the '062 patent is permissible, and he is not required to "reinvent the wheel." *Eclipse Elec., 176 F.Supp.2d at 412.*

Mr. Carson's qualifications and extensive experience in the field further support finding that his methodology is reliable. *Schneider v. Fried*, 320 F.3d 396, 407 (3d Cir. 2003).  The court may consider factors other than scientific acceptance where a method has no established track record in litigation. *United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985); *Izumi Products*, 315 F.Supp.2d at 601 (*quoting Kumho Tire*, 526

U.S. at 152 ("each factor need not be applied in every case").  Whether the best foundation or the best equipment available to the industry was used by the expert is not a prerequisite for admitting expert testimony.  *Oddi*, 234 F.145-146 (*quoting Kannankeril v. Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).

*Ex parte* tests performed by an expert are admissible where the opposing party is afforded the opportunity to cross-examine the expert who performed the tests.  *Johnson & Johnson v. W.L. Gore & Assoc., Inc.*, 436 F.Supp. 704, 720 (D. Del. 1977). "Deficiencies cited by defendant with respect to the manner in which the tests were performed go to the weight of the evidence, not the admissibility…"  *Id. See also Standard Oil Co. v. Montedison, S.p.A.*, 664 F.2d 356, 372 (3d Cir. 1981) ("the number of experiments to run is in the discretion of the scientist").

Mr. Carson's reasoning in designing both the methodology of performing the tests and in collecting results was grounded on a valid basis.  He applied standards in how the testing technique(s) were performed, maintained and recorded methods, data and results in lab notes and compiled photographic records of data/results where necessary and useful.  The methods he used were previously established by the inventors of the '062 patent, which they used for non-judicial use – obtaining the '062 patent.

      C.     <u>Plaintiff Mischaracterizes Facts And Deposition Testimony</u>

Throughout its brief, plaintiff misconstrues the facts and deposition testimony, and attempts to impose requirements for Mr. Carson's testimony based on tangential details such as oatmeal expertise or comprehensive knowledge on the orange oil industry. Such limited qualifications are not useful here in a case involving a "cleaning

composition" and accused product formulations for personal fragrant body care lotions, creams, etc. Such expertise, which plaintiff's expert does not have, is not determinative or helpful in giving expert testimony in a case such as this. No definitive checklist exists – the "inquiry must be 'tied to the facts" of a particular case, promoting a case-by-case determination of admissibility." *O'Connell v. LeBloch*, 2000 Del. Super. LEXIS 128, *10-11 (April 19, 2000). *See also Daubert*, 509 U.S. at 590-592.

In short, Mr. Carson is qualified to render opinions on his testing and on invalidity of the '062 patent and disclosures in the prior art. Mr. Carson's methodology was reliable and based on reliable data. Further, Mr. Carson was an emulsion and formulation chemist at the time of the invention in the late 1980s – who better than an expert working in the field at the time of the invention to give opinion on state of the art. LPM merely has no evidence to support its position, just as the inventors of the '062 patent kept no records of their testing. Plaintiff relies on theoretical statements from its expert and now hopes to exclude the cold, hard scientific data refuting their position.

## CONCLUSION

Because Mr. Carson meets the standards of admissibility espoused in *Daubert*, the Limited Defendants respectfully request that this Court deny LPM's *Daubert* motion.

Respectfully submitted,

FOX ROTHSCHILD LLP

Dated: July 7, 2006       By:  /s/ Sheldon K. Rennie
                          Francis G.X. Pileggi (Del. Bar No. 2624)
                          Sheldon K. Rennie (Del. Bar No. 3772)
                          FOX ROTHSCHILD LLP

15

Suite 1300
919 North Market Street
Wilmington, Delaware 19801
Phone: (302) 655-3667
Fax: (302) 656-8920
E-mail: fpileggi@foxrothschild.com
E-mail: srennie@foxrothschild.com

OF COUNSEL:

John F. Ward
David M. Hill
Michael J. Zinna
WARD & OLIVO
708 Third Avenue
New York, New York 10017
Phone: (212) 697-6262
Fax: (212) 972-5866
E-mail: wardj@wardolivo.com
E-mail: hilld@wardolivo.com
E-mail: zinnam@wardolivo.com

*Attorneys for Defendants*
Bath and Body Works, Inc.
Limited Brands, Inc.