# EXHIBIT A

# United States Patent [19]

## Greenspan et al.

[11] **Patent Number:** **5,063,062**

[45] **Date of Patent:** **Nov. 5, 1991**

[54] **CLEANING COMPOSITIONS WITH ORANGE OIL**

[75] Inventors: **Douglas H. Greenspan**, Louisville; **Phillip A. Low**, Littleton, both of Colo.

[73] Assignees: **D. Greenspan; W. Ingram**, both of Louisville, Calif.

[21] Appl. No.: **413,395**

[22] Filed: **Sep. 27, 1989**

[51] Int. Cl.$^5$ ............................................. **A61F 13/00**
[52] U.S. Cl. ................................ **424/443**; 424/195.1; 424/401; 252/142; 514/783; 514/846
[58] Field of Search ................. 424/443, 401; 514/783

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,014,995 | 3/1977 | Juliano et al. | 514/783 |
| 4,533,487 | 8/1985 | Jones | 252/173 |
| 4,620,937 | 11/1986 | Dellutri | 252/162 |

### OTHER PUBLICATIONS

D. Limonene as a Degreasing Agent Richard L. Cole-man, The Citrus Industry, vol. 56, No. 11, Nov., 1975, pp. 23–25.

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—James M. Spear
*Attorney, Agent, or Firm*—Timothy J. Martin

[57]     **ABSTRACT**

A cleaning composition for cleaning the skin contains orange oil, a pharmaceutically acceptable moisturizer and an emulsifying agent, Preferably the orange oil accounts for between 5% and 60% by volume, and it further preferred that the composition contains 40% orange oil by volume. The moisturizer is either glycerin, aloe vera, jojoba oil, safflower oil or a combination thereof. The emulsifying agent preferably is oatmeal. The composition is constituted to have a pH of between 4.5 and 6.0, and the composition may be packaged as moistened towellets in hermetic packets.

**12 Claims, No Drawings**

5,063,062

1

# CLEANING COMPOSITIONS WITH ORANGE OIL

## FIELD OF THE INVENTION

The present invention generally relates to cleaning compositions suitable for external application to human skin tissue in order to remove unwanted substances such as tar, caulking compounds, sealants, adhesives and the like. More specifically, however, the present invention is directed to a natural cleaning composition that utilizes only plant based ingredients. As such, the present invention is particularly adapted for cleaning non-water soluble products from the human skin in a safe, effective manner.

## BACKGROUND OF THE INVENTION

A wide variety of cleaning compositions are known for external application to skin tissue in order to remove dirt and unwanted materials. Among these cleaning compounds are the various hard and liquid soaps which may be used for cleaning human skin, especially the hands. However, numerous substances with which the hands may be soiled do not respond to ordinary soap compositions. Examples of substances that are difficult to remove include grease, tar, oils, ink, caulking materials, adhesives, sealants, gums, cosmetics and other non-water soluble products.

While some cleaning compositions have been developed for these materials, the typical cleaners are harsh and can damage the skin, especially after prolonged use. Examples of these compounds include turpentine, acetone, toluene and other petroleum based products as well as ammonia based products. These products, though, often damage the skin and otherwise exhibit a high level of toxicity. Further, if inhaled during use, these petroleum based products may cause respiratory damage. When absorbed through the skin, the petroleum based products can cause damage to the major organs of the body and can have a less serious side effect of drying and chaffing the skin where applied. Thus, it should be appreciated that, although petroleum is a naturally occurring product, it is not toxilogically healthy for the human body. Accordingly, there have been substantial efforts which have been made to find suitable alternative substances for skin cleaning. While some synthetically derived substances have been developed, many of these substances are medically suspect, and in some instances produce side effects making them unsuitable for use on a regular basis.

Orange oil, as a natural product derived from the rind of oranges, has been recognized in the past to have some cleaning capabilities. Prior to the present invention, however, it is not believed that the suitability of orange oil in cleaning human skin was realized. Orange oil by itself is a skin irritant that can cause inflammation of the tissues. When used by itself, fumes from orange oil may cause headaches, dizziness and other side effects. Accordingly, it has not been readily apparent that orange oil alone or in combination with other substances could prove effective in cleaning compounds otherwise difficult to remove from the tissues of the skin. Rather, efforts in the past have been directed to the combination of orange oil with other cleaning solvents to produce floor cleaners, glass cleaners and the like.

From the foregoing, it should be appreciated that the thrust of prior development of skin cleaners, other than soap, have been directed to petroleum based products and ammonia based products and the industry has ig-

2

nored the potential for orange oil as a constituent of skin cleaning compounds. Despite the long felt need for better cleaners, the suitability of orange oil has thus not been recognized, and the inventors of the subject invention have found success by examining this substance contrary to the direction of inquiry adopted by the industry at large.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a new and useful compound for cleaning the human skin.

Another object of the present invention is to provide a skin cleaning compound suitable for cleaning non-water soluble products such as grease, caulking, adhesives, sealants, tar, oils, ink and the like.

Yet another object of the present invention is to provide a skin cleaning composition which is non-toxic.

It is a further object of the present invention is to provide a skin cleaning composition that is derived from natural vegetable and plant sources.

Still a further object of the present invention is to provide a skin cleaning composition that not only removes unwanted substances from the human skin but also acts to help clean and revitalize the human skin.

The present invention, then, provides a skin cleaning composition which is adapted for external use on human tissues. Broadly, this composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent. Preferably, the moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, and safflower oil. Further, it is preferred that the emulsifying agent also function as an emollient. Preferably the emulsifying agent is a natural grain derivative, preferably either oat gum or oatmeal. Further, it is preferred that the first, second, and third ingredients are selected and mixed in a ratio such that the resulting skin cleaning composition has a pH range of between 4.5 and 6.0 inclusively. To this end, a fourth ingredient in the form of a buffering compound may be added to the composition.

In the more specific composition according to the preferred embodiment, the cleaning composition comprises forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of the emulsifying agent and the pharmaceutically acceptable moisturizer. The preferred emulsifying agent in this composition is oatmeal, and the preferred moisturizer is a mixture of jojoba oil, aloe vera and glycerin mixed by volume of approximately two parts jojoba oil, two parts aloe vera and one part glycerin. It is further desired to use a small portion of safflower oil both as a moisturizer and to help form a stable emulsion.

These and other objects of the present invention will become more readily appreciated and understood from a consideration of the following detailed description of the preferred embodiment:

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention is directed to a cleaning composition utilized on skin tissues and having, as its cleaning ingredient, the commercially available substance known as orange oil derived from the rinds of oranges. In this broad form, the composition includes orange oil,

5,063,062

**3**

an emulsifying agent and a pharmaceutically acceptable moisturizer. In order to determine the preferred composition of the present invention, a series of samples having differing properties were evaluated to establish a desired range in pH and to establish the necessary proportion of orange oil to give suitable cleaning. These test samples are set forth below.

In their investigation of cleaning compositions according to the present invention, Applicants first investigated several compositions which were mixtures of orange oil, water, moisturizers and vitamin E. These samples were developed to test the cleaning properties of orange oil and to evaluate orange oil mixed with moisturizing agents. A test group of ten persons, male and female, were selected to subjectively evaluate the results of these samples. Initially, three such samples were prepared, and the compositions are set forth as Samples I–III, as follows:

SAMPLE I

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 39 |
| Water | 33 |
| Glycerin* | 12 |
| Aloe Oil* | 12 |
| Jojoba Oil* | 3 |
| Vitamin E | 1 |

*Total Moisturizers accounted for approximately 27% by volume.

SAMPLE II

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 34.5 |
| Water | 27.5 |
| Glycerin* | 17 |
| Aloe Vera* | 14 |
| Jojoba Oil* | 3.5 |
| Vitamin E | 3.5 |

*Total Moisturizers accounted for approximately 34.5% by volume.

