# EXHIBIT 1



UNITED STA.._S DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/413,395 | 09/27/89 | GREENSPAN | 1286 |

| EXAMINER | |
|---|---|
| SPEAR, J | |
| ART UNIT | PAPER NUMBER |
| 152 | 4 |

TIMOTHY J. MARTIN
44 UNION BLVD., STE. 620
LAKEWOOD, CO 80228

DATE MAILED: 06/18/90

This is a communication from the examiner in charge of your application
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined ☐ Responsive to communication filed on ____ ☐ This action is made final.

A shortened statutory period for response to this action is set to expire 3 month(s), ____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ____

Part II SUMMARY OF ACTION

1. ☒ Claims 1-18 are pending in the application.

   Of the above, claims 16-18 are withdrawn from consideration.

2. ☐ Claims ____ have been cancelled.

3. ☐ Claims ____ are allowed.

4. ☒ Claims 1-15 are rejected.

5. ☐ Claims ____ are objected to.

6. ☐ Claims ____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on ____. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ____, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed ____, has been ☐ approved; ☐ disapproved (see explanation).

12. ☐ Acknowledgement is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ____; filed on ____.

13. ☐ Since this application apppears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

EXAMINER'S ACTION

PTOL-326 (Rev. 9-89)

This action is in response to the election with traverse of claims 1-15 submitted May 17, 1990 by Timothy J. Martin. The applicants' arguments have been considered but they are not deemed to be persuasive.

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) and (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

Claim 1 is rejected under 35 U.S.C. 103 as being unpatentable over Coleman, The Citrus Industry Pub., November 1975.

Coleman shows a lotion hand cleaner comprising approximately 57% d-limonene, moisturizer (lanolin) and emulsifying agents (Arlacel and Tween). Although distilled citrus oil (94% d-limonene) is used it would be obvious to use orange oil, if it were not the source in this case. Page 24-25.

Claim 2 is rejected under 35 U.S.C. 103 as being

unpatentable over Coleman as applied to claim 1 above, and further in view of Dellutri US 4,620,937.

Dellutri shows a skin cleaner comprising d-limonene and further comprising aloe vera. To use aloe vera in the Coleman invention would be obvious since both inventors teach hand cleaners of similar compositions containing moisturizers. Col. 1, lines 60-65. Col. 3, lines 23-28.

Claims 3-7; 9-15 are rejected under 35 U.S.C. 103 as being unpatentable over Coleman and Dellutri as applied to claim 2 above, and further in view of Juliano et al US 4,014,995.

Juliano for claim 3 shows compositions for use on the skin containing oat flour. Juliano further shows oat flour as an emulsifier. Col. 1, lines 34-40. Col. 3, lines 16-25. To use the oat flour in the invention described above would be obvious in as much as the use of emulsifiers is a well recognized art. Nothing unobvious is seen by using oatmeal in claim 4, since oatmeal by definition is ground oats of a larger particle size than flour.

For claim 5 both Dellutri and Juliano teach compositions having a ph of 5.5. Juliano col. 2, lines 3-13, col. 3, lines 5-15. Dellurti col. 3, lines 52-59.

For claims 6-7 Juliano teaches the inclusion of substances to maintain a specific ph. Nothing un-obvious is seen in applicant' use of a ph range of 4.5-6, since the prior art shows the importance of ph balanced preparations for on the skinuse.

Claim 8 is rejected under 35 U.S.C. 103 as being unpatentable over Coleman, Dellutri, Juliano as applied to claims 1-7 above, and further in view of Jones US 4,5 33,487.

Jones shows the preparation of d-limonene containing buffers. The preparation is rendered harmless to the skin primarily due to the presence of the buffers. Sum, Col. 3, lines 43-50. To use the buffered stable d-limonene preparations of Jones in the above mentioned inventions would be obvious in view of the prior art teachings. Note Dellutri's use of stabilized d-limonene. Col. 2, lines 19-23.

For claims 9-11 see Coleman, Dellutril and Juliano as applied to claim 3 above.

For claim 12 see Juliano as applied to claim 4 above.

For claims 13-15 see Coleman and Dellutri as applied to claim 2. Glycerin, aloe vera, jojoba oil and safflower oil are considered equivalents. Nothing un-obvious is seen in applicants use of mixtures.

The motivation to produce cleaning compositions for use on the skin arises from the teachings of Coleman, Dellutri, Juliano and Jones who suggest the desirability to prepare cleaners comprised of orange oil having enhanced cleaning properties. The formulations are non-toxic, stable and non irritating to the skin.

Claims 1-15 are rejected.

The Group and/or Art Unit location of your application in the Patent and Trademark Office has changed. To aid in correlating any papers for this application, all further correspondence regarding this application should be directed to Group 150, Art Unit 152.

Any inquiry concerning this communication should be directed to James M. Spear at telephone number 703-557-6525.

Spear:pla
(703) 557-6525
06/11/90

SPE
AU152

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP-APART AND DISCARD CARBON

FORM PTO-892 (REV. 3-78)

U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE

NOTICE OF REFERENCES CITED

| SERIAL NO. | GROUP ART UNIT | ATTACHMENT TO PAPER NUMBER |
|---|---|---|
| 413395 | 152 | 4 |

APPLICANT(S): Greenspan et al.

