# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LP MATTHEWS, L.L.C.

       Plaintiff,

       v.

BATH & BODY WORKS, INC.; LIMITED
BRANDS, INC.;
KBC BRANDS CO.
(f/k/a THE ANDREW JERGENS
COMPANY); and KAO CORPORATION

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**REDACTED PUBLIC VERSION**

Civil Action No. 04-1507-SLR

## LP MATTHEWS' ANSWERING MEMORANDUM IN OPPOSITION
## TO THE LIMITED DEFENDANTS' PROPOSED CLAIM CONSTRUCTION

*Of Counsel*:

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
800-553-9910

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, D.C. 20006
202-775-0725

ASHBY & GEDDES
Steven J. Balick (I.D. # 2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888

*Attorneys for Plaintiff*

Dated: August 4, 2006

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS...................................................1

INTRODUCTION.............................................................................1

BACKGROUND..............................................................................2

ARGUMENT.................................................................................5

    A.    The Term "Cleaning Composition" Should Be Construed
        To Require A Composition That Facilitates The Removal
        Of Unwanted Substances (i.e., Cleans).........................................5

    B.    "Orange Oil" Is A Non-Water Soluble Liquid Derived From
        An Orange And Present At A Concentration Of At Least 0.01%...............8

    C.    By Definition, "Oatmeal" Is A Processed Oat Kernel – Not
        Rolled Oats Boiled In Water...................................................9

    D.    The Term "Emulsifying Agent" Should Be Construed To
        Mean A Product That Can Function To Stabilize An Oil
        And Water System............................................................10

    E.    "Oat Grain Derivative Product" Means A Product Derived
        From *Any* Oat Grain..........................................................11

    F.    The Term "Moisturizer" Is Not Limited To Naturally Occurring
        Moisturizing Substances......................................................13

    G.    A Person Of Ordinary Skill In The Art Would Understand That
        "pH Within A Range Of 4.5 To 6.0, Inclusively" Encompasses
        pH Values Of 4.0 To 6.5 Because Of The Inherent Imprecision
        Of Applicants' Measurement Techniques.....................................14

CONCLUSION..............................................................................16

# TABLE OF AUTHORITIES

*Cordis Corp. v. Medtronic AVE, Inc.*,
    339 F.3d 1352 (Fed. Cir. 2003)...........................................................12

*E-Pass Techs., Inc. v. 3COM Corp.*,
    343 F.3d 1364 (Fed. Cir. 2003)..............................................................9

*Interactive Gift Express, Inc. v. CompuServe, Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001).......................................................5, 10

*Jansen v. Rexall Sundown, Inc.*,
    342 F.3d 1329 (Fed. Cir. 2003).............................................................5

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir 1999)..............................................................5

*KCJ Corp. v. Kinetic Concepts, Inc.*,
    223 F.3d 1351 (Fed. Cir. 2000)...........................................................10

*Leibel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004)...............................................................5

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
    Nos. 05-1261-1264, 05-1302-1304, 2006 WL 1867475 (Fed. Cir. July 7, 2006)...2

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996)...............................................................7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................6

*Utter v. Hiraga*,
    845 F.2d 993 (Fed. Cir. 1988).............................................................12

*Varco, L.P. v. Pason Sys. USA Corp.*,
    436 F.3d 1368 (Fed. Cir. 2006)..............................................................5

## I.    NATURE AND STAGE OF PROCEEDINGS

On December 8, 2004, plaintiff LP Matthews, L.L.C. filed a Complaint for patent infringement against defendants KBC Brands Company (formerly known as The Andrew Jergens Company), Kao Corporation, Limited Brands, Inc., and Bath & Body Works, Inc. (D.I. 1.) LP Matthews amended its Complaint on February 2, 2005. (D.I. 5, 8.) This Court entered a Scheduling Order on June 9, 2005. (D.I. 39.) Pursuant to the Scheduling Order, the parties filed a Joint Claim Construction Statement on June 15, 2006. (D.I. 228.) The deadline for filing simultaneous claim construction briefs was June 29, 2006. (D.I. 39 at 5.) LP Matthews timely filed its Memorandum in Support of its Proposed Claim Construction (D.I. 254). On June 30, the Limited defendants[1] filed an Opening Claim Construction Brief. (D.I. 255.) This Memorandum opposes the Limited defendants' proposed claim construction.

## II.    INTRODUCTION

The Limited defendants advocate an extremely narrow and erroneous claim construction that ignores the plain language of the claims, fails to use words' ordinary and accustomed meaning to a person of ordinary skill in the art and imports non-existent limits into the claims. They also consistently and repeatedly propose to interpret the claims based *solely* on the description of preferred embodiments in the patent specification – all the while ignoring the Federal Circuit's admonition against importing limitations from the specification into the claims. In essence, the Limited defendants ask this Court to ignore over 100 years of patent jurisprudence by ignoring the claims and limiting the invention to an overly narrow and highly selective interpretation of what was disclosed in the specification of U.S. Patent No. 5,063,062 ("the '062 patent"). For these reasons, the Limited defendants' proposed construction should not be adopted.

---

[1] "Limited defendants" collectively refers to Limited Brands, Inc. and Bath & Body Works, Inc.

There are two claims of the '062 patent at issue in this litigation – claims 6 and 9 (italicized boldface terms to be construed in this motion):

> 6.    A skin *cleaning composition* for external use on human tissues, comprising *orange oil*, a pharmaceutically acceptable *moisturizer* for human skin and an *oat grain derivative product* as an *emulsifying agent*, wherein said composition has a pH within a range of 4.5 to 6.0, *inclusively*.

> 9.    A *cleaning composition for use on human skin* comprising forty-five percent (45%) or less by volume of *orange oil*, forty-five percent (45%) or less by volume of *oatmeal* and a pharmaceutically acceptable *moisturizer*.

As stated in the Joint Claim Construction Statement, this Court needs to construe the terms "cleaning composition," "orange oil," "oatmeal," "moisturizer," "oat grain derivative product," "emulsifying agent," and "inclusively" – terms all found in both claims 6 and 9. These terms should *not* be construed as defendants suggest, but rather accorded their ordinary and customary meaning to a person of ordinary skill in the art in 1989, when the application for the patent-in-suit was filed. *LG Elecs., Inc. v. Bizcom Elecs., Inc.,* Nos. 05-1261-1264, 05-1302-1304, 2006 WL 1867475, at *8 (Fed. Cir. July 7, 2006) ("The proper claim construction is 'the ordinary and customary meaning ... that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.'") (quoting *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005)). Because defendants' proposed construction is wholly inconsistent with well-established claim construction principles, it must be rejected in its entirety.

## III.    BACKGROUND

The United States Patent and Trademark Office issued United States Patent No. 6,063,062 to Douglas Greenspan and Philip Low on November 5, 1991. The application for the '062 patent was filed on September 27, 1989.

2

The '062 patent claims compositions for cleaning human skin that contain orange oil, an oat ingredient, and a moisturizer. (LPM Ex. A, '062 patent at 9:3-10:25.[2]) The invention "provide[s] a skin cleaning composition that not only removes unwanted substances from the human skin, but also acts to help clean and revitalize the human skin." (*Id.* at 2:21-25.) The inventors, Mr. Greenspan and Mr. Low, tested the "skin effecting property" (*id.* at 6:62-64), "softening effect" (*id.* at 2:68), and "cleaning properties" (*id.* at 1:24-28, 6:30-31) of their invention. The tests described in the specification included "determining that test Samples…performed adequately in cleaning the hands *and in moisturizing the hands*…." (*Id.* at 4:19-20 (emphasis added).) The "Samples…were submitted to the test group [of independent evaluators] to evaluate cleaning effectiveness and *moisturizing ability*." (*Id., e.g.,* at 66-67.) The inventors identified an intended use in the preambles – skin cleaning – and used the open-ended transitional phrase "comprising" in the claims. (*Id.* at 4:19-20, 66-67.)

The plain and unambiguous language of claims 6 and 9 disclose a composition that cleans human skin and contains orange oil, an oat element, and a moisturizer, and may contain other ingredients because the transitional phrase "comprising" is used in the claims. The inventors disclosed combinations of varying ingredients with differing functions. For example, they noted that glycerin or safflower oil act as both moisturizers and emulsifying agents. (*Id.* at 8:14-19.) As further example, oatmeal adds cleaning properties. (LPM Ex. B, '062 patent prosecution history at LPM 000186.) In addition, the embodiments disclosed in the '062 patent specification included compositions with baking soda, Vitamin E, and multiple moisturizers. (LPM Ex. A, '062 patent at 7:10-57.)

---

[2] In this brief, "LPM Br." is LP Matthews' Opening Claim Construction Brief. (D.I. 254.) "LPM Ex." refers to exhibits to that brief. "Ex. __" refers to exhibits attached hereto. "Limited Br." is the Limited defendants' Opening Claim Construction Brief. (D.I. 255.) "Ltd Ex." refers to exhibits to Limited Br.

The preambles of both claims at issue limit the claimed compositions to cleaning compositions for use on human skin, i.e., compositions that treat an unwanted substance on the skin in order to facilitate removal of those substances by some other mechanism, such as rinsing, wiping, rubbing, or shearing. (A cleaning composition need not both treat the substance and remove it.) Nothing in the claim requires cleaning of non-water soluble or difficult to remove substances.

