## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LP MATTHEWS, L.L.C.,           )   **REDACTED PUBLIC VERSION**

                           )

        Plaintiff,          )

                           )

        v.                 )   C.A. No. 04-1507-SLR

                           )

BATH & BODY WORKS, INC., LIMITED   )

BRANDS, INC., KBC BRANDS CO.     )

(f/k/a THE ANDREW JERGENS       )

COMPANY), and KAO CORPORATION,  )

                           )

        Defendants.      )

## LP MATTHEWS' ANSWERING MEMORANDUM IN
## OPPOSITION TO KBC'S PROPOSED CLAIM CONSTRUCTION

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff LP Matthews, L.L.C.*

*Of Counsel:*

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, DC  20006

Dated: August 4, 2006
171741.1

# TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS.................................................................1

INTRODUCTION..........................................................................................................1

BACKGROUND............................................................................................................3

ARGUMENT.................................................................................................................5

      A.    The Term "Orange Oil" Should Be Construed To Mean Oil Derived From An Orange In An Amount Sufficient To Have A Cleaning Effect.........................................................................................................5

      B.    The Term "Skin Cleaning Composition" Means Compositions That Treat Unwanted Substances On The Skin In Order To Facilitate Removal Of Those Substances....................................................................8

CONCLUSION.............................................................................................................10

# TABLE OF AUTHORITIES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003)...................................................................6

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002)..............................................................9, 10

*DeGeorge v. Bernier*,
    768 F.2d 1318 (Fed. Cir. 1985)...............................................................9

*Interactive Gift Express, Inc. v. CompuServe, Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001)...............................................................5

*Jansen v. Rexall Sundown, Inc.*,
    342 F.3d 1329 (Fed. Cir. 2003)...............................................................5

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999)............................................................1, 5

*Laitram Corp. v. NEC Corp.*,
    163 F.3d 1342 (Fed. Cir. 1998)...............................................................8

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*,
    445 F.3d 1348 (Fed. Cir. 2006)...............................................................1

*Modine Mfg. Co. v. United States Int'l Trade Comm'n*,
    75 F.3d 1545 (Fed. Cir. 1996)................................................................6

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002)...............................................................8

*Varco, L.P. v. Pason Sys. USA Corp.*,
    436 F.3d 1368 (Fed. Cir. 2006)..............................................................10

## I.    NATURE AND STAGE OF PROCEEDINGS

On December 8, 2004, plaintiff LP Matthews, L.L.C. filed a Complaint for patent infringement against defendants KBC Brands Company (formerly known as The Andrew Jergens Company), Kao Corporation, Limited Brands, Inc., and Bath & Body Works, Inc. (D.I. 1.)  LP Matthews amended its Complaint on February 2, 2005.  (D.I. 5, 8.)  This Court entered a Scheduling Order on June 9, 2005.  (D.I. 39.)  Pursuant to the Scheduling Order, the parties filed a Joint Claim Construction Statement on June 15, 2006.  (D.I. 228.)  The deadline for filing simultaneous claim construction briefs was June 29, 2006. (D.I. 39 at 5.)  On that day, KBC filed an Opening Claim Construction Brief.  (D.I. 244.) This Memorandum opposes KBC's proposed claim construction.

## II.    INTRODUCTION

KBC's proposed claim construction has three major flaws:  (1) it improperly focuses on the patent specification and not the claims, (2) it blatantly ignores the plain meaning of the claims, and (3) it imports a nonexistent limitation from the specification into the claims.  These necessarily follow from KBC's improper conflation of claim construction and determination of infringement.  An infringement analysis is a two-step process: first, the court determines the scope and meaning of the patent claims asserted and second, the properly construed claims are compared to the allegedly infringing device. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed. Cir. 1999).  Construing the claims "with reference to the accused products" as urged by KBC is legal error.  As the Federal Circuit stated, "a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to exclude an accused product..." *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1350 (Fed. Cir. 2006).

In an unapologetic effort to prejudge the ultimate infringement analysis, KBC wants the claims of the '062 patent narrowed to a minimum orange oil percentage even though claim 6 does not recite *any* percentage limitations and claim 9 recites only a maximum percentage. (LPM Ex. A, '062 patent at 10:1-6, 13-17.[1]) KBC also proposes construing the term "skin cleaning composition" – not according to ordinary and customary meaning to a person of ordinary skill in the art – but solely based on preferred embodiments and a selected statement of use in the '062 patent specification. The Court should reject KBC's proposed claim construction because it contravenes the law.

