IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LP MATTHEWS, L.L.C., | ) | |
|     Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 04-1507 (SLR) |
| | ) | JURY TRIAL DEMANDED |
| BATH & BODY WORKS, INC., | ) | |
|    and | ) | PUBLIC VERSION FILED: |
| LIMITED BRANDS, INC., | ) | AUGUST 7, 2006 |
|    and | ) | |
| KAO BRANDS CO. (f/k/a THE ANDREW | ) | DATED: JULY 31, 2006 |
| JERGENS COMPANY), | ) | |
|    and | ) | |
| KAO CORPORATION, | ) ) | |
|    Defendants. | ) | |

**DEFENDANTS BATH & BODY WORKS, INC. AND LIMITED BRANDS INC.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF LP MATTHEWS' OPENING CLAIM CONSTRUCTION BRIEF**

                             FOX ROTHSCHILD LLP
                             Francis G.X. Pileggi (Del. Bar No. 2624)
                             Sheldon K. Rennie (Del. Bar No. 3772)
                             919 North Market Street, Suite 1300
                             Wilmington, Delaware  19801
                             Phone: (302) 655-3667
                             Fax: (302) 656-8920

                             *Attorneys for Defendants Bath & Body*
                             *Works, Inc. and Limited Brands, Inc.*

OF COUNSEL:

WARD & OLIVO
John F. Ward
David M. Hill
Michael J. Zinna
708 Third Avenue
New York, New York  10017
Phone: (212) 697-6262
Fax: (212) 972-5866

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

SUMMARY OF ARGUMENT...........................................................................................3

ARGUMENT.........................................................................................................................5

    A.    The Governing Law On Claim Construction..................................................5

    B.    This Court Should Reject LPM's Proposed Claim Constructions Because They Are Not Supported By And/Or Are Directly Contradicted By The Intrinsic Evidence .......................................................6

        1.    "Cleaning Composition"..................................................................6

        2.    "Orange Oil".......................................................................................7

        3.    "Oat Grain Derivative Product" and "Oatmeal".........................9

        4.    "An Emulsifying Agent" ................................................................11

        5.    "Pharmaceutically Acceptable Moisturizer" ...........................12

        6.    "pH Within the Range of 4.5 to 6.0, Inclusively" ................13

CONCLUSION ..................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Key Pharms. V. Hercon Lab. Corp.* 161 F.3d 709 (Fed. Cir. 1998)..................................9

*Lemelson v. United States*, 752 F.2d 1538 (Fed. Cir. 1985)...............................................12

*Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340 (Fed. Cir. 2004) ...............6, 7, 10

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)..............................................5, 9, 11

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998)................9

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995).........................7

*Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371 (Fed. Cir. 2002) ..............13

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997)......................12, 13

## **INTRODUCTION**

Was it prophetic that LP Matthews ("LPM" or "plaintiff") refers to the patent-in-suit as United States Patent No. 6,063,062? For all the resemblance its proposed constructions bear to the '062 patent (United States Patent No. 5,063,062, that is), LPM might as well be construing the claims of 6,063,062. LPM's proposed claim constructions ignore the language of the claims, ignore the patent's specification, and ignore the prosecution history. Instead of relying on the intrinsic evidence, as mandated by voluminous Supreme Court and Federal Circuit precedent, LPM has assembled a hodgepodge of extrinsic sources to prop up its fundamentally flawed interpretations.

LPM has never come to grips with the fact that Claim 1 simply tracks the language in the specification identifying not merely a preferred embodiment, but the ***broadest*** embodiment of the claimed invention:

> Broadly, this composition comprises a first ingredient being between five percent (5%) and sixty percent (60%) by volume orange oil, a second ingredient being a pharmaceutically acceptable moisturizer for human skin and a third ingredient being an emulsifying agent.[1]

(D.I. 255, Ex. A, Col. 2, lns. 28-33).

In the next breath, the '062 patent describes an even more preferable composition:

> Preferably the emulsifying agent is a natural grain derivative, preferably either oat gum or oatmeal. Further, it is preferred that the first, second, and third ingredients are selected and mixed in a ratio such that the resulting skin cleaning composition has a pH range of between 4.5 and 6.0.

(D.I. 255, Ex. A, Col. 2, lns. 36-44). This embodiment is tracked almost without change in Claim 6. Thus, according to the '062 patent itself, the embodiment described in Claim 6 is narrower than the embodiment of Claim 1.