SAMPLE III

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 37 |
| Water | 26 |
| Glycerin* | 14.75 |
| Aloe Vera* | 14.75 |
| Jojoba Oil* | 3.5 |
| Vitamin E | 4 |

*Total Moisturizers accounted for approximately 33% by volume.

Prior to presenting these samples to the test group, Applicants tested the relative acidity of the samples since it was believed desirable to avoid a composition that was either too acidic or too basic. The result of this acidity measurement, correlated to the Samples, is set forth in Table 1 below:

TABLE 1

| Sample | pH (Approximate) |
|---|---|
| I | 4.5 |
| II | 5 |
| III | 4.7 |

In each of the cases of Samples I–III, the respective components were mixed and blended in an attempt to form an emulsion. An initial problem was noted with each of these Samples, however, in that the emulsion separated, that is, "broke" after approximately one to

**4**

two days. Since it was fairly simple to re-blend the Samples, Samples I–III were submitted to the test group for evaluation. Generally, the results of the composition was excellent with each of Samples I–III readily removing polyurethane and silicone base caulking compounds, tars, grease, oil and adhesives; each of these industrial type substances are regarded as difficult to remove, from the human hands. All ten members of the test group reported comparable cleaning properties and reported that their hands were left soft after a two week period of using the compounds. Indeed, after two weeks of use, certain male members of the test group who had dry hands resulting from the use of other solvents noted substantial improvement in the texture and softness of their hands. No allergic reactions were reported by any members of the test group.

After determining that test Samples I–III performed adequately in cleaning the hands and in moisturizing the hands, it became necessary to determine whether the oil orange and moisturizer emulsion could be stabilized so that it would not break over a period of time. In order to determine if a natural ingredient could act as an emulsifying agent, the Applicants selected a grain base derivative as an emulsifying agent. To this end, Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier. Accordingly, two more test samples, Samples IV and V were prepared according to the compositions set forth below:

SAMPLE IV

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 42.75 |
| Aloe Vera* | 7 |
| Jojoba Oil* | 3.5 |
| Safflower Oil* | 4 |
| Oatmeal Gum | 42.75 |

*Total Moisturizers accounted for approximately 14.5% by volume.

SAMPLE V

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 36.5 |
| Aloe Vera | 14 |
| Jojoba Oil* | 14 |
| Glycerin* | 7 |
| Safflower Oil* | 0.5 |
| Oatmeal | 28 |

*Total Moisturizers accounted for approximately 35.5% by volume.

It may be noted that, in Samples IV and V, vitamin E and water were both omitted from the composition. However, it should be noted that both the oatmeal gum in Sample IV and the oatmeal in Sample V each contain a portion of water. In Sample IV, the oatmeal gum was prepared by boiling rolled oats in water and straining the resultant mass to remove the hulls. In Sample V, rolled oats were boiled in water and the resulting mass (containing approximately 50% water) was used to prepare the composition. Relatively equal parts of orange oil and oat derivatives were used and a small portion of safflower oil was included. Again, relative acidity was tested and it was found that Sample IV had a pH of approximately 5.0 while Sample V had a pH of 5.5.

Samples IV and V were submitted to the test group to evaluate cleaning effectiveness and moisturizing ability. Further, observation of the two compositions were

5,063,062

5                                                                    6

made to determine whether or not the emulsions broke. The results of this study determined that the emulsion of Sample IV broke after approximately seven days while the emulsion according to Sample V did not separate over any observed duration of time (several months). The test group observed that the cleaning properties of Samples IV and V were almost, but not quite, as effective as the cleaning properties of Samples I-III, but that the cleaning effectiveness was estimated at approximately 90% of Samples I-III. With respect to Sample IV, the test group reported that their hands did not roughen, but that the sample did not feel as comfortable when on the hands. With respect to Sample V, the test group reported that the emulsion both felt comfortable on the hands and left their hands soft after approximately five days of regular usage. In each case, the emulsions were able to clean all caulking materials and tars, including silicone and polyurethane based caulking compounds as well as oil and grease from the skin. Further tests were conducted on compositions similar to Sample V were in the amount of orange oil was slightly increased while holding the amounts of the remaining ingredients constant until the emulsion broke. It was found that, with these compositions, the emulsion broke when orange oil accounted for approximately 38% by volume of the composition.

From the foregoing, Applicants determined that Sample V offered the best compromise among emulsion stability, cleaning effectiveness, and skin effect. Therefore, utilizing Sample V as a reference, Applicants adjusted the amount of orange oil (ignoring whether the emulsion broke) to determine an effective pH range wherein the composition felt comfortable on the human hands. A first set of samples set forth below as Samples VI-IX were prepared to be less acidic than Sample V, and a second set of test samples, set forth below as Samples X-XIII were tested for compositions having greater acidity than Sample V. Samples VI-IX were prepared by simply buffering Sample V with differing amounts of sodium bicarbonate. The resulting samples were buffered to have pH values according to Table 2 as follows:

TABLE 2

| Sample | pH (Approximate) |
|--------|------------------|
| VI     | 9.0              |
| VII    | 8.0              |
| VIII   | 7.0              |
| IX     | 6.0              |

Each of Samples VI-IX were evaluated by the test group. Samples VI and VII were reported to immediately make the hands dry upon first application of the respective composition and removal of the composition with water. With respect to Samples VIII and IX, the test group reported less drying than Samples VI and VII although more dryness of the hands was noted in comparison to test Sample V. These empirical observations lead Applicants to conclude that an acidity of at least ph 6.0 is desirable, that is, that the preferred composition should not be more basic than ph 6.0.

To evaluate test compositions for excess acidity, Applicants merely increased the amount of orange oil in test Sample V while holding the amounts of the remaining ingredients constant to obtain desired acidity levels according to Table 3, below:

TABLE 3

| Sample | pH (Approximately) |
|--------|--------------------|
| X      | 2.5                |
| XI     | 3.0                |
| XII    | 3.5                |
| XIII   | 4.0                |

Test Sample X had a volume percent of approximately 80% orange oil, Sample IX had orange oil of approximately 70% by volume, Sample XII had orange oil of approximately 60% by volume, and Sample XIII had orange oil of approximately 50% by volume.

It had previously been found that orange oil alone exhibited excellent cleaning properties, but left the hands feeling too dry and too astringent. With respect to Samples X-XIII, in each case no emulsion formed. The test group reported that each of Samples X-XIII had excellent cleaning properties, but the emulsions felt too astringent on the hands even after limited use. Applicants accordingly concluded that it was desirable that the emulsified composition have a pH that is approximately 4.5. Thus, Applicants further concluded that the composition according to the preferred embodiment of the present invention should have a pH of between 4.5 and 6.0, inclusively.

As noted in the above examples, the emulsions according to Sample V broke at approximately 38% orange oil by volume. In order to evaluate cleaning properties as a function of percent volume of orange oil, additional samples were prepared wherein the weight percentages of the ingredients other than orange oil was held constant while the amount of orange oil was varied to provide differing volume percentages of orange oil. Accordingly, Samples XIV-XVII were prepared to have volume percents of orange oil approximately 5%, 10%, 15% and 25%, respectively. In each case, the emulsions were stable. These Samples XIV-XVII were given to the test group to subjectively evaluate cleaning effectiveness. With respect to Sample XIV, the test group reported that cleaning properties were substantially reduced; Sample XIV could not effectively clean tar or caulking compounds. Indeed, Sample XIV was only effective in removing cosmetics from the skin. Sample XV eventually was able to remove silicone caulking compounds but was unable to remove polyurethane caulkings or tar. With respect to Sample XVI, the test group reported about 50%-60% of the cleaning effectiveness of Sample V with no marked increase in benefits in skin softening. Sample XVII was reported to have approximately 80% of the cleaning effectiveness of Sample V in removing all of the tested materials, but again there was no report of skin enhancements over Sample V.

From these tests, Applicants concluded that, with respect to cosmetics, a composition according to the present invention could have as little as 5% by volume of orange oil although it was preferable to have a cleaning composition having at least 25% by volume of orange oil.