U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | 4014995 | 3-77 | Juliano et al. | 514 | 783 | |
| | B | 4533487 | 8-85 | Jones | 252 | 173 | |
| | C | 4620937 | 11-86 | Dellutri | 252 | 162 | |
| | D | | | | | | |
| | E | | | | | | |
| | F | | | | | | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

R D-Limonene as a Degreasing Agent Richard L. Coleman, The Citrus Industry Vol. 56, No. 11, November, 1975, pages 23-25

S

T

U

| EXAMINER | DATE |
|---|---|
| James M. Spear | 6-1-90 |

* A copy of this reference is not being furnished with this office action. (See Manual of Patent Examining Procedure, section 707.05 (a).)

# EXHIBIT 2

RECEIVED
SEP 21 1990
GROUP 150
MAIL ROOM SEP 20 1989

c of M 9/18/90

152

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Patent Application for Greenspan and Low
Serial No.: 07/413,395
Filed: September 27, 1989
For: CLEANING COMPOSITIONS WITH ORANGE OIL

Date: September 18, 1990
Group: Art Unit 152
Examiner: J. Spear
Action: AMENDMENT

5

150

Recond 10-9-90 Dalla

TO: The Commissioner of Patents and Trademark Office
Washington, DC 20231

Sir:

In response to the Office Action of 18 June 1990, please reconsider the claims of this application in view of the following remarks:

REMARKS

These remarks are in response to the Office Action of 18 June 1990 in the above referenced patent application. In that application, Claims 1-18 were pending. However, Claims 16-18 were deemed withdrawn from consideration despite Applicants' traverse of the election.

Of the remaining claims, Claim 1 was rejected over Coleman, The Citrus Industry Publication, November 1975 under 35 U.S.C. Section 103. Claim 2 was rejected over Coleman in further view of U.S. Patent No. 4,620,937 to Dellutri under 35 U.S.C. Section 103. Claims 3-7 and 9-15 were rejected over Coleman and Dellutri in further view of U.S. 4,014,995 to Juliano. Claim 8 was rejected over the Coleman reference in view of Dellutri and Juliano and in further view of U.S. Patent No. 4,553,487 to Jones.

At the outset, Applicants note with appreciation the thoroughness of the Examiner's comments in applying the cited references against the claims. However, Applicants have not amended their claims since they believe that the references teach away from the present invention, as currently claimed, so that all of the claims in this application are allowable over these references. Applicants' position is supported by two arguments.

First, as the Examiner has noted, none of the cited references disclose the use of orange oil as a primary constituent. Rather, each of the references rely on the cleaning properties of d-limonene as the primary cleaning constituent. The Examiner then concludes that it would be obvious to substitute orange oil for the d-limonene since the d-limonene is distilled from a citrus oil.

Simply put, these references do not suggest the use of orange oil alone, but rather <u>teach away from</u> the use of orange oil since they rely on the distillate d-limonene. Applicants have found that undistilled orange oil has higher cleaning properties when used in a composition than distilled d-limonene. Applicants have tested the compositions produced according to the ranges of the present application wherein an equal weight percent of d-limonene was substituted for the orange oil. In each case, the orange oil based composition had superior cleaning properties than the identical composition with an equivalent amount of d-limonene substituted for the orange oil. While Applicants believe that other esters and volatiles in the orange oil may contribute to the enhanced cleaning properties, although the

exact reason for the enhanced cleaning properties has not yet been determined. Nonetheless, Applicants have learned of a surprising result from the raw orange oil in these enhanced cleaning properties. This distinction over the use of d-limonene in the prior art is significant and not at all obvious. Indeed, Applicants have found that their composition is effective on substances such as urethane caulking, paint and tar that resist d-limonene cleaning compositions.

The enhanced cleaning property of orange oil contributes to the second distinction between the compositions recited in this application and the prior art. A review of the prior art shows that d-limonene is used in weight percentage ratios that are above the lower ratios claimed in the present application. These ratios run from a low of 51% d-limonene (Coleman) to a high of approximately 70% d-limonene (Coleman). Dellutri uses approximately 58%-60% d-limonene. As noted in the Coleman reference, citrus oil contains approximately 94% d-limonene so that the equivalent amount of citrus oil necessary to provide the amount of d-limonene in the prior art compositions run from approximately 55%-75%.

Claim 1 of the present application claims a range of 5% to 60% orange oil which, as noted above, allows for greater cleaning ability for lesser of the included cleaning agent (orange oil): Since the expense of orange oil is fairly substantial, this surprising result allows a reduction in the proportion of orange oil as opposed to d-limonene, and this leads to substantial economies.

A derivative benefit is seen where the quantity of orange oil, (and thus the amount of d-limonene) since studies have indicated that d-limonene may have carcinogenic effects. For example, the attached study taken from the National Toxicology Study Program (January 1990) indicates a possible adverse effect from excess d-limonene. Where a cleaning composition is intended as one suitable for hand cleaning, as is the present invention, the benefits from reducing the quantity of d-limonene while maintaining the cleaning ability may be appreciated without further explanation.

Accordingly, all of the claims in this application are believed allowable for the inclusion of orange oil. However, several points directed to the dependent claims are in order since it is believed that the dependent claims contain allowable subject matter in their own right. In particular, those claims including the use of oat-grain derivatives and oatmeal. Here, it has been found that the oatmeal may lend cleaning properties in that oatmeal acts as a drawing agent to help remove certain oils or other materials from the surface to be cleaned. It also adds an abrasive quality to the cleaning compound to enhance the scrubbing ability.