With respect to orange oil, the patent specification provides that orange oil can be used to clean human skin. (*Id.* at 1:53-54.) Orange oil is oil derived from an orange (any reddish-yellow fruit of the genus *Citrus*, including Mandarin Oranges (*Citrus nobilus*)). Messrs. Greenspan and Low observed that in its "broadest form," the "composition includes orange oil" with no minimum percentage restriction. (*Id.* at 2:68.) Further, they disclosed that "the more specific composition according to the preferred embodiment… comprises *forty-five percent (45%) or less by volume of orange oil.*" (*Id.* at 2:45-48.)

Asserted claim 9 calls for "forty-five percent (45%) or less by volume of orange oil" and claim 6 simply for "orange oil" – this claim language was in the original application. (*Id.* at 10:13-18, 10:1-6.) Neither the specification nor the asserted claims require a minimum percentage of orange oil.

The moisturizer element is a product that attracts water or prevents water loss.
**REDACTED**      A pharmaceutically acceptable moisturizer is one that is generally accepted as safe for topical use in pharmaceutical or cosmetic products. (*Id.*) The exemplary moisturizers described in the '062 patent specification include glycerin stearate, aloe vera, jojoba oil, safflower oil, or those that could be developed without undue experimentation by the ordinarily skilled chemist. (LPM Ex. A, '062 patent at 8:47-52.)

## IV.   __ARGUMENT__

Claim interpretation "must begin and remain centered on the language of the claims themselves." *Interactive Gift Express, Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). "The general rule is that terms in the claim are to be given their ordinary and accustomed meaning." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362-63 (Fed. Cir. 1999); *see also Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1332 (Fed. Cir. 2003) ("ordinary meaning of the claim language"). "[A] party wishing to alter the meaning of a clear claim term must overcome the presumption that the ordinary and accustomed meaning is the proper one, demonstrating why such an alteration is required." *K-2*, 191 F.3d at 1363; *see also Leibel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]he claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope...").

Claims are construed in the context of intrinsic evidence, such as other claims, the specification, and the prosecution history. *Jansen*, 342 F.3d at 1333. "In examining the specification for proper context, however, [the Federal Circuit] will not at any time import limitations from the specification into the claims." *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006).

Applying these principles here, it is evident that the Limited defendants' proposed claim construction must be rejected.

### A.    The Term "Cleaning Composition" Should Be Construed To Require A Composition That Facilitates The Removal Of Unwanted Substances (i.e., Cleans)

Defendants' proposed construction of "cleaning composition" is irreconcilably at odds with both the claim language and legal precedent governing claim construction. Although claims 6 and 9 do not contain any minimum percentage of orange oil, defendants propose to construe

"cleaning composition" as requiring at least 5% orange oil. The claimed composition has to clean; but it does not have to clean even notoriously difficult to remove substances. The claims do not specify a required degree of cleaning ability.

Asserted claims 6 and 9 of the '062 patent claim compositions that have a cleaning effect on human skin. "Cleaning" means treating unwanted substances on the skin in order to facilitate removal of those substances (for example, loosening or dissolving or drawing or sheering substances such as dead skin, dirt, oil, blemishes (*e.g.* ashen coloration) etc…). The unwanted substances can then be removed by rinsing, wiping, abrasion or evaporation. The claims of the '062 patent do not call for a particular quantity or quality of cleaning, just that it occur.

In order for orange oil to have a cleaning effect, it must be at least 0.01% of the cleaning composition. Claim 6 claims a composition "comprising orange oil" (LPM Ex. A, '062 patent at 10:1-6) and claim 9 requires "forty-five percent (45%) or less by volume of orange oil" (*id.* at 10:1-6, 13-17). The plain meaning of the 45% or less in claim 9 is more than no orange oil but not more than 45% by volume. The upper limit of 45% was based on the desire to maintain the softening (i.e., lotion) effect of the claimed composition. (*Id.* at 7:23-27.) Thus, the only minimum percentage limitation in claims 6 and 9 is that the composition have a cleaning effect.

There is a claim in the '062 patent reciting a 5% minimum percentage of orange oil, but that is claim 1, which is *not* asserted against defendants. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.") (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991)). "It is usually incorrect to read numerical precision into a claim from which it is absent, *particularly when other claims contain the numerical limitation*."

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) (emphasis added). The 5% limitation in claim 1 should not be imported into claims 6 and 9.

The descriptions of the preferred embodiments in the specification of the '062 patent do not limit the claims to a minimum orange oil percentage of 5% either. For example, as stated in the '062 patent specification, "the more specific composition according to the preferred embodiment … comprises forty-five percent (45%) or less by volume of orange oil." (LPM Ex. A, '062 patent at 2:45-48.) The applicants recognized that lower percentages of orange oil could still clean, just not as well. Since the applicants declined to specify the degree of cleaning effectiveness required, this Court should not add that limitation to the claims.

Properly construed, claims 6 and 9 require only that a cleaning composition contain enough orange oil to have a cleaning effect. Defendants assert that any amount of orange oil less than 5% is unsupported by the specification, but a person of ordinary skill in the art at the time of the invention would have known that orange oil has a cleaning effect at 0.01%. Indeed, United States Patent No. 5,013,485 ("the '485 patent") teaches that 0.01% orange oil (or more) has a cleaning effect. (LPM Ex. H, '485 patent at 3:5-8.) Furthermore, a person of ordinary skill in the art would have known that an ingredient that cleans difficult to remove substances such as cosmetics at a relatively high concentration (5%) would both clean less difficult to remove substances at lower concentrations or even clean difficult to remove substances with longer application. (Ex. A, Rhodes Dep. Tr. at 159:14-160:11.) A person of ordinary skill in the art with "knowledge of the use of surfactants and of solvents, knowing that surfactants in particular are very active even at very low concentrations, [would] … know that the limits of the effectiveness of the teachings of the '062 patent are going to be much lower than 5 percent." (*Id.* at 160:13-18.)

Claim 6 was not written "a skin cleaning composition for external use on human tissues *[soiled by unwanted non-water soluble substances]*, comprising *[at least 5%]* orange oil, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as an emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively." Similarly, claim 9 was not written "a cleaning composition for use on human skin *[soiled by unwanted non-water soluble substances]*, comprising *[between five percent (5%) and]* forty-five percent (45%) *[or less]* by volume of orange oil, forty-five percent (45%) or less by volume of oatmeal and a pharmaceutically acceptable moisturizer." This Court should not construe these claims as if they were.

Accordingly, "cleaning composition" should be construed as a composition that treats unwanted substances on the skin in order to facilitate removal of those substances and contains orange oil in an amount sufficient to have a cleaning effect.

**B.    "Orange Oil" Is A Non-Water Soluble Liquid Derived From An Orange And Present At A Concentration Of At Least 0.01%**

LP Matthews agrees that orange oil is a non-water soluble liquid derived from oranges, but does not concede that it can solely be derived from the rind of an orange. The plain meaning of "orange oil" is the oil (i.e., non-water soluble liquid) derived from an orange, as by (for example) cold pressing or processing oranges or orange rinds. (LPM Ex. A, '062 patent at 2:66-67; Ex. A, Rhodes Dep. Tr. at 252:8-16). An orange is a globose, reddish-yellow, bitter or sweet, edible citrus fruit from any of the white-flowered rutaceous trees of the genus *Citrus*. (LPM Ex. G, Random House College Dictionary 934 (1972).)

LP Matthews also disagrees with any proposed construction that imposes a minimum orange oil limit of 5%. Claims 6 and 9 both simply require "orange oil," not at least 5% orange oil. Claim 6 recites "orange oil" without any percentage limitations, while claim 9 recites orange

oil only with a maximum orange oil percentage. To the extent there is a minimum percentage of orange oil, it is only that amount required to have a cleaning effect.

Accordingly, orange oil is a non-water soluble liquid derived from an orange.

**C.     By Definition, "Oatmeal" Is A Processed Oat Kernel – Not Rolled Oats Boiled In Water**

Even with the term "oatmeal," defendants ignore the term's ordinary and accustomed meaning in favor of a construction based solely on the disclosure of preferred embodiment in the specification. And once again, the specification does not support defendants' narrow interpretation. Nowhere in the '062 patent specification is oatmeal defined simply as rolled oats boiled in water. The portions of the specification cited by defendants only establish that, for samples IV and V, the inventors boiled rolled oats. They do not establish that oatmeal is, was, or should be defined as rolled oats boiled in water. As the Federal Circuit has recognized, "Interpretation of descriptive statements in a patent's written description is a difficult task, as an inherent tension exists as to whether a statement is a clear lexicographic definition or a description of a preferred embodiment." *E-Pass Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003).

The ordinary and customary meaning of "oatmeal" to a person of ordinary skill in the art is processed oat kernel.

**REDACTED**

**REDACTED**

Thus, there is no reason to adopt the Limited defendants' proposed construction of "oatmeal." The ordinary and customary meaning of "oatmeal" should be applied and oatmeal construed to mean a processed oat kernel.