There are two claims of United States Patent No. 5,063,062 at issue in this litigation – claims 6 and 9 (italicized boldface terms to be construed in this motion):

> 6.    A *skin cleaning composition* for external use on human tissues, comprising *orange oil*, a pharmaceutically acceptable moisturizer for human skin and an oat grain derivative product as an emulsifying agent, wherein said composition has a pH within a range of 4.5 to 6.0, inclusively.

> 9.    A *cleaning composition for use on human skin* comprising forty-five percent (45%) or less by volume of *orange oil*, forty-five percent (45%) or less by volume of oatmeal and a pharmaceutically acceptable moisturizer.

As stated in the Joint Claim Construction Statement, this Court needs to construe the terms "skin cleaning composition" and "orange oil," found in both claims 6 and 9. These terms should be accorded their ordinary and customary meaning to a person of ordinary skill in the art in 1989, when the application for the patent-in-suit was filed. Accordingly, a cleaning composition is a composition that cleans human skin and orange oil is oil derived from an orange.

---

[1]  In this brief, "LPM Br." is LP Matthews' Opening Claim Construction Brief. (D.I. 254.) "LPM Ex." refers to exhibits to that brief. "Ex. __" refers to exhibits attached hereto. "KBC Br." is KBC's Opening Claim Construction Brief. (D.I. 244.)

This Court should decline KBC's invitation to deviate from Federal Circuit precedent by disregarding the claim language and importing unwarranted limitations from the specification into claims 6 and 9.

## III.     **BACKGROUND**

The United States Patent and Trademark Office issued United States Patent No. 6,063,062 to Douglas Greenspan and Philip Low on November 5, 1991.  The application for the '062 patent was filed on September 27, 1989.

The '062 patent claims compositions for cleaning human skin that contain orange oil, an oat ingredient, and a moisturizer.  (LPM Ex. A, '062 patent at 9:3-10:25.)  The invention "provide[s] a skin cleaning composition that not only removes unwanted substances from the human skin, but also acts to help clean and revitalize the human skin." (*Id.* at 2:21-25.)  The inventors, Mr. Greenspan and Mr. Low, tested the "skin effecting property" (*id.* at 6:62-64), "softening effect" (*id.* at 2:68), and "cleaning properties" (*id.* at 1:24-28, 6:30-31) of their invention.  The tests described in the specification included "determining that test Samples…performed adequately in cleaning the hands *and in moisturizing the hands*…." (*Id.* at 4:19-20 (emphasis added).)  The "Samples…were submitted to the test group [of independent evaluators] to evaluate cleaning effectiveness and *moisturizing ability*." (*Id., e.g.,* at 66-67.)  The inventors identified an intended use in the preambles – skin cleaning – and used the open-ended transitional phrase "comprising" in the claims.  (*Id.* at 4:19-20, 66-67.)

The plain and unambiguous language of claims 6 and 9 disclose a composition that cleans human skin and contains orange oil, an oat element, and a moisturizer, and may contain other ingredients because the transitional phrase "comprising" is used in the

claims. The inventors disclosed combinations of varying ingredients with differing functions. For example, they noted that glycerin or safflower oil act as both moisturizers and emulsifying agents. (*Id.* at 8:14-19.) As further example, oatmeal adds cleaning properties. (LPM Ex. B, '062 patent prosecution history at LPM 000186.) In addition, the embodiments disclosed in the '062 patent specification included compositions with baking soda, Vitamin E, and multiple moisturizers. (LPM Ex. A, '062 patent at 7:10-57.)

The preambles of both claims at issue limit the claimed compositions to cleaning compositions for use on human skin, i.e., compositions that treat an unwanted substance on the skin in order to facilitate removal of those substances by some other mechanism, such as rinsing, wiping, rubbing, or shearing. (A cleaning composition need not both treat the substance and remove it.) Nothing in the claim requires cleaning of non-water soluble or difficult to remove substances.