---

[1] This language is nearly identical to the language of independent Claim 1. (*See* D.I. 255, Ex. A, Col. 9, lns. 4-10).

1

> Finally, the inventors described the most preferred embodiment of their invention:
>
> > In the more specific composition according to the preferred embodiment, the cleaning composition comprises forty-five percent (45%) or less by volume of orange oil, forty-five percent (45%) or less by volume of the emulsifying agent, and the pharmaceutically acceptable moisturizer. The preferred emulsifying agent is this composition is oatmeal.

(D.I. 255, Ex. A, Col. 2, lns. 45-51). Claim 9 tracks the language of this narrowest embodiment. Given the progressively narrower scope of these disclosed and claimed embodiments, it is intellectually dishonest to seek an interpretation of Claims 6 and 9 that ignores the 5% minimum orange oil volume required by the broadest claim (i.e., Claim 1).

However, LPM's entire case is premised on taking advantage of sloppy claim language to interpret Claims 6 and 9 more broadly than Claim 1, and ***more broadly than the disclosure***. This is improper. Viewed in light of its own specification, LPM's claim interpretations simply do not make sense.

Accordingly, Limited Brands, Inc. and Bath & Body Works, Inc. (hereinafter collectively the "Limited Defendants") respectfully request that the Court reject all of plaintiff's proposed claim constructions and adopt the constructions proposed in the Limited Defendants' Opening Brief (D.I. 255). The Nature and Stage of Proceedings and a Statement of Facts[2] were provided in that Brief as well. Accordingly, the Limited Defendants incorporate those sections by reference in their entirety into this Brief.

---

[2] One particularly egregious statement of fact made in LPM's Opening Brief does require rebuttal. LPM states that "none of the claims were amended during prosecution." That statement is false. (D.I. 254, p. 4; 3/18/91 Office Action Response, pp. 1-2, attached as Ex. K). Among other things, the "oat grain derivative product as an emulsifying agent" element of claim 6 and the "oatmeal" element of Claim 9 were added during prosecution.

2

## SUMMARY OF THE ARGUMENT

1.  Since the vast majority of Accused Products are intended to treat skin, LPM takes the novel approach of contending that its "cleaning compositions" actually are intended to "treat" dirt. LPM has proffered no evidence (intrinsic or extrinsic) to validate its constructions, particularly with regard to the apparent position that "cleaning" is synonymous with "treating." Certainly no support for these constructions can be found in the '062 patent, its specification or the prosecution history. To the contrary, during the prosecution of the '062 patent's continuation-in-part, the Applicants argued that "treating" and "cleaning" were *not* the same.

2.  LPM's proposed constructions of "Orange Oil" and "Forty-Five percent (45%) or Less By Volume of Orange Oil" are contradicted by the specification and the prosecution history, both of which make clear that the invention requires 5 percent or more orange oil to effect cleaning. LPM admits that each claim requires a lower limit of orange oil, but rather than look to intrinsic evidence or even inventor testimony, it asks the Court to rely on a wholly unrelated patent which happened to incorporate 0.01% orange oil in a wholly unrelated cleaner. Perhaps most shockingly, the 0.01% argument flies in the face of LPM's own acknowledgement that the invention calls for orange oil as the "primary ingredient" of the cleaning composition.    **REDACTED**

**REDACTED**

3.  LPM's proposed constructions of "Oat Grain Derivative Product" and "Oatmeal" are not supported by the claims or the specification, and are contradicted by the prosecution history of the '062 patent and its continuation-in-part application, which clearly and unequivocally identify the "oat grain derivative" as either "oatmeal or oat

3

gum." LPM also asserts that an oat grain derivative product which provides "any amount or type" of emulsification meets the oat grain derivative product claim element, despite the fact that the '062 patent identifies the oat grain derivative product as the "primary emulsifier."

4. LPM's proposed construction of "An Emulsifying Agent" is not supported by Claim 6, the specification, or the prosecution history. LPM appears to contend that an emulsifying agent need only be *capable* of, but need not *actually* form and stabilize an emulsion. This contradicts Claim 6, which states the oat grain derivative product's *actual* purpose – emulsifying. It also contradicts the specification, which states that the oat grain derivative was used as the primary emulsifier. The primary emulsifier must *actually* emulsify. None of the Accused Products use an oat derivative as an emulsifying agent.