To determine whether the moisturizers had any effect on the composition or whether pH was the dominant skin effecting property, Applicants prepared yet another sample, Sample XVIII, wherein 100% orange oil was buffered with sodium bicarbonate so that it had a pH of 5.5. This Sample XVIII was tested and it was determined that it was exceptionally drying and astrin-

5,063,062

7

gent on the human hands. Indeed, Sample XVIII proved almost as drying and astringent as Sample X.

In order to increase the amount of orange oil, Applicants further tested a variation on Sample V wherein both the amount of orange oil and the amount of oatmeal were increased while the amount of moisturizers was decreased. This Sample XIX, was prepared as follows:

### SAMPLE XIX

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 40.5 |
| Aloe Vera* | 7.75 |
| Jojoba Oil* | 7.75 |
| Glycerin* | 4.5 |
| Safflower Oil* | .5 |
| Oatmeal | 39 |

*Total Moisturizers accounted for 20.5% by volume.

From Sample XIX, it was concluded that orange oil could be increased, along with a corresponding increase in an oat grain derivative, until approximately 45% by volume of orange oil was included in the composition. Any amount of orange oil in excess of this amount would result in the diminishment of moisturizers so as to negate the softening effect of the hand cleaning composition according to the preferred invention.

Other samples, set forth below as Samples XX–XXIII were prepared utilizing other materials. These samples are as follows:

### SAMPLE XX

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Olive Oil | 25 |
| Jojoba Oil | 25 |
| Baking Soda | Trace |

### SAMPLE XXI

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Glycerin | 50 |

### SAMPLE XXII

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 50 |
| Aloe Vera | 50 |

### SAMPLE XXIII

| Ingredient | Volume Percent (Approximate) |
|---|---|
| Orange Oil | 12.5 |
| Vitamin E | 87.5 |

Sample XX was found to have a pH of approximately 8.5. While Sample XX was deemed effective in cleaning, there was some reduction of cleaning effectiveness over Sample V and the composition left a dryness when wiped off of the skin. Further, the emulsion broke almost immediately. With respect to Samples XXI and XXII, both samples left a sticky residue on the hands but were approximately equal in cleaning effectiveness to Sample V. Sample XXI had a pH a little greater than 2.0 while Sample XXII had a pH of approximately 3.5.

8

It was thus observed that aloe vera had some buffering effect on the acidity of the orange oil. Each of Samples XXI and XXII were highly astringent and left the test groups hands dry after washing with water. With respect to Sample XXIII, again this sample proved effective in removing cosmetics, but the sample was not effect in removing heavier, industrial substances such as caulking compounds, adhesives, tars and the like. The orange oil and Vitamin E, however, did mix without separation and a resulting acidity of pH 5.0.

From the information derived form all of the aforementioned samples, Applicants determined that glycerin and safflower oil are both desirable in the preferred compositions. On one hand glycerin appears both to stabilize the emulsion and perform as a moisturizer while, on the other hand, safflower oil appears to act as an emulsion stabilizer, as an emulsifying agent and as a moisturizer.

According to the above, Applicants prefer the compositions set forth in Sample V and Sample XIX for use in cleaning unwanted materials from human skin. In order to test administration of the preferred composition, Applicants applied the compound directly to the skin as a liquid emulsion and removed the emulsion from the hands by washing with water. In addition, Applicants were successful in soaking towellets, formed of standard absorbent material such as paper, cloth and the like, in the liquid emulsion so that a towellet would become impregnated with the cleaning composition. These towellets can be hermetically sealed in standard foil packages, as known in the industry, so that the user can simply remove from the skin any of the described unwanted materials with a pre-moistened towellet. This is particularly useful in situations where water is not readily available. Further, individualized packets of pre-moistened towellets are convenient for portability and on-the-job use.

From the foregoing, the inventors have concluded that a suitable skin cleaning composition can be prepared wherein the skin composition has a first ingredient of between 5% and 60% by volume of orange oil, a second ingredient being a pharmaceutical acceptable moisturizer for human skin and a third ingredient being an emulsifying agent. Preferably, the moisturizer is either one or more of a group of moisturizes selected from the following: glycerin, aloe vera, jojoba oil, safflower oil. However, other pharmaceutically acceptable moisturizers are within the scope of this invention as could be developed without undue experimentation by the ordinarily skilled chemist according to the teachings of the present invention. One example of such a moisturizer is glycerin stearate. These other compositions are thus intended, unless otherwise specifically limited, to be encompased by the general phrase "moisturizer" both in this specification and in the appended claims. In any event, it is preferred that the resultant composition have a pH between 4.5 to 6.0 and can be so buffered if necessary by the utilization of aloe vera or a buffering agent, such as baking soda.

Accordingly, the present invention has been described with some degree of particularity directed to the preferred embodiment of the present invention. It should be appreciated, though, that the present invention is defined by the following claims construed in light of the prior art so that modifications or changes may be made to the preferred embodiment of the present inven-

5,063,062

9

tion without departing from the inventive concepts contained herein.

We claim:

1. A skin cleaning composition adapted for external use on human tissues, comprising a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent in the form of an oat grain derivative product.

2. A skin cleaning composition according to claim 1 wherein said moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, and safflower oil.

3. A skin cleaning composition according to claim 1 wherein said oat grain derivative product is one of oat gum and oatmeal.

4. A skin cleaning composition according to claim 1 wherein said first, second and third ingredients are selected and mixed in a ratio such that the resulting skin cleaning composition has a pH range of between 4.5 to 6.0, inclusively.

5. A skin cleaning composition according to claim 1 including as a fourth ingredient a buffering compound in a proportion such that the resulting composition is pH balanced within a range of 4.5 to 6.0, inclusively.

10

6. A skin cleaning composition for external use on human tissues, comprising orange oil, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as an emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively.

7. A skin cleaning composition according to claim 5 including a buffering compound.

8. A skin cleaning composition according to claim 5 wherein said moisturizer is selected from a group consisting of: glycerin, aloe vera, jojoba oil, safflower oil and glycerol stearate.

9. A cleaning composition for use on human skin comprising forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of oatmeal and a pharmaceutically acceptable moisturizer.

10. A cleaning composition according to claim 8 wherein said moisturizer is a mixture of jojoba oil, aloe vera and glycerin.

11. A cleaning composition according to claim 1 wherein said mixture includes by volume two parts jojoba oil, two parts aloe vera and one part glycerin.

12. A cleaning composition according to claim 9 wherein said mixture includes safflower oil.

*  *  *  *  *

# EXHIBIT B

# **<u>REDACTED</u>**

# EXHIBIT C

Phillip Low                                        January 14, 2006
Bloulder, CO

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


LP MATTHEWS, LLC,              )

          Plaintiff,           )

          v.                   )

BATH & BODY WORKS, INC.;       )   CASE NO.:

LIMITED BRANDS, INC.;          )   04-CV-01507 SLR

KAO BRANDS CO. (f/k/a THE      )

ANDREW JERGENS COMPANY);       )

and KAO CORPORATION,           )

          Defendants.          )

          - - - - - - - - - -


DEPOSITION OF PHILLIP LOW

Saturday, January 14, 2006


Reported by:

Craig L. Knowles, CM

Phillip Low                                    January 14, 2006

Bloulder, CO

**2**

```
1            Boulder, Colorado
2            Saturday, January 14, 2006
3
4        Deposition of PHILLIP LOW, a witness
5   herein, called for examination by counsel for
6   Defendants in the above-entitled matter, pursuant
7   to notice and the Federal Rules of Civil Procedure,
8   the witness being previously duly sworn by CRAIG
9   KNOWLES, a Notary Public in and for the State of
10  Colorado, taken at the Boulder Marriott, Telluride
11  Room, 2660 Canyon Boulevard, Boulder, Colorado, at
12  9:23 a.m., on Saturday, January 14, 2006, and the
13  proceedings being taken down in Stenotype by CRAIG
14  KNOWLES and transcribed under his direction.
15
16
17
18
19
20
21
22
```