Based on the foregoing, it is believed that this application is conditioned for allowance and action to that end is courteously solicited. Should the Examiner request any further information, in the form of affidavits or otherwise, regarding the matters addressed in this Amendment, the Examiner is invited to contact attorney for the Applicants at the telephone number

listed below. Applicants would specifically request the opportunity to submit such affidavits in the event that the Examiner maintains the rejection of the present application.

Respectfully submitted,

TIMOTHY J. MARTIN, P.C.

Timothy J. Martin, #28,640
Dana Rewoldt, #P-33,762
44 Union Blvd., Suite 620
Lakewood, Colorado 80228
(303) 988-0800

CERTIFICATE OF MAILING UNDER 37 C.F.R. 1.8

I hereby certify that the foregoing AMENDMENT is being deposited with the United States Postal Service as first-class mail, postage prepaid, in an envelope addressed to The Commissioner of Patents and Trademarks, Washington, DC 20231, on this 18th day of September, 1990.

NTP TECHNICAL REPORT

ON THE

# TOXICOLOGY AND CARCINOGENESIS STUDIES OF *d*-LIMONENE

(CAS NO. 5989-27-5)

# IN F344/N RATS AND B6C3F$_1$ MICE

(GAVAGE STUDIES)

C.W. Jameson, Ph.D., Study Scientist

NATIONAL TOXICOLOGY PROGRAM
P.O. Box 12233
Research Triangle Park, NC 27709

January 1990

NTP TR 347

NIH Publication No. 90-2802

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
Public Health Service
National Institutes of Health

# EXHIBIT 3

*Conclusions:* Under the conditions of these 2-year gavage studies, there was *clear evidence of carcinogenic activity** of *d*-limonene for male F344/N rats, as shown by increased incidences of tubular cell hyperplasia, adenomas, and adenocarcinomas of the kidney. There was *no evidence of carcinogenic activity* of *d*-limonene for female F344/N rats that received 300 or 600 mg/kg. There was *no evidence of carcinogenic activity* of *d*-limonene for male B6C3F$_1$ mice that received 250 or 500 mg/kg. There was *no evidence of carcinogenic activity* of *d*-limonene for female B6C3F$_1$ mice that received 500 or 1,000 mg/kg.

An increased severity of spontaneous nephropathy, increased incidences of linear mineralization of the renal medulla and papilla, and hyperplasia of the transitional epithelium of the renal papilla were present in dosed male rats.

**SUMMARY OF THE TWO-YEAR GAVAGE AND GENETIC TOXICOLOGY STUDIES OF *d*-LIMONENE**

| Male F344/N Rats | Female F344/N Rats | Male B6C3F$_1$ Mice | Female B6C3F$_1$ Mice |
|---|---|---|---|
| **Doses** | | | |
| 0, 75, or 150 mg/kg *d*-limonene in corn oil by gavage, 5 d/wk | 0, 300, or 600 mg/kg *d*-limonene in corn oil by gavage, 5 d/wk | 0, 250, or 500 mg/kg *d*-limonene in corn oil by gavage, 5 d/wk | 0, 500, or 1,000 mg/kg *d*-limonene in corn oil by gavage, 5 d/wk |
| **Body weights in the 2-year study** | | | |
| Approximately 5% reduction in high dose group | Approximately 5% reduction in high dose group | No effect | 10% reduction in high dose group by end of study |
| **Survival rates in the 2-year study** | | | |
| 29/50; 33/50; 40/50 | 42/50; 40/50; 26/50 | 33/50; 24/50; 39/50 | 43/50; 44/50; 43/50 |
| **Nonneoplastic effects** | | | |
| Mineralization (7/50; 43/50; 48/50) and epithelial hyperplasia (0/50; 35/50; 43/50) of the renal papilla; renal tubular cell hyperplasia (0/50; 4/50; 7/50) | None | None | None |
| **Neoplastic effects** | | | |
| Renal tubular cell adenomas (0/50; 4/50; 8/50) and adenocarcinomas (0/50; 4/50; 3/50) | None | None | None |
| **Level of evidence of carcinogenic activity** | | | |
| Clear evidence | No evidence | No evidence | No evidence |

**Genetic toxicology assays**

| *S. typhimurium* (gene mutation) | Mouse L5178Y/TK$^{+/-}$ (Tft-resistance) | CHO Cells in Vitro: SCE | CHO Cells in Vitro: Aberration |
|---|---|---|---|
| Negative with and without S9 | Negative with and without S9 | Negative with and without S9 | Negative with and without S9 |

*Explanation of Levels of Evidence of Carcinogenic Activity is on page 6.
A summary of the Peer Review comments and the public discussion on this Technical Report appears on pages 9-10.



UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/413,395 | 09/27/89 | GREENSPAN | D 1286 |

TIMOTHY J. MARTIN
44 UNION BLVD., STE. 620
LAKEWOOD, CO 80228

| EXAMINER | |
|---|---|
| SPEAR, J | |
| ART UNIT | PAPER NUMBER |
| 152 | 6 |

DATE MAILED: 12/20/90

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined ☐ Responsive to communication filed on ______ ☒ This action is made final.

A shortened statutory period for response to this action is set to expire 3 month(s), ——— days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, Form PTO-152
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ______

Part II SUMMARY OF ACTION

1. ☒ Claims 1-15 are pending in the application.

Of the above, claims ______ are withdrawn from consideration.