**D.     The Term "Emulsifying Agent" Should Be Construed To Mean A Product That Can Function To Stabilize An Oil And Water System**

As the Limited defendants correctly point out, claim 6 requires *an* emulsifying agent. However, an emulsifying agent is neither *the* emulsifying agent nor the *primary* emulsifying agent. *See, e.g., KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'").

The language of claim 6 is clear on its face. It does not limit emulsifying agents to oatmeal and oat gum, and it would be improper to import limitations from the specification. As the Federal Circuit noted in *Interactive Gift Express*, where "the claim language is clear on its face, ... consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." *Interactive Gift Express*, 256 F.3d at 1331. No deviation from the clear language of the claim is specified with respect to "an emulsifying agent" and it would be error to add a limitation from the specification.

Once the Limited defendants' proposed construction is rejected, it is evident that the term should be given its plain and ordinary meaning. The ordinary and customary meaning of "emulsifying agent" to a person of ordinary skill in the art at the time of the invention is a product that can function to physically stabilize an oil and water system.     **REDACTED**

**REDACTED** As Dr. Rhodes testified, "an emulsifying agent is something that accumulates at an interface such as an oil/water interface to form a condensed film and will provide mechanical stabilization for an emulsion." (Ex. A, Rhodes Dep. Tr. at 69:14-18.)

Claim 6 was not written "a skin cleaning composition for external use on human tissues, comprising orange oil, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as *[an the primary]* emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively." This Court should not construe the claim as if it were.

Accordingly, the limitation "an emulsifying agent" should be construed as a product that can function to stabilize an emulsion in accordance with its ordinary and customary meaning to a person of ordinary skill in the art.

### E.    "Oat Grain Derivative Product" Means A Product Derived From *Any* Oat Grain

Defendants similarly want to limit "oat grain derivative product" to oatmeal and oat gum because of the preferred embodiment (oatmeal and oat gum) without regard to the customary meaning to a person of ordinary skill in the art. Just like this limitation is improper with respect to "an emulsifying agent," it is equally improper with respect to the term "oat grain derivative product." Claim 6 simply requires "*an* oat grain derivative product as *an* emulsifying agent." (LPM Ex. A, '062 patent at 10:1-6.) The plain meaning of oat grain derivative product is any product derived from an oat grain.    **REDACTED**    This is the ordinary and customary meaning to a person of ordinary skill in the art at the time of the invention. The term "oat grain derivative product" in claim 6 should thus be construed as a product derived from an oat grain that has any emulsifying effect anywhere in the composition in accordance with its ordinary and customary meaning to a person of ordinary skill in the art.

The Limited defendants also mistakenly argue that the inventors "were forced to specify oatmeal and oat gum as the only oat grain derivative products to overcome an indefiniteness rejection" in a related patent application. (Limited Br. at 13.) First, that patent application contained a wholly different specification than the '062 patent and is therefore irrelevant in determining how to construe "oat grain derivative product" here. Moreover, the inventors did not specify oatmeal and oat gum as the *only* oat grain derivative products, as defendants purport. To be sure, in the 07/786,804 application, the inventors amended claim 3 – a dependent claim – to specify oatmeal and oat gum. As for the other references to "oat grain derivative product," however, the inventors repeatedly and consistently asserted that the term was much broader than just oatmeal and oat gum. Indeed, in the inventors' August 25, 1993 response to the third rejection of the '804 application, they noted that the present invention employed grain based derivatives such as corn, wheat, barley, rice and oats. (Ex. B, 8/25/93 Response at 4.) The inventors also explicitly refused to list grain based derivatives as oatmeal, although the samples in the specification used both oatmeal and oat gum. (*Id.*) The inventors denied such a limitation again in their June 3, 1994 response, explaining that "grain-based derivatives" encompassed not only those five grains referred to in the specification, but also any other species of similar grain that would accomplish the desired result. (Ex. C, 6/3/94 Response at 6.) *See also Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988) (a specification may contain a written description of a broadly claimed invention without describing all species encompassing that claim); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) (same). Thus, not only did the inventors decline to limit grain based derivatives to oat gum and oatmeal, but they acknowledged that other grains were equally suitable. Tellingly, the Board reversed the Examiner's enablement rejection on appeal. (Ltd Ex. C, 4/15/97 Board Decision at 3-4.)

Appropriately, the term "oat grain derivative product" should be construed according to the '062 patent. That patent does not limit it to oatmeal or oat gum. Defendants' proposed construction should therefore be rejected.

### F.    The Term "Moisturizer" Is Not Limited To Naturally Occurring Moisturizing Substances

Claims 6 and 9 require a pharmaceutically acceptable moisturizer that can be used on human skin. (LPM Ex. A, '062 patent at 10:1-6, 13-17.) A pharmaceutically acceptable moisturizer is an ingredient that attracts water or prevents water loss and is safe for use on human skin.    **REDACTED**    , This is the ordinary and customary meaning to a person of ordinary skill in the art and there is no reason to construe this claim term differently. The '062 patent discloses numerous moisturizers consistent with this understanding and suitable for use in the claimed invention, including glycerin, aloe vera, jojoba oil, safflower oil, glycerin stearate, and glycerol stearate. (LPM Ex. A, '062 patent at 8:46-48, 54, and 10:12.)

The ordinary and customary meaning is consistent with the teachings of the patent-in-suit. The '062 patent teaches that "other pharmaceutically acceptable moisturizers are within the scope of this invention as could be *developed without undue experimentation by the ordinarily skilled chemist* according to the teachings of the present invention." (*Id.* at 8:48-52) (emphasis added). A naturally occurring moisturizing substance is not one developed by an ordinarily skilled chemist. The applicants specifically noted that "these other compositions are thus intended, unless otherwise specifically limited, to be encompassed by the general phrase 'moisturizer' both in this specification and in the appended claims." (*Id.* at 8:54-58.) The applicants did not limit the claimed moisturizers only to naturally occurring substances or only to those ingredients disclosed in the patent; since the applicants did not use the phrase "naturally

occurring" in the claims, this Court should decline the Limited defendants' invitation to insert those words into the claims.

"Moisturizer" should therefore be construed as an ingredient that attracts water or prevents water loss and is not harmful to human skin in accordance with its ordinary and customary meaning to a person of ordinary skill in the art.

> **G.    A Person Of Ordinary Skill In The Art Would Understand That "pH Within A Range Of 4.5 To 6.0, Inclusively" Encompasses pH Values Of 4.0 To 6.5 Because Of The Inherent Imprecision Of Applicants' Measurement Techniques**

The Limited defendants' attempted reliance on unrelated extrinsic evidence is inapposite to claim construction. It is difficult to conceive of anything less relevant to the understanding of an ordinarily skilled chemist in 1989 than a recent pronouncement by the Environmental Protection Agency on engine emissions as it is neither timely nor technologically related. The Limited defendants have not demonstrated that construing the pH claim limitations as they propose is consistent with how a person of ordinary skill in the art would have understood these terms, and their proposal should therefore be rejected by this Court. *Varco*, 436 F.3d at 1372 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation.") (internal citation omitted). Claim 6 requires that a composition have a "pH within a range of 4.5 to 6.0, inclusively." The claim term "pH" is a measure of acidity or alkalinity (the negative common logarithm of hydrogen ion activity). pH is often determined using litmus paper that changes color (to a particular shade of blue or pink) depending on the alkalinity or acidity of the composition being measured. The pH value is then determined by putting the litmus paper next to a color chart and identifying the closest match. (                    **REDACTED**

14

Although the '062 patent does not specify any particular method of measuring pH, a person of ordinary skill in the art would know that the inventors used colorimetric methods (using test papers impregnated with various pH indicators that change colors generally corresponding to the pH level (i.e., litmus paper)). **REDACTED** . Ex. A, Rhodes Dep. Tr. at 130:17-131:2) The colorimetric method does not permit precise measurements. (See Ex. A, Rhodes Dep. Tr. at 130:6-16.) Moreover, a person of ordinary skill in the art would know that measuring pH in an emulsion (e.g., the claimed compositions) is problematic because of electrode drift. (*Id.* at 123:10-22.)

A person of ordinary skill in the art at the time of the invention would have known that pH measured colorimetrically has a precision of ± 0.5 pH units. **REDACTED** Ex. A, Rhodes Dep. Tr. at 131:13-14.) This is consistent with the '062 patent's labeling of pH in Tables 1-3 as "approximate" and the fact that all the pH values in the patent, save one, are either an integer or an exact half of a pH unit. **REDACTED** Ex. A, Rhodes Dep. Tr. at 130:17-131:2.)

Thus, a person of ordinary skill in the art at the time of the invention who was reading claim 6 in the context of the '062 patent specification would understand that the pH range limitations are expressed in approximate values because of the precision limits imposed by the colorimetric pH measuring used by the inventors. **REDACTED** Ex. A, Rhodes Dep. Tr. at 128:10-14.) That person would further understand that these limitations implied an imprecision of plus or minus 0.5 pH units. **REDACTED** Ex. A, Rhodes Dep. Tr. at 131:13-14.) Because of that implied precision, a person of ordinary skill in the art at the time of the invention would understand that a pH range of 4.5 to 6.0 would encompass pH values

15

as low as 4.0 (4.5 – 0.5) and as high as 6.5 (6.5 + 0.5) if the pH values were measured using a more precise measurement technique (e.g., potentiometric).