With respect to orange oil, the patent specification provides that orange oil can be used to clean human skin. (LPM Ex. A, '062 patent at 1:53-54.) Orange oil is oil derived from an orange (any reddish-yellow fruit of the genus *Citrus*, including Mandarin Oranges (*Citrus nobilus*)). Messrs. Greenspan and Low observed that in its "broadest form," the "composition includes orange oil" with no minimum percentage restriction. (*Id.* at 2:68.) Further, they disclosed that "the more specific composition according to the preferred embodiment... comprises forty-five percent (45%) *or less* by volume of orange oil." (*Id.* at 2:45-48.)

Asserted claim 9 calls for "forty-five percent (45%) or less by volume of orange oil" and claim 6 simply for "orange oil" – this claim language was in the original application. (*Id.* at 10:13-18, 10:1-6.) Neither the specification nor the asserted claims

require a minimum percentage of orange oil.

## IV.    ARGUMENT

Claim interpretation "must begin and remain centered on the language of the claims themselves." *Interactive Gift Express, Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001). "The general rule is that terms in the claim are to be given their ordinary and accustomed meaning." *K-2*, 191 F.3d at 1362-63; *see also Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1332 (Fed. Cir. 2003) ("ordinary meaning of the claim language"). Applying these principles here, KBC's proposed claim construction must be rejected.

### A.    The Term "Orange Oil" Should Be Construed To Mean Oil Derived From An Orange In An Amount Sufficient To Have A Cleaning Effect

Claim 6 simply requires "orange oil" without any percentage limitations. The plain meaning of orange oil is the oil (i.e., non-water soluble liquid) derived from an orange, as by (for example) cold pressing or processing oranges. (LPM Ex. A, '062 patent at 2:66-67; Ex. A, Rhodes Dep. Tr. at 252:8-16.) An orange is a globose, reddish-yellow, bitter or sweet, edible citrus fruit from any of the white-flowered rutaceous trees of the genus *Citrus*. (LPM Ex. G, Random House College Dictionary 934 (1972).) Orange oil contains numerous molecular species, including esters and other volatiles. (Ex. A, Rhodes Dep. Tr. at 265:9-15; LPM Ex. B at LPM 000184.)

Neither claim 6 nor claim 9 recites a minimum percentage of orange oil in the composition. (LPM Ex. A, '062 patent at 10:1-6, 13-17.) Claim 6 of the '062 patent claims a composition "comprising orange oil." (*Id.* at 10:1-6.) Claim 9 requires "forty-five percent (45%) or less by volume of orange oil." The plain meaning of 45% or less in claim 9 is more than no orange oil but not more than 45% by volume. The upper limit of

45% was based on the desire to maintain the softening (i.e., lotion) effect of the claimed composition. (LPM Ex. A, '062 patent at 7:23-27.)

The specification of the '062 patent does not limit the claims to a minimum orange oil percentage. For example, as stated in the '062 patent specification, "the more specific composition according to the preferred embodiment ... comprises forty-five percent (45%) or less by volume of orange oil." (LPM Ex. A, '062 patent at 2:45-48.)

In contrast to claims 6 and 9, claim 1 was drafted to require at least 5% orange oil: "between five percent (5%) and sixty percent (60%) orange oil...." (*Id.* at 9:4-10.) Claim 1 includes a numerical limitation of 5%, but claims 6 and 9 do not. "It is usually incorrect to read numerical precision into a claim from which it is absent, *particularly when other claims contain the numerical limitation.*" *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) (emphasis added); *see also Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) ("[W]hen a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.").

Properly construed, claims 6 and 9 require only that the accused product contain oil derived from an orange and require only enough of that ingredient to have a cleaning effect. A person of ordinary skill in the art at the time of the invention would have known that orange oil has a cleaning effect at 0.01%. Indeed, a contemporaneous document by KBC, United States Patent No. 5,013,485 ("the '485 patent") teaches that 0.01% orange oil (or more) has a cleaning effect. (LPM Ex. H, '485 patent at 3:5-8.) Furthermore, a person of ordinary skill in the art would have known that an ingredient

that effectively cleans difficult to remove substances such as cosmetics at a relatively

high concentration would clean less difficult to remove substances at lower

concentrations or even clean difficult to remove substances with longer application. (Ex.