5. LPM's proposed construction of "Pharmaceutically Acceptable Moisturizer" is too broad. The '062 patent requires that only "natural, plant and vegetable-based ingredients" are to be used in the composition.

6. LPM's proposed construction of "pH Within a Range of 4.5 to 6.0, Inclusively" contradicts the plain language of Caim 6 and the specification. LPM's construction links together one unsupported assumption after another to arrive at a conclusion that "4.5 to 6.0" actually means "4.0 to 6.5." This ignores the word "inclusively," which serves to cap the endpoints of a range. LPM concludes with the nonsensical and unworkable position that the claimed range should be interpreted differently depending on how one measures pH.

## ARGUMENT

A.   The Governing Law on Claim Construction

It is inconceivable that LPM could discuss claim interpretation without citing the Federal Circuits seminal, en banc decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). But in an effort to extract implausibly broad constructions, this is exactly what LPM has done.

LPM seeks solace from a now largely discredited line of cases which imparted greater weight to dictionary definitions than the intrinsic evidence. *Phillips* has reversed this errant tide: "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips*, 415 F.3d at 1321. The court noted a particular shortcoming in the reliance on dictionaries: "[t]he problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive." *Phillips*, 415 F.3d at 1321. "Thus, the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent." *Phillips*, 415 F.3d at 1321.

LPM's "plain meaning" arguments are just dictionary wolves dressed in sheeps' clothing. The claim constructions proffered by LPM are inherently suspect post-*Phillips*, because they seek to divorce the claims from the rest of the intrinsic evidence.

    B.    This Court Should Reject LPM's Proposed Claim Constructions Because They Are Not Supported By And/Or Are Directly Contradicted By The '062 Patent And Other Intrinsic Evidence

        1.    "Cleaning Composition"

LPM states that "Skin Cleaning Composition for External Use on Human Tissues" and "Cleaning Composition for Use on Human Skin" should be construed to mean "compositions that treat an unwanted substance on the skin in order to facilitate removal of those substances by some other mechanism, such as rinsing, wiping, rubbing or shearing."[3] (D.I. 254, p. 4).

During the prosecution of the '062 patent's continuation-in-part, the Applicants argued that "treating" and "cleaning" were *not* the same. (*See* '804 patent application, Amendment and Response dated 6/17/97, p. 7, attached hereto as Exhibit M). Statements made by applicants during the prosecution of related applications regarding the scope of the invention are relevant to the claim construction of earlier-issued claims when, as here, the two share a common specification. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004). In response to the Board's rejection of the '804 application's claims, the Applicants argued that the cited references were not combinable, because one was a "cleaner" and one was for "treating" damaged skin:

> At most, one of ordinary skill having knowledge of Coleman and Dellutri [i.e., the prior art] would look to other sources of art for additives that might enhance the <u>cleansing properties</u> of a <u>hand cleaning agent</u>. One having knowledge of Dellutri would also look to other art for cleansers which are particularly useful in industrial cleaning applications. The [Physician's Desk References] on the other hand, are more particularly

---

[3] This proposed construction differs slightly from the definition proposed by LPM in the Parties' Proposed Element-By-Element Claim Construction, which was, "composition that has an effect of treating unwanted substances so that the unwanted substance is [sic] easier to remove from the skin." (D.I. 229). Nonetheless, the Limited Defendants' arguments apply to each of these definitions.

> directed to <u>damaged</u> skin, not <u>unclean</u> hands. Accordingly, it is suggested that any such combination of the prior art as suggested by the Board would be arbitrary because Coleman/Dellutri are actually directed to addressing different needs.

(Ex. M at 7) (emphasis in original). An applicant's "statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation." *Microsoft Corp.*, 357 F.3d at 1350. The Applicants went out of their way to distinguish a composition which cleans unclean hands from one which treats damaged skin. Now, seeking a broad interpretation, LPM has shifted gears and argues that cleaning and treating are the same. It is axiomatic that applicants cannot argue one way to gain allowance, and then the opposite to allege infringement. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers").