**4**

```
1            APPEARANCES (Cont'd)
2
3   For Defendants Bath & Body Works and Limited
4   Brands:
5        John F. Ward, Esquire
6        WARD & OLIVO
7        708 Third Avenue
8        New York, New York 10017
9        212-697-6262
10
11
12
13
14
15
16
17
18
19
20
21
22
```

**3**

```
1            APPEARANCES
2
3   For Plaintiff:
4        Robert A. Auchter, Esquire
5        Jason R. Buratti, Esquire
6        ROBINS, KAPLAN, MILLER & CIRESI, LLP
7        Suite 1200
8        1801 K Street, Northwest
9        Washington, D.C. 20006-1307
10       202-775-0725
11
12  For Defendants KAO Corp. and KAO Brands:
13       Stephen G. Baxter, Ph.D., Esquire
14       Richard L. Chinn, Ph.D., Esquire
15       OBLON, SPIVAK, McCLELLAND, MAIER &
16       NEUSTADT, P.C.
17       1940 Duke Street
18       Alexandria, Virginia 22314
19       703-413-3000
20
21
22
```

**5**

```
1              C O N T E N T S
2   THE WITNESS:                    PAGE NO.
3   PHILLIP LOW
4        By Mr. Ward.............................. 6
5        By Mr. Baxter........................... 92
6
7              E-X-H-I-B-I-T-S
8   LOW EXHIBIT NO.                 PAGE NO.
9   1    Copy of Assignment, LPM 000012/14      38
10  2    One-page handwritten document PL 0002  39
11  3    Agreement PL 0001              44
12  4    Promissory Note PL 0003/4          47
13  5    Copy of envelope from Mr. Brady PL 00005 48
14  6    Letter, Low to Ingram, 6/16/93      52
15  7    Letter, Greenspan to Low, 6/26/93,
16       PL 0007                 54
17  8    Envelope, Greenspan to Low, 6/21/93  57
18  9    Undated Letter, Greenspan to Low PL 0009 75
19  10   Copy of check stub PL 0010        78
20  11   Three-page document, 11/17/89 DG6001/03 109
21  12   Two-page document DG3271/72        113
22
```

Henderson Legal Services
(202) 220-4158

Phillip Low                                    January 14, 2006
Bloulder, CO

---

**6**

1        PROCEEDINGS:
2          - - -
3     Whereupon,
4          PHILLIP LOW,
5   called for examination by counsel for Defendants
6   and, having been previously duly sworn to the
7   truth, the whole truth and nothing but the truth,
8   was examined and testified further upon his oath
9   as follows:
10         - - -
11      EXAMINATION BY COUNSEL FOR DEFENDANT
12      BATH & BODY WOKS and LIMITED BRANDS
13      BY MR. WARD:
14   Q.  Good morning, Mr. Low.
15   A.  Good morning.
16   Q.  My name is John Ward, I'm with Ward & Olivo
17   in New York, and I represent Limited Brands and
18   Bath3 & Body Works in this action.
19      Have you ever been deposed before?
20   A.  Yes.
21   Q.  Would you tell me what were the
22   circumstances of that?

**7**

1    A.  It was a building lawsuit.
2    Q.  Were you the plaintiff?
3    A.  We were.
4    Q.  How did it turn out?
5    A.  We won.
6    Q.  Good.  Just so you know, you know, I'm
7   going to ask a series of questions, you'll answer.
8   You can't nod or make sounds that the court
9   reporter can't record for us.
10      And any time you feel like you'd like to
11   take a break, say the word.
12   A.  Okay.
13   Q.  What do you do for a living?
14   A.  I have a home improvement and construction
15   company.
16   Q.  How long have you had that?
17   A.  Ten years.
18   Q.  What did you do before that?
19   A.  I was a subcontract window installer.
20   Q.  Do you recall how long you were doing that
21   for?
22   A.  Yeah, I have been doing that since 1979.

**8**

1    Q.  Okay.  Before that, school?
2    A.  Before that I was in school.
3    Q.  Did you graduate from high school?
4    A.  I did.
5    Q.  Any college?
6    A.  None.
7    Q.  Any technical training?
8    A.  Nope.
9    Q.  It's my understanding that you are the man
10   who had the idea to use orange in a cleaning
11   composition, is that true?
12   A.  That's true.
13   Q.  Can you tell me how that came about, how'd
14   you get that idea?
15   A.  I was installing windows, and when you
16   install windows, you have polyurethane type
17   sealants that you use, two-part.  And you get it
18   all over your hands.
19   Q.  Tell me, what --
20   A.  Nothing really cleans it off.
21   Q.  Take me through the process.  So you are
22   installing a window.

**9**

1    A.  Right.
2    Q.  You've got a frame.  Run us through it.
3    A.  Well, you have a window opening.  You take
4   out the wood sashes.  It depends how the window is
5   measured, how the new system is going to go in.
6   You are from the east, right?
7    Q.  Yes.  You can tell, huh?
8    A.  You have a lot of wood windows, a lot of
9   historic looking products, right.
10   Q.  Yes, indeed.
11   A.  Okay.  What we will do is, we will take out
12   the wooden sashes, leave the buck frame in.  Then
13   what we do is, we have a system that is
14   historically replicated to cap over all of the old
15   wood on the outside.  And it's a new window frame
16   that goes in on the inside and has new sashes and
17   everything else.  Then we seal up the outside, sort
18   of a panning system out there.  We seal up the
19   panning system to make it weather tight.  We put
20   trims on the inside and seal that up to make it
21   weather tight.
22   Q.  All right.

---

Henderson Legal Services
(202) 220-4158

Phillip Low

January 14, 2006

Bloulder, CO

**10**

1    A. The caulkings that we have to use, they
2   need to have a very high flexibility rate. Have to
3   be real durable stuff.
4    Q. The reason is?
5    A. So that they last 20 years. Ten year
6   warranty, but if you go with a little bit stronger
7   product, you don't -- you can't use a regular latex
8   household type product. You have to use something
9   that has kind of more your industrial adhesions,
10  movements and those kind of things.
11   Q. Okay.
12   A. So that is the window process.
13   Q. Thanks. I got new windows coming in, so I
14  want to know what I'm looking forward to.
15   A. Yours might be different. This is
16  commercial. You may get vinyls.
17   Q. Well, we'll see. Thank you, anyhow. So
18  now we are up to, did you say polyurethane?
19   A. Yeah, polyurethane type sealants.
20   Q. What do you do?
21   A. Use a caulking gun, they come in tubes, use
22  a caulking gun or there's big sausages, different

**11**

1   means of putting this stuff on. It gets all over
2   you because you are using your fingers to tool it.
3    Q. Fill in the spots?
4    A. Yeah, when you are caulking, it's like
5   icing on the cake. It's the pretty part, yet it's
6   the function part, too, because it weatherproofs,
7   stains.
8       You are also using a product called Fooz,
9   which is manufactured out of parts, vinyl parts
10  that you use to fill cracks and crevices and stuff
11  like that, hardens up.
12      All this stuff gets on your hands, because,
13  you know, even ink gets on your hands, I don't know
14  how it does, but it gets everywhere.
15   Q. Sure.
16   A. That is how the caulking gets on your
17  hands.
18      Now with respect to the orange product, is
19  that where you want to go.
20   Q. In a second.
21   A. Okay.
22   Q. Tell me. You have the caulk on your hands,