2. ☐ Claims ______ have been cancelled.
3. ☐ Claims ______ are allowed.
4. ☒ Claims 1-2, 5-9 and 11 are rejected.
5. ☒ Claims 3-4, 10 and 12-15 are objected to.
6. ☐ Claims ______ are subject to restriction or election requirement.
7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.
8. ☐ Formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on ______. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable; ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).
10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ______, has (have) been ☐ approved by the examiner; ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed ______, has been ☐ approved; ☐ disapproved (see explanation).
12. ☐ Acknowledgement is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ______; filed on ______.
13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

JS

PTOL-326 (Rev.2-89)

EXAMINER'S ACTION

15.

Applicant's arguments filed September 18, 1990 have been fully considered but they are not deemed to be persuasive.

16.

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

17.

Claims 1-2, 9 and 11 are rejected under 35 U.S.C. § 103 as being unpatentable over Dellutri US 4,620,937.

For claim 1, Dellutri shows compositions wherein 20-90% citric oil is used in combination with stearic acid, oleic acid and aloe vera. See col. 2, lines 10-13, Claims 1 and 7. Note that the stearic and oleic acids emulsify the composition. Col. 2, lines 33-38. Aloe Vera acts as a moisturizer as in applicants' claimed invention. Col. 3, lines 23-28. Dellutri

does not specify orange oil. IT would have been obvious to one of ordinary skill in the art to the use orange oil the motivation factor being suggested by Dellutri's use of undistilled citrus oil. Although distilled D-Limonene is preferred, Dellutri teaches that citrus oil, which can be derived from oranges, is suitable for the invention. Col. 2, lines 10-17, thus negating applicants' claim of unobviousness.

For claims 2, 9 and 11, see Dellutri as explained above.

18.

Claims 5-8 are rejected under 35 U.S.C. § 103 as being unpatentable over Dellutri as applied to claim 1 above, and further in view of Juliano US 4,014,995.

Juliano teaches the inclusion of substances to maintain a specific pH. Both Juliano and Dellutri teach compositions having teach compositions having a pH of 5.5 Juliano col. 2, lines 3-13, col. 3, lines 5-15. Dellutri col. 3, lines 52-59. To use Juliano's agent in the Dellutri invention would have been obvious to one of ordinary skill in the art. The motivation to do so is suggested by Dellutri's use of emulsifiers in view of Juliano's teaching emulsifiers in maintaining pH.

Claims 1-2, 5-9 and 11 are rejected.

19.

Claims 3-4, 10 and 12-15 are objected to as being dependent upon a rejected base claim, but would be allowable if rewritten

in independent form including all of the limitations of the base claim and any intervening claims.

20.

THIS ACTION IS MADE FINAL. Applicant is reminded of the extension of time policy as set forth in 37 C.F.R. § 1.136(a).

A SHORTENED STATUTORY PERIOD FOR RESPONSE TO THIS FINAL ACTION IS SET TO EXPIRE THREE MONTHS FROM THE DATE OF THIS ACTION. IN THE EVENT A FIRST RESPONSE IS FILED WITHIN TWO MONTHS OF THE MAILING DATE OF THIS FINAL ACTION AND THE ADVISORY ACTION IS NOT MAILED UNTIL AFTER THE END OF THE THREE-MONTH SHORTENED STATUTORY PERIOD, THEN THE SHORTENED STATUTORY PERIOD WILL EXPIRE ON THE DATE THE ADVISORY ACTION IS MAILED, AND ANY EXTENSION FEE PURSUANT TO 37 C.F.R. § 1.136(a) WILL BE CALCULATED FROM THE MAILING DATE OF THE ADVISORY ACTION. IN NO EVENT WILL THE STATUTORY PERIOD FOR RESPONSE EXPIRE LATER THAN SIX MONTHS FROM THE DATE OF THIS FINAL ACTION.

21.

The Group and/or Art Unit location of your application in the PTO has changed. To aid in correlating any papers for this application, all further correspondence regarding this application should be directed to Group Art Unit 152.

Serial No. 413,395 -5-

Art Unit 152

22.

Any inquiry concerning this communication should be directed to James M. Spear at telephone number (703) 308-2457.

Spear:ltd
December 18, 1990
(703)308-2351

THURMAN PAGE
PRIMARY EXAMINER
ART UNIT 152

# EXHIBIT 4

IN THE U TED STATES PATENT AND TRA MARK OFFICE

RE: Patent Application for Douglas Greenspan et al
Serial No.: 07/786,804
Filed: November 4, 1991
For: CITRUS OIL COMPOSITIONS AND USES THEREOF

Date: June 16, 1997
Art Unit: 1500
Examiner: R. Bawa
Action: AMENDMENT

TO: The Commissioner of Patents and Trademarks
Washington, DC 20231

Sir:

In response the Decision by the Board of Patent Appeals and Interferences mailed April 15, 1997, Applicant elects to further prosecute this case before the Primary Examiner and requests that the application be amended as follows:

<u>In the claims</u>:

1. A method of externally treating human skin including the steps of:

applying to said skin a composition having a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin [including] <u>containing</u> a plant material [such as plant oils and plant extract] and a third ingredient being an emulsifying agent in the form of a grain based derivative.

15. A method according to claim 1 wherein said composition is [operative] <u>adapted</u> when applied to human skin which is sunburned to reduce the peeling of the human skin resulting from said sunburn.

16. A method according to claim 1 wherein said composition is [operative] <u>adapted when applied to human skin</u> to repel insects from human tissue.



OCT. 3.1997 12:02PM TIMOTHY MARTIN PC NO.013 P.4

17. A method for treating acne on human skin comprising the step of applying a composition including fortn-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of a grain based emulsifying agent in the form of a grain based derivative, and a pharmaceutically acceptable moisturizer including plant material [such as] selected from a group consisting of plant oils and plant extract to said acne on the human skin.