Accordingly, the claim limitation "pH within a range 4.5 to 6.0, inclusively" should be construed as pH between 4.5 and 6.0 if measured colorimetrically (i.e., using litmus paper) and pH between 4.0 and 6.5 if measured potentiometrically (i.e., using a pH meter).

## V.    **CONCLUSION**

Based upon the foregoing analysis and argument presented herein and in LP Matthews' Memorandum in Support of its Proposed Claim Construction (D.I. 254) and the other pleadings submitted to this Court, LP Matthews respectfully requests that the Court reject the Limited defendants' proposed construction of the claims of the patent-in-suit and adopt the construction proposed by LP Matthews.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*LP Matthews, L.L.C.*

16

*Of Counsel:*

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, DC  20006

Dated:  July 31, 2006

171765.1

# EXHIBIT A

4/26/2006 Rhodes, Christopher

```
1          IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3   - - - - - - - - - - - - - - - - x
4   L.P. MATTHEWS, L.L.C.,        :
5                    Plaintiff,   :
6           vs.                   : Civil Action
7   BATH & BODY WORKS, INC.;      : No. 04-1507 (SLR)
8   LIMITED BRANDS, INC.; KAO     :
9   BRANDS CO., (f/k/a THE        :
10  ANDREW JERGENS COMPANY);      :
11  and KAO CORPORATION,          :
12                   Defendants.  :
13  - - - - - - - - - - - - - - - - x
14  Deposition of CHRISTOPHER T. RHODES, Ph.D., a witness
15  herein, called for examination by counsel for Defendant
16  in the above-entitled matter, pursuant to notice, the
17  witness being duly sworn by Robert M. Jakupciak, a
18  Notary Public in and for the District of Columbia, taken
19  at the offices of Robins, Kaplan, Miller & Ciresi, L.L.P.,
20  1801 K Street, N.W., Washington, D.C., 20006, at 9:00 a.m.,
21  on April 26, 2006, and the proceedings being taken down
22  by Stenotype by Robert M. Jakupciak, RPR.
```

1

4/26/2006 Rhodes, Christopher

```
1              C O N T E N T S
2   THE WITNESS: CHRISTOPHER T. RHODES, Ph.D.
3   EXAMINATION                        PAGE NO.
4     By Mr. Baxter ....................    4
5
6
7
8              E X H I B I T S
9   RHODES EXHIBIT NUMBER               PAGE NO.
10  1     Curriculum Vitae ...............   49
11  2     Rhodes Report ..................  109
12  3     Rhodes Updated Report ..........  109
13  4     '062 Patent ....................  133
14  5     '495 Patent ....................  150
15  6     Rhodes Responsive Report .......  216
16
17
18
19
20
21
22
```

3

4/26/2006 Rhodes, Christopher

```
1   APPEARANCES:
2   On behalf of the Plaintiff:
3      JASON R. BURATTI, ESQUIRE
4      Robins, Kaplan, Miller & Ciresi, L.L.P
5      1801 K Street, N.W
6      Washington, D.C., 20006
7      (202) 736-2710
8   On behalf of Limited Defendants:
9      JOHN F. WARD, ESQUIRE
10     Ward & Olivo
11     798 Third Avenue
12     New York, New York  10017
13     (212) 697-6262
14  On behalf of Kao Corporation:
15     STEPHEN G. BAXTER, ESQUIRE
16     RICHARD L. CHINN, ESQUIRE
17     Oblon, Spivak, McClelland
18     Maier & Neustadt, P.C.
19     1940 Duke Street
20     Alexandria, Virginia  22314
21     (703) 413-3000
```

2

4/26/2006 Rhodes, Christopher

```
1   Whereupon,
2            CHRISTOPHER T. RHODES, Ph.D.,
3   called for examination by counsel for Defendant and
4   having been duly sworn by the Notary Public, was
5   examined and testified as follows:
6        EXAMINATION BY COUNSEL FOR DEFENDANT
7   BY MR. BAXTER:
8        Q.    Good morning.
9        A.    Good morning.
10       Q.    Could you please state your full name
11  for the record?
12       A.    Christopher Thomas Rhodes.  R-H-O-D-E-S.
13       Q.    Could you please state your current
14  address for the record?
15       A.    28 Prospect Avenue, Narragansett, Rhode
16  Island.
17       Q.    Is it Dr. Rhodes or Professor Rhodes or
18  Mr. Rhodes?
19       A.    Professor Rhodes is perfectly
20  satisfactory, thank you, sir.
21       Q.    My name is Steve Baxter, and I represent
22  the Kao defendants in this litigation.  Do you
```

4

4/26/2006 Rhodes, Christopher

1  classifying surfactants would be chemically and you
2  could talk then about anionic, cationic, non-ionic
3  or amphoteric.
4      Q.    What's a cationic surfactant?
5      A.    A cationic surfactant would be a
6  surfactant in which the surfactant is a cation.
7      Q.    Is there an anion associated with the
8  cation?
9      A.    Yes.
10     Q.    So when you say that -- is the -- is a
11  cationic surfactant a salt?
12     A.    A cationic surfactant is a salt, yes.
13     Q.    So when you say that the surfactant is a
14  cation, you can't have a cation by itself, can you?
15     A.    You obviously, if you had a cation by
16  itself, you would have electrical charge surplus.
17  Obviously, when you are talking about the ionic
18  surfactants, you are going to have a cation and an
19  anion, plus and minus.  And the distinction is is
20  that one of them is the surfactant molecule and the
21  other one is a regular micro-ion or is it the other
22  one that is the surfactant ion and the other one is

65

4/26/2006 Rhodes, Christopher

1  a regular counter-ion.
2      Q.    So is it your understanding that a
3  cationic surfactant is a salt in which the cation
4  portion of the salt is a molecular ion which
5  contains both hydrophilic and hydrophobic regions?
6          MR. BURATTI:  Objection; ambiguous.
7      A.    I want to be careful how I reply.  I
8  don't think your answer is as precise as I would
9  like.  But I think you've got the general idea.
10     Q.    What was the imprecision?
11     A.    Basically, I would -- could we have the
12  question read back to me, please?
13              -   -   -
14          (Discussion off the Record.)
15              -   -   -
16  BY MR. BAXTER:
17     Q.    Why don't I rephrase the question.  Is
18  it your understanding that a cationic surfactant is
19  a salt which contains a cation and an anion and that
20  it is the cation of that salt which is a molecular
21  ion as opposed to an atomic ion and that molecular
22  ion contains both a hydrophilic and a hydrophobic

66

4/26/2006 Rhodes, Christopher

1  region?
2          MR. BURATTI:  Objection; ambiguous and
3  compound.
4      A.    I believe in essence that is correct.
5      Q.    What are the uses of cationic
6  surfactants?
7      A.    If you go back to your Bible, sir, you
8  will see that cationic surfactants have been used
9  for many years as soaps, for example.
10     Q.    And what would be that soap?
11     A.    Well, when you say what would be that
12  soap, many soaps were made by treating animal fats
13  with wood ash, and so you didn't end up with just
14  one molecular species, you ended up with a mixture
15  of sodium and potassium salts of a number of fatty
16  acids; stearic, oleic, palmitic and so on.  So the
17  kind of soaps that we used hundreds of years ago
18  were not one single molecular entity.
19     Q.    I'm a little confused.  Are you saying
20  that those are cationic surfactants?
21          MR. BURATTI:  Objection;
22  mischaracterizes his testimony.

67

4/26/2006 Rhodes, Christopher

1      A.    What I'm saying to you is that a
2  material such as a soap is a cationic surfactant,
3  yes.
4      Q.    Can you draw the structure of the sodium
5  salt of a fatty acid?
6      A.    Certainly.  I'm sorry.  I have got it
7  wrong.  I've got it wrong.  It's an anionic
8  surfactant.  Sorry.  I have got the surfactant
9  around the wrong way.  Let me clarify it again.
10         A sodium salt of a fatty acid, the
11  cation is going NA-plus or K-plus, and the ion that
12  is going to be the surfactant is going to be the
13  oleate, the palmitate or the linoleate or whatever.
14  I do apologize.  I got my cats and my ans confused.
15     Q.    So again I'm going to ask the question;
16  what are the uses of cationic surfactants?
17     A.    Well, they had been used as, for
18  example, emulsifying agents.
19     Q.    Any other uses?
20     A.    There is all sorts of uses of
21  surfactants in various industries.  I can't give you
22  a list at the moment, no.