A, Rhodes Dep. Tr. at 159:14-160:11.) A person of ordinary skill in the art with

"knowledge of the use of surfactants and of solvents, knowing that surfactants in

particular are very active even at very low concentrations, [would] ... know that the

limits of the effectiveness of the teachings of the '062 patent are going to be much lower

than 5 percent." (*Id.* at 160:13-18.) Accordingly, orange oil is a non-water soluble liquid

derived from an orange. To the extent there is a minimum percentage, it is a

concentration of at least 0.01% (sufficient to have a cleaning effect).

Not only do claims 6 and 9 use clear language that does not specify a minimum

orange oil percentage, but the excerpted portion of the specification cited by KBC

*supports* applying the plain meaning of that claim language. That excerpt demonstrates

that an embodiment of the invention with 5% orange oil effectively cleans difficult to

remove substances specifically contemplated by the invention.

KBC cited from this excerpt:

> From these tests, Applicants concluded that...a
> composition according to the present invention could have
> as little as 5% by volume of orange oil although it was
> preferable to have a cleaning composition having at least
> 25% by volume orange oil.

(LPM Ex. A, '062 patent at 6:56-61 (D.I. 244, KBC Br. at 2).) That testing included an

embodiment of the invention with 5% orange oil that removed cosmetics from the skin.

(*Id.* at 6:44-45.) Cosmetics are "examples of substances that are difficult to remove" that

led to the conception of this invention. (*Id.* at 1:26.) Accordingly, this excerpt suggests

that a composition with less than 5% orange oil would still clean, albeit with longer

application or substances that are not as difficult to remove.

The orange oil elements of claims 6 and 9 do not have a minimum percentage

requirement. "It is the *claims*, not the written description, which define the scope of the

patent right." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998)

(emphasis original). KBC has not overcome the presumption of the claims' ordinary

meaning simply by pointing to the testing of an embodiment in the specification. *See*

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (ordinary

meaning presumption not rebutted "simply by pointing to the preferred embodiment or

other structures or steps disclosed in the specification").

For these reasons, claims 6 and 9 should not be construed (as KBC argues) to

require a minimum of 5% by volume of orange oil.

## B. The Term "Skin Cleaning Composition" Means Compositions That Treat Unwanted Substances On The Skin In Order To Facilitate Removal Of Those Substances

Asserted claims 6 and 9 of the '062 patent claim compositions that have a

cleaning effect on human skin. This is the ordinary and customary meaning of the

preambles to a person of ordinary skill in the art. As Dr. Rhodes testified, "A skin

cleaning composition is a composition that has the ability to clean the skin." (Ex. A,

Rhodes Dep. Tr. at 134:15-16.) Dr. Rhodes further testified that "[cleaning composition

for use on human skin] means a composition that can be applied to the human skin and

this composition has cleaning properties," (*id.* at 135:1-3), and that there is no significant

difference between the two preambles. (*Id.* at 135:10-11.)

"Cleaning" means treating unwanted substances on the skin in order to facilitate removal of those substances (for example, loosening or dissolving or drawing or sheering substances such as dead skin, dirt, oil, blemishes (*e.g.* ashen coloration) etc...). The unwanted substances can then be removed by rinsing, wiping, abrasion or evaporation. In the '062 patent, a preferred embodiment was tested by washing with water. (LPM Ex. A, '062 patent at 8:24-26.)

The claims of the '062 patent do not specify a particular quantity or quality of the cleaning effect. Nor do they require that orange oil be the only cleaning component. Indeed, the applicants recognized that oat grain derivative products may contribute to the cleaning effect of the composition. (LPM Ex. B at LPM 000186.) Because the patentees used the open transitional phrase "comprising," the claimed composition may have other effects besides cleaning and may include other cleaning components. *DeGeorge v. Bernier*, 768 F.2d 1318, 1322 (Fed. Cir. 1985). Indeed, the specification of the '062 patent states objectives of the invention that include other effects, *e.g.*, softening and rejuvenating the skin. This softening effect was not incidental to the invention. As noted previously, the 45% limitation on orange oil was arrived at because "any amount of orange oil in excess of this amount would result in the diminishment of moisturizers so as to negate the softening effect ...." (LPM Ex. A, '062 patent at 7:23-26.)