### 2. "Orange Oil"

LPM defines "Orange Oil" and "Forty-Five percent (45%) or Less By Volume of Orange Oil" as the non-water soluble liquid derived from an "orange," which it defines as "a globose, reddish-yellow bitter or sweet edible citrus fruit from any of the white-flowered rutaceous trees of the genus Citrus." (D.I. 254, p. 9; D.I. 254, Ex. G, p. 934, Random House College Dictionary (1972)). LPM must have searched far and wide to find the only reference to support its construction of the term "orange" – a dictionary from 1972. Were the definitions in the intervening 34 years too narrow?[4] LPM previously claimed that there was no minimum percentage of orange oil required for

---

[4] Of course, despite LPM's best efforts to assert otherwise, it is well known that citrus fruits such as mandarins are not oranges -- they are tangerines. Accused Products using mandarin or mandarin orange are not covered by the '062 patent because they are using oils from tangerines. In the '804 application, the inventors clearly distinguished orange oil from tangerine oil.

Claim 6 or Claim 9. (D.I. 229, p. 2). Now, it admits that there should be a lower limit. (D.I. 254, pp. 10-11).

LPM also admits that Claims 6 and 9 require enough orange oil to have a cleaning effect. (D.I. 254, p. 10). LPM further admits that intrinsic evidence – the claims, the specification, and the prosecution history – will frequently resolve any ambiguity in a disputed claim. (D.I. 254, p. 6). However, rather than look to the intrinsic evidence here, LPM looks to extrinsic evidence in a strained attempt to get the result it wants – a lower limit of 0.01 percent. Unfortunately for LPM, the specification clearly states what the inventors found the lower limit to be – 5 percent. The patent states, "a composition according to the present invention could have as little as 5% by volume orange oil although it was preferable to have a cleaning composition having at least 25% by volume orange oil." (D.I. 255, Ex. A, Col 6, lns. 58-61).

Perhaps most shockingly, the 0.01% argument flies in the face of LPM's own acknowledgement, most recently made in motion papers just last week, that the invention calls for orange oil as the "primary ingredient" – a title not usually given to an ingredient present at 0.01%, (D.I. 310, p. 6), **REDACTED**

**REDACTED** The fact is that none of the Accused Products use orange oil for any cleaning effect. In each and every instance orange oil (if any) is used as a fragrance – a use LPM finally acknowledges is not covered by the '062 patent. (*See* D.I. 306).

Given the clarity of the intrinsic record, there is no need to utilize extrinsic evidence here. Even if extrinsic evidence were useful, unrelated U.S. Pat. No. 5,013,485 ("the '485 patent") is not. The '485 does not stand for the proposition that orange oil has

a cleaning effect at 0.01%, nor does it impact what Douglas Greenspan and Phillip Low believed they invented. Let's be honest. The only reason the '485 patent is relied upon by LPM is because it is assigned to co-defendant KAO. LPM obviously believes that KAO will therefore be somewhat restrained in its attack of a reference it owns. The Limited Defendants are under no such constraints. The '485 patent is directed to a three component cleaning system. It does not disclose the efficacy of orange oil as a stand alone cleaner. In fact, it clearly teaches away from the invention of the '062 patent (to the extent there is one) because it demonstrates than only low levels of orange oil are effective (i.e., under 1% and certainly less than 10%). Accordingly, reliance on the '485 patent is entirely irrelevant and misplaced. (D.I. 254, Ex. H, Table 2). In contrast, the '062 patent discloses that at least 5%, and preferably more than 25% orange oil must be used.

Claim terms must be construed in a manner consistent with what the applicant actually invented. *See RenishawPLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). The testimony of LPM's expert, who relied on the '485 patent for his conclusions and did no testing to determine the percentage at which orange oil begins to clean, is also useless. Conclusory, unsupported statements by experts as to the definition of a claim term are not useful to a court. *Phillips*, 415 F.3d at 1318; *see also Key Pharms. V. Hercon Lab. Corp.* 161 F.3d 709, 716 (Fed. Cir. 1998).

### 3. "Oat Grain Derivative Product" and "Oatmeal"

LPM's defines "Oat Grain Derivative Product" as "any product derived from an oat grain" and "Oatmeal" as "processed oat kernel." (D.I. 254 at 11-12). These

definitions are not supported by the claims or the specification, and are contradicted by the prosecution history of the '062 patent and its continuation-in-part.

The '062 patent states:

> In order to determine if a natural ingredient could act as an emulsifying agent, the Applicants selected a grain base derivative as an emulsifying agent. To this end, <u>Applicants tested oatmeal gum and oatmeal to act as the primary emulsifier.</u>

(D.I. 255, Ex A, Col. 4, lns 22-27) (emphasis added).