**12**

1   does the stuff start to harden?
2    A. It's an oil based product so it stains, you
3   get stains on your hands. It can last up to a week
4   if you don't try to use something to take it off.
5    Q. Okay.
6    A. The only things we found that works is
7   toluene or acetone or gasoline, the only stuff that
8   removes this stuff.
9    Q. Stuff like Goop doesn't work?
10   A. No, Goop didn't work, pumices didn't work,
11  none of that stuff works.
12   Q. I think we are probably up on the orange
13  part?
14   A. We are up to the orange part. Okay?
15   Q. Unless you tell me otherwise.
16   A. This was like 10:30 at night and it was the
17  first week in December because the Parade of lights
18  was going on down below.
19   Q. Do you remember the year?
20   A. Yeah, it was 1988.
21   Q. Okay?
22   A. We were -- actually, I was working by

**13**

1   myself, 10:30 at night, trying to caulk these
2   windows up.
3    Q. Obviously it was your business.
4    A. My business.
5    Q. I understand that part.
6    A. I was trying to caulk the windows, 10th
7   floor, and my wife packed me a lunch and the only
8   thing I had left to eat was an orange, I needed
9   something.
10   Q. Sure.
11   A. Work late obviously, wanted to get done.
12  So I went to eat the orange, I'm peeling the
13  orange, and I notice all this black stuff all over
14  the orange peel. I'm thinking, now I got to go --
15  something is contaminating my food. I didn't know
16  what it was.
17   Q. Right.
18   A. I'm sitting here peeling this orange and
19  it's turning black.
20   Q. The rind is turning back?
21   A. Yes, the orange, everything I'm touching on
22  the orange is starting to turn black.

Henderson Legal Services
(202) 220-4158

Phillip Low

January 14, 2006

Bloulder, CO

---

**14**

1  Q.  So you can't even eat your orange now, you
2  are stuck?
3      MR. BURATTI: Object to form.
4  A.  So I go and I wash my hands and I notice
5  that my fingertips are clean.
6      BY MR. WARD:
7  Q.  Uh-huh.
8  A.  So I went back and I'm like what the heck
9  happened here.  So I go back and I start looking at
10  the orange, and I started messing with the orange
11  peels.  The orange juice, itself.  Everything else.
12  And found out if I squeezed the rind on my hand,
13  that stuff dissolved, loosened up and I could
14  actually wipe it off.
15  Q.  You started to play around with it?
16  A.  Right.
17      MR. BURATTI: Objection to form.
18      BY MR. WARD:
19  Q.  What happened next.
20  A.  Obviously, I was excited because I thought
21  I could create a natural cleaning product that
22  would remove stuff off your hands that nothing else

---

**15**

1  would.
2  Q.  So even this first time it was working
3  better than the things you traditionally used to
4  clean your hands?
5      MR. BURATTI: Objection. Ambiguous.
6  A.  I don't know, I didn't say that.
7      BY MR. WARD:
8  Q.  I'm asking, not trying to tell.
9  A.  All I did, all I did was find that the
10  orange oil removed the stuff off my hands.
11  Q.  Were you surprised?
12  A.  I was surprised.
13  Q.  So what did you do about it?
14  A.  Well, then what I did is I called up Doug
15  Greenspan.
16  Q.  Why'd you do that?
17  A.  Because Doug, Doug and I had a fairly good
18  relationship.  He was our accountant.  And we knew
19  a little bit of his background.  I knew that he had
20  an M.B.A. in business, and I knew that he had a
21  minor in chemistry, and I knew that he was looking
22  for, you know, something other than doing what he

---

**16**

1  was doing, just like we all were.  I didn't want to
2  be a windows installer forever.  There didn't seem
3  to be any money in it.  So I thought you know, I
4  called him up and I said you can't believe what I
5  just discovered.
6  Q.  Do you recall, was he your personal
7  accountant or the business's accountant?
8  A.  He was both.  Well, you know at the time my
9  personal was my business.
10  Q.  Go ahead.  So you give him a call.  Do you
11  remember when that was?
12  A.  It would have been the next day.
13  Q.  Really.  You were that excited?
14  A.  Oh, yeah, absolutely.
15      MR. BURATTI: Objection to form.
16      BY MR. WARD:
17  Q.  Okay.
18  A.  So anyway, I called him up and I told him
19  what the deal was, that I had found and he said,
20  Phil, you're a genius.  And he said, let's -- I
21  said, you know, you got -- you're a chemist kind of
22  guy, maybe we can make a hand cleaner, some sort of

---

**17**

1  a natural cleaner that's going to work to take this
2  stuff off of our construction industry's hands.
3  Q.  All right.  So what happened next?
4  A.  Then --
5  Q.  You talk on the phone, then --
6  A.  Yeah, well, I -- I hooked up with him.
7  That weekend, because it was -- I believe it was
8  a -- the Parade of Lights goes on Friday nights and
9  on Saturday.  This would have been a Friday night,
10  caution I went over to his place on Saturday, so I
11  went on over there.
12  Q.  Okay.
13  A.  And we proceeded to try to find some orange
14  oil so that we could start making concoctions.
15  Q.  You didn't bring a bag of oranges over with
16  you?
17  A.  You know, we may have gotten a bag of
18  oranges.  You know, I know that I had shown to him
19  that it actually worked, and he thought -- the
20  citric acid in there would naturally dissolve
21  petroleum products.  Oh, you're a genius, I never
22  thought of that.  So, anyway.

---

Phillip Low                                    January 14, 2006
                        Bloulder, CO

---

26

1  I knew, I would say try this and let me know what
2  you think.
3       Q.  Do you remember the volume, the percentages
4  of this product, how much orange oil was in it, how
5  much of the other components?
6       MR. BURATTI:  Objection.  Compound.
7       A.  You know, okay.  So let me ask you a
8  question.  What -- you need to clarify what it is
9  you are asking one more time?
10      BY MR. WARD:
11      Q.  Yes, probably the easiest way to get at it
12  is, do you remember how much of the composition was
13  orange oil?
14      MR. BURATTI:  Objection.  Vague.
15      A.  What we did is we started out with, we kind
16  of used the pH system, okay.  And we would use I
17  would say 50 percent orange oil in the composition
18  to see what happened, and then we would drop it
19  down percentagewise.  I think we even went down to
20  1 percent, just a small amount of orange oil, based
21  on my wife's findings, we needed to figure, well,
22  maybe that's too much.

---

27

1       But, you know, from the small amount on up
2  until we found where, A, pH worked well and, B, it
3  worked relatively well, cleaned off what it was we
4  wanted to clean off.
5       Q.  Do you remember where that point was?
6       MR. BURATTI:  Objection.
7       A.  I don't remember that point.  That's Doug's
8  deal.
9       BY MR. WARD:
10      Q.  Do you recall ever testing it on anybody
11  other than the family?
12      A.  No animals.
13      MR. BURATTI:  Objection --
14      A.  No animal testing.
15      BY MR. WARD:
16      Q.  Uh-huh.  I understand.
17      A.  I had a friend that -- I had a friend that
18  was working with me who used it from a window
19  installation standpoint, so --
20      Q.  When you did these tests do you remember if
21  you recorded the results in any way?
22      MR. BURATTI:  Objection to form.

---

28

1       A.  No, I didn't record anything.  That would
2  have been Doug.
3       BY MR. WARD:
4       Q.  After somebody tried it for you you told
5  Doug what happened?
6       MR. BURATTI:  Objection to form.
7       A.  Yes, that is what happened.  That didn't
8  work here, or it needs to be stronger,  or it needs
9  to be less, or this one seems to burn and this one
10  didn't.
11      Q.  And do you know if he kept records?
12      MR. BURATTI:  Objection.
13      A.  I don't know how he kept records, I
14  couldn't answer that.
15      BY MR. WARD:
16      Q.  Did you ever see him write down the
17  information you gave him?
18      A.  I saw him write down the information and I
19  saw him write down formulas.  That was his --
20      Q.  He was the chemist, right?
21      MR. BURATTI:  Object to form.
22      A.  Right.