18. A [composition] method according to claim 17 wherein said emulsifying agent is oatmeal.

19. A [composition] method according to claim 17 wherein said moisturizer is a mixture of jojoba oil, aloe vera and glycerine.

20. A [composition] method according to claim [17] 19 wherein said mixture includes by volume four parts jojoba oil, five parts aloe vera and two parts glycerin.

21. A [composition] method according to claim [17] 19 wherein said mixture includes safflower oil.

25. A cleaning product comprising a towellet formed of an absorbent material, said towellet being impregnated with a cleaning composition and hermetically sealed in a packet member wherein said cleaning composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin including a plant material [such as] selected from a group consisting of plant oils and plant extract[, for human skin] and a third ingredient being a grain based emulsifying agent in the form of an oat grain based

derivative prod ct.

Kindly add the following claim:

26. A method according to claim 1 wherein said plant material is selected from a group consisting of: plant oils and plant extracts.

Remarks

The present Amendment is in response to the Decision by the Board of Patent of Appeals and Interferences and is submitted in accordance with 37 C.F.R. §1.196(b)(1) for consideration by the Primary Examiner.

In its decision, the Board noted that the Examiner has not, to date, relied upon any prior art in rejecting the claims on appeal. With respect to the Examiner's rejections of claims 1-3, 5-21 and 25 under 35 U.S.C. §112(a), this has been reversed by the Board. The Board has, however, affirmed the rejection of these claims under 35 U.S.C. §112(b). In addition, the Board has entered new grounds of rejection pursuant to 37 C.F.R. §1.196(b) as well as raised various issues requiring the Examiner's attention. This response is specifically directed to these new grounds of rejection.

With respect to the new grounds of rejection, the Board has rejected claims 1-3, 5-21 and 25 under 35 U.S.C. §112(b) as being indefinite. Specifically, the Board maintains that the use of the phrase "such as" in claims 1, 17 and 25 raises the question as whether plant oils and plant extracts are exemplary or limiting. In response to this, an amendment is made to each of claims 17 and 25 to now recite, without being limiting, a plant material is selected from a group consisting of plant oils and

plant extract . . . It is believed that the exemplary wording adequately addresses the Board's concerns under §112(b). Claim 1 has been amended to reflect that the second ingredient contains a plant material.

A new claim 26 has been added to include the deleted language from claim 1 that the plant material is either a plant oil or a plant extract. This claim makes a positive recitation of this limitation. No additional fling fee is believed necessary for this added claim, however, due to previous cancellation of claims for which the full filing fee was paid. The Commissioner is hereby authorized to charge any deficiency in the payment of the required fee(s) or credit any overpayment to Deposit Account No. 13-1940.

The Board also maintains that the scope of claims 15 and 16 is unclear in that there is no indication what, if anything, needs to be done so that the composition is "operative" for the stated purposes. In an effort to address these concerns of the Board, Appellant has amended claims 15 and 16 tea now recite that the composition is adapted to perform the stated purposes when applied to the human skin. Again, Appellant respectfully disagrees with the Board that the recitation "operative" is unclear by necessarily requiring that something actually be done to the composition in order for it to effectuate these results. Notwithstanding this, the word adapted is incorporated to remove any such perceived unclarity. That is, when the composition having the ingredients recited in claim 1 is applied to the skin, it is adapted to both reduce skin peeling and repel insects. Only application of the composition to human skin is required for



OCT. 3.1997 12:04PM TIMOTHY MARTIN PC NO.013 P.7

these things to happen.

The Board has correctly pointed out that claims 17-21 are indefinite and that claim 17 is directed to a method for treating acne on human skin while claims 18-21 are directed to compositions. Upon review of the previous amendments filed in this case, it appears that this inadvertent mistake arose as a result of an amendment filed on February 9, 1993. In the communication, claim 17 was amended to recite a method as opposed to a composition; however, Applicant inadvertently neglected to amend claims 18-21 accordingly. Therefore, the Examiner will please note that each of claims 18-19 has now been amended to recite a method, with claims 20 and 21 also amended to properly recite their dependence from dependent claim 19. These amendments fully address the Board's concerns and do not add any new matter to this application.

Claims 1, 2, 5-17 and 19-21 are rejected under 35 U.S.C. §112(a) as being non-enabled by the supporting specification. The Board deems certain statements made in the specification as an admission that the weed based derivatives recited in claims 1 and 17 are not useful as an emulsifying agent. The Examiner will please note that on May 15, 1997, Appellant submitted a request for modification of this portion of the Board's decision, maintaining that no such admissions of any kind were made. The Board has yet to render its decision on such request for modification. Accordingly, it is believed that a substantive response to the Board's enablement rejection, articulated on page 8 of its decision on appeal, is premature until such decision is rendered. Nonetheless, a copy of Appellant's request for



OCT. 3.1997 12:05PM TIMOTHY MARTIN PC NO.013 P.8

modification of decision on appeal is attached hereto and incorporated herein by reference.

Finally, the Board has entered two new rejections of some of the claims over the prior art. Specifically, claims 1-3 and 5-18 are rejected under 35 U.S.C. §103 as being obvious over the combination of Coleman, Dellutri and PDR 1969. Claim 25 is rejected as being obvious under 35 U.S.C. §103 over the combination above and further in view of PDR 1989. With respect to the first of these rejections, the Board briefly summarizes the respective teachings of Coleman, Dellutri and PDR 1969 and then maintains that the hypothetical person having knowledge of these references would have found it obvious to use the claimed composition to treat damaged skin.