68

4/26/2006 Rhodes, Christopher

```
1       Q.    Just give me the uses you can remember
2   off the top of your head.
3       A.    Emulsifying agents, solubilizing agents,
4   degreasing agents; they have been used in small
5   amounts I believe in cosmetics, in food stuffs, all
6   sorts of areas.
7       Q.    Is there any difference between a
8   surfactant and an emulsifier?
9             MR. BURATTI:  Objection; form.
10      A.    A surfactant we have talked about as
11  having these distinct areas of lipophilic and
12  hydrophilic tendency.  An emulsifying agent can be
13  used in two terms, in two ways.  In one way, which I
14  would call the more precise way, an emulsifying
15  agent is something that accumulates at an interface
16  such as an oil/water interface to form a condensed
17  film and will provide mechanical stabilization for
18  an emulsion.  And, also, that surfactant by reducing
19  the surface tension, so reducing the repulsive
20  forces between the oil and the water will stabilize.
21            In a more general sense, an emulsifying
22  agent, not only would it be acting as a surfactant,
```

69

4/26/2006 Rhodes, Christopher

```
1   but might also stabilize an emulsion by increasing
2   the viscosity or the density of the continuous
3   phase.
4       Q.    What's an anionic surfactant?
5       A.    Something like cetyl-trimethyl
6   ammonium-bromide.
7       Q.    Are you sure that's an anion?
8       A.    No.  I have got it the wrong way again.
9   I must have overslept.  I keep getting it wrong.  I
10  repent of my heresy.
11            An anionic surfactant is one in which it
12  is the anion that is the surfactant.  So I've
13  already been -- thank you for correcting me,
14  counselor, on a very basic error.
15      Q.    So would an anionic surfactant be an ion
16  which contains an anion and a cation and it's the
17  anion which is the molecular ion and which contains
18  both a hydrophilic and a hydrophobic portion?
19            MR. BURATTI:  Objection to form.
20      A.    You are correct, sir.
21      Q.    What are the uses of anionic
22  surfactants?
```

70

4/26/2006 Rhodes, Christopher

```
1       A.    Anionic surfactants, well, I think I've
2   already said that surfactants are used; emulsifying
3   agents, solubilizing agent, they are used for
4   degreasing, they have been used in some foods, in
5   cosmetics.  I think you will see that they are
6   ubiquitous in the pharmacy -- in many industries.
7       Q.    What's a non-ionic surfactant?
8       A.    A non-ionic surfactant is a surfactant
9   in which the hydrophilic group is not a group that
10  is capable of ionizing, but it is hydrophilic in
11  that it can interact with water.  For example, a
12  polyoxyethylene oxide will tend to be the O group,
13  will tend to be delta negative, and therefore it
14  will hydrogen bond very readily with water.
15      Q.    And by delta negative, do you mean it
16  has a slight negative charge but not fully ionized?
17      A.    That's correct.
18      Q.    Can you give me an example of a
19  non-ionic surfactant?
20      A.    Cetylmacrigol.
21      Q.    I have two words written here.  One is
22  amphoteric and one is amphiphilic.
```

71

4/26/2006 Rhodes, Christopher

```
1       A.    Yes.
2       Q.    Is there a difference between those two
3   words?
4       A.    Yes.
5       Q.    Can you explain the difference?
6       A.    Amphiphilic means that we have a
7   molecule which has got both groups that will
8   interact with water and groups that will interact
9   with oil, and so we would say these are areas which
10  are hydrophilic or alternatively you could call them
11  lipophobic.
12            The other groups would be lipophilic or
13  hydrophobic.  Amphoteric means that we have a
14  molecule which is capable, because it has different
15  functional groups, of acting as a proton acceptor or
16  a proton donor.  In other words it has both acidic
17  and basic functional groups.
18      Q.    Are cationic, non- -- strike that.
19            So is it proper to use the word
20  amphoteric to describe a class of surfactant?
21            MR. BURATTI:  Objection; vague and
22  ambiguous.
```

72

the second decimal place. For example, one might
well record a pH value of 5.11. If one were using
the colorimetric method, it would be quite
unacceptable to attempt to measure pH to that level
of precision.

However, one would hope that if you
compared potentiometric and colorimetric methods, as
long as both were carried out in a reliable and
validated manner, that the values after allowing for
differences in precision would not be biased high or
low with respect to either method.

Q. Why do you say one would hope?

MR. BURATTI: Objection.

A. What I am saying is in order to answer
the question, I have to assume that the methods have
been used appropriately, and that there would be a
sufficiency of determinations so that I could see if
the average values are the same. Allowing, as I've
said, for the difference in precision.

Q. Is the skin cleanser according to claim
6 of the '062 patent a solution?

A. It is not a solution. It is an

121

emulsion. It is not a true solution.

Q. Are you aware of any differences between
measuring pH colorimetrically and measuring pH
potentiometrically which would give rise to the
obtained values differing when those techniques are
applied to emulsions as opposed to solutions?

MR. BURATTI: Objection to form and
relevance as to the Kao defendants for reasons
stated previously.

A. It is well-known that trying to measure
the pH of a disperse system such as an emulsion can
present a number of challenges. And, in particular,
one often experiences the problem of electrode
drift. If I take this fruit juice and put a
combined electrode into that -- let's assume that
everything has been calibrated correctly -- as long
as I have an appropriate level of stirring, I'll
expect to get a stable pH reading within 30 second
or so.

When I go to disperse systems, it may
well take very much longer before I get a stable pH
value.

122

Q. Taking into consideration the effect
that a system existing in an emulsifying state can
have on the technique of measuring pH
potentiometrically, taking into consideration that
affect, would measuring the pH of a skin cleanser
according to claim 6 of the '062 patent
colorimetrically give the same value as measuring
the pH of that product potentiometrically?

MR. BURATTI: Objection to form and
relevance as to the Kao defendants.

A. I think I understand your question, but
I'm not certain. Let me, if I may, try to be as
responsive as possible by giving an example.

Supposing I determined the pH of the
cleansing lotion colorimatrically and after say
three or four determinations each of them showed it
as being 5. If I carried out potentiometric
determinations, and let's say I did three or four
determinations, and they were all round about say
5.1, 5.12, 5.09, 5.14, that would be a pretty good
agreement.

If, however, I got values of 6.1, 6.2,

123

then there would be discrepancy. I would expect and
hope that if the process had been calibrated, I see
no reason why if you were using the potentiometric
value, once you allowed for this difference in
precision, you should not in essence get the same
results.

Q. I just want to make sure. So if I start
off with a purely aqueous solution and let's say
I -- it was deionized water, and I added enough HCL
such that potentiometrically I measured a value of
3.

A. Yes.

Q. You would expect if I measured it
colorimetrically I would also get a value of about
3?

A. Yes. As long as in both cases I've used
the appropriate procedures, yes.

MR. BURATTI: Counsel, you understand my
objection as to pH to be to this line of questions?

MR. BAXTER: Yes.

BY MR. BAXTER:

Q. I just want to make sure that if I then

124

4/26/2006 Rhodes, Christopher

1   replaced that solution with an emulsion and carry
2   out the same kind of pH measurements, it's your
3   opinion that they would still also agree; there
4   would not be a difference of a half a pH unit or a
5   full pH unit?
6       A.      There might be a difference of half a pH
7   unit, yes, but not a full pH unit.
8               This brings me back to this question
9   about in any comparison between the two methods, you
10  have to allow for the difference in precision.  But
11  if you allow for that difference in precision, then
12  the two should be in agreement, as long as the
13  process, both processes have been carried out
14  appropriately.
15      Q.      So are you saying that if I took a skin
16  cleanser, according to claim 6 and I measured it --
17  let me back up.
18              Am I correct in understanding what you
19  mean by measuring the pH colorimetrically is by
20  using paper?
21      A.      That's one method you could use.  I
22  think this is the most likely colorimetric method.

125

4/26/2006 Rhodes, Christopher

1   There are others.
2       Q.      And that would be using something called
3   pH paper?
4       A.      Correct.
5       Q.      So let's say I took a skin cleanser and
6   I stuck the pH paper in there and I would pull it
7   out and observe some color on the portion that had
8   been emersed in the skin cleanser.  Is that correct?
9       A.      Well, I take it out and I look at that
10  color in comparison with a standard chart that gives
11  me different colors at different pH values.
12      Q.      Right.  And let's say, for example, in
13  this particular case that pH comes out 6.  Now, if I
14  took the same, exact same skin cleanser and I stuck
15  the -- and I measured the pH potentiometrically, are
16  you saying it's possible that I would get a pH value
17  of 6.5 or 6.25?
18      A.      I think you might get a value of 6.25.
19  I doubt that you would get 6.5.
20              My point is that there is a difference
21  in the precision for the two methods and, therefore,
22  any comparison between the two, obviously you've got

126

4/26/2006 Rhodes, Christopher

1   to make allowance for the difference in precision.
2       Q.      But there is no difference in accuracy?
3   There is no fundamental underlying difference in
4   accuracy?  What I'm saying is let's say I did that
5   pH colorimetric measurement and I did it a hundred
6   times and I calculated all my standard deviations
7   and everything like that and I would get some value
8   with a small error in it or hopefully a small error
9   and I did it with my pH meter; would I get the same
10  value?
11              MR. BURATTI:  Objection to form.
12      Q.      Ruling out statistics?  I mean using a
13  statistical analysis.
14              MR. BURATTI:  Objection; form.
15              MR. BAXTER:  Strike that.  Let me
16  withdraw the question.
17  BY MR. BAXTER:
18      Q.      If I wanted to know if I had, if my skin
19  cleanser or if a product had a pH between 4.5 and
20  6.0, would it depend on how I measured the pH?
21              MR. BURATTI:  Objection to form.
22      Q.      Could it depend on how I measured the

127

4/26/2006 Rhodes, Christopher

1   pH?
2               MR. BURATTI:  Same objection.
3       A.      If I want a pH to be exactly, the pH
4   range to be exactly from 4.5000 to 6.000, the
5   colorimetric method doesn't give that precision.  So
6   if you are using the colorimetric method, you have
7   to allow for the fact that the precision of the
8   method does not allow you to go to the second
9   decimal place.
10              My reading of the patent, for example,
11  indicates to me that the inventors, when they used
12  the term pH, were indeed not referring to a pH value
13  which has got two decimal points.  I think they are
14  referring to a pH within half a pH unit.
15              Now, if indeed you took a hundred
16  determinations using the colorimetric method and a
17  hundred determinations using a potentiometric method
18  and you applied a statistical method of seeing if
19  there are any significant differences in the two,
20  there should be no significant difference greater
21  than the precision, or the imprecision if you like,
22  of the colorimetric method.