Furthermore, KBC's proposed construction limiting "skin cleaning compositions" only to those suitable for cleaning "tar, caulking compounds, sealants, adhesives, and the like" necessarily disregards well-established legal principles. While some aspects of the invention may be described in the specification, an applicant is not required to conceive of every use to which his invention may be put. *See Catalina Mktg. Int'l, Inc. v.*

- 9 -

*Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002) (citing 35 U.S.C. § 271 (1994) and *Roberts v. Ryer*, 91 U.S. 150, 157 (1875)).  KBC's construction limits the claimed composition based on nothing more than a statement of one use of the invention – one that is not a claim element and should not be imported into the claims from the specification.  *Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368, 1373 (Fed. Cir. 2006) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims.").

Accordingly, "skin cleaning composition" should be construed to mean compositions that treat unwanted substances on the skin in order to facilitate removal of those substances – including compositions that moisturize as well as clean – just like the preferred embodiments of the '062 patent.

## V.     CONCLUSION

Based upon the foregoing analysis and argument presented herein and in LP Matthews' Memorandum in Support of its Proposed Claim Construction (D.I. 254) and the other pleadings submitted to this Court, LP Matthews respectfully requests that the Court reject KBC's proposed construction of the claims of the patent-in-suit and adopt the construction proposed by LP Matthews.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware  19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*LP Matthews, L.L.C.*

*Of Counsel:*

Ronald J. Schutz
Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Robert A. Auchter
Jason R. Buratti
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, Suite 1200
Washington, DC  20006

Dated:  July 31, 2006
171741.1

# EXHIBIT A

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - -x

L.P. MATTHEWS, L.L.C.,        :

5    Plaintiff,    :

6    vs.    : Civil Action

7    BATH & BODY WORKS, INC.,    : No. 04-1507 (SLR)

8    LIMITED BRANDS, INC.; KAO    :

9    BRANDS CO., (f/k/a THE    :

10    ANDREW JERGENS COMPANY);    :

11    and KAO CORPORATION,    :

12    Defendants.    :

13    - - - - - - - - - - - - - - - -x

14    Deposition of CHRISTOPHER T. RHODES, Ph.D., a witness

15    herein, called for examination by counsel for Defendant

16    in the above-entitled matter, pursuant to notice, the

17    witness being duly sworn by Robert M. Jakupciak, a

18    Notary Public in and for the District of Columbia, taken

19    at the offices of Robins, Kaplan, Miller & Ciresi, L.L.P.,

20    1801 K Street, N.W. Washington, D.C., 20006, at 9:00 a.m.,

21    on April 26, 2006, and the proceedings being taken down

22    by Stenotype by Robert M. Jakupciak, RPR.

1

---

1    C O N T E N T S

2    THE WITNESS: CHRISTOPHER T. RHODES, Ph.D.

3    EXAMINATION    PAGE NO.

4    By Mr. Baxter ..................... 4

5

6

7

8    E X H I B I T S

9    RHODES EXHIBIT NUMBER    PAGE NO.

10    1    Curriculum Vitae ................. 49

11    2    Rhodes Report ................... 109

12    3    Rhodes Updated Report ........... 109

13    4    '062 Patent ..................... 133

14    5    '485 Patent ..................... 150

15    6    Rhodes Responsive Report ......... 216

16

17

18

19

20

21

22

3

---

1

2    APPEARANCES:

3    On behalf of the Plaintiff:

4    JASON R. BURATTI, ESQUIRE

5    Robins, Kaplan, Miller & Ciresi, L.L.P.

6    1801 K Street, N.W

7    Washington, D.C., 20006

8    (202) 736-2710

9    On behalf of Limited Defendants:

10    JOHN F. WARD, ESQUIRE

11    Ward & Olivo

12    798 Third Avenue

13    New York, New York  10017

14    (212) 697-6262

15    On behalf of Kao Corporation:

16    STEPHEN G. BAXTER, ESQUIRE

17    RICHARD L. CHINN, ESQUIRE

18    Oblon, Spivak, McClelland

19    Maier & Neustadt, P.C.

20    1940 Duke Street

21    Alexandria, Virginia  22314

(703) 413-3000

2

---

1    Whereupon,

2    CHRISTOPHER T. RHODES, Ph.D.,

3    called for examination by counsel for Defendant and

4    having been duly sworn by the Notary Public, was

5    examined and testified as follows:

6    EXAMINATION BY COUNSEL FOR DEFENDANT

7    BY MR. BAXTER:

8    Q.    Good morning.

9    A.    Good morning.

10    Q.    Could you please state your full name

11    for the record?