A few lines later, Applicants described their oat gum and oatmeal in greater detail:

> In Sample IV, the oatmeal gum was prepared by boiling rolled oats in water and straining the resultant mass to remove the hulls. In Sample V, rolled oats were boiled in water and the resulting mass was used to prepare the composition.

(D.I. 255, Ex. A, Col. 4, lns. 55-60).

The '062 patent does not disclose any other natural grain based product that can act as an emulsifier. In addition, the Applicants were forced to specify oatmeal and oat gum as the only "oat grain derivative products" to overcome a rejection of the '804 application. (D.I. 255, Ex. G, p. 2). They said succinctly, "oat grain derivative product" means a product "selected from the group consisting of oat gum and oatmeal." (D.I. 255, Ex. G, p. 2). Statements made during the prosecution of a later patent application are relevant to earlier-issued patents sharing common specifications. *See Microsoft Corp.*, 357 F.3d at, 1350). In short, the '062 patent and the '804 application only support "oatmeal or oat gum" as the definition of "oat grain derivative product."

LPM also asserts that an oat grain derivative which provides "any amount or type" of emulsification meets the oat grain derivative claim element, despite the

10

Applicants' statements that the oat grain derivative was the "primary emulsifier." (D.I. 255, Ex A, Col. 4, lns. 22-27).   **REDACTED**

**REDACTED**   A cursory review of the products-in-suit reveals that none of them contain oatmeal, oat gum, or any oat ingredient as an emulsifying agent to any degree.

LPM's strained construction of oatmeal is forced to include things like stand-alone liquid extracts in order to encompass all of the Accused Products, but the specification defines oatmeal simply as "rolled oats boiled in water," which would also be the customary meaning of that term.  (D.I. 255, Ex A, Col. 4, lns 57-60).

LPM's reliance on its liability expert's opinion and the mischaracterized testimony of the Limited Defendants' 30(b)(6) witness, both extrinsic pieces of evidence, are irrelevant to how the inventors defined "oat grain derivative" and "oatmeal" and are not needed because these terms can be defined by using the intrinsic record.

Accordingly, LPM's constructions of "Oat Grain Derivative Product" and "Oatmeal" should be denied.

4.  "An Emulsifying Agent"

LPM's proposed construction of "An Emulsifying Agent" is "one or more ingredients in the composition which *can have* the effect of emulsifying."[5] (D.I. 254, p. 12).  The unsupported theories of plaintiff's expert are not relevant, and certainly not enough to contradict the words of the specification itself.  *See Phillips*, 415 F.3d at 1318.  LPM contends that an emulsifying agent need only be *capable* of, but need not *actually* form and stabilize an emulsion.  This contradicts Claim 6, which states the oat grain

---

[5] Again, this definition differs slightly from the definition proposed in The Parties' Joint Element-By-Element Claim Construction Chart, but the Limited Defendants' arguments are equally applicable to both proposed definitions. (D.I. 229).

11

derivative's *actual* purpose – "an oat grain derivative *as an* <u>emulsifying agent</u>." (D.I. 255, Ex. A, Col. 10, lns. 3-4) (emphasis added). In other words, the oat grain derivative product must *act* as an emulsifier. LPM's construction also contradicts the specification, which states that the oat grain derivative product was used as the primary emulsifier. (D.I. 255, Ex. A, Col. 4, ln. 27 - Col 5 ln. 27). If the primary emulsifier did not *actually* form and stabilize the emulsion, the invention would not have worked – capability would not have been enough.

In fact, LPM's flimsy claim construction would effectively read the requirement that the oat ingredient actually function as an emulsifying agent right out of the claim. It is well settled that "[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985) ([I]t is...well settled that each element of a claim is material and essential..."). If an oat ingredient need only be present (as LPM alleges), and not actually serve as an emulsifier, then the term "emulsifying agent" has effectively (though improperly) been written out of the claim.

5. "Pharmaceutically Acceptable Moisturizer"

LPM's proposed construction of "pharmaceutically acceptable moisturizer" is any "ingredient that attracts water or prevents water loss and is safe for use on human skin."[6] (D.I. 254, p. 14). This definition is too broad because only natural, plant and vegetable-based ingredients were contemplated by the inventors. The patent plainly states, "the present invention is directed to a natural cleaning composition that utilizes only plant

---

[6] This definition also differs from Plaintiff's proposed definition in the Joint Element-By-Element Claim Construction Chart. (D.I. 229). As with the other inconsistent definitions, the Limited Defendants' arguments apply equally to both.

based ingredients." (D.I. 255, Ex. A, Col. 1, lns. 9-11). As such, "pharmaceutically acceptable moisturizer" should be limited to only naturally-occurring moisturizers.