---

29

1       (Discussion off the record.)
2       BY MR. WARD:
3       Q.  Tell me, at this point did you and
4  Greenspan have any sort of an agreement?
5       MR. BURATTI:  Objection.  Vague.
6       A.  I don't understand what you mean.
7       BY MR. WARD:
8       Q.  Well, you are working together to make a
9  product, correct?
10      A.  Correct.
11      Q.  You are working together to get a patent
12  application on file, correct?
13      A.  Correct.
14      Q.  Did you have some sort of an understanding
15  of how you were going to split proceeds, if any?
16      MR. BURATTI:  Objection.  Vague.
17      A.  We created I think a corporation called
18  Midwhelm.
19      Q.  Could you spell that for us?
20      A.  M-I-D-W-H-E-L-M.  Midwhelm, something like
21  that.  We didn't want to be an overwhelm and we
22  didn't want to be and underwhelm, so we figured

---

Phillip Low                                              January 14, 2006

Bloulder, CO

---

**86**

1  much as you want.
2      THE WITNESS: I can read as much as I want?
3      MR. BURATTI: The paragraph refers to tests
4  in the patent, I just wanted to alert you, you are
5  allowed to read more to get up to speed.
6      THE WITNESS: Okay.
7      MR. BURATTI: You don't have to. You can
8  hear the question first.
9      THE WITNESS: Roll with the question.
10      BY MR. WARD:
11     Q. Do you remember how you came up with that
12  five percent figure?
13      MR. BURATTI: Object to the form.
14     A. Well, as I said earlier, we took from
15  probably 50 percent orange oil down to maybe even
16  one percent and found -- found it worked for what
17  we needed it to work.
18      And with respect to cosmetics, it would
19  have had to do with the burning of my wife's
20  eyelids.
21      BY MR. WARD:
22     Q. That is when the orange oil --

---

**87**

1     A. There was too much.
2     Q. There was too much orange oil in that
3  initial sample?
4     A. Right.
5      MR. BURATTI: Objection. Vague.
6      BY MR. WARD:
7     Q. Do you remember was that a 50 percent
8  sample?
9     A. I don't believe that was 50, no. But I
10  can't -- I don't remember what percentage that was.
11     Q. You said you went down all the way to
12  one percent?
13     A. We went almost down to nothing and then
14  back up to see where the effect started in.
15     Q. Was it your conclusion that the effects
16  started in at five percent?
17      MR. BURATTI: Objection misleading.
18     A. As far as any conclusions, I didn't come to
19  any conclusions, all I was after was my specific
20  target was for caulking. Me personally.
21      BY MR. WARD:
22     Q. Sure. Do you remember what happened at the

---

**88**

1  one percent level?
2     A. I don't remember.
3      MR. BURATTI: Objection.
4      THE WITNESS: Sorry. I'll slow down for
5  you.
6      MR. BURATTI: Objection to form.
7      MR. WARD: The reporter will catch up with
8  us. Don't worry.
9      MR. AUCHTER: It's not fair to the
10  reporter.
11      BY MR. WARD:
12     Q. Let's go to Column 9. Just a quick
13  question. The last page. Do you see line 4,
14  Claim 1 starts on line 4.
15     A. Okay.
16     Q. Do you want to read that to yourself?
17     A. Okay.
18     Q. Claim 1 discloses a composition that has
19  three ingredients.
20      MR. BURATTI: Objection. Sorry.
21      BY MR. WARD:
22     Q. The first ingredient is identified as

---

**89**

1  between 5 and 60 percent by volume orange oil. The
2  second ingredient is a pharmaceutically acceptable
3  moisturizer and the third ingredient is an
4  emulsifying agent. Do you see that?
5     A. Well, you had me read section 4. That
6  doesn't say that at all.
7     Q. I said starting with line 4.
8     A. That is number 4, isn't it? Oh, sorry.
9     Q. That's okay.
10      (Witness examines document.)
11     A. It's pretty much mumbo jumbo to me. What
12  do you want to know?
13      BY MR. WARD:
14     Q. I want to know for each of these
15  ingredients, we will go through them one at a time,
16  whether it was your idea, Greenspan's idea or a
17  joint idea. Okay?
18      The first idea is five percent to
19  60 percent orange oil?
20      MR. BURATTI: Objection. Calls for a legal
21  conclusion.
22     A. That would have been between the two of us.

---

# **EXHIBIT D**

RECEIVED

SEP 21 1990

GROUP 150

152

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patent Application for          :    Date: September 18, 1990
Greenspan and Low               :    Group: Art Unit 152
Serial No.:  07/413,395         :    Examiner: J. Spear
Filed:  September 27, 1989      :    Action: AMENDMENT
For: CLEANING COMPOSITIONS WITH :
      ORANGE OIL                :

TO:  The Commissioner of Patents and Trademark Office
      Washington, DC   20231

Sir:

     In  response  to  the Office Action of 18 June  1990,  please
reconsider  the  claims  of  this  application  in  view  of  the
following remarks:

### REMARKS

     These  remarks  are in response to the Office Action  of  18
June  1990  in the above referenced patent application.    In  that
application,  Claims 1-18 were pending.   However,  Claims  16-18
were  deemed  withdrawn from  consideration  despite  Applicants'
traverse of the election.

     Of the remaining claims, Claim 1 was rejected over  Coleman,
The  Citrus  Industry Publication, November 1975 under  35  U.S.C.
Section  103.   Claim 2 was rejected over Coleman in further  view
of  U.S. Patent No. 4,620,937 to Dellutri under 35 U.S.C.  Section
103.   Claims 3-7 and 9-15 were rejected over Coleman and Dellutri
in  further  view of U.S. 4,014,995 to Juliano.   Claim  8  was
rejected  over  the  Coleman reference in view of  Dellutri  and
Juliano  and  in  further view of U.S. Patent No.  4,553,487  to
Jones.

1

LPM 000183

At the outset, Applicants note with appreciation the thoroughness of the Examiner's comments in applying the cited references against the claims. However, Applicants have not amended their claims since they believe that the references teach away from the present invention, as currently claimed, so that all of the claims in this application are allowable over these references. Applicants' position is supported by two arguments.

First, as the Examiner has noted, none of the cited references disclose the use of orange oil as a primary constituent. Rather, each of the references rely on the cleaning properties of d-limonene as the primary cleaning constituent. The Examiner then concludes that it would be obvious to substitute orange oil for the d-limonene since the d-limonene is distilled from a citrus oil.

Simply put, these references do not suggest the use of orange oil alone, but rather teach away from the use of orange oil since they rely on the distillate d-limonene. Applicants have found that undistilled orange oil has higher cleaning properties when used in a composition than distilled d-limonene. Applicants have tested the compositions produced according to the ranges of the present application wherein an equal weight percent of d-limonene was substituted for the orange oil. In each case, the orange oil based composition had superior cleaning properties than the identical composition with an equivalent amount of d-limonene substituted for the orange oil. While Applicants believe that other esters and volatiles in the orange oil may contribute to the enhanced cleaning properties, although the

2

LPM 000184

exact reason for the enhanced cleaning properties has not yet been determined. Nonetheless, Applicants have learned of a surprising result from the raw orange oil in these enhanced cleaning properties. This distinction over the use of d-limonene in the prior art is significant and not at all obvious. Indeed, Applicants have found that their composition is effective on substances such as urethane caulking, paint and tar that resist d-limonene cleaning compositions.

The enhanced cleaning property of orange oil contributes to the second distinction between the compositions recited in this application and the prior art. A review of the prior art shows that d-limonene is used in weight percentage ratios that are above the lower ratios claimed in the present application. These ratios run from a low of 51% d-limonene (Coleman) to a high of approximately 70% d-limonene (Coleman). Dellutri uses approximately 58%-60% d-limonene. As noted in the Coleman reference, citrus oil contains approximately 94% d-limonene so that the equivalent amount of citrus oil necessary to provide the amount of d-limonene in the prior art compositions run from approximately 55%-75%.

Claim 1 of the present application claims a range of 5% to 60% orange oil which, as noted above, allows for greater cleaning ability for lesser of the included cleaning agent (orange oil). Since the expense of orange oil is fairly substantial, this surprising result allows a reduction in the proportion of orange oil as opposed to d-limonene, and this leads to substantial economies.