While Appellant does not disagree with the respective teachings of the references, it is submitted that one of ordinary skill in this field would not be motivated to arrive at the claimed combination based on these teachings alone. With respect to each of independent claims 1, 17 and 25 a composition is required which broadly contains three ingredients - orange oil, a pharmaceutically acceptable moisturizer and an emulsifying agent in the form of a grain based derivative. The closest reference is Dellutri which describes a cleaning agent in the form of a hand cleaner which includes de-limonene obtained from orange oil and may also include, as an optional ingredient, aloe vera extract. Individually, Coleman describes the use of de-limonene obtained from citrus oils, such as orange oil, as a hand cleaner. Individually, PDR 1969 shows that colloidal oatmeal may be used to treat various skin conditions. There is nothing in

the prior art, ˙ ɔwever, to suggest that onr ᵞould be inclined to utilize oatmeal in a hand cleaner that may or may not include aloe vera extract. Dellutri is specifically directed to a non-toxic cleaning agent which can provide heavy duty industrial cleaning, yet which is mild enough to prevent irritation of the user's skin. Column 1, lines 30-33. Accordingly, Dellutri is in no way concerned with a composition for externally treating human skin which has been damaged. As such, and notwithstanding the teachings of PDR 1969 and PDR 1989, there would be no reason to combine these teachings. At most, one of ordinary skill having knowledge of Coleman and Dellutri would look to other sources of art for additives that might enhance the cleansing properties of a hand cleaning agent. One having knowledge of Dellutri would also look to other art for cleansers which are particularly useful in industrial cleaning applications. The PDR 1969 and PDR 1989 references, on the other hand, are more particularly directed to damaged skin, not unclean hands. Accordingly, it is suggested that any such combination of the prior art as suggested by the Board would be arbitrary because Coleman/Dellutri are actually directed to addressing different needs than the PDR references. At most, Coleman/Dellutri teach compositions which may be applied to human skin but do not teach compositions which are directed to alleviating or treating skin which has been damaged.

Notwithstanding the above, it is anticipated that the Examiner will need to conduct a new prior art search based on the Board's recommendations and its decision. Moreover, there are no outstanding rejections to date of claims 19-21. Therefore,

while Appellar disagrees with the Boar 's determination of obviousness based on the new grounds of rejection, Appellant should be entitled to more fully address this issue after the Examiner has re-searched and re-evaluated the patentability of the pending claims in this application. It is also believed that any subsequent action by the Examiner in this regard should not be made final as it would necessarily contain new grounds of rejection.

Based on the foregoing, it is respectfully requested that the Examiner conduct a new prior art search based on the Board's recommendations and its decision. It is also respectfully requested that with the Board's determination of obviousness based on the new grounds of rejection, Appellant should be entitled to more fully address this issue after the Examiner has re-searched and re-evaluated the patentability of the pending claims in this application. It is also believed that any subsequent action by the Examiner in this regard should not be made final as it would necessarily contain new grounds of rejection. If any issues remain to be resolved prior to the granting of this application, it is requested that the Examiner contact the undersigned attorney for the Appellant.

Respectfully submitted,

TIMOTHY J. MARTIN, P.C.

Timothy J. Martin, #28,640
9250 W. 5th Avenue, Suite 200
Lakewood, Colorado 80226
(303) 232-3388

CERT ICATE OF MAILING UNDER 37 C.F.R. 1.8

I hereby certify that the attached AMENDMENT INCLUDING COPY OF REQUEST FOR MODIFICATION OF DECISION ON APPEAL is being deposited with the United States Postal Service as first-class mail in an envelope addressed to the Assistant Commissioner of Patents Office, Washington, DC 20231, on this 16th day of June, 1997.

[signature]



OCT. 3.1997 12:07PM TIMOTHY MARTIN PC NO.013 P.12

# EXHIBIT 5




SCIENTIFIC LIBRARY
AUG 9 1989
PAT. & T.M. OFFICE

# PHYSICIANS' DESK REFERENCE

Publisher • EDWARD R. BARNHART

Director of Production
MARY TRELEWICZ

Production Manager
CARRIE HENWOOD

Manager of Production Services
ELIZABETH H. CARUSO

Managing Editor
BARBARA B. HUFF

Index Editor
ADELE L. DOWD

Medical Consultant
NATHAN W. NEMIROFF, M.D.

Art Associate
JOAN AKERLIND

Editorial Assistant
JANE T. PASINSKI

Editorial Consultant
DAVID W. SIFTON

Marketing and Circulation Director
THOMAS C. MILLER

Assistant Circulation Director
ANNETTE G. VERNON

Professional Relations Manager
ANNA E. BARBAGALLO

Circulation Coordinator
MARY J. CADLEY

National Sales Manager
PETER J. MURPHY

Account Manager
JEFFERY J. BONISTALLI

Administrative Assistants
SONIA C. RYAN
HELENE WATTMAN

Senior Research Analyst
VICKIE FAVRE

Design Director
JOHN NEWCOMB

Copyright © 1989 and published by Medical Economics Company Inc., at Oradell, N.J. 07649. All rights reserved. None of the content of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means (electronic, mechanical, photocopying, or otherwise) without the prior written permission of the publisher. PHYSICIANS' DESK REFERENCE®, PDR®, PDR For Ophthalmology® and PDR For Nonprescription Drugs® are trademarks of Medical Economics Company Inc., registered in the United States Patent and Trademark Office.