128

1     Q.   So I just want to summarize.  It sounds
2  like to me what you are saying is that even in the
3  context of an emulsion, the, any differences in pH
4  values measured colorimetrically or
5  potentiometrically are due solely to precision and
6  that there is no mechanistic difference between
7  measuring pH colorimetrically in an emulsion and
8  measuring pH potentiometrically in an emulsion which
9  would give different values regardless of precision?
10        MR. BURATTI:  Objection to form.
11     A.   Counselor, that's rather a long question
12  and there are a number of points where I'm sure
13  inadvertently you've misrepresented my testimony.  I
14  did not say they were mechanistically.  I don't
15  think I ever used that modifier at all.
16        What I've said is, I think I said it
17  several times, that if you allow for the difference
18  in precision, as long as the two methods are carried
19  out appropriately, then they both of them should
20  give reliable data, but allowing for the difference
21  in precision.
22     Q.   I understand they might give reliable

1  data, but would -- putting precision aside, would
2  they give the same value?
3     A.   You cannot put precision aside, because
4  the precision is the number you get.  Let's
5  assume -- let me try this again one more time.
6        If I used a colorimetric method of
7  determining the pH of a skin lotion and the true pH
8  is 5.11, I would hope that if I used a
9  well-validated potentiometric method, in fact I
10  would go further and say I would expect that I would
11  get 5.11 or possibly 5.12, 5.10, like that.  But
12  with my colorimetric method, when I go to compare
13  with the color chart, I can't go to that precision,
14  and so I'm going to get a value of 5, and so there
15  will be differences in the values I'll get because
16  of the level of precision.
17        And I suggest that the patent is very
18  clear on this point.  It tells us in the tables that
19  they are approximate pH values.  And all the pH
20  values quoted, there's not one which is quoted to
21  the second decimal point.  And with one exception,
22  there is one pH value of 4.7.  But apart from that

1  exception, all the other values are given at either
2  a whole pH unit or half a pH unit.  4.5 or 4.
3     Q.   Can you measure a pH of 4.7
4  colorimetrically?
5     A.   Well, you take the chart and what you've
6  got on the chart is a color at the top at the most
7  alkaline range of that particular color paper and
8  you have got a color down at the bottom.  If you
9  were using this color paper, you see on the right
10  side of this chart that say 6, 5.5, 5, 4.5, 4 and so
11  on.  If you decided that you could interpolate
12  between, then indeed you might say 4.7.
13        But in general, using pH papers, a
14  precision of no better than plus/minus half a pH
15  unit is to be expected.
16     Q.   So is it proper to refer to a pH
17  measured colorimetrically as being 6.0 without a
18  plus or minus half pH unit?
19        MR. BURATTI:  Objection to form and same
20  standing objection to his line of questions.
21     A.   The patent very clearly indicates that
22  when the inventors were measuring pH, they knew that

1  they were not measuring it with great precision.
2  They specifically say in the tables approximate pH.
3  The reader is given that information.
4        You are now asking me should they not
5  have put a standard deviation with the value.  I
6  think that is expecting too much.  What they are
7  interested in is coming up with a skin lotion and
8  they give me a practical way of determining a pH
9  range.
10        MR. BAXTER:  Is it time to break for
11  lunch?
12        MR. BURATTI:  It is.  But before we do
13  that, I just want to put something on the record.
14  This pertains to counsel for the limited defendants
15  that's here.  Can you put an appearance in, John,
16  when you can?
17        The Kao defendants have waived defenses
18  based on pH and oat grain derivative elements in
19  this case.  They have denied L.P. Matthews discovery
20  on those elements, and L.P. Matthews in reliance on
21  the waiver of those defenses has foregone discovery
22  efforts.

1  you would like to see the documents, you can ask for

2  them.

3        A.    In the absence of going through the

4  transcripts, I'm afraid I can't be more helpful.

5        Q.    Sitting here today you just can't

6  remember?

7        A.    I just can't remember.

8        Q.    Now let me hand you a copy of U.S.

9  Patent 5,013,485, which we have marked as Rhodes

10  Exhibit Number 5.  Can you identify Rhodes Exhibit

11  Number 5?

12        A.    Yes, I can.

13        Q.    I notice you cite that, I believe, as

14  Exhibit 4 on the very bottom of page 4 of your

15  updated report.

16        A.    Can I just turn to that?

17        Q.    Sure.  I was going to do it for you.

18  But that's okay.

19        A.    Page 4.

20        Q.    The very bottom.  Page 4, where it says

21  the claim term orange oil.

22        A.    Yes.

157

1        Q.    Then you go on.

2        A.    I see.  Yes.

3        Q.    So Rhodes Deposition Exhibit Number 5 is

4  Exhibit 4 of your updated expert report?

5        A.    Yes, sir.  The numbers are beginning to

6  jump around a bit, but I think I'm on track at the

7  moment.

8        Q.    We will just try to keep it straight.

9  Now you say:  Based on Rhodes Exhibit Number 5, I

10  conclude that orange oil can perform cleaning at

11  levels of 0.01 percent or lower.  Do you see that?

12        A.    Correct.  Yes, sir.

13        Q.    Aside -- first of all, when was the

14  first time you saw Rhodes Exhibit Number 5?

15        A.    I don't recall.

16        Q.    Was it during the course of this

17  litigation?

18        A.    Oh, yes.  I had never seen that patent

19  before January '06.

20        Q.    Did you find that patent yourself?

21        A.    No, sir.

22        Q.    Was it provided to you by Mr. Buratti or

158

1  somebody at Robins Kaplan?

2        A.    I think it was Mr. Buratti who provided

3  it to me, yes.

4        Q.    Do you have any basis other than Rhodes

5  Exhibit Number 5 to believe that orange oil can

6  perform cleaning at levels of 0.01 percent or lower?

7        A.    Yes, I do.

8        Q.    Can you tell us those?

9        A.    Certainly.  In the '062 patent itself,

10  the patentees report studies in which they go down

11  to orange oil concentrations at 5 percent.  And if I

12  may just turn to the '062 patent.

13        Q.    You may want to turn to column 6.

14        A.    Thank you.  It tells us that the

15  effectiveness of the products, of the cleaning

16  ability, was reduced.  It could still remove

17  cosmetic products.  It wasn't good or as effective

18  at removing caulking compounds and so on.

19        So the first thing I know, looking at

20  the patent, we have got products which contain a

21  number of different concentrations of the oil.  And

22  certainly if you look at the claim, we are talking

159

1  about orange oil up to 45 percent, and within the

2  patent itself we see data going down to 5 percent

3  which has still got cleaning properties but not as

4  good as higher concentrations.

5        So the first thing I can do as a

6  scientist who has worked on emulsions, skin lotions,

7  is carry out an extrapolation procedure and say,

8  well, it will certainly be, still be effective at

9  lower concentrations.  It may require a little

10  longer application, but an extrapolation procedure.

11  So that's the first approach I can use.

12        The second approach I can use is my

13  knowledge of the use of surfactants and of solvents,

14  knowing that surfactants in particular are very

15  active even at very low concentrations, and so I

16  know that the limits of the effectiveness of the

17  teachings of the '062 patent are going to be much

18  lower than 5 percent.  And I believe that in the

19  prosecution file history, that when the patent was

20  first submitted, in fact there was an indication

21  that the product would be effective at quite low

22  concentrations.

160

4/26/2006 Rhodes, Christopher

1  But where I found the patent that you
2  just put before me, the '485 patent, particularly
3  useful was I already knew that the teachings would
4  be useful well below 5 percent.  This patent gave me
5  a lower limit, which was very much in line with what
6  I had previously hypothesized.
7  So the '485 patent was confirmatory in
8  nature.  And I found it very useful in that sense.
9  Q.  Does the '062 patent itself report any
10  testing of a cleaning composition which contains
11  less than 5 percent orange oil?
12  A.  I think I've already told you the lowest
13  concentration reported in the '062 patent is 5
14  percent.
15  Q.  Do you know why or how the number 5
16  percent was arrived at?
17  MR. BURATTI:  Objection to form.
18  A.  Could you rephrase that question,
19  please, counsel?
20  Q.  Do you know how -- strike that.  Do you
21  know how the inventors arrived at the number 5
22  percent?