12    A.    Christopher Thomas Rhodes.  R-H-O-D-E-S.

13    Q.    Could you please state your current

14    address for the record?

15    A.    28 Prospect Avenue, Narragansett, Rhode

16    Island.

17    Q.    Is it Dr. Rhodes or Professor Rhodes or

18    Mr. Rhodes?

19    A.    Professor Rhodes is perfectly

20    satisfactory, thank you, sir.

21    Q.    My name is Steve Baxter, and I represent

22    the Kao defendants in this litigation.  Do you

4

1    If the Kao defendants are going to

2  continue to ask questions concerning those two

3  elements as they pertain to infringement and,

4  therefore, including claim construction, we are

5  going to stop the examination and contact the Court.

6    We are also going to object to the

7  limited defendant's examination on those elements,

8  to the extent they go to claim construction, if

9  there is overlapping, cumulative testimony. So I'm

10  going to request that the defendants over lunch

11  discuss whether or not they want to continue to

12  proceed in this examination manner.

13    MR. BAXTER: Off the record.

14      -  -  -

15    (Recessed at 12:54 p.m.)

16    (Reconvened at 1:37 p.m.)

17      -  -  -

18    (Rhodes Exhibit No. 4

19      was marked for

20      identification.)

21  BY MR. BAXTER:

22    Q.  Welcome back, Professor Rhodes.

133

1    A.  That means a composition that can be

2  applied to the human skin and this composition has

3  cleaning properties.

4    Q.  Does that term have the same meaning as

5  the term a skin cleaning composition in claim 6?

6    A.  I have considered that point, and I am

7  obviously not a patent lawyer, and therefore I will

8  not trespass into legal matters, but speaking as a

9  scientist who has worked with emulsions and other

10  disperse systems, I would not see any significant

11  difference between those two sets of words.

12    Q.  Did you rely on any part of the

13  specification of the '062 patent in interpreting the

14  meaning of the term a skin cleaning composition as

15  it's used in claim 6?

16    MR. BURATTI: Objection to form.

17    A.  Certainly whenever I look at a patent, I

18  firstly read the whole patent from start to the end.

19  And so I may do that on more than one occasion.

20    When I get to the claims, I obviously

21  take what the claims are stating in the context of

22  the whole patent. I bear in mind what is in the

135

1    A.  Thank you, sir.

2    Q.  I just handed you a copy of U.S. Patent

3  Number 6,063,062, which has been marked as Rhodes

4  Exhibit Number 4. Do you recognize Rhodes Exhibit

5  Number 4 as the '062 patent?

6    A.  Yes, sir.

7    Q.  I would like you to turn back to the

8  last page and look at the claims. In particular, I

9  would like you to look at claim 6. Do you see the

10  first four words of claim 6 are a skin cleaning

11  composition?

12    A.  I do.

13    Q.  What does that mean, a skin cleaning

14  composition?

15    A.  A skin cleaning composition is a

16  composition that has the ability to clean the skin.

17    Q.  And I would like you to take a look at

18  claim 9. Do you see the first line of claim 9

19  reads: A cleaning composition for use on human

20  skin?

21    A.  Yes, sir.

22    Q.  What does that term mean?

134

1  whole patent when I come to read the claims.

2    Q.  Did any part of the specification of the

3  '062 patent in fact contribute to your understanding

4  of the term a skin cleaning composition as it's used

5  in claim 6?

6    MR. BURATTI: Objection to form.

7    A.  Certainly. If you go back to column 2,

8  among other parts of the specification that I think

9  are of use, starting at line 10, it says it is an

10  object of the present invention to provide a new and

11  useful compound for cleaning the human skin.

12    Another object of the present invention

13  is to provide a skin cleaning compound suitable for

14  cleaning non-water soluble products such as grease,

15  caulking, adhesives, sealants, tar, oil, ink and the

16  like. Yet another object of the present invention

17  is to provide a skin cleaning composition which is

18  non-toxic.