Accordingly, LPM's construction of "Pharmaceutically Acceptable Moisturizer" should be denied as overly broad.

      6.    <u>"pH Within the Range of 4.5 to 6.0, Inclusively"</u>

LPM's proposed construction of "pH Within a Range of 4.5 to 6.0, Inclusively" is a pH of 4.0 – 6.5. (D.I. 254, p. 16). This contradicts the plain language of Claim 6 and the specification. LPM's construction links together one unsupported assumption after another to arrive at a conclusion that "4.5 to 6.0" actually means "4.0 to 6.5," and that somehow the word "inclusively" has no impact on this element's scope. However, this claim element speaks for itself – broadening the range beyond 4.5 – 6.0 would read the word "inclusively" right out of the claim. "Each element contained in a patent claim is deemed material to defining the scope of the patented invention" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

LPM's proposed construction flies in the face of its own "plain meaning" argument. LPM asserts that the plain meaning of the range "less than 45%" reaches to the endpoints of the range recited in a claim (i.e., 0.0% and 45.0%). (D.I. 254, pp. 9-10) (citing *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1375 (Fed. Cir. 2002). Thus, LPM's own tenets of claim construction mandate that the range 4.5 to 6.0, inclusively reach only to the endpoints of the range.

In fact, it seems highly likely that the range had already been expanded. The preferred embodiments of the '062 patent have a pH of 5.0 and 5.5, respectively. (D.I. 255, Ex. A, Col. 4, lns. 62-65). Mr. Martin, the patent agent who prosecuted the '062

patent,                            **REDACTED**

**REDACTED**     A reasonable inference is that an expert claim draftsman such as Mr. Martin accounted for the +/- 0.5 unit discrepancy directly in the claim.  Indeed, the range 4.5 to 6.0 encompasses a range that is exactly +/- 0.5 pH units from the preferred embodiments.

Further, LPM's construction is contingent upon a series of unsupported assumptions.  In short, LPM asserts that the range "4.5 to 6.0" should be expanded depending on how one tests pH.  If one tests potentiometrically the range is as claimed. If one tests colorimetrically, the range should be broadened to 4.0 to 6.5.  Conceivably, if a method of lesser precision is used, the range should be broadened further still.  There is simply no support for this fanciful position in either the intrinsic evidence or the patent law.

The specification also makes clear that the Applicants tested a wide range of pHs and claimed the entire range that worked.  (D.I. 255, Ex. A, Col. 5, ln. 20 – Col. 6, ln. 27).  Phrasing the pH element of Claim 6 as "4.5 to 6.0, *inclusively*" underscores that this was the only acceptable pH range for the composition.  A person of skill in the art would understand the claim as such.

Accordingly, LPM's construction of "pH of 4.5 to 6.0, Inclusively" should be denied.

# CONCLUSION

For the forgoing reasons, the Limited Defendants respectfully request that the Court construe the claims accordance with the meanings advanced in their Opening Claim Construction Statement. (D.I. 255).

                                                  Respectfully submitted,

                                                  FOX ROTHSCHILD LLP

Dated: July 31, 2006                   By:   /s/ Sheldon K. Rennie
                                                  Francis G.X. Pileggi (Del. Bar No. 2624)
                                                  Sheldon K. Rennie (Del. Bar No. 3772)
                                                  FOX ROTHSCHILD LLP
                                                  Suite 1300
                                                  919 North Market Street
                                                  Wilmington, Delaware  19801
                                                  Phone: (302) 655-3667
                                                  Fax: (302) 656-8920
                                                  E-mail: fpileggi@foxrothschild.com
                                                  E-mail: srennie@foxrothschild.com

                                                  OF COUNSEL:

                                                  John F. Ward
                                                  David M. Hill
                                                  Michael J. Zinna
                                                  WARD & OLIVO
                                                  708 Third Avenue
                                                  New York, New York  10017
                                                  Phone: (212) 697-6262
                                                  Fax: (212) 972-5866
                                                  E-mail: wardj@wardolivo.com
                                                  E-mail: hilld@wardolivo.com
                                                  E-mail: zinnam@wardolivo.com

                                                  *Attorneys for Defendants*
                                                  Bath & Body Works, Inc.
                                                  Limited Brands, Inc.