3

LPM 000185

A derivative benefit is seen where the quantity of orange oil, (and thus the amount of d-limonene) since studies have indicated that d-limonene may have carcinogenic effects. For example, the attached study taken from the National Toxicology Study Program (January 1990) indicates a possible adverse effect from excess d-limonene. Where a cleaning composition is intended as one suitable for hand cleaning, as is the present invention, the benefits from reducing the quantity of d-limonene while maintaining the cleaning ability may be appreciated without further explanation.

Accordingly, all of the claims in this application are believed allowable for the inclusion of orange oil. However, several points directed to the dependent claims are in order since it is believed that the dependent claims contain allowable subject matter in their own right. In particular, those claims including the use of oat-grain derivatives and oatmeal. Here, it has been found that the oatmeal may lend cleaning properties in that oatmeal acts as a drawing agent to help remove certain oils or other materials from the surface to be cleaned. It also adds an abrasive quality to the cleaning compound to enhance the scrubbing ability.

Based on the foregoing, it is believed that this application is conditioned for allowance and action to that end is courteously solicited. Should the Examiner request any further information, in the form of affidavits or otherwise, regarding the matters addressed in this Amendment, the Examiner is invited to contact attorney for the Applicants at the telephone number

4

LPM 000186

listed   below.   Applicants   would   specifically   request   the

opportunity   to   submit   such affidavits in the   event   that   the

Examiner maintains the rejection of the present application.


Respectfully submitted,

TIMOTHY J. MARTIN, P.C.


Timothy J. Martin, #28,640
Dana Rewoldt, #P-33,762
44 Union Blvd., Suite 620
Lakewood, Colorado     80228
(303)   988-0800


## CERTIFICATE OF MAILING UNDER 37 C.F.R. 1.8

I   hereby   certify   that the foregoing   AMENDMENT   is   being
deposited   with the United States Postal Service as   first-class
mail,   postage   prepaid,   in   an   envelope   addressed     to     The
Commissioner of Patents and Trademarks, Washington, DC 20231,   on
this  18th  day of September, 1990.


5

LPM 000187

# EXHIBIT E

# REDACTED

# EXHIBIT F



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/786,804 | 11/04/91 | GREENSPAN | D | DN-1364 |

D.6-

TIMOTHY J. MARTIN
44 UNION BLVD., STE. 620
LAKEWOOD, CO 80228

| EXAMINER |
|---|
| BAWA, R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1502 | 6 |

DATE MAILED:    04/06/92

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined   ☐ Responsive to communication filed on_____   ☐ This action is made final.

A shortened statutory period for response to this action is set to expire ___3___ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I   THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner, PTO-892.   2. ☐ Notice re Patent Drawing, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.   4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☒ Information on How to Effect Drawing Changes, PTO-1474.   6. ☐ _____

**Part II   SUMMARY OF ACTION**

1. ☒ Claims _1 - 25_ _____ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☐ Claims_____ have been cancelled.

3. ☐ Claims_____ are allowed.

4. ☒ Claims _1 - 25_ _____ are rejected.

5. ☐ Claims_____ are objected to.

6. ☐ Claims_____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____. has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed _____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. _____; filed on _____.

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**EXAMINER'S ACTION**

PTOL-326 (Rev.9-89)

BBW   008446

Dear Client:

This is the best copy available, of the attached page(s), due to the condition of the source document.

Please be assured that every effort has been made to supply you with the highest quality documentation.

---

Patent Imaging Corporation
*Patent Legal & Scientific Information Service*
2001 Jefferson Davis Highway
Crystal Plaza One, Suite 600
Arlington, VA 22202-3610
(703) 553-000

Serial No. 786,804                                    -2-

Art Unit   1502

Claims 1-25 are rejected under 35 U.S.C. § 112, second

paragraph, as being indefinite for failing to particularly point

out and distinctly claim the subject matter which applicant

regards as the invention.

The following phrases are vague and indefinite and must

either be deleted from the claimed or clearly specified/defined:

"external use on tissues" (replaced with "external use on

human tissues"); "citrus oil" (replaced with "orange oil"); "oat

grain derivative product" (specify); "harmful solar radiation"

(delete "harmful" or clearly specify the phrase); "over-exposure

of the tissue area";  "inflammatory condition of the skin"

(specify); "reducing peeling of the human skin;" "damaged tissue"

and "human tissue" (replace with "skin" or specify the tissue);

"rash-causing poisonous plant"; "emulsifying agent" (specify the

agent or replace with "emulsifying agent in the form of oat gum

or "soothing" oatmeal").

Note that in claim 25, "ingredient" is repeated.

Appropriate correction required.

Claims 1-6, and 17-25 are rejected under the judicially

created doctrine of obviousness-type double patenting as being

unpatentable over claims 1-12 of U.S. Patent No. 5,063,062.

Although the conflicting claims are not identical, they are not

patentably distinct from each other because they both disclose a

BBW  008448

Serial No. 786,804                        -3-

Art Unit   1502

cleaning composition containing the <u>same ingredients</u> and in the <u>same ratios</u>. The terms "rash," "burn," "acne" etc. are all skin conditions. The terms "orange oil" and "citrus oil" are equivalent.

The obviousness-type double patenting rejection is a judicially established doctrine based upon public policy and is primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent. *In re Vogel*, 164 USPQ 619 (CCPA 1970). A timely filed terminal disclaimer in compliance with 37 C.F.R. § 1.321(b) would overcome an actual or provisional rejection on this ground provided the conflicting application or patent is shown to be commonly owned with this application. See 37 C.F.R. § 1.78(d).

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

Claim 16 is rejected under 35 U.S.C. § 103 as being unpatentable over Grant et al.

Grant et al. clearly discloses that orange oil is used as a mosquito repellant. Hence, it would be obvious to formulate a

BBW   008449

Serial No. 786,804                    -4-

Art Unit   1502

compostion containing orange oil to repell insects.  Accordingly,
claim 16 is prima facie obvious.

Claims 7-15 would be allowable if rewritten to overcome the
rejection under 35 U.S.C. § 112 and to include all of the
limitations of the base claim and any intervening claims.

The title of the invention is not descriptive.  A new title
is required that is clearly indicative of the invention to which
the claims are directed.

This application does not contain an Abstract of the
Disclosure as required by 37 C.F.R. § 1.72(b).  An Abstract on a
separate sheet is required.

Any inquiry concerning this communication or earlier
communications from the examiner should be directed to Raj Bawa,
Ph.D. whose telephone number is (703) 308-2423.

Any inquiry of a general nature or relating to the status of
this application should be directed to the Group receptionist
whose telephone number is (703) 308-2351.

*R. Bawa*

R. Bawa:mbb
April 03, 1992

THURMAN K. PAGE
SUPERVISORY PATENT EXAMINER
ART UNIT 152

BBW   008450

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP–APART AND DISCARD CARBON

| FORM PTO-892 (REV. 3-78) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | | SERIAL NO. 786804 | GROUP ART UNIT 1502 | ATTACHMENT TO PAPER NUMBER 6 |
|---|---|---|---|---|---|
| | NOTICE OF REFERENCES CITED | | APPLICANT(S) *Greenspan et al.* | | |

## U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | 5 0 6 3 0 6 2 | 11-91 | *Greenspan* | 424 | 401 | |
| | B | | | | | | |
| | C | | | | | | |
| | D | | | | | | |
| | E | | | | | | |
| | F | | | | | | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

## FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

## OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | *Grant et al. (1987). Grant & Hackh's chemical Dictionary, page 139.* |
| S | |
| T | |
| U | |

| EXAMINER *R. BAWA* | DATE *2/29/92* | |
|---|---|---|

\* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

BBW   008451

# **EXHIBIT G**



*EAP*
*07/28/92*
*8/a*

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

RE:  Patent Application for      :    Date:  July 6, 1992
     Greenspan et al            :    Group: Art Unit 1502
Serial No.:  07/786,804         :    Examiner:
Filed:  November 4, 1991        :    Action:  AMENDMENT
For:  CITRUS OIL COMPOSITIONS AND  :
      USES THEREOF              :
                                :

TO:  The Commissioner of Patents and Trademark Office R E C E I V E D
     Washington, DC   20231
                                          JUL 2 7 1992
Sir:
                                          GROUP 150

     In response to the Office Action dated 6 April 1992, please

amend the above identified application as follows:


In the specification

     Page 1, delete the title " CITRUS OIL COMPOSITIONS AND USES

THEREOF  and  substitute  --AN  INSECTICIDE  REPELLENT,  ACNE

TREATMENT, SUNBURN TREATMENT AND RASH TREATMENT FORMULATED OF

CITRUS OIL COMPOSITIONS--.