...visions

...Methenamine is excreted in breast milk. ...be exercised when these products are administered to ...g women.

...AUTIONS

...l disturbances (nausea, stomach upset), gen... dysuria, painful or difficult urination ...ally with the use of methenamine prepa... ...le and, rarely, gross hematuria have also ...

...fects (diarrhea, nausea, stomach pain, ...ay occur with the use of sodium phosphates. ...e effects have been encountered less fre... ...ministration of sodium phosphates: head... ...mental confusion; seizures; weakness or ...; unusual tiredness or weakness; muscle ..., tingling, pain or weakness in hands or ...r tingling around lips; fast or irregular ...s of breath or troubled breathing; swell... ...legs; unusual weight gain; low urine out...

...Initially, 3 tablets 4 times daily. For main... ...tablets, 4 times daily. UROQID-Acid® No. 2: ...4 times daily. For maintenance, 2 to 4 tab... ...ded doses. Give these products with a full ...

...D

...is a yellow, sugar coated, tablet with the ...and the number 1112 printed on each tablet. ...s of 100 (NDC 0486-1112-01) and 500 (NDC ...tablets. UROQID-Acid® No. 2 is a yellow, film ...shaped tablet with the name BEACH and the ...bossed on each tablet. Packaged in bottles of ...1114-01) and 500 (NDC 0486-1114-05) tablets.

...Store at controlled room temperature ...°F).

...its dispensing without prescription.

R 4/87

...Product Identification Section, page 405

...am Products
...N OF BEECHAM INC.
...FFICE BOX 1467
...GH, PA 15230

...LL® Douches

...VERVIEW

...e brand name for a line of douches which are ...for routine cleansing and for temporary relief ...tching and irritation. Massengill Disposable ...lable in two Vinegar & Water formulas (Ex... & Extra Cleansing), three Cosmetic solutions ...wers, Belle-Mai, and Mountain Herbs) and a ...ble (with povidone-iodine). Massengill also is ...Medicated liquid concentrate (povidone-iodine) ...Medicated liquid concentrate and powder form.

[illegible]

...Vinegar & Water and Cosmetic douches are ...d for routine douching, or for cleansing follow... ...tion or the prescribed use of vaginal medication ...tives. Massengill Medicated is recommended in ...ations for the symptomatic relief of minor itch... ...ation associated with vaginitis due to Candida ...chomonas vaginalis and Gardnerella vaginalis.

...FORMATION

...during pregnancy unless directed by a physi...

...Vinegar & Water and Cosmetic Douches—If irri... ...s, discontinue use.

...Medicated — Women with iodine-sensitivity ...this product. If symptoms persist after seven

PRODUCT INFORMATION

**MASSENGILL®**
[mas'en-gil]
Disposable Douches
**MASSENGILL®**
Liquid Concentrate

**MASSENGILL®** Powder

INGREDIENTS

DISPOSABLES: Extra Mild Vinegar and Water—Water and Vinegar.
Extra Cleansing Vinegar and Water—Water, Vinegar, Puraclean™ (Cetylpyridinium Chloride), Diazolidinyl Urea, Disodium EDTA.
Belle-Mai—Water, SD Alcohol 40, Lactic Acid, Sodium Lactate, Octoxynol-9, Cetylpyridinium Chloride, Propylene Glycol (and) Diazolidinyl Urea (and) Methyl Paraben (and) Propyl Paraben, Disodium EDTA, Fragrance, FD&C Blue #1.
Country Flowers—Water, SD Alcohol 40, Lactic Acid, Sodium Lactate, Octoxynol-9, Cetylpyridinium Chloride, Propylene Glycol (and) Diazolidinyl Urea (and), Methyl Paraben (and) Propyl Paraben, Disodium EDTA, Fragrance, D&C Red #28, FD&C Blue #1.
Mountain Herbs—Water, SD Alcohol 40, Lactic Acid, Sodium Lactate, Octoxynol-9, Cetylpyridinium Chloride, Propylene Glycol (and) Diazolidinyl Urea (and) Methyl Paraben (and) Propyl Paraben, Disodium EDTA, Fragrance, D&C Yellow #10, FD&C Blue #1.
LIQUID CONCENTRATE: Water, SD Alcohol 40, Lactic Acid, Sodium Bicarbonate, Octoxynol-9, Fragrance, D&C Yellow #10, FD&C Yellow #6 (Sunset Yellow).
POWDER: Sodium Chloride, Ammonium alum, PEG-8, Phenol, Methyl Salicylate, Eucalyptus Oil, Menthol, Thymol, D&C Yellow #10, FD&C Yellow #6 (Sunset Yellow).
FLORAL POWDER: Sodium Chloride, Ammonium alum, Octoxynol-9, SD Alcohol 23-A, Fragrance, and FD&C Yellow #6 (Sunset Yellow).

INDICATIONS

Recommended for routine cleansing at the end of menstruation, after use of contraceptive creams or jellies (check the contraceptive package instructions first) or to rinse out the residue of prescribed vaginal medication (as directed by physician).

ACTIONS

The buffered acid solutions of Massengill Douches are valuable adjuncts to specific vaginal therapy following the prescribed use of vaginal medication or contraceptives and in feminine hygiene.