161

4/26/2006 Rhodes, Christopher

1  Q.  That's the lowest effective amount they
2  have reported in the patent?
3  MR. BURATTI:  Objection to the form and
4  misleading.
5  Q.  Is that correct?
6  A.  That's the product with the lowest
7  concentration that they report.
8  Q.  Isn't it true that that sentence says:
9  From these tests, applicants concluded that with
10  respect to cosmetics, a composition according to the
11  present invention could have as little as 5 percent
12  by volume of orange oil, although it was preferable
13  to have a cleaning composition having at least 25
14  percent by volume of orange oil?  Isn't that what it
15  says?
16  A.  You have read out that sentence
17  correctly.
18  Q.  Doesn't that indicate that 5 percent is
19  the lowest amount that they considered effective for
20  cleaning as the tests are set out in the
21  application?
22  MR. BURATTI:  Objection to form.

163

4/26/2006 Rhodes, Christopher

1  MR. BURATTI:  Same objection.
2  A.  I'm still not quite sure I understand.
3  Are you asking me do you know why the inventors
4  didn't carry out tests at say 1 percent or 2
5  percent?  Is that what you are asking me?
6  Q.  No.
7  A.  No, you are not.  Could you -- I'm
8  regretting to say I'm quite lost.  Could you
9  rephrase the question?
10  Q.  Do you know how the inventors arrived at
11  the number 5 percent?  Why did they determine that
12  it would work with as little as 5 percent?
13  MR. BURATTI:  Objection to form.  Calls
14  for speculation.
15  Q.  Why didn't they say as little as one
16  percent?
17  MR. BURATTI:  Same objection.
18  A.  I'm not sure, I'm still not sure I
19  understand the question.  What they have done is
20  they presented data with various concentrations of
21  olive oil -- orange oil, and the lowest one they
22  have reported in the patent is 5 percent.

162

4/26/2006 Rhodes, Christopher

1  A.  I disagree.  I think what that's saying
2  is if you are interested particularly in having a
3  cleansing composition to remove the real toughies,
4  like calking compounds, et cetera, et cetera, then 5
5  percent may not be appropriate.  However, if you are
6  interested in removing cosmetics or other forms of
7  dirt which are less tenacious, then 5 percent or
8  even less may be perfectly appropriate.
9  Q.  Where does the even less come?  It
10  doesn't say as little as.  It doesn't say as little
11  as 5 percent or less, does it?
12  MR. BURATTI:  Object.
13  Q.  Where do you read in the or less?
14  MR. BURATTI:  Objection to form.
15  A.  What I read is this.  Applicants
16  concluded that with respect to cosmetics, a
17  composition according to the present invention could
18  have as little as 5 percent volume.  They can only
19  state that because that's all they've tested.  Since
20  they haven't tested below 5 percent, they don't make
21  a statement about it.  So they are being very
22  cautious, they are being very conservative and I'm

164

DEPOSITION OF CHRISTOPHER T.
RHODES, Ph.D. (dated 4/27/06)


VOLUME 2


REDACTED IN ITS
ENTIRETY

# EXHIBIT B

*15C1*   #15/C

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

RE: Patent Application for        :    Dated: August 25, 1993
    Greenspan et al.              :    Group: Art Unit 1502
Serial No.: 07/786,804           :    Examiner: Bawa R.
Filed: November 4, 1991          :    Action: AMENDMENT
For: CITRUS OIL COMPOSITIONS     :
     AND USES THEREOF

To: The Commissioner of Patents and Trademarks
    Washington, D.C.   20231

Sir:                                    RECEIVED

                                          SEP 1 1993

        In response to the Office Action dated May 25, 1993, please
                                        GROUP 1500
amend the above identified application as follows:

**In the Specification**

Page 9, line 23, delete "base", insert --based--.

**In the Claims**

1.   (Thrice Amended)  A method of externally treating human
skin including the steps of:

        applying to said skin a composition <u>having</u> a first
ingredient being between five percent (5%) and sixty percent
(60%) by volume of [citrus] <u>orange</u> oil, a second ingredient being
a pharmaceutically acceptable moisturizer for human skin
<u>including a plant material such as plant oils and plant extract</u>
and a third ingredient being an emulsifying agent <u>in the form of
a grain based derivative</u>.

17.   (Thrice Amended)  A method for treating acne on human
skin comprising the step of applying a composition including
forty-five percent (45%) or less by volume of [citrus oil] <u>orange
oil</u>, forty-five percent (45%) or less by volume of an emulsifying
agent <u>in the form of a grain based derivative</u>, and a
pharmaceutically acceptable moisturizer <u>including plant material
such as plant oils and plant extract</u> to said acne on the human

1



skin.

25.    (Thrice Amended)    A cleaning product comprising a towellet formed of an absorbent material, said towellet being impregnated with a cleaning composition and hermetically sealed in a packet member wherein said cleaning composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer including a plant material such as plant oils and plant extract, for human skin and a third ingredient being a grain based emulsifying agent in the form of an oat grain based derivative product.

## REMARKS

This Amendment is in response to the Examiner's Office Action of March 25, 1993.  The Examiner has made a second double patenting rejection in this case.  ·The Applicant received a double patenting rejection in a previous Office Action.   In response to this previous rejection the Applicant submitted the terminal disclaimers ·(by both inventors) and the required fee to remove the double patenting rejection.  The Applicant amended the claims and requested the Examiner to withdraw the terminal disclaimers if appropriate (i.e.) if the amended claims were not subject to a second double patenting rejection.

In the Office Action dated May 25, 1993, the Examiner is once again making a double patenting rejection.  If the claims as amended were still subject to the double patenting rejection, then the terminal disclaimers filed in this case should not be withdrawn and should still be in effect.   If the Examiner is

2

requiring new terminal disclaimers and new payment of fees, the Applicant protests this as a highly inefficient method of prosecuting a patent application.  The Applicant's position is that terminal disclaimers are on file in this case and thus all rejections under double patenting should be mooted by these disclaimers.

The Applicant's position is that the Examiner's §112 rejection to the claims are inappropriate.  The Examiner's attention is drawn to the parent case in which the following claim was allowed:

1.    A skin cleaning composition adapted for external use on human tissues, comprising a first ingredient being between five percent (5%) and sixty percent (60%) by volume of orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent in the form of an oat grain derivative product.

The Applicant's right to claim his disclosed invention should only be limited by the Examiner's prior art references.

In spite of the fact that the Examiner is clearly attempting to limit the claims to a much too narrow scope, the Applicant has amended Claims 1, 17 and 25 to overcome the §112 rejection. Claims 1 and 17 have been amended to recite orange oil.  Claims 1, 17 and 25 have been amended so that the moisturizer has been defined to include a plant material such as plant oils or plant extract.  The plant oils and plant extract are clearly outlined and listed on page 8 of the specification lines 2-27.  Clearly, the specification discloses and enables these claims as amended.

Although the Applicant again protests the limitation, the

3

emulsifying agent has been amended to reflect a grain based derivative. Again, the specification clearly notes on page 9, lines 18-27, that the present invention employs grain based derivatives as the preferred emulsifying agents. The specification lists corn, wheat, barley, rice and oats as types of grain based emulsifiers. The Examiner's requirement that this be listed as oatmeal is unwarranted. The samples listed in the specification use both oatmeal and oat gum as emulsifiers. The Applicant submits that the Claims 1, 17 and 25 are fully enabled and disclosed in the specification and are now allowable as amended.

Based on the foregoing, it is respectfully requested that the Examiner reconsider the rejection of this application and enter an allowance in this matter. If any issues remain to be resolved prior to the granting of this application, it is requested that the Examiner contact the undersigned attorney for the Applicant.

Respectfully submitted,

TIMOTHY J. MARTIN, P.C.

By: _____
Timothy J. Martin, #28,640
Dana S. Rewoldt, #33,762
44 Union Blvd., Suite 620
Lakewood, Colorado    80228
(303) 988-0800

CERTIFICATE OF MAILING UNDER 37 C.F.R. 1.8

I hereby certify that the foregoing AMENDMENT is being deposited with the United States Postal Service as FIRST CLASS MAIL for delivery in a postage pre-paid envelope addressed to The Commissioner of Patents and Trademarks, Washington, D.C. 20231, on this __25__ day of August, 1993.

*Tonya Hessler*

RECEIVED
SEP 1 1993
GROUP 1500

# EXHIBIT C

JUN 03 '94 11:47 LAW OFFICE: (ᴅᴏᴇ) 988-1568                                P.4

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| RE:  Patent Application for    : | Dated:    June 3, 1994 |
| Douglas Greenspan et al.  : | Art Unit: 1502 |
| Serial No.: 07/786,804        : | Examiner: Bawa, R. |
| Filed: November 4, 1991       : | Action:   AMENDMENT |
| For: CITRUS OIL COMPOSITIONS  : | |
| AND USES THEREOF        : | |

To:  The Commissioner of Patents and Trademarks
     Washington, D.C.   20231

Sir:

In response to the Office Action dated December 7, 1993,
finally rejecting the above-identified application, it is
proposed to amend the application as follows:


In the Specification:

Page 9, line 19, delete "such as", substitute --examples
being--.