19    It is further -- it is a further object

20  of the present invention to provide a skin cleaning

21  composition that is derived from natural vegetable

22  and plant sources. Still a further object of the

136

1  you would like to see the documents, you can ask for
2  them.
         A.       In the absence of going through the
   transcripts, I'm afraid I can't be more helpful.
5        Q.       Sitting here today you just can't
6  remember?
7        A.       I just can't remember.
8        Q.       Now let me hand you a copy of U.S.
9  Patent 5,013,485, which we have marked as Rhodes
10  Exhibit Number 5. Can you identify Rhodes Exhibit
11  Number 5?
12       A.       Yes, I can.
13       Q.       I notice you cite that, I believe, as
14  Exhibit 4 on the very bottom of page 4 of your
15  updated report.
16       A.       Can I just turn to that?
17       Q.       Sure. I was going to do it for you.
18  But that's okay.
19       A.       Page 4.
20       Q.       The very bottom. Page 4, where it says
21  the claim term orange oil.
22       A.       Yes.

                            157

1        Q.       Then you go on.
2        A.       I see. Yes.
3        Q.       So Rhodes Deposition Exhibit Number 5 is
4  Exhibit 4 of your updated expert report?
5        A.       Yes, sir. The numbers are beginning to
6  jump around a bit, but I think I'm on track at the
7  moment.
8        Q.       We will just try to keep it straight.
9  Now you say: Based on Rhodes Exhibit Number 5, I
10  conclude that orange oil can perform cleaning at
11  levels of 0.01 percent or lower. Do you see that?
12       A.       Correct. Yes, sir.
13       Q.       Aside -- first of all, when was the
14  first time you saw Rhodes Exhibit Number 5?
15       A.       I don't recall.
16       Q.       Was it during the course of this
17  litigation?
18       A.       Oh, yes. I had never seen that patent
19  before January '06.
20       Q.       Did you find that patent yourself?
21       A.       No, sir.
         Q.       Was it provided to you by Mr. Buratti or

                            156

1  somebody at Robins Kaplan?
2        A.       I think it was Mr. Buratti who provided
3  it to me, yes.
4        Q.       Do you have any basis other than Rhodes
5  Exhibit 5 to believe that orange oil can
6  perform cleaning at levels of 0.01 percent or lower?
7        A.       Yes, I do.
8        Q.       Can you tell us those?
9        A.       Certainly. In the '062 patent itself,
10  the patentees report studies in which they go down
11  to orange oil concentrations at 5 percent. And if I
12  may just turn to the '062 patent.
13       Q.       You may want to turn to column 6.
14       A.       Thank you. It tells us that the
15  effectiveness of the products, of the cleaning
16  ability, was reduced. It could still remove
17  cosmetic products. It wasn't good or as effective
18  at removing caulking compounds and so on.
19       So the first thing I know, looking at
20  the patent, we have got products which contain a
21  number of different concentrations of the oil. And
22  certainly if you look at the claim, we are talking

                            158

1  about orange oil up to 45 percent, and within the
2  patent itself we see data going down to 5 percent
3  which has still got cleaning properties but not as
4  good as higher concentrations.
5        So the first thing I can do as a
6  scientist who has worked on emulsions, skin lotions,
7  is carry out an extrapolation procedure and say,
8  well, it will certainly be, still be effective at
9  lower concentrations. It may require a little
10  longer application, but an extrapolation procedure.
11  So that's the first approach I can use.
12       The second approach I can use is my
13  knowledge of the use of surfactants and of solvents,
14  knowing that surfactants in particular are very
15  active even at very low concentrations, and so I
16  know that the limits of the effectiveness of the
17  teachings of the '062 patent are going to be much
18  lower than 5 percent. And I believe that in the
19  prosecution file history, that when the patent was
20  first submitted, in fact there was an indication
21  that the product would be effective at quite low
22  concentrations.

                            160

1        But where I found the patent that you
2   just put before me, the '485 patent, particularly
3   useful was I already knew that the teachings would
4   be useful well below 5 percent.  This patent gave me
5   a lower limit, which was very much in line with what
6   I had previously hypothesized.
7        So the '485 patent was confirmatory in
8   nature.  And I found it very useful in that sense.
9        Q.   Does the '062 patent itself report any
10  testing of a cleaning composition which contains
11  less than 5 percent orange oil?
12        A.   I think I've already told you the lowest
13  concentration reported in the '062 patent is 5
14  percent.
15        Q.   Do you know why or how the number 5
16  percent was arrived at?
17            MR. BURATTI:  Objection to form.
18        A.   Could you rephrase that question,
19  please, counsel?
20        Q.   Do you know how -- strike that.  Do you
21  know how the inventors arrived at the number 5
22  percent?