     Page 5, line 11, delete ";" and substitute --,--.

     Page 6, line 12, delete "damages" and substitute --damaged--.

            line 13, delete "damages" and substitute --damaged--.

     Page 9, line 23, delete "base" and substitute --based--.


In the claims:

     Claim 1, line 2, delete "tissues" and substituted --human

skin--.

     3.   (Once Amended)   A *method* composition according to claim 1

wherein said emulsifying agent is an oat grain derivative product

1

**selected from a group consisting of:  oat gum and oatmeal.**

Please delete claim 4.

7.  (Once Amended)  A method of treating damaged <u>human skin</u> [tissue] by applying to [a] <u>the</u> damaged <u>human skin</u> [tissue] area the composition of claim  1.

Claim 8, line 2, delete "tissue" and substitute --human skin--.

Claim 10, line 2, delete "tissue" and substitute --human skin--;

line 3, delete "harmful".

Claim 11, line 2, delete "tissue" and substitute --human skin--.

Claim 14, line 2, delete "rash-causing poisonous" and substitute --dermatitis-causing--.

Claim 16, line 2, delete first and second occurrence of "tissue" and substitute in the first and second occurrence --skin--.

Claim 17, line 4, delete "an" and substitute --a grain based--.

Claim 22, line 2, delete "tissues" and substitute --skin--.

Claim 23, line 2, delete "tissues" and substitute --skin--.

Claim 24, line 4, delete "an" and substitute --a grain based--.

Claim 25, line 5, delete "ingredient";

2

BBW   008461

line 9, delete "an" and substitute --a grain based--.


## REMARKS

The Examiner rejected claims 1-25 under 35 U.S.C. § 112, second paragraph as being indefinite for failing to particularly point out and distinctly claim the subject matter of the invention. To comply with the Examiner's suggestion, the Applicant has changed the word "tissue" throughout the claims to reflect "human skin".

The Examiner has requested that citrus oil be replaced by orange oil. The Applicant respectfully declines to change citrus oil to orange oil. Specify only orange oil in the claims is simply an incorrect statement of what the invention teaches. The invention has used various citrus oils including lemon oil, lime oil, tangerine oil, grapefruit oil, orange oil, etc. Therefore, the claims should cover what the invention actually teaches. Citrus oil appears to be adequately reflect what the invention teaches.

Claim 3 was amended to clearly specify what oat grain derivative products were being referred to in the claim.

Claim 10 was amended to delete the word harmful.

Over-exposure of the tissue area "and "inflammatory condition of the skin" were considered indefinite terms by the Examiner. The Applicant has corrected over-exposure of the tissue are to

3

BBW   008462

reflect over-exposure of the skin area.

The Applicant is at a loss as to what the Examiner finds vague about inflammatory condition of the skin.  The definition of inflammatory in the dictionary says "a condition in which something is inflamed."  "Inflamed" means "to be affected by inflammation."  "Inflammation" when used in reference to skin tissue means "localized heat, redness, swelling and pain as a result of irritation, injury or infection."  (See, <u>The American Heritage Dictionary</u>).  Accordingly, Applicant does not understand the Examiner's position in this regard.

The Examiner has stated that rash-causing poisonous plant is considered indefinite.  Rash-causing and dermatitis-causing are equivalent.  Thus, the Applicant's attorney has replaced "rash-causing poisonous plant" with "dermatitis-causing plant".

The Examiner has requested that "an emulsifying agent" be amended to specify the agent.  Therefore, "emulsifying agent" now has been amended to stated "grain based emulsifying agent".

The repetition of the word "ingredient" in claim 25 which the Examiner noted has been corrected.

Claims 1-6 and 17-25 were rejected under the judicially created doctrine of obviousness-type double patenting.  Thus, filed concurrently with this Amendment, the Applicant has submitted two terminal disclaimers signed by Doug Greenspan who is an assignee and an inventor in the patent and William Ingram who is an assignee of the patent.  The joint inventor, Phillip Low, no longer has any interest in the patent.  Mr. Low's

4

BBW   008463

interest has been jointly assigned to both Doug Greenspan and William Ingram.

The Examiner rejected claim 16 under 35 U.S.C. §103 as being unpatentable over Grant et al. The Applicant admits that Grant et al clearly shows that lemongrass has a constituent that is used as a mosquito repellent. However, lemongrass is a plant. Lemongrass is not a citrus oil nor has the prior art shown that citrus oil or orange oil are oils that are used as mosquito repellents. Therefore, Applicant submits that claim 16 is allowable as written.

Because the Applicant has submitted the terminal disclaimers and thus has removed all of the rejections to claims 1-6 and 17-25, the Applicant believes that claims 7-15 should be allowable as written.

The Examiner has required that Applicant rename the title of the invention; therefore, the Applicant has amended the title on page 1 of the specification to state "An Insecticide Repellent, Acne Treatment, Sunburn Treatment and Rash Treatment Formulated of Citrus Oil Compositions".

Filed concurrently with this Amendment is an abstract which the Examiner had requested that Applicant submit.

The Applicant submits that the present invention is now in complete form and should be allowable as amended. Action to this effect is courteously solicited from the Examiner. No other prior art patents alone or in combination fully and fairly disclose the structure now recited in the above discussed claims.

5

BBW  008464

The Examiner is requested to grant an early allowance in this matter.

Respectfully submitted,

TIMOTHY J. MARTIN, P.C.

Timothy J. Martin, #28,640
Dana Rewoldt, #33,762
44 Union Blvd., Suite 620
Lakewood, Colorado    80228
(303) 988-0800

## CERTIFICATE OF MAILING UNDER 37 C.F.R. 1.8

I hereby certify that the foregoing AMENDMENT, TERMINAL DISCLAIMER AND ABSTRACT is being deposited with the United States Postal Service as first-class mail, postage prepaid, in an envelope addressed to The Commissioner of Patents and Trademarks, Washington, DC 20231, on this 15 day of July, 1992.

6

BBW  008465

## ABSTRACT

The present invention is a composition that can be topically applied to human skin for cleaning the skin, for treating and/or relieving certain skin conditions, such as acne, sunburn and rashes.   Furthermore, the composition can be used as an insect repellent.  The present invention is formed of natural ingredients and contains citrus oil as an active constituent.  The composition of the invention includes five percent to sixty percent by volume of citrus oil, and a pharmaceutically acceptable moisturizer for human skin, and an emulsifying agent.  More specifically, the citrus oil can be orange oil, lemon oil, grapefruit oil, tangerine oil and the like with orange oil being the preferred oil.   The pharmaceutically acceptable moisturizer is from a group consisting of glycerin, aloe vera, jojoba oil and safflower oil.  The emulsifying agent may function as an emollient and is preferably made of a natural grain derivative particularly useful are oat gum and oat meal.   The citrus oil and the moisturizer and the emulsifying agent are mixed in a ratio such that the resulting composition has a pH range of 4.5 to 6.0.  A buffering compound can be added to the composition to reach the preferred pH range.

BBW    008466