DIRECTIONS

DISPOSABLES: Twist off flat, wing-shaped tab from bottle containing premixed solution, attach nozzle supplied and use. The unit is completely disposable.
LIQUID CONCENTRATE: Fill cap ¾ full, to measuring line, and pour contents into douche bag containing 1 quart of warm water. Mix thoroughly.
POWDER: Dissolve two rounded teaspoonfuls in a douche bag containing 1 quart of warm water. Mix thoroughly.

WARNING

Vaginal cleansing douches should not be used more than twice weekly except on the advice of a physician. If irritation occurs, discontinue use. Keep out of reach of children. In case of accidental ingestion, seek professional assistance by contacting your physician, the local poison control center, or the Rocky Mt. Poison Control Center at 303-592-1710 (Collect), 24 hours a day.

HOW SUPPLIED

Disposable—6 oz. disposable plastic bottle.
Liquid Concentrate—4 oz., 8 oz., plastic bottles.
Powder—4 oz., 8 oz., 16 oz., 22 oz., Packettes—10's, 12's.

**MASSENGILL®** Medicated
[mas'en-gil]
Disposable Douche
**MASSENGILL®** Medicated
Liquid Concentrate

ACTIVE INGREDIENT

DISPOSABLE: Cepticin™ (povidone-iodine)
LIQUID CONCENTRATE: Cepticin™ (povidone-iodine)

INDICATIONS

For symptomatic relief of minor irritation and itching associated with vaginitis due to Candida albicans, Trichomonas vaginalis, and Gardnerella vaginalis.

ACTION

Povidone-iodine is widely recognized as an effective broad spectrum microbicide against both gram negative and gram positive bacteria, fungi, yeasts and protozoa. While remaining active in the presence of blood, serum or bodily secre...

WARNINGS

If symptoms persist after seven days of use, or if redness, swelling or pain develop during treatment, consult a physician. Women with iodine-sensitivity should not use this product. Women may douche during menstruation if they douche gently. Do not douche during pregnancy or while nursing unless directed by a physician. Douching does not prevent pregnancy. Keep out of reach of children. In case of accidental ingestion, seek professional assistance by contacting your physician, the local poison control center, or the Rocky Mt. Poison Control Center at 303-592-1710 (Collect), 24 hours a day.

DOSAGE AND ADMINISTRATION

DISPOSABLE: Dosage is provided as a single unit concentrate to be added to 6 oz. of sanitized water supplied in a disposable bottle. A specially designed nozzle is provided. After use, the unit is discarded. Use one bottle a day. Although symptoms may be relieved earlier, for maximum relief, use for seven days.
LIQUID CONCENTRATE: Pour one capful into douche bag containing one quart of water. Mix thoroughly. Use once daily. Although symptoms may be relieved earlier, for maximum relief, use for seven days.

HOW SUPPLIED

Disposable—6 oz. bottle of sanitized water with 0.17 oz. vial of povidone-iodine and nozzle.
Liquid Concentrate—4 oz., 8 oz. plastic bottles.

**MASSENGILL®** Medicated
[mas'en-gil]
Soft Cloth Towelettes

ACTIVE INGREDIENT

Hydrocortisone (0.5%)

INDICATIONS

For soothing relief of minor external feminine itching or other itching associated with minor skin irritations, inflammation, and rashes.

ACTION

Massengill Medicated Soft Cloth Towelettes contain hydrocortisone, a proven anti-inflammatory, anti-pruritic ingredient. The towelette delivery system makes the application soothing, soft, and gentle.

WARNING

For external use only. Avoid contact with eyes. If condition worsens, symptoms persist for more than seven days, or symptoms recur within a few days, discontinue use and consult a physician. If experiencing a vaginal discharge, see a physician.
Keep this and all drugs out of the reach of children. As with any drug, if pregnant or nursing a baby, seek the advice of a health professional before using this product. In case of accidental ingestion, seek professional assistance or contact a Poison Control Center immediately.

DIRECTIONS

Adults and Children two years of age and older—apply to the affected area not more than three to four times daily. Children under two years of age—consult a physician before using. Remove towelette from foil packet, gently wipe, and discard. Throw away towelette after it has been used once.

HOW SUPPLIED

Ten individually wrapped, disposable towelettes per carton.

EDUCATIONAL MATERIAL

Booklet:
"A Personal Guide to Feminine Freshness"
A 16 page illustrated booklet on vaginal infections, feminine hygiene and douching. Free to physicians, pharmacists and patients in limited quantities by writing Beecham or calling 800-BEECHAM. (PA residents 800-242-1718)
Film, Video:
"Feminine Hygiene and You"
This 14 minute color film begins with a simple explanation of how a woman's body works (reproductive system, menstrual cycle, and vaginal secretions) then explains douching. Free loan to physicians, pharmacists and clinics. Available in ...

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of July, 2006, the attached **LP MATTHEWS' OPPOSITION TO KBC'S MOTION FOR SUMMARY JUDGMENT OF INVALIDITY BASED UPON A SUBSEQUENT BOARD DECISION** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esquire
Potter Anderson & Corroon, LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801

HAND DELIVERY

Arthur I. Neustadt, Esquire
Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
1940 Duke Street
Alexandria, VA 22314

VIA ELECTRONIC MAIL

Francis G.X. Pileggi, Esquire
Fox Rothschild LLP
Suite 1300
919 North Market Street
Wilmington, DE 19801

HAND DELIVERY

John Ward, Esquire
Ward & Olivo
708 Third Avenue
New York, NY 10017

VIA ELECTRONIC MAIL

/s/ *Steven J. Balick*

Steven J. Balick