In the Claims:

1. (Fourth Amendment)   A method of externally treating
human skin including the steps of:

applying to said skin a composition having a first
ingredient being between five percent (5%) and sixty percent
(60%) by volume of orange oil, a second ingredient being a
pharmaceutically acceptable moisturizer for human skin [including
a plant material such as plant oils and plant extract] such
moisturizer to include plant oils and aloe vera plant extract and

1

JUN 03 '94 11:47 LAW OFFICE: (aDa) 988-1568

a third ingredient being an emulsifying agent in the form of a
grain based derivative.

17.  (Fourth Amendment)  A method for treating acne on human
skin comprising the step of applying a composition including
forty-five percent (45%) or less by volume of orange oil, forty-
five percent (45%) or less by volume of an emulsifying agent in
the form of a grain based derivative, and a pharmaceutically
acceptable moisturizer [including plant material such as plant
oils and plant extract] such moisturizer to include plant oils
and aloe vera plant extract to said acne on the human skin.

25.  (Fourth Amendment)  A cleaning product comprising a
towellet formed of an absorbent material, said towellet being
impregnated with a cleaning composition and hermetically sealed
in a packet member wherein said cleaning composition comprises
a first ingredient being between five percent (5%) and sixty
percent (60%) by volume of orange oil, a second ingredient being
a pharmaceutically acceptable moisturizer [including a plant
material such as plant oils and plant extract], such moisturizer
to include plant oils and aloe vera plant extract for human skin
and a third ingredient being a grain based emulsifying agent in
the form of an oat grain based derivative product.

## REMARKS

This Amendment is in response to the Office Action dated
December 7, 1993.  Filed concurrently herewith by mail is a
Request for a Three Month Extension of Time making this Amendment
due June 7, 1994.  A copy of this three (3) month request is also

2

enclosed.    Also filed concurrently herewith by facsimile transmission is an Associate Power of Attorney to Carl Schaukowitch.

The Examiner has rejected Claims 1-3, 5-21 and 25 under the judicially created doctrine of obviousness-type double patenting. In response to a previous rejection based on double patenting in the Office Action of May 25, 1993, Applicant filed a Terminal Disclaimer on July 30, 1992 disclaiming the terminal portion of any patent granted on this application which would extend beyond the expiration date of U.S. Patent No. 5,063,062.  In the Office Action of December 7, 1993, the Examiner found this Terminal Disclaimer to be unacceptable in that it did not comply with 37 C.F.R. 1.321(a).  As grounds for nonacceptance of the Terminal Disclaimer, the Examiner stated that the person who signed the Disclaimer did not state the extent of his interest in the Application/Patent; the person who signed the Terminal Disclaimer failed to state his capacity to sign for the corporation or other business entity; and that the Disclaimer failed to include a statement by the Assignee specifying that the evidentiary documents had been reviewed and certifying that, to the best of the Assignee's knowledge and belief, title was in the Assignee seeking to take action.

Thus, filed concurrently with this Amendment, the Applicant has submitted a new Common Terminal Disclaimer, signed by Douglas Greenspan, who is an original inventor and as an Assignee of his co-invention (Phillip Low) in the Patent, and signed by William Ingram, who is also an Assignee of the co-inventor (Phillip Low) of the Patent.  The Terminal Disclaimer has been rewritten to

3

include a statement of the extent of both Douglas Greenspan and
William Ingram's interests in the Application/Patent, as well as
a statement by both Assignees certifying that they personally own
the entire right, title and interest in the Application/Patent.

Regarding the Examiner's statement that the person who
signed the Terminal Disclaimer failed to state his or her
capacity to sign for the "corporation or other business entity",
the signors of the terminal disclaimer have not signed on behalf
of a corporation or other business entity. Douglas Greenspan and
William Ingram accepted Assignment of the Patent as individuals,
not as corporate representatives, and personally own right and
title to the Application/Patent.

Claims 1-3, 5-21 and 25 were rejected under 35 U.S.C. §112,
second paragraph, on grounds that the phrases "plant material"
and "plant extract" are vague and indefinite. As a result of the
Office Action of May 25, 1993, Claims 1, 17 and 25 were amended
so that the moisturizer was more completely described in the
claims to include a plant material such as plant oils or plant
extract. The plant oils and plant extract are clearly outlined
and listed on Page 8, lines 2-27 of the specification. The claim
referred to a single "plant extract," and the specifications
designate aloe vera as the preferred extract. Applicant believes
that the term "plant extract", when read with the specifications,
is not vague and is clearly defined. However, Claims 1, 17 and
25 have been amended again to delete the term "plant material"
and to specify aloe vera as the claimed "plant extract." Thus,
this rejection should be removed.

Claims 1-3, 5-21 and 25 were also rejected under 35 U.S.C.

4

§112, first paragraph.  The Examiner stated that the disclosure enabled only claims limited to emulsifiers being derived from grains such as corn, rice, barley and oats.   Applicant respectfully disagrees with this analysis.  The list of grains included in the specification was meant to be considered only as examples of grain that could be used to create the emulsifiers. Emulsifiers could also be derived from other grains not included in the list of examples of the specification.  Thus, to further illustrate that these five (5) types of grain were meant only as suggested examples, the specification has been changed on Page 9, line 19 from "such as corn, rice, . . ." to "examples being, corn, rice, wheat, barley and oats."

   More specifically, the examples listed in the specification are merely a enumerated species of the genus, "grain," referred to in "grain-based derivatives" named in the claims.   A specification may, within the meaning of 35 U.S.C. §112(1), contain a written description of a broadly claimed invention without describing all species that that claim encompasses. Utter v. Hiraga, 845 F. 2nd 993 (Fed. Cir. 1988).  Case law has not fixed any definite number of species which will establish completion of a generic claim, and it is evident from these cases that the number will vary, depending on the circumstances of particular cases.  Thus, in the case of a small genus such as the halogens, consisting of four species, a reduction to practice of three or perhaps even two, might serve to complete the generic invention, while in the case of a genus comprising hundreds of species, a considerably larger number of reductions to practice would probably be necessary.  Application of Shokal, 242 F. 2nd

771 (Cust. Pat. App. 1957). Applicant may enumerate a
considerable number of chemicals which he discloses as being
usable for the purpose for which the invention was intended,
however, he is not limited to the use of one specific substance.
The broad class covered in the claims cover and include other
species of and other chemicals than those enumerated in the
Application. Wayne v. Kingsland, 80 U.S.P.Q. 486(D.C. 1948).

. In the case at hand, Applicant's claim is for the genus of
"grain" such grain to be used to form an emulsifying agent. The
grains listed in the specifications, corn, rice, wheat, barley
and oats, are species of that genus. Applicant is not required
to disclose every type of grain from which its emulsifier could
be made. The number of species of grain given as examples is
sufficient to convey to one skilled in the art the nature of the
substances which will accomplish the desired result, i.e., that
grains similar to those listed will be suitable to create an
emulsifier. Thus, the Applicant requests that its claim for the
genus of "grain" referred to in its claims in the context of
"grain-based derivatives" to be used as an emulsifying agent, be
allowed and that the types of grain enumerated in the
specifications be considered examples of species of that genus.

Based on the foregoing, it is respectfully requested that
the Examiner reconsider the rejection of this application, enter
this Amendment and allow the application. The Applicant submits
that the present invention is now in its complete form and should
be allowable as amended. In the event that the Examiner
disagrees, it is requested that the Amendment be entered for
purposes of appeal. Action to this affect is courteously

solicited from the Examiner.  The Examiner is requested to grant

a timely allowance in this matter, so that Applicant may comply

with impending time deadlines.

Respectfully submitted,

TIMOTHY J. MARTIN, P.C.

By: _____

Timothy J. Martin, #28,640
Carl Schaukowitch, #29,211
9250 W. 5th Avenue, Suite 200
Lakewood, Colorado   80226
(303) 232-3388

7

## CERTIFICATE OF FACSIMILE TRANSMISSION

I hereby certify that this AMENDMENT in reference to patent application Serial No. 07/786,804, filed November 4, 1991 entitled CITRUS OIL COMPOSITIONS AND USES THEREOF is being facsimile transmitted to The Commissioner of Patents and Trademarks Office, Washington, D.C. 20231, Attn: Examiner R. Bawa, dated this ___ day of June, 1994.

8

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th of August, 2006, the attached **REDACTED PUBLIC VERSION OF LP MATTHEWS' ANSWERING MEMORANDUM IN OPPOSITION TO THE LIMITED DEFENDANTS' PROPOSED CLAIM CONSTRUCTION** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esquire                        HAND DELIVERY
Potter Anderson & Corroon, LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801

Arthur I. Neustadt, Esquire                       VIA ELECTRONIC MAIL
Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
1940 Duke Street
Alexandria, VA  22314

Francis G.X. Pileggi, Esquire                       HAND DELIVERY
Fox Rothschild LLP
Suite 1300
919 North Market Street
Wilmington, DE  19801

John Ward, Esquire                              VIA ELECTRONIC MAIL
Ward & Olivo
708 Third Avenue
New York, NY  10017

*/s/ Tiffany Geyer Lydon*

Tiffany Geyer Lydon