1        Q.   That's the lowest effective amount they
2   have reported in the patent?
3            MR. BURATTI:  Objection to the form and
4   misleading.
5        Q.   Is that correct?
6        A.   That's the product with the lowest
7   concentration that they report.
8        Q.   Isn't it true that that sentence says:
9   From these tests, applicants concluded that with
10  respect to cosmetics, a composition according to the
11  present invention could have as little as 5 percent
12  by volume of orange oil, although it was preferable
13  to have a cleaning composition having at least 25
14  percent by volume of orange oil?  Isn't that what it
15  says?
16        A.   You have read out that sentence
17  correctly.
18        Q.   Doesn't that indicate that 5 percent is
19  the lowest amount that they considered effective for
20  cleaning as the tests are set out in the
21  application?
22            MR. BURATTI:  Objection to form.

1            MR. BURATTI:  Same objection.
2        A.   I'm still not quite sure I understand.
3   Are you asking me do you know why the inventors
4   didn't carry out tests at say 1 percent or 2
5   percent?  Is that what you are asking me?
6        Q.   No.
7        A.   No, you are not.  Could you -- I'm
8   regretting to say I'm quite lost.  Could you
9   rephrase the question?
10        Q.   Do you know how the inventors arrived at
11  the number 5 percent?  Why did they determine that
12  it would work with as little as 5 percent?
13            MR. BURATTI:  Objection to form.  Calls
14  for speculation.
15        Q.   Why didn't they say as little as one
16  percent?
17            MR. BURATTI:  Same objection.
18        A.   I'm not sure, I'm still not sure I
19  understand the question.  What they have done is
20  they presented data with various concentrations of
21  olive oil -- orange oil, and the lowest one they
22  have reported in the patent is 5 percent.

1        A.   I disagree.  I think what that's saying
2   is if you are interested particularly in having a
3   cleansing composition to remove the real toughies,
4   like calking compounds, et cetera, et cetera, then 5
5   percent may not be appropriate.  However, if you are
6   interested in removing cosmetics or other forms of
7   dirt which are less tenacious, then 5 percent or
8   even less may be perfectly appropriate.
9        Q.   Where does the even less come?  It
10  doesn't say as little as.  It doesn't say as little
11  as 5 percent or less, does it?
12            MR. BURATTI:  Object.
13        Q.   Where do you read in the or less?
14            MR. BURATTI:  Objection to form.
15        A.   What I read is this.  Applicants
16  concluded that with respect to cosmetics, a
17  composition according to the present invention could
18  have as little as 5 percent volume.  They can only
19  state that because that's all they've tested.  Since
20  they haven't tested below 5 percent, they don't make
21  a statement about it.  So they are being very
22  cautious, they are being very conservative and I'm

# DEPOSITION OF CHRISTOPHER T. RHODES, Ph.D. (dated 4/27/06)

# VOLUME 2

# REDACTED IN ITS ENTIRETY

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th of August, 2006, the attached **REDACTED PUBLIC VERSION OF LP MATTHEWS' ANSWERING MEMORANDUM IN OPPOSITION TO KBC'S PROPOSED CLAIM CONSTRUCTION** was served upon the below-named counsel of record at the address and in the manner indicated:

Richard L. Horwitz, Esquire                                   HAND DELIVERY
Potter Anderson & Corroon, LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801

Arthur I. Neustadt, Esquire                                   VIA ELECTRONIC MAIL
Oblon, Spivak, McClelland, Maier & Neustadt, P.C.
1940 Duke Street
Alexandria, VA  22314

Francis G.X. Pileggi, Esquire                                 HAND DELIVERY
Fox Rothschild LLP
Suite 1300
919 North Market Street
Wilmington, DE  19801

John Ward, Esquire                                            VIA ELECTRONIC MAIL
Ward & Olivo
708 Third Avenue
New York, NY  10